IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | : | Case No.    C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, BILLY |
| Defendant. | : | <u>BRANTLEY</u> |
| | : | |

Comes now Defendant, Cinergy Corp., pursuant to Rule 56 of the Federal Rules of Civil

Procedure, and respectfully moves the Court for an order granting summary judgment in its favor

as to plaintiff, Billy Brantley, there being no genuine dispute as to any material fact, and this

defendant being entitled to judgment as a matter of law.  This Motion is supported by pleadings;

the depositions of Billy Brantley, Vol.  I and Vol. II, filed separately herein; the Affidavit of

Rick Beach, the Affidavit of Ken Toebbe  and the Affidavit of Bernadette Reinhard filed in

conjunction with Defendant, Cinergy Corp.'s, Motion to Sever Plaintiffs' Claims; the Affidavit

of Jim O'Connor, the Supplemental Affidavit of Ken Toebbe and the Supplemental Affidavit of

Jay Alvaro, Esq. RE EEOC Charges filed separately herein, Federal and Ohio law and the within

memorandum.

Respectfully submitted,


/s/ Jill T. O'Shea_____
Jill T. O'Shea (0034692)
Attorney for Defendant,
Cinergy Corp.
139 East Fourth Street – 25 AT II
P.O. Box 960
Cincinnati, Ohio 45201-0960
(513) 287-2062


/s/ Gregory V. Mersol_____
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740


*Attorneys for Defendant
Cinergy Corp.*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | : | Case No.    C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | MEMORANDUM OF LAW IN SUPPORT |
| | | OF DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, BILLY BRANTLEY |
| Defendant. | : | |

I.    **INTRODUCTION**

Plaintiff, Billy Brantley ("Brantley") has brought this action alleging race discrimination. For the reasons explained more fully below, summary judgment should be granted in Cinergy Corp.'s ("Cinergy") favor. Brantley has failed to affirmatively prove racial discrimination in promotion or discipline and a hostile work environment as a matter of law.

II.    **STATEMENT OF FACTS**

A.    **Brantley's Employment**

Brantley began working at CG&E on November 30, 1987 as a Groundman.  Brantley has never been employed by Cinergy Corp., which is a public utility holding company. (Beach Affid., ¶ 9; Toebbe Affid., ¶3).  Cinergy does not directly employ any personnel. (O'Connor Affid., ¶ 9). Brantley has been employed throughout his employment in the Electric T&D C&M Department of CG&E until his July 1, 2002 promotion to Field Supervisor at which time he transferred into the Electric T&D Projects East Department of CG&E.  (Toebbe Affid., ¶ 6)

Brantley testified he was **timely** promoted to Lineman "C" effective January 12, 1989, Lineman "B" effective September 18, 1990, Lineperson "A" effective April 7, 1992, and Senior

Lineperson "A" effective July 29, 1994, the latter based on seniority (Brantley, Vol. I, pp. 25-26, 83, 104, 107, 112-113, 128-129).  In this progression, all employees were required to take written examinations tailored to the lineperson program which Brantley acknowledged were not unfair or discriminatory to African-Americans. (Brantley, Vol. I, pp. 23-27, 83-84, 104-107, 112, 115).

Brantley did not recall any testing that African Americans were required to do and Caucasians were not. Brantley testified that his written job performance evaluations were fair, other than some in the first year with which he disagreed (which dates back to 1987 and is time barred.)  Brantley could not recall if his disagreement with the supervisor or addressed it at another level. (Brantley, Vol. I, pp. 103-104, 115, Vol. II, p. 209). Brantley has no information that he did not receive pay increases comparable to substantially same or similar employees in his positions.  (Brantley, Vol. II, pp 410-411).

### B.    Alleged Failure To Promote

Brantley's allegations relate to his applications for Training Crew Lead, Joint Trench Field Supervisor and Field Supervisor.   Brantley has not heard any statements by management evidencing an  intent to discriminate in hiring or promoting of African-Americans, nor has he observed same. (Brantley, Vol. II, p. 219).

Brantley applied for Training Crew Lead in 1999.  The Temporary Training Lead Person hiring process has been validated internally in accordance with EEOC Guidelines. (Reinhard Affid., ¶ 10). Brantley testified that the Company started the Training Crew Lead program in 1997 for people to go to Indiana to train new hires. John Huwell, a Caucasian supervisor, approached him in 1997 to see if he was interested and Brantley responded that he would to like to be considered if the Lead position was at Brecon, the district in which he worked.  Four Caucasians with more seniority were selected which he did not feel was discriminatory.

(Brantley, Vol. I, p. 136-139). Brantley then spoke separately to Kenny Auchberger and Neal Schnecker as to the criteria to go to Indiana sometime in 1998 but could not identify when in 1998. He did not get much of a response from Schnecker and could not recall the response of Auchberger and did not follow up related to same. Brantley had no knowledge as to who was involved in or the criteria for selection of the Training Crew Leads at that time. He did not follow up with his supervisor because he had been involved in the electrical contact incident at that time. (Brantley, Vol. I, pp. 139-144).

Brantley applied for the Field Supervisor position for the first time in September 1999. The position was posted and he could not identify any instance where the Field Supervisor position for Electric T&D and C&M was not posted. The Targeted Selection Interview Process has been validated externally in accordance with EEOC Guidelines.

CG&E provided Brantley with the Targeted Selection Materials in advance to review. He had no information or knowledge that the Targeted Selection Process is unfair or discriminatory. He also had no problems or objections as to the interview process. Brantley did not know how many applicants there were for the position or how many people were interviewed. He did not know who was involved in the final selection. He has no information or knowledge that the successful candidates were less qualified. (Brantley, Vol. II, pp. 325-326, 334-336, 340-341; Reinhard Affid., ¶4)

Brantley did not enroll or attend the CG&E sponsored Supervisor Job Fair in 1999. He believes that he was on vacation and may have missed the information in the company newsletter. Other than a brief conversation with Tony Moran with whom he discussed the program for less than five minutes, Brantley did nothing further to follow up related to same or obtain the materials or information from the program. (Brantley, Vol. II, pp. 321-325).

Brantley testified that he submitted a resume on-line for the Field Supervisor position in "June 2000" and did not receive an interview but did not follow up related to same. The Company has no record of Brantley applying for the July 2000 posting for Field Supervisor. Tony Moran, an African American, was made Field Supervisor at that time.  (Brantley, Vol. II, pp. 345-350; Reinhard Affid., ¶ 5).[1]

Brantley also testified that he submitted a hard copy resume to someone at Human Resources whom he can not identify or whether it was a male or female for the Joint Trench Supervisor in late 2000, early 2001. He acknowledged the position was posted. The only posting for this position during this time frame was in November 2000, job posting 00-407.  The Company has no record of Brantley applying for the November 2000 posting for Joint Trench Supervisor. Brantley never heard from anyone related to his application. He never followed up with Human Resources to check if his resume was received. Brantley did not follow up with any of his supervisors or anyone in the Company why he was not interviewed for the position. Brantley again has no knowledge as to the number of applicants or the number of individuals interviewed. (Brantley, Vol. II, pp.  344-345, 358-360; Reinhard Affid.,  ¶¶ 4, 5, 6, 10).

 Brantley applied for Field Supervisor in June 2002. He acknowledged that he had "stepped up to the plate" before the 2002 posting. Among other things, he became involved in a company diversity initiative known as the Hartwell Diversity Team in 2001, volunteering for the Career Opportunity Fair in October and November of 2001 and being involved in making the Career for Recruitment video in November of 2001. Brantley was promoted to Field Supervisor in the Electric T&D Projects East department effective July 1, 2002.  Brantley testified that he has not received unfair or discriminatory treatment since being promoted. He described that it

---

[1] Brantley's document production and discovery responses do not include resumes for the Field Supervisor position in 2000 or  the Joint Trench Supervisor Position in 2000.

has been a good experience being a field supervisor. (Brantley, Vol. III, pp. 197-199, 203, 359-361)

Brantley never took advantage of the Company's tuition reimbursement program in the sixteen (16) years of his employment until August, 2002 at which time he enrolled in a Dale Carnegie course. (Brantley, Vol. I, pp. 13-15). He did talk to a handful of supervisors, John Huwell and Les Blackburn on topics including management expectations, goal setting and creating a resume which were helpful. (Brantley, Vol. II, pp. 286-287).

As a groundperson, Brantley could not recall any training that was provided to Caucasians that was not provided to African-Americans. (Brantley, Vol. I, p. 91) Brantley testified that he was required to dig holes in performing overtime as a groundperson while Caucasians were able to drive as a groundperson. He did not know if Caucasians were required to dig holes as well. (Brantley, Vol. I, pp. 58-62). [2] Brantley could not recall any training provided to Caucasians that was not provided to African-Americans as a Lineperson C. (Brantley, Vol. I, pp. 91-92).

Prior to September of 1990, it was Brantley's perception that Roger Reis was acting discriminatorily because he would speak to Caucasians directly and to Mr. Brightwell and himself, African-Americans, indirectly and would give instructions through another employee in the Lineman C position rather than directly to them. Reis responded that he would try not to do that anymore. He thereafter looked at them directly and gave directions directly to he and Mr. Brightwell and responded sufficiently. (Brantley, Vol. I, pp. 117-124).[3]

---

[2]    Brantley was a groundperson in the time frame of 1987-1989 and any discrimination claims are barred by the six (6) year statute of limitations.

[3]    Brantley testified as a C-B and B lineman, he and Mr. Brightwell were assigned more "dirty jobs" by his supervisor, Roger Reis, such as the loading and unloading of transformers, setting up and pulling poles and being sent to pick up things. He could not identify how many occasions he was assigned this work such as less than five, less than 10, less than 20 or more than 20. He stated that he could not give any quantification. This allegedly occurred prior to 1992 and is again time barred by the statute of limitations. (Brantley, Vol. II. pp. 210-211).

Brantley testified that he was given less "opportunity" to work out of a bucket truck as a Lineperson B than Caucasians. He could not recall any other work as a Lineperson B that was available to Caucasians more than African-Americans. He asked supervisors, Roger Reis and Fred Goodman, to perform bucket truck work more than five times but could not identify if it was less than or more than 20.  Roger Reis responded several times that he would try to get him in bucket work. Roger Reis would rotate Brantley upon request. He could not recall how many times he asked Roger Reis and Fred Goodman to be rotated to bucket truck work and they did not immediately rotate him over.  He could only identify two Caucasian males who were in the bucket truck more than him. Brantley was not impeded in his promotion to Lineperson "A" because of the bucket truck work.  Brantley could not identify anyone who was promoted ahead of him.[4]  Brantley could not identify any training or opportunities that were denied to him as a Lineperson "A", any requests that he made for additional training that were denied or training that was given to Caucasians and not African-Americans. (Brantley, Vol. I, pp. 92-100, 107-108.).

As a Senior Lineperson "A", he asked supervisors, Bill Gatto and Dan Morris, on one occasion each to take a computer class and their response was that line personnel did not require it to perform their job. Brantley acknowledged that Linepersons were not required to use computers in their jobs. He only knew of one Caucasian, Ronnie Ayers, who was allowed to take a computer class. Brantley did not know if it was the same class that he requested or another class or who authorized Mr. Gatto to take the class or in what year. He does not know of anyone else who was allowed to take a computer class or if these supervisors had also turned down

---

[4] Brantley was a Lineperson "B" from September 18, 1990 to April 7, 1992 and any claims, albeit non-material job actions, are barred by the six (6) year statute of limitations.

Caucasian employees. Brantley first enrolled in computer training provided by the Company after he became a supervisor. [5] (Brantley, Vol. I, pp. 88-91, Vol. II, p. 207).

Brantley also testified that as a Senior Lineperson there was a time period when the Company was restructuring and there was an abundance of committees. Brantley requested to be on a committee in 1996 or 1996 but did not recall the name of the committee or what the committee did. He asked Bill Gatto and he responded that the Union picked the members of the committee. Other than this committee that he could not remember what it was in 1995 or 1996, there were no other committees that Brantley requested to be on and was denied. (Brantley, Vol. I, pp.129 –132, 135-136). No one ever discouraged him from seeking a different job or promotion at the Company. (Brantley, Vol. II, p. 236).

## C. Alleged Unfair Discipline

On August 27, 1998, Brantley and a co-worker, Todd Tolbert ("Tolbert") were involved in an electrical contact incident. Tolbert was transferring a head guy and made contact with a 7200 volt phase, an energized conductor. Brantley was working in another bucket of the same truck. The two individuals who set up the work and were actually performing the work were Tolbert and himself. Brantley was the Senior lineperson on the job. Brantley acknowledged that he and Tolbert violated the reach, fall or come into contact rule. Brantley received a letter of discipline, Exhibit 18, and was given a one-day suspension. Brantley confirmed that the Company takes employees' safety very seriously. (Brantley, Vol. I, pp. 150-151, 153 157-161, 163-164, 181).[6]

---

[5]     Brantley met with Lou Frith in June of 1999 to discuss how to improve himself in order to be promoted. Lou Frith recommended that he take a computer class on his own time. Brantley did not. (Brantley, Vol. II, pp. 301-304).

[6]     Mr. Brantley alleges others involved in a later incident involving Rich Bennett were disciplined differently. However, he knew Bennett was disciplined but did not know what his discipline was. Brantley did not know if anybody was up in the air with Bennett or the details of where the others were working at the time of the incident. (Brantley, Vol. I., pp.168-169). Tolbert testified that Bennett also had an electrical contact incident and received the same discipline. Both received a letter and one day in-house suspension. Tolbert has no knowledge of a Caucasian

Brantley identified a handful of issues as to potential discipline and non-material job actions such as a coaching and counseling and oral warnings dating back before the six (6) year statute of limitations.  He felt he received unfair or discriminatory treatment when he received a record of counseling that "As a Senior Lineperson, you should know to make immediate notification to the trouble desk and your immediate supervisor" after Anthony Martin ran over a rock with a Company vehicle.  Brantley testified he attempted to call the district but did not make contact with anyone in the District and did not call the trouble desk. Brantley acknowledged that as a supervisor, he expects Company employees to report incidents when a Company vehicle is damaged.  (Brantley, Vol. II, pp. 361-367).Brantley identified that they had meetings on several occasions where possible discipline was discussed which they disputed. These occurred during his employment as a Lineperson "A", prior to 1994 and the six-year statute of limitations. He did not receive oral warnings or any discipline related to these incidents. He saw nothing in his personnel file about these incidents when he reviewed it. (Brantley, Vol. II, pp 372-375, 382-387).

Brantley also objected to a Certification of Oral Warning related to the circle of safety check before moving equipment dating back to 1993 wherein the entire crew was disciplined. He objected that only the driver should have been disciplined even though Brantley was the Senior man on the job. However, it was not his testimony that the driver is fully responsible for how equipment is place on the truck and that the other crew members have no responsibility. (Brantley, Vol. II, pp. 380-382). Brantley could not identify any other incidents of "unfair or

employee who had an electrical contact and was given lesser than a one-day in-house suspension and written letter. (Tolbert, Vol. I, pp. 270, 317-319).  In fact, Richie A. Bennett, a Caucasian employee, received a one (1) day suspension **with loss of pay** and a written disciplinary letter related to an electrical contact incident on September 30, 1998 for similar violations of failing to use personal protective equipment and the minimum approach distances. He was docked pay because it was determined the violation of the minimum approach distance was "flagrant" whereas Brantley and Tolbert solely received the non-materially adverse discipline of an in-house one-day suspension **with pay** for his violations of failing to use personal protective equipment and the minimum approach distances on August 27, 1998. (Ward Affid., ¶¶ 3-4,10-11).

discriminatory" discipline issued as to him and did not observe negative items in his personnel file. (Brantley, Vol. II, pp. 372-376).

      **D.**      **Alleged Hostile Work Environment**

Brantley's testimony fails to establish any hostile work environment claim. Brantley testified that racial comments were never made to him or in his presence by co-employees, supervisors, district managers or area supervisors or upper management, nor can he recall observing any offensive items in the workplace. (Brantley, Vol. I, pp. 36-37, 42, 50-51, 62-63, 71, 74-76). There was no point in time in his career where any supervisors or co-workers acted in a threatening or intimidating manner to him, nor did he ever observe same. (Brantley, Vol. II, pp. 219-220).

      **E.**      **Policies and Failure to Take Advantage of Corrective Opportunities**

CG&E has strong policies and programs in place to uphold the Company's commitment to Equal Employment Opportunity and Workplace Harassment. (O'Connor Affid., ¶¶ 21-25, 28-34; Exhs. "D" and "L").Brantley was aware of the policies and procedures that if racially offensive comments are made in the workplace, there were reporting procedures for complaints to be investigated. He acknowledged they were in place for the last five years but did not know as to the last ten years. Brantley has never read through the entire employee manual and could not recall if he has read through any portions of the Employee Manual in the last five (5) years. He acknowledged that employee manuals are made available to employees and that if he had an interest, he could obtain one from a supervisor. (Brantley, Vol. I, pp. 15-17). Brantley could not recall when he received Exhibit 6, an Equal Employment Opportunity policy signed by James E. Rogers. He took down from a bulletin board Exhibit 7, the Affirmative Action Statement dated 7/1/99 signed by Jim Rogers. He acknowledged there are bulletin boards where things are posted but did not recall what has been posted over the years. Brantley identified Exhibit 8, Sexual

Harassment Policy dated July 1, 1999 signed by James E. Rogers and was trained on the policy but did not know if it was posted in the workplace. (Brantley, Vol. I, pp. 74, 79-83).

Brantley has never reported that the work environment was racially offensive or hostile to anyone in the company or made a report pursuant to the Workplace Harassment Policy. He recalled seeing the Workplace Harassment Policy, Exhibit 5, and attended training on same. Brantley acknowledged that the policy identifies that harassment may include inappropriate conduct or a hostile work environment based on race and that the training did address it went beyond sexual harassment. He could not identify, for example, any reason why he did not make any reports to Rose Abi Radi, Manager of Compliance Services. (Brantley, Vol. I, pp. 68-76).

Brantley is familiar with and involved in the mentoring program with Jim O'Connor, who is in upper management with H.R. His experience was a good one and he gained more direction in how to be promoted. (Brantley, Vol. I, pp. 76, 78). Brantley acknowledged that the Company has had diversity programs dating back five years or more. As an employee, Brantley was required to attend diversity training. He was involved in developing and continues to participate in the Hartwell Diversity Team. (Brantley, Vol. II, pp. 406 –407).

## III.   PROCEDURAL POSTURE

On April 11, 2000, Brantley filed a charge with the EEOC, with assistance of counsel, solely naming "Cinergy" and claiming that he had been blocked in receiving promotions, held to different standards because of his race, had received negative evaluations and alleged a hostile work environment.[7]   In August 2000, Brantley amended his charge, with assistance of counsel, again solely naming Cinergy, generally alleging the same allegations and additionally claiming

---

[7]       As demonstrated above, Brantley's allegations which are virtually identical to the general and conclusory allegations made by the other named plaintiffs in their EEOC charges, prepared by counsel at that time, William Whalen, Esq., are in no manner supported by Brantley's sworn deposition testimony.

that prior to and on May 17, 2000, he was denied the Leadperson position. Brantley withdrew his

charge on December 19, 2000.  (Suppt. Alvaro Affid., ¶¶ 3-7, Exhs. "A" - "C").

IV.    **ARGUMENT OF LAW**

A.    **Cinergy Corp. is not an "employer" under Title VII**

Title VII of the United States Code, under which Tolbert has sued, applies only to

"employers" as defined at 42 U.S.C. § 2000e (b).  An "employer" is a person "engaged in an

industry affecting commerce who has fifteen or more employees . . ." As an initial matter,

Cinergy should be dismissed from this proceeding. Cinergy has no employees and therefore is

not an "employer".  Cinergy's relationship as a parent company to CG&E, which employed

Tolbert, does not create liability under the statute. Absent special circumstances, a parent

corporation is not liable for the alleged statutory violations of its wholly owned subsidiary.

Branham. v. Home Depot et. al., 2002 U.S. Dist. Lexis 18903 (E.D. Mich., 2003) (attached

hereto); Watson v. Gulf & W. Indus., 650 F.2d 990, 993 (9th Cir. 1991).  Exceptional

circumstances exist only where "the parent corporation exercises a degree of control that exceeds

that normally exercised by a parent corporation."  Id. * 12, citing, Armburster v. Quinn, 711 F.2d

1332 (6th Cir. 1983).

In this case, Cinergy Corp. is a public utility holding company as defined under the

Public Utility Holding Company Act of 1935 and the parent company of CG&E. Cinergy Corp.

has no employees and thus neither shares management nor control over labor relations with its

subsidiaries. Moreover, each subsidiary is operated separately from Cinergy Corp. which has no

operational functions such as providing retail electric and natural gas services.  Brantley has

never been employed by Cinergy Corp. and has at all times been employed by CG&E. (Beach

Affid., ¶¶ 4, 9 and 11; O'Connor Affid., ¶¶ 4 - 9). CG&E was not named in the Amended EEO

charge and the Complaint.[8]  Thus, Brantley's claims against Cinergy Corp. are barred as a matter of law.

**B**.    **Plaintiff's Race Discrimination Claims Under Title VII and Ohio Law Are Not Actionable As A Matter of Law.**

**1.    Plaintiff's Claims Are Barred As Untimely**

Title VII requires an employee to file a charge with the EEOC within 300 days of an alleged unlawful employment practice before filing suit.  See 42 U.S.C. § Section 2000e-5(e)(1); Love v. Pullman Co., 404 U.S. 522, 92 S. Ct. 616 (1972); Rivers v. Barberton Board of Education, 143 F.3d 1029, 1032 (6th Cir. 1998); Donahoo v. Ohio Department of Youth Services, 237 F. Supp. 2d 844 (N.D. Ohio 2002).

A Title VII plaintiff is also confined to those matters which were made in the charge of discrimination or those charges which are reasonably expected to grow out of the charge of discrimination. Duggins v. Steak and Shake, Inc., 195 F.3d 828-832 (6th Cir. 1999); Donahoo v. Ohio Department of Youth Services, *supra*. Under federal law, Brantley had 300 days from an alleged adverse employment action to file an EEO charge.  Because his first charge was filed on April 11, 2000, Brantley would normally be precluded from bringing any action based on any alleged failure to promote which is a discrete event which does not fall into the ambit of a continuing violation.  Thus, Brantley's complaint is limited to his applications for the positions of Training Crew Lead in 1999, Field Supervisor in September of 1999 and in this regard,

---

[8] At this point, plaintiff cannot bring a claim against CG&E under Title VII because he has failed to first file a charge with the EEOC.  Ordinarily, a party not named in an EEOC charge may not be sued under Title VII. Perkins v. Silverstein, 939 F.2d 463, 471 (7th Cir. 1991); Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 126 (7th Cir. 1989). Plaintiff can not escape this rule unless he can show  that (1)  CG&E's role as his employer, could not have been ascertained at the time of filing the EEO charge; (2) the interests of Cinergy Corp. are so similar to CG&E's interests for purposes of voluntary conciliation and compliance, that it would have been unnecessary to include CG&E in the EEOC proceedings; (3) that the absence of CG&E does not result in actual prejudice to CG&E in the EEO proceedings; and (4) that CG&E, in some way represented to him that its relationship with plaintiff was through Cinergy Corp.  Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 907-08 (7th Cir. 1981). With respect to Plaintiffs' Complaint, Defendant denied that Cinergy Corp. was the employer and raised the affirmative defenses of failure to join an indispensable party; Cinergy Corp. is not the real party in interest; and that Cinergy Corp. , as the parent Company, was not liable for the alleged tortuous acts of CG&E.

Brantley cannot identify any unfairness either in the process, testing, or selection of any candidates.[9]

## 2.     Plaintiff Offers No Direct Evidence Of Race Discrimination In Any Employment Action.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or nation origin. 42 U.S.C. 2000e-(2(a)(1). To prevail in an employment discrimination claim under Title VII, a plaintiff may either provide direct evidence of discrimination or establish a prima facie case as set forth under the burden-shifting method in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Policastro v. Northwest Airlines, Inc. 297 F.3d 535, 538 (6th Cir. 2002). Brantley offers no evidence of statements or actions that require a conclusion that unlawful discrimination was a motivating factor in any decision relating to his employment. Thus, Brantley's testimony fails to provide any direct evidence of discrimination. (See Statement of Facts, pp. 1-11).

## 3.     Plaintiff Cannot Demonstrate A Prima Facie Case Of Race Discrimination As A Matter Of Law.

To make a prima facie claim of race discrimination under Title VII, a plaintiff must establish that: (1) he is a member of a protected group, (2) he was qualified for continuing employment in his position, (3) he suffered an adverse employment action, and (4) he was treated less favorably than a "similarly-situated" person outside of the protected group. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973); Texas Dep't of

---

[9]     Again, the Company has no record of Brantley submitting applications for the Field Supervisor posting in July 2000 or the Joint Trench Supervisor posting in November 2000, nor did Brantley produce copies of any such applications or resumes in his discovery responses in this matter (See Notice of Filing of Responses to First Set of Interrogatories and request for Production of Documents Propounded to Plaintiff, Billy Brantley).

Community Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S. Ct. 1089 (1981).[10] ; Clayton v. Meijer, Inc. 281 F.3d 605, 610 (6th Cir. 2002); Keaton v. State of Ohio, 2002 U.S. Dist. LEXIS 19993 (S.D. Ohio 2002) (copy attached hereto). Brantley cannot demonstrate a prima facie case under these requirements.

4.    **Plaintiff Cannot Demonstrate A Prima Facie Case Because He Can Not Demonstrate A Materially Adverse Employment Action.**

It is well settled that to satisfy the second element of the prima facie case, the adverse employment action must be "materially adverse".  Hollins v. Atlantic Co., 188 F.3d 652 (6th Cir. 1999); Bowman v. Shawnee State University, 220 F.3d 456, 461-62 (6th Cir. 2000). The Sixth Circuit has consistently held that unless employment actions involve some significant detriment, they are not materially adverse and, thus, not actionable.  See, e.g., Roelen v. Akron Beacon Journal, 199 F. Supp. 2d 685 (N.D. Ohio 2002) (De minimus employment actions are not materially adverse and therefore not actionable.); White v Burlington Northern v. Santa Fe Ry. Co., 310 F.3d 443 (6th Cir. 1999)(De minimus employment actions are not actionable as the change in employment conditions must be more disruptive that a mere inconvenience or an alteration of job responsibilities).

The Sixth Circuit and Ohio courts recognize that an adverse employment action "must materially affect the plaintiff's terms and conditions of employment".  See, e.g., Toth v. Ohio Dept of Youth Services, 113 Ohio Misc. 2d 1, 754 N.E. 2d 305 (2001)(counseling and unpleasant working relationship does not rise to level of a materially adverse employment action.); Bowers v. Hamilton School Board , 2002 Ohio App LEXIS 1356 (Ct. App. 12th App. Dist. March 25, 2002)(attached hereto). (tension and unpleasant working relationship not sufficient to demonstrate an adverse employment action); Hopkins v. Electronic Data System

---

[10] Plaintiff also has asserted parallel claims under Ohio's anti-discrimination statute, ORC § 4112.02(A). The analysis for claims under the Ohio employment discrimination statute is identical to that for Title VII claims.  See,

Corp., 196 F.3d 655 (6th Cir 1999) (transfer not "material adverse" change when receive same

pay and benefits);  Williams v. AP Parts, Inc. 252 F. Supp 2d 495 (N.D. Ohio 2003) (court

observed that discipline can constitute a significant change in employment status if it is a

materially adverse change in the terms and conditions of employment, but the anti-discrimination

statutes do not insulate an employee from discipline for violating the employer's rules or

disrupting the workplace); Vitt v. City of Cincinnati, 250 F. Supp. 885 (S.D. Ohio 2002) ( dearth

a case authority to support position that denial of computer training constitutes an adverse

employment action and observing the decisions related  to same clearly fall within the realm of

the employer's business judgment and that plaintiff was free to seek any desired training in free

time at own expense).

 The Sixth Circuit in Primes v. Reno, 190 F. 3d 765 (6th Cir 1990) held that even

unsatisfactory performance reviews did not rise to the level of an adverse employment action:

> If every low evaluation or other action by an employer that makes an employee unhappy
> or resentful were considered an adverse action Title VII would be triggered by
> supervisor.  Criticism or even facial expressions indicating displeasure.  Paranoia in the
> workplace would replace the prima face case se as the basis for a title VII cause of action.

None of the alleged incidents of discipline in this case rise to a level of an **adverse**

**employment action** under Federal and Ohio law.  Moreover, the alleged different opportunities,

i.e., less bucket work as a Lineperson "B" or denial of computer training (see Vitt above) fail to

constitute materially adverse employment actions and are not actionable.  The failure of

Brantley's proof as to the promotions is addressed above. This does not even factor in the lack of

evidence as to any discriminatory animus. Thus, Brantley's prima facie case fails on the grounds

that Brantley cannot demonstrate a materially adverse employment action.

---

Barnes v. GenCorp., Inc. 896 F.2d 1457 (6th Cir. 1990); Plumbers v. Steamfitters Commt. v. Ohio Civil Rights
Commn. 66 Ohio St. 2d 192, 196, 421 N.E. 2d 128, 131 (1981).

**5.      Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Because He Cannot Demonstrate That Similarly Situated Employees Were Treated More Favorably.**

In applying the last prong of the <u>McDonnell Douglas</u> analysis, the Sixth Circuit has explained that the plaintiff must show that the "comparables" are similarly-situated in all respects.  <u>Mitchell v. Toledo Hosp.</u>, 964 F. 2d 577, 582 (6th Cir. 1992).  The <u>Mitchell</u> Court held that, "to be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Id.</u> at 583.

Brantley's testimony fails to demonstrate that "similarly situated" individuals were treated more favorable in promotion as to the positions of Training Crew Lead or  Field Supervisor or in terms of discipline.  Brantley expressly testified that he had no information or knowledge that the successful candidates were less qualified.  Moreover, another African-American, Tony Moran, was promoted to Field Supervisor in June 2000, a job posting in which Brantley allegedly applied although the company has no record of same.  (Brantley, Vol. II, pp. 334-336, 340-341; Reinhard Affid., ¶¶ 4, 5).  Moreover, there is a dearth of evidence as to discriminatory animus on behalf of CG&E.  Moreover, by Brantley's own testimony, he had stepped up to the plate prior to his promotion to Field Supervisor in June 2002.  (Brantley, Vol. I, pp. 359-361).  Thus, Brantley's *prima facie* case fails as a matter of law.

**6.      CG&E's Legitimate, Non-Discriminatory Reason Justified Its Actions As A Matter Of Law.**

If the plaintiff is able to establish a <u>prima facie</u> case of discrimination, the burden of

production shifts to the employer to assert a legitimate non-discriminatory justification for its actions. Ang v. Procter and Gamble Co., 932 F. 2d 540, 548 (6th Cir. 1991). Once the employer has come forward with evidence of a legitimate reason for its actions, the burden shifts back to the employee to establish that the employer's proffered explanation is a mere pretext for unlawful discrimination. Manzer v. Diamond Shamrock Chemicals Co., 29 F. 3d 1078, 1083 (6th Cir. 1994). CG&E has the burden of production on the issue of its legitimate, non-discriminatory reason, but the burden of persuasion remains with the Plaintiff at all times. See, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749 (1993).

Assuming arguendo for purposes of this motion alone that Brantley is able to demonstrate a prima facie case of race discrimination, which CG&E expressly denies, CG&E is entitled to summary judgment based on its legitimate, non-discriminatory reason for the failure to promote Brantley to the Training Crew Lead Position in 1999 and Field Supervisor positions in 1999 [11] and 2000. In this regard, the evidence demonstrates that the other candidates were selected for the positions utilizing the EEOC validated Targeted Selection Process for the Lineperson Apprentice Program and the top scorers were the successful candidates (Toebbe Suppt. Affid., ¶¶ 2- 11; Ward Affid., ¶¶ 22-29).

**7.      As A Matter Of Law, Plaintiff Is Unable To Demonstrate Pretext.**

To demonstrate pretext, the plaintiff must produce sufficient evidence from which the jury could reasonably reject employer's explanation and infer that there was intentional discrimination by the employer. Braithwaite v. Timken, Co. 258 F.3d 488 (6th Cir 2001). Unsupported allegations are insufficient to demonstrate discrimination. Vaughn v. Watkins Motor Lines, Inc. 291 F.3d 900 (6th Cir 2002). Subjective beliefs and feelings are similarly insufficient as are subjective conclusory allegations. Ngeunjuntr v. Metropolitan Life Insurance

---

[11]      Brantley ignores that he was directly involved in the performance of work involving an electrical contact in August 1998.

Co., 146 F.3d 464 (7th Cir 1998);  Lomax v. Sears, Roebuck Co. 2000 U.S. App. LEXIS 33884 (6th Cir. 2000) (copy attached hereto); Chappell v. GT&E Products Corp., 803 F.2d 262, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination.");  Rin Das v. The Ohio State University, 2003 U.S. App LEXIS 2236 (6th Cir. 2003) (copy attached hereto) (employee failed to produce competent objective materials evidence to prove discriminatory animus and disprove defendant's articulated legitimate business reason for her discharge); Smith v. Legget Wire Company, 220 F. 3d. 752 (6th Cir. 2000)(court observed that "Smith's vague assertion that there was a general attitude of discrimination at Adcom is insufficient to establish pretext); Wixson v. Dowagiac Nursing Home, 87 F.3d 164 (6th Cir. 1996) (holding that plaintiffs failed to create issue of fact by alleging numerous instances of disparate treatment and hostile work environment in conclusory terms with no references to names, times and occasions).

Brantley has failed to demonstrate that the reasons for any discipline or failure to promote proffered by CG&E were mere pretexts.  Other than speculation and conjecture, there is no evidence that any conduct by CG&E in terms of a failure to promote or non-materially adverse discipline as to Brantley was imposed based on race.

     **C.**     **Racial Harassment Claims Under Title VII**

     **1.**     **Plaintiff Cannot Demonstrate A Hostile Work Environment Or Racial Harassment As A Matter Of Law.**

The United States Supreme Court has elaborated on what type of conduct can constitute harassment and form the basis for a hostile work environment claim.  See, Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S. Ct. 367 (1993).  To prevail, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."  See, Harris v. Forklift Systems, Inc., supra; Meritor Savings Bank FSB v. Vincent, 477 U.S. 57, 67, 106 S. Ct. 2399 (1986).  Conduct that is "merely

offensive" will not suffice to support a hostile work environment action.  Harris, supra.    In

determining whether there was a hostile or abusive workplace environment, courts look to the

totality of the circumstances.  See, Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.

Ct. 2275 (1998).  Specifically, courts consider "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  Harris, supra,  at 23;

Hafford v. Seidner, 183 F. 3d 506 (6th Cir. 1999). The Supreme Court has consistently held that

"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524

U.S. at 788.  Finally, the work environment must be both objectively and subjectively offensive.

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment that a reasonable person would find hostile or abusive is not actionable. Oncale v.

Sundowner Offshore Servs., 523 U.S. 75, 118 S. Ct. 998 (1998) These standards for judging

hostility are sufficiently demanding to ensure that Title VII does not become a "general civility

code." Id. at 81, 118 S. Ct. 1003.  Brantley has failed to demonstrate any racial harassment, let

alone racial harassment that was sufficiently severe and pervasive to be objectively and

subjectively hostile as a matter of law. (See Statement of Facts, p. 9).

> **2.     Defendant, CG&E, Exercised Reasonable Care To Prevent And Promptly Correct Any Harassing Behavior And Plaintiff Failed To Take Advantage Of Corrective Opportunities.**

Even assuming arguendo for purposes of this motion alone that Brantley demonstrated

that the harassment was based on race and sufficiently severe and pervasive which is expressly

denied, Brantley must establish that the employer bears the responsibility for the harassment.  If

the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the

harassment culminated in a tangible job action against the employer.  See, e.g., Faragher v. City

of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 367 (1993); Burlington Indus., Inc. v. Ellerth, 524

U.S. 742, 765, 118 S. Ct. 2257 (1993). If there was no tangible job action, the employer can

avoid liability by establishing (1) that it exercised reasonable care to prevent and promptly

correct any harassing behavior, and (2) that the plaintiff unreasonably failed  to take advantage of

corrective opportunities. Farragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. If the alleged

harassers were merely co-workers, the employer will be liable only where the plaintiff can

demonstrate that the employer knew or should have known of the harassment and failed to take

appropriate remedial action. EEOC v. Harbert-Yeargin, Inc., 266 F. 3d 498, 518 (6th Cir. 2001);

Courteny v. Landair Transp., Inc., 227 F.3d 559, 564-65 (6th Cir. 2000).

There is no evidence in the record of Brantley being harassed based on race by a

supervisor culminating in a tangible job action.  Since Brantley fails to identify any incidents of

harassment based on race, there is no evidence to demonstrate that any incidents involving co-

workers were known or should have been known by CG&E. Brantley identifies by his own

testimony that Brantley was aware of the company's policies and procedures that if racially

offensive comments were made in the workplace in the last five years, there were people to

report the incidents to in order to investigate and respond.  He could not identify any valid reason

for his failure to take advantage of corrective opportunities (Brantley, Vol. I, pp. 15-17, 68-76,

79-83).

## V.   CONCLUSION

For the foregoing reasons, Defendant, Cinergy Corp. respectfully request that summary

judgment be entered in its favor as to all claims by Plaintiff, Billy Brantley, there being no

genuine issue of any material fact and this Defendant being entitled to summary judgment as a

matter of law.

Respectfully submitted,


/s/ Jill T. O'Shea
Jill T. O'Shea (0034692)
Attorney for Defendant,
Cinergy Corp.
139 East Fourth Street – 25 AT II
P.O. Box 960
Cincinnati, Ohio 45201-0960
(513) 287-2062



/s/ Gregory V. Mersol
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740


Attorneys for Defendant
*Cinergy Corp.*



## CERTIFICATE OF SERVICE


I certify that a copy of the foregoing pleading was forwarded via ordinary mail this 28th day of July, 2004 to:

Paul H. Tobias
David D. Kammer
TOBIAS, KRAUS & TORCHIA, LLP
414 Walnut Street
Suite 911
Cincinnati, OH  45202

David W. Sanford, Esq.
Sanford, Wittels & Heisler, LLP
2120 K Street NW
Suite 700
Washington, D.C.  20037

Barry Vaughn Frederick
Herman Nathaniel Johnson, Jr.
Robert L. Wiggins
Ann K. Wiggins
Susan Donahue
Robert F. Childs
Wiggins, Childs, Quinn & Pantazis, P.C.
1400 South Trust Tower
420 North 20th Street
Birmingham, Alabama 35203

Grant E. Morris
Law Offices of Grant E. Morris
7 DuPont Circle, N.W.
Suite 250
Washington, D.C.  20036

/s/ Jill T. O'Shea_____
Jill T. O'Shea