IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | : | Case No.     C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, TODD |
| Defendant. | : | <u>TOLBERT</u> |
| | : | |

Comes now Defendant, Cinergy Corp., pursuant to Rule 56 of the Federal Rules of Civil

Procedure, and respectfully  moves the Court for an order granting summary judgment in its

favor as to plaintiff, Todd Tolbert, there being no genuine dispute as to any material fact, and this

defendant being entitled to judgment as a matter of law. This Motion is supported by the

pleadings; the depositions of Todd Tolbert, Vol.  I and Vol. II, filed separately herein; the

Affidavit of Rick Beach, the Affidavit of Jay Alvaro Esq. RE EEOC Charges, the Affidavit of

Bernadette Reinhard and the Affidavit of Ken Toebbe filed in conjunction with Defendant,

Cinergy Corp.'s, Motion to Sever Plaintiffs' Claims; the Affidavit of David C. Ward,

Supplemental Affidavit of Jay Alvaro RE EEOC Charges, the Affidavit of Jim O'Connor, the

Affidavit of Scott Murrison and the Affidavit of Robert E. Feucht filed separately herein, Federal

and  Ohio law and the within memorandum.

Respectfully submitted,


/s/ Jill T. O'Shea
Jill T. O'Shea (0034692)
Attorney for Defendant,
Cinergy Corp.
139 East Fourth Street – 25 AT II
P.O. Box 960
Cincinnati, Ohio 45201-0960
(513) 287-2062



/s/ Gregory V. Mersol
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Attorneys for Defendant*
*Cinergy Corp.*

**RULE 7.2(3) COMBINED AND SUMMARY**
**TABLE OF CONTENTS**

I.    **INTRODUCTION**……………………..………………………......1

II.    **STATEMENT OF FACTS**……………………….……………………1-10

A.    **Tolbert's Employment**……………………………...……….....……….1-2

CG&E timely promoted Tolbert and he has never been employed by Cinergy Corp.

B.    **Alleged Failure to Promote**………………………….………..……………..…...2-3

There were legitimate non-discriminatory reasons for the failure to promote Tolbert to the position of a Temporary Training Crew Lead and Field Supervisor in 1999 both of which hiring processes were validated in accordance with EEOC Guidelines.

C.    **Weight Restriction Issue**……………………………………...…………..3-4

As a lineperson, Tolbert is required to work on ladders and bucket trucks or aerial lifts, both of which are essential job functions. CG&E has, consistent with manufacturer's specifications and capacity ratings, ANSI standards and OSHA requirements, promulgated a 275 pound weight limitation for linepersons. Tolbert has failed to maintain the required weight dating back to as early as November of 1995. The Company worked with Tolbert for over four (4) years to address his ongoing weight violations before taking any tangible employment action in terms of wage or job classification. He was restricted from working unscheduled overtime in April 1999 and finally demoted, after consistent warnings, in February of 2000.Tolbert did not reduce his weight to the acceptable weight until September of 2001 at which time CG&E promptly  reinstated him as a Lineperson "A"

D.    **Other Alleged Unfair Discipline**……………………….……..…………….5-6

Tolbert cannot identify any discipline he alleges was unfair based on race other than mere speculation. He alleges a delay in being promoted to a Lineperson C which occurred in 1990, such that any claim for delay is time barred. He alleges that he received oral warnings and disciplinary notes in his file before 1997, which again are time-barred and involved non-tangible job actions. With respect the discipline following an electrical contact incident on August 27, 1998,  Tolbert expressly acknowledged that a Caucasian employee similarly involved in an electrical contact incident in 1998 received the same discipline, actually more severe involving a one day suspension with **loss of pay** which Tolbert did not.

E.    **Alleged Hostile Work Environment**……………………….………….…………6-8

The record clearly establishes that no racially offensive statements were **made in his presence** in the last five years other than one statement made by a co-employee. Other

than a handful, Tolbert could not identify any other jokes or comments that he **overheard** in other rooms or around the corner in the last five years.  He could not identify who made the statements he overheard, the content of the statements or how frequent the statements were made that he overheard. Tolbert has not observed anything in the workplace that he felt was racially offensive at any time during his employment with the Company other than two vague allegations regarding his observation of a confederate flag sticker on the inside door of a locker and a hard hat with a confederate sticker on it, both of which he cannot identify occurred within the six year statute of limitations period. The remaining alleged handful of alleged incidents are time barred with no reasonable specificity about the incidents.

**F.**    **Policies and Failure to Take Advantage of Corrective Opportunities**…………………………………………………………………8-9

CG&E has strong policies and programs in place to uphold the Company's commitment to equal employment opportunity and a harassment free workplace. On February 6, 2000 and underwent mandatory training in May of 2000. Notwithstanding his knowledge and receipt and training, for example on the Company's Workplace Harassment Policy, Tolbert failed to take advantage of corrective opportunities.

**III.**    **PROCEDURAL POSTURE**………………………...………………………..…9-10

**IV.**    **ARGUMENT OF LAW**…………………………….………...…………….10-24

**A.**    **Cinergy Corp. is not an "employer" under Title VII**…………………......10-11

Cinergy should be dismissed from this proceeding for the reason that Cinergy, a public utility holding company and parent company to CG&E, is not an employer as defined by Title VII. Branham v. Home Depot et. al., 2002 U.S. Dist. Lexis 18903 (E.D. Mich., 2003)

**B.**    **Plaintiff's Race Discrimination Claims Under Title VII and Ohio Law are not Actionable As A Matter of Law**…………………………………11

**1.**    **Plaintiff's Claims Are Barred As Untimely**…………………………………...11

Title VII requires an employee to file a charge with the EEOC within 300 days of an alleged unlawful employment practice before filing a lawsuit Love v. Pullman Co., 404 U.S. 522, 92 S. Ct. 616(1972)……………………………..11

Rivers v. Barberton Board of Education, 143f.3d 1029, 1032 (6th Cir. 1998)……………………………………………………………………………11

**2.**    **Plaintiff Offers No Direct Evidence of Race Discrimination In Any Employment Action**…………...………………………………...…………11-12

Tolbert offers no evidence of statements or actions that require a conclusion the

unlawful discrimination was a motivating factor in any decision relating to his employment

McDonnell Douglas Corp. v. Green, 411 U.S. 792(1973)……………………..…………12

**3.      Plaintiff Cannot Demonstrate A Prima Facie Case of Race Discrimination As A Matter Of Law**………………………..…………………12

Tolbert cannot demonstrate under the prima facie case requirements.

McDonnell Douglas Corp. v. Green, 411 U.S. 792,802,93S.Ct. 1817(1973)……..……12

**4.      Plaintiff Cannot Demonstrate A Prima Facie Case Because He Can Not Demonstrate A Materially Adverse Employment Action**………………………..………………………………………………12-14

The alleged discipline generally does not rise to a level of a materially adverse employment action.. The discipline imposed as to the violations of the weight restriction, by Tolbert's admission, was based on safety. CG&E had reasonable and legitimate business reasons for the discipline related to weight and the 1998 electrical contact incident.

Hollins v. Atlantic Co., 188 F.3d 652 (6th Cir. 1999)………………………………………12

Bowman v. Shawnee State University, 220 F.3d 456, 461062 (6th Cir. 2000)……..……12

Primes v. Reno 190 F3d 765 (6th Cir 1990)…………………………………………..13-14

**5.      Plaintiff Cannot Demonstrate A Prima Facie Case Because He Cannot Demonstrate That Similarly Situated Employees Were Treated More Favorably**……………………………..……………….....14-15

Tolbert cannot identify employees similarly-situated in all relevant aspects that were treated more favorably than him.

Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1999)……………………….…14

Warfield v. Lebanon Correctional Inst., 181 F.3d 723 (6th Cir. 1999)…..………………14

Williams v. Cargill, Inc., 159 F. Supp.2d 984 (S.D. Ohio 2001)…………….…………14

**6.      CG&E's Legitimate, Non-Discriminatory Reason Justified Its Actions As a Matter of Law**……………………………………………………15-16

CG&E had legitimate non-discriminatory justification for its actions.

Ang. v. Procter and Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991)…………………….15

Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994)….…15

**7.      As A Matter of Law, Plaintiff Is Unable to Demonstrate Pretext**………..16-17

Tolbert has failed to demonstrate that the reasons for the discipline and demotion

proffered by CG&E were mere pretexts.

Braithwaite v. Timken Co. 258 F3d 488(6th Cir 2001)…………………………….....16

Vaughn v. Watkins Motor Lines, Inc. 291 F3d 900 (6th Cir 2002)…...………….…..16

**C.      Plaintiff's Racial Harassment Claims Under Title VII Are Not
         Actionable As A Matter of Law**………..……………………………….……17-20

**1.      Plaintiff Cannot Demonstrate A Hostile Work Environment Or
         Racial Harassment As A Matter of Law**………………………………..17-19

Tolbert has failed to establish that any harassment was based on race and/or
sufficiently severe and pervasive to be objectively and subjectively hostile as a
matter of law.

Williams v. General Motors Corp., 187 F.3d 553(6th Cir 1999)………………….....17

Smith v. Leggett Wire Company, 220 F.3d 752(6th Cir 2000)…………….………..19

Skipper v. Giant Food, Inc. 2003 U.S. App LEXIS 11562 (4th Cir. June 11, 2003)..19-20

**2.      Defendant, CG&E, Exercised Reasonable Care To Prevent and
         Promptly Correct Any Harassing Behavior and Plaintiff Failed
         To Take Advantage of Corrective Opportunities**……...…………………20-21

Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 367 (1993)………..…..21

**D.      Plaintiff Likewise Has Failed to Demonstrate A <u>Prima Facie</u> Case of
         Disability Discrimination As A Matter of Law**…………….…………21-24

Coleman v. Georgia Power Company, 81 F. Supp. 2d 1365………………….…..21-22

Francis v. City of Meridan, 129 f.3D 281(2d Cir. 1997)……………………………21-23

**V.      <u>CONCLUSION</u>**……………………………………………………..……..24

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | : | Case No.    C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | MEMORANDUM OF LAW IN SUPPORT |
| | | OF DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, TODD  TOLBERT |
| Defendant. | : | |

## I.    **INTRODUCTION**

Plaintiff, Todd Tolbert ("Tolbert") , a Senior Lineperson "A" employed by The

Cincinnati Gas & Electric Company ("CG&E"),  a subsidiary of Cinergy Corp. ("Cinergy"), has

brought this action alleging race and disability discrimination based primarily upon discipline he

received for exceeding the company's maximum weight limitations for linepersons.  For the

reasons explained more fully below, summary judgment should be granted in Cinergy's favor.

The modest actions CG&E took were based upon undisputed safety reasons and specifically

compliance weight limitations imposed as to all linepersons with regard to equipment utilized by

linepersons which was not based on Tolbert's race or any alleged disability.

## II.    **STATEMENT OF FACTS**

### A.    **Tolbert's Employment.**

CG&E hired Tolbert on August 13, 1990 as a Groundman.  He was timely promoted to a

Lineperson "C" effective December 9, 1991[1]; timely promoted to Lineperson "B" effective

---

[1]    Tolbert alleges, albeit time-barred, that his promotion to Lineperson "C"  in 1991 was delayed several months due to problems he experienced driving company vehicles and equipment. The other individuals hired at the same time including another African-American, Golden Watson, were promoted after a year or so. (Tolbert, Vol. I,

September 22, 1992; and timely promoted to Lineperson "A" effective May 18, 1995. (Tolbert Vol. I, pp. 19, 21, 73-74, 88-89, 109, 111).

Tolbert admits that the written tests were tailored to the lineperson program and were not unfair or discriminatory to African-Americans. (Tolbert, Vol. I, pp. 20, 61, 73-75, 109) Tolbert has never been employed by Cinergy Corp., which is a public utility holding company. (Affidavit of Rick Beach, ¶ 9)  Cinergy does not directly employ any personnel. (Affidavit of Jim O'Connor, ¶ 9).

**B.  Alleged Failure to Promote.**

On April 28, 1999, Tolbert applied for the position of a Temporary Training Crew Lead, a job opening that was posted on company bulletin boards. (Tolbert, Vol. II, p. 351). The Temporary Training Lead Person hiring process has been validated internally in accordance with EEOC Guidelines. Tolbert was not selected to undergo the Temporary Training Lead Person Simulation Assessment. (Defendant's, Cinergy Corp.'s, Response to Plaintiffs' First Set of Interrogatories ("Interrogatory Responses"), No. 4). Tolbert admitted that he was denied the lead person position because of the ongoing weight violations, and not his race.[2] (Tolbert, Vol. I,  p. 120-121, Vol. II, p. 351 ).[3]

Tolbert originally testified that he never applied for Field Supervisor position and his memory had to be refreshed by Exhibit 81, a resume for Job Posting # 99-347. Tolbert believes that Billy Brantley ("Brantley") "printed it up for him" and sent Tolbert's resume in or "however he sent it". (Tolbert, Vol. II, pp. 334-337). Tolbert was not interviewed for the position.  (Interrogatory Responses, No. 4).  Tolbert failed to take advantage of number of

---

pp. 24-28).  Tolbert "believes" that Lou Fritz delayed his promotion because he did not want Tolbert to drive his truck. Tolbert cannot state Fritz acted based on race. (Tolbert, Vol. I., p 57).

[2]        A Temporary Training Crew Lead is responsible for instructing new Lineperson personnel in the safe and proper method of performing Lineperson work. This posting for Temporary Training Crew Lead was within eight (8) months of Tolbert's serious electrical contact incident on August 28, 1998.

opportunities provided by the Company at this time to assist employees with advancing their careers with the Company.[4]  Tolbert did not know if the successful candidates were qualified or not. (Tolbert, Vol. II.,  p. 354; see Ward Affid., ¶¶ 22-29).

Tolbert was recently promoted to Senior Lineperson "A" in 2002 after taking a written test that was required for all employees. He bid on the position two other times but employees with more seniority received the position. He confirmed that race had nothing to do with the decision on those occasions.  (Tolbert, Vol. II,  pp. 334, 352-354).

### C.     Weight Restriction Issue

As a lineperson, Tolbert is required to work on ladders and bucket trucks or aerial lifts also known as a "cherrypickers", both of which are essential job functions.  CG&E has, consistent with manufacturer's specifications and capacity ratings, ANSI standards and OSHA requirements, promulgated a 275 pound weight limitation for Linepersons employed in the Electric T&D C&M Department.[5]  Despite this clear, common sense safety standard, Tolbert has frequently failed to maintain the required weight dating back to as early as November of 1995, but only received modest discipline, all of which he either concedes was not based on race or cannot state was race-related.  Tolbert was first restricted from working on ladders from November 14, 1995 through January 23, 1996 at which time he lost sufficient weight to meet the 275 pound  standard. Tolbert acknowledged that company "gave him a break" and did not even dock his pay during the

---

[3]      The successful candidates who qualified for the Temporary Training Crew Lead position at that time included an African-American, Tony Moran.

[4]      Tolbert never took advantage of CG&E's tuition credit assistance until January 2003 (Tolbert, Vol. I., p. 15, Vol. II. , pp. 332-333) He likewise did not participate in the Star Program for a period of time which provide assistance on resumes and interviews which he discussed with Terry Eibel, the hiring manager for the Lineperson program at the time. (Tolbert, Vol. II, pp. 356-358). Tolbert further did not take advantage of Project Connect or other mentoring opportunities. He was going to get in on the next class but did not get his materials in on time. He could not recall if Project Connect was posted, on the Internet or if he looked for it. (Tolbert, Vol. II, pp. 382-383).

[5]      Tolbert expressly acknowledged that the weight limitation was implemented for safety reasons, not discriminatory reasons. (Tolbert Vol. I, p. 136).

time that he was restricted. (Tolbert, Vol. I, pp. 141-142; Vol. II, pp. 223-224; Exhibit 16).

 Six months later, Tolbert regained the weight and was advised that if he failed to comply with the weight limitation, he could be demoted and receive lower pay. The Company worked with Tolbert for over four (4) years to address his ongoing weight violations before taking any tangible employment action in terms of wage or job classification.  In April, 1999, Tolbert was restricted from working unscheduled overtime. (Tolbert, Vol. I, pp. 149-150, 152-153, 165-169; Vol. II, p. 225-226; Exhibits 22 and 36)[6].  CG&E continued to advise Tolbert of his need to meet the 275-pound restriction and advised him again in writing on December 2, 1999 that he would be demoted if he did not lose the necessary weight.  The company finally demoted Tolbert, after consistent warnings, on February 1, 2000 at which time he weighed 304.5 lbs., substantially in violation of the maximum safe weight limitation. (Tolbert Exhs. 44 and 48).

 Tolbert did not reduce his weight to the acceptable weight until September of 2001 at which time CG&E promptly  reinstated him as a Lineperson "A" effective on September 11, 2001.[8] One year later, Tolbert was promoted  to a Senior Lineperson "A" effective November 7, 2002.  (Tolbert, Vol. II, pp. 231, 258, 334; Affidavit of Ken Toebbe  ¶¶ 9-11).

---

[6]  The Company monitored Tolbert's weight during this time period and relied upon medical documentation from Tolbert's dietitian including a note dated May 28, 1999 identifying a weight loss goal of 5 pounds per month and correspondence dated February 10, 2000 stating "In response to your request for medical documentation regarding the appropriate rate of weight loss for Mr. Todd Tolbert, I refer you back to my original document dated May 28, 1999. At that time a goal of five pounds of weight loss per month was recommended." Tolbert failed to achieve the maximum weight limitation with a five pound rate of weight loss. (Tolbert, Vol. I,  pp. 186-187; Vol. II, pp. 228-230; Exhibits 50, 56).

[7]  Tolbert filed a grievance related to the demotion with the IBEW which stated that this was a medical problem which Tolbert was working to resolve on May 15, 2000. However, Tolbert acknowledged that the alleged medical problem was sleep apnea and he had corrective surgery in December of 1999. Tolbert acknowledged that he did not have a medical problem as of the filing of the grievance.  (Tolbert, Vol. II, pp. 235-237)

[8]  Tolbert has failed a number of weigh-ins since that time including 2/6/03 at which time he weighed 280.4 pounds. However, he has completed the six (6) month post compliance period and is no longer being periodically

### D.  Other Alleged Unfair Discipline

Other than the weight issue discussed above, the alleged delay in being promoted to a Lineperson C (which occurred in 1990, such that any claim for delay is time barred) and oral warnings and disciplinary notes in his file (again, many of which are dated and time-barred) and the discipline following an electrical contact incident in August 1998, Tolbert cannot identify any other discipline he alleges was unfair. (Tolbert, Vol. II, p. 278). Tolbert, however, could not identify that these disciplinary measures -- most of which involved non-tangible job actions such as oral warnings or write ups that occurred before 1997 and are time-barred -- were based on race.[9]

Tolbert alleges that based on hearsay discussions with other African-Americans, he believes African-American employees were generally disciplined unfairly. However, he has never seen the files or evaluations of Caucasian employees as to any discipline imposed. (Tolbert, Vol. II, pp. 290-291).

Tolbert was disciplined for an electrical contact incident on August 27, 1998. However, Tolbert expressly acknowledged that a Caucasian employee, Richie Bennett, likewise had an electrical contact incident and received the same discipline. Tolbert has no knowledge of a Caucasian employee who had an electrical contact and was given lesser discipline. (Tolbert, Vol. I, pp. 270,  317-319). In fact, Richie Bennett's discipline was more severe than Tolbert's

---

weighed in compliance with the Seven Steps to a Safer Workplace Program, Weight Limitation. (Feucht Affid. ¶¶ 7-8,10-12).

[9]     A substantial amount of the "allegations" of unfair discipline related to non-materially adverse employment actions such as oral warnings primarily in the early 90's, well before the six (6) year statute of limitations. For example, Tolbert disagreed that he was in greater need of driving instruction but could not state any complaints by Lou Frith dating back to 1990 related to his driving abilities were based on race. Tolbert could not state that what he perceived as his supervisor's accepting Frith's complaint at face value was based on race. (Tolbert, Vol. I,  pp. 58, 60). In 1991, he complained of incident where he received oral rebukes by Danny Morris for not having a hard hat on for safety reasons. However, he described Morris as intimidating and talked down and acted superiorly to both African-Americans and Caucasian employees. (Tolbert, Vol. I,  pp. 77-79, Vol. II, p. 276).

discipline for the reason that his one (1) day suspension was without pay and Tolbert's was **with pay.** (emphasis added). [10]

### E.    Alleged Hostile Work Environment

With respect to any alleged hostile work environment claims, Tolbert alleges several incidents most of which are time-barred with no reasonable specificity about the incidents. [11] As explained below, other than a handful, Tolbert could not identify any other jokes or comments that he overheard in other rooms or around the corner in the last five years.  He could not identify who made the statements he overheard, the content of the statements or how frequent the statements were made that he overheard. (Tolbert, Vol. I, pp. 50-51).

For example, although Tolbert testified at his deposition that comments were made during the O.J. Simpson trial [12], he could not identify the specifics or the identity of any persons who made them.[13] Likewise, Tolbert could not recall the names of any individuals who made any

---

[10]     In fact, Richie A. Bennett, a Caucasian employee, received a one (1) day suspension with loss of pay and a written disciplinary letter related to an electrical contact incident on September 30, 1998 for similar violations of failing to use personal protective equipment and the minimum approach distances. He was docked pay because it was determined the violation of the minimum approach distance was "flagrant" whereas Tolbert solely received the non-materially adverse discipline of an in-house one-day suspension **with pay** for his violations of failing to use personal protective equipment and the minimum approach distances on August 27, 1998. Tolbert was most recently involved in a incident involving the failure to use personal protective equipment on July 30, 2003. The Zero Tolerance Rules were originally implemented in the fall of 2000 and a revised policy was issued on February 19, 2002. Brian Cox, a Caucasian, and Tolbert, were both issued the same discipline of a five (5) day suspension without pay consistent with the Zero Tolerance policy. (Ward Affid., ¶¶ 3-4,10-11; Murrison Affid., ¶¶ 3-13).

[11]     For example, Tolbert testified that Lou Balzhizer, a supervisor in 1990, referred to him as a "boy" on several occasions.  He could not recall how many times other than stating  "more than once."  He felt more than once was too many.  He could not recall if he said it less than five times, less than ten times or give any other quantification. It was not daily and he could not recall if it was weekly or monthly. Balhizer did not make any other racially offensive statements to him at any other time. He did not report this to anyone in 1990 because he did not think Ralph Heffner, his supervisor,  would believe him. It was not based on any experience or dealings with Mr. Heffner. (Tolbert, Vol. I., pp. 24, 34- 39). During training in the first several weeks after he was hired in 1990, a trainer asked how you detect a drug dealer and identified they wear earrings and carry pagers. Tolbert wore an earring and had a pager at the time due to  a medical condition involving his son. Tolbert expressed to the trainer that he felt it was humiliating and directed at him. The trainer responded he got the information from Reader's Digest and his wife who worked at a hospital.  (Tolbert, Vol. I,  pp. 62-68)

[12]     Judicial notice should be taken of the fact that the O. J. Simpson criminal trial started on January 24, 1995 and concluded October 3, 1995 and thus these allegations are likewise time-barred.

[13]     In terms of the numbers of jokes or statements that he overheard, his testimony was as follows:
      Q:      How many occasions were any jokes having to do with the race of O.J. Simpson made in your
            presence?
      A:      A lot of them were overheard. None were directed towards me.

jokes or statements about African-Americans with respect to the riots in Cincinnati in 2001, what the comments were, or even how many were made. (Tolbert, Vol. I, pp. 46-49). Tolbert stated jokes were made around 9/11 about "Taliban this, rag head," and so on. When questioned how these comments had anything to do with African-Americans, he responded that he overheard **a comment** from another room after September 11 that we should just empty the prisons and let the gangbangers over into those holes and find Bin Laden. He **assumed** the reference to gangbangers referred to African-Americans.  (Tolbert, Vol. I, pp. 45-46). Tolbert can not identify that any of the O.J. Simpson, riots or 9/11 comments were made by supervisors. (Tolbert, Vol. I, p. 55)

The record clearly established that no racially offensive statements were **made in his presence** in the last five years other than one statement made by a co-employee, Dick Bennett, to a group of African-Americans when they were discussing the Company allowing employees to use diversity days for events and their intention to use it on Martin Luther King day. Bennett stated that he should use his on James Earl Ray day. Tolbert could not recall the date of the comment. (Tolbert, Vol. I., pp. 42-43, 50-52). Tolbert also complained of a general attitude of

---

| | |
|---|---|
| Q: | In terms of overheard comments about the O.J. Simpson trial, how many comments did you overhear? |
| A: | A few. |
| Q: | One to three? |
| A: | More. |
| Q: | Three to five? |
| A: | I would say quite a bit more than that. |
| Q: | Five to ten? |
| A: | Possibly. |
| Q: | Ten to 15? |
| A: | I couldn't say the exact. I know it was quite a few comments… |
| Q: | You can't say between 5 and 10, 10 and 15, 15 and 20? |
| A: | No, I can't. |
| Q: | Over 20? |
| A: | I can't recall |
| Q; | Over 50? |
| A: | I can't recall. |

(Tolbert, Vol. I, pp.46-47)

supervisors with a military type atmosphere, who were strict with all employees, both African-Americans and Caucasians. (Tolbert, Vol. I, p. 93).

Tolbert has not observed anything else in the workplace that he felt was racially offensive at any time during his employment with the Company other than vague allegations regarding two confederate flag stickers. (Tolbert, Vol. I, p. 103). He observed confederate flags on private vehicles in the parking lot but never on company vehicles. (Tolbert, Vol. I, pp. 69, 94-95). He observed a confederate flag sticker on the inside door of a locker on one occasion  but could not identify where, what job position he held at the time or when he observed the sticker including any time frame or if it was ten years ago. (Tolbert, Vol. I, pp. 95-98). On one occasion, he observed a hard hat with a confederate sticker on it but could not recall the location, did not recall if it was on someone's head but "thinks it was but could not recall on who", did not recall if supervisors were present and could not recall if it was in the last five years or what job position he held at the time.

### F.     Policies and Failure to Take Advantage of Corrective Opportunities

CG&E has strong policies and programs in place to uphold the Company's commitment to equal employment opportunity and a harassment free workplace including an Equal Employment Opportunity Policy, Harassment Free Workplace Policy and Affirmative Action Statement.  All employees were provided with a copy of the Company's Workplace Harassment Policy on or about February 6, 2000, which also prohibits inappropriate conduct based on race and provides employees with several options to address any concerns they may have.  (See, e.g., Brantley Exhibit 9).   There was mandatory training for all employees on the policy and Tolbert attended a one (1) hour training session on or about May 4, 2000. Tolbert also received a copy of the Working Environment Policy Manual which includes both policies and acknowledged receipt of same on October 17, 2002. (O'Connor Affid., ¶¶ 21-25, 28-34 ; Exhs. "D" and "L").

Tolbert testified that he was aware that the Company frowns on anything racially offensive in the workplace. He acknowledged that there were policies and procedures in place so that offensive statements made in the workplace were to be reported. He admitted that he was trained on the Harassment Free Workplace Policy.  Tolbert has never taken advantage of the policies and procedures and reported any problems internally other than through the Union. Despite his knowledge and training, Tolbert did not bring the one confederate sticker on the inside of the locker or the one confederate sticker on the hard hat to anyone's attention and could not identify why not. He did not report Bennett's statement to the Company because "he did not feel anything would be done." However, he was familiar with Suzane Bradley, an African-American female, who is in charge of the diversity program and had good experience with her and could not identify anything  which caused him not to make a report to her.  Tolbert also knew of the Compliance Specialist with whom he had no problems, but never raised any complaints with her either. Tolbert has also worked with senior management in connection with company-sponsored diversity initiatives, but never spoke with them about his complaints.  When asked why not, Tolbert responded   "I don't know at this time". (Tolbert, Vol. I, pp. 52 –55,  99-100, 114-115).

## III.  **PROCEDURAL POSTURE**

On April 11, 2000, Tolbert filed a charge with the EEOC, with assistance of counsel, solely naming "Cinergy" and claiming that he had been blocked in receiving promotions, held to different standards because of his race, had received negative evaluations and alleged a hostile work environment.  In August 2000, Tolbert amended his charge, with assistance of counsel, again solely naming Cinergy Corp. and alleging the same allegations and **additionally claiming that he was unlawfully discriminated based on disability**. (emphasis added). Tolbert withdrew

his charge on December 19, 2000. (Alvaro Affid., ¶¶ 3, Exh. "A"; Suppt. Alvaro Affid., ¶¶ 8-9, Exh. "F").

## IV.    ARGUMENT OF LAW

### A.    Cinergy Corp. is not an "employer" under Title VII

Title VII of the United States Code, under which Tolbert has sued, applies only to "employers" as defined at 42 U.S.C. § 2000e (b).  An "employer" is a person "engaged in an industry affecting commerce who has fifteen or more employees . . ." As an initial matter, Cinergy should be dismissed from this proceeding. Cinergy has no employees and therefore is not an "employer". Cinergy's relationship as a parent company to CG&E, which employed Tolbert, does not create liability under the statute. Absent special circumstances, a parent corporation is not liable for the alleged statutory violations of its wholly owned subsidiary. Branham. v. Home Depot et. al., 2002 U.S. Dist. Lexis 18903 (E.D. Mich., 2003) (copy attached hereto); Watson v. Gulf & W. Indus., 650 F.2d 990, 993 (9th Cir. 1991).  Exceptional circumstances exist only where "the parent corporation exercises a degree of control that exceeds that normally exercised by a parent corporation."  Id. * 12, citing, Armburster v. Quinn, 711 F.2d 1332 (6th Cir. 1983).

In this case, Cinergy Corp. is a public utility holding company as defined under the Public Utility Holding Company Act of 1935 and the parent company of CG&E. Cinergy Corp. has no employees and thus neither shares management nor control over labor relations with its subsidiaries. Moreover, each subsidiary is operated separately from Cinergy Corp. which has no operational functions such as providing retail electric and natural gas services.  Tolbert has never been employed by Cinergy Corp. and has at all times been employed by CG&E. (Beach Affid.,

¶¶ 4, 9 and 11; O'Connor Affid., ¶¶ 4-9). CG&E was not named in the EEOC charge and the

Complaint.[14] Thus, Tolbert's claims against Cinergy Corp. are barred as a matter of law. [15]

**B**.    **Plaintiff's Race Discrimination Claims Under Title VII and Ohio Law Are Not Actionable As A Matter of Law.**

**1.    Plaintiff's Claims Are Barred As Untimely**

Title VII requires an employee to file a charge with the EEOC within 300 days of an

alleged unlawful employment practice before filing a lawsuit.  See 42 U.S.C. § Section 2000e-

5(e)(1; Love v. Pullman Co., 404 U.S. 522, 92 S. Ct. 616 (1972); Rivers v. Barberton Board of

Education, 143 F.3d 1029, 1032 (6th Cir. 1998); Donahoo v. Ohio Department of Youth

Services, 237 F. Supp. 2d 844 (N.D. Ohio 2002).  A Title VII plaintiff is also confined to those

matters which were made in the charge of discrimination or those charges which are reasonably

expected to grow out of the charge of discrimination. Duggins v. Steak and Shake, Inc., 195 F.3d

828-832 (6th Cir. 1999); Donahoo v. Ohio Department of Youth Services,  supra.

**2.    Plaintiff Offers No Direct Evidence Of Race Discrimination In Any Employment Action.**

Title VII prohibits an employer from discriminating "against any individual with respect

to his compensation, terms, conditions, or privileges of employment because of such individual's

race, color, religion, sex, or nation origin.  42 U.S. C. 2000e-(2(a)(1).  To prevail in an

---

[14] At this point, plaintiff cannot bring a claim against CG&E under Title VII because he has failed to first file a charge with the EEOC.  Ordinarily, a party not named in an EEOC charge may not be sued under Title VII. Perkins v. Silverstein, 939 F.2d 463, 471 (7th Cir. 1991); Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 126 (7th Cir. 1989). Plaintiff can not escape this rule unless he can show  that (1)  CG&E's role as his employer, could not have been ascertained at the time of filing the EEOC charge; (2) the interests of Cinergy Corp. are so similar to CG&E's interests for purposes of voluntary conciliation and compliance, that it would have been unnecessary to include CG&E in the EEOC proceedings; (3) that the absence of CG&E does not result in actual prejudice to CG&E in the EEO proceedings; and (4) that CG&E, in some way represented to him that its relationship with plaintiff was through Cinergy Corp.  Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 907-08 (7th Cir. 1981). With respect to Plaintiffs' Complaint, Defendant denied that Cinergy Corp. was the employer and raised the affirmative defenses of failure to join an indispensable party, Cinergy Corp. is not the real party in interest, and Cinergy Corp. , as the parent Company, was not liable for the alleged tortuous acts of CG&E.

[15]    The District Court for the Northern District of Georgia in Cooper v. Southern Company, Case No. 1:00-CV-2231-ODE granted summary judgment as to The Southern Company, the holding company, based on analogous reasoning as to all the named plaintiffs in that suit. (Copy of decision attached hereto).

employment discrimination claim under Title VII, a plaintiff may either provide direct evidence of discrimination or establish a <u>prima</u> <u>facie</u> case as set forth under the burden-shifting method in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Policastro v. Northwest Airlines, Inc.</u> 297 F.3d 535, 538 (6th Cir. 2002). Tolbert offers no evidence of statements or actions that require a conclusion the unlawful discrimination was a motivating factor in any decision relating to his employment. Thus, Tolbert fails to demonstrate any direct evidence of discrimination.

**3.    Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Of Race Discrimination As A Matter Of Law.**

To make a <u>prima</u> <u>facie</u> claim of race discrimination under Title VII, a plaintiff must establish that:  (1) he is a member of a protected group, (2) he was qualified for continuing employment in his position, (3) he suffered an adverse employment action, and (4) he was treated less favorably than a "similarly-situated" person outside of the protected group. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973); <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 255-56, 101 S. Ct. 1089 (1981).[16] : <u>Clayton v. Meijer, Inc.</u> 281 F.3d 605, 610 (2002); <u>Keaton v. State of Ohio</u>, 2002 U.S. Dist. LEXIS 19993 (S.D. Ohio 2002) (copy attached hereto). Tolbert cannot demonstrate a <u>prima</u> <u>facie</u> case under these requirements.

**4.    Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Because He Can Not Demonstrate A Materially Adverse Employment Action.**

It is well settled that to satisfy the second element of the <u>prima</u> <u>facie</u> case, the adverse employment action must be "materially adverse". <u>Hollins v. Atlantic Co.</u>, 188 F.3d 652 (6th Cir. 1999); <u>Bowman v. Shawnee State University</u>, 220 F.3d 456, 461-62 (6th Cir. 2000). The Sixth Circuit has consistently held that unless employment actions involve some significant detriment,

---

[16] Plaintiff also has asserted parallel claims under Ohio's anti-discrimination statute, ORC § 4112.02(A). The analysis for claims under the Ohio employment discrimination statute is identical to that for Title VII claims.  <u>See</u>, <u>Barnes v. GenCorp., Inc.</u> 896 F.2d 1457 (6th Cir. 1990); <u>Plumbers v. Steamfitters Commt. v. Ohio Civil Rights Commn.</u> 66 Ohio St. 2d 192, 196, 421 N.E. 2d 128, 131 (1981).

they are not materially adverse and, thus, not actionable.  See, e.g., Roelen v. Akron Beacon

Journal, 199 F. Supp. 2d 685 (N.D. Ohio 2002) (De minimus employment actions are not

materially adverse and therefore not actionable.); White v Burlington Northern v. Santa Fe Ry.

Co., 310 F3d 443 (6th Cir. 1999)(De minimus employment actions are not actionable as the

change in employment conditions must be more disruptive that a mere inconvenience or an

alteration of job responsibilities).

The Sixth Circuit and Ohio courts recognize that an adverse employment action "must

materially affect the plaintiff's terms and conditions of employment". See, e.g., Toth v. Ohio

Dept of Youth Services, 113 Ohio Misc. 2d 1, 754 N.E. 2d 305 (2001)(Counseling and

unpleasant working relationship does not rise to level of a materially adverse employment

action.); Bowers v. Hamilton School Board , 2002 Ohio App LEXIS 1356 (Ct. App. 12th App.

Dist. March 25, 2002)(copy attached hereto). (tension and unpleasant working relationship not

sufficient to demonstrate an adverse employment action); Hopkins v. Electronic Data System

Corp., 196 F3d 655 (6th Cir 1999) (transfer not "material adverse" change when receive same

pay and benefits.); Williams v. AP Parts, Inc. 252 F Supp 2d 495 (N.D. Ohio 2003) (court

observed that discipline can constitute a significant change in employment status if it is a

materially adverse change in the terms and conditions of employment, but the anti-discrimination

statutes do not insulate an employee from discipline for violating the employer's rules or

disrupting the workplace).

The Sixth Circuit in Primes v. Reno 190 F3d 765 (6th Cir 1990), held that even

unsatisfactory performance reviews did not rise to the level of an adverse employment action:

> If every low evaluation or other action by an employer that makes an employee unhappy
> or resentful were considered an adverse action Title VII would be triggered by
> supervisor.  Criticism or even facial expressions indicating displeasure.  Paranoia in the
> workplace would replace the prima face case se as the basis for a title VII cause of action.

With two exceptions, none of the incidents alleged in this case rise to a level of an **materially adverse employment action** under Federal and Ohio law. By Tolbert's own testimony, the weight standards were not implemented for discriminatory reasons. The Company had a reasonable and legitimate business expectation that employees should be in a position to fully perform the essential jobs functions of the Lineperson job.  Notwithstanding repeated cautions to Tolbert, CG&E imposed no materially adverse job action for over five years until 1999, and even then the discipline was limited to not regularly scheduling him for overtime, and ultimately temporarily demoting him in 2000.  (See Statement of Facts, pp. 2 - 6).

    **5.**      **Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Because He Cannot Demonstrate That Similarly Situated Employees Were Treated More Favorably.**

In applying the last prong of the <u>McDonnell Douglas</u> analysis, the Sixth Circuit has explained that the plaintiff must show that the "comparables" are similarly-situated in all respects.  <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992).  The <u>Mitchell</u> Court held that, "to be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Id.</u> at 583; <u>Warfield v. Lebanon Correctional Inst.</u>, 181 F. 3d 723 (6th Cir. 1999) (concluding a discrimination plaintiff has the burden to establish that the other employee's acts are comparably serious to his or her own infraction); <u>Williams v. Cargill, Inc.</u>, 159 F. Supp. 2d 984 (S.D. Ohio 2001) (comparing oneself to others not similarly-situated "in all relevant aspects" and to others who have not committed similar acts of comparable seriousness within the same time frame fails to demonstrate disparate treatment as a matter of law).

Tolbert cannot identify other employees similarly-situated in all relevant aspects, which does not include employees with differentiating or mitigating circumstances that would distinguish their conduct or CG&E's treatment of them, that were treated more favorably than him. Tolbert, in fact, cannot identify any Caucasian employee who similarly violated the safe weight limitation for linepersons and was treated more favorably or that Tolbert's treatment was discriminatory based on race. The Seven Steps to a Safer Workplace Policy was issued in February 6, 2003. The substantial majority of linepersons in the Electric T&D C&M Department have been trained and weighed on the policy. Tolbert is in compliance at this time and not being weighed as part of post-compliance monitoring. (O'Connor Affid., ¶¶ 45, 48; Feucht Affid., ¶¶ 3, 11-12). Tolbert, by his own testimony, acknowledges that he cannot identify discriminatory animus based on race as to the weight issue and discipline. (See Statement of Facts, pp. 3 - 6).

**6.    CG&E's Legitimate, Non-Discriminatory Reason Justified Its Actions As a Matter of Law.**

If the plaintiff is able to establish a prima facie case of discrimination, the burden of production shifts to the employer to assert a legitimate non-discriminatory justification for its actions. Ang v. Procter and Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991). Once the employer has come forward with evidence of a legitimate reason for its actions, the burden shifts back to the employee to establish that the employer's proffered explanation is a mere pretext for unlawful discrimination. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994). CG&E has the burden of production on the issue of its legitimate, non-discriminatory reason, but burden of persuasion remains with the Plaintiff at all times. See, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993).

Assuming arguendo for purposes of this motion alone that Tolbert is able to demonstrate a prima facie case of race discrimination, which CG&E expressly denies, CG&E is entitled to summary judgment based on its legitimate, non-discriminatory reason for disciplining Tolbert

related to his continuous violations of the safe maximum weight limitation. Coleman v. Georgia Power Company, 81 F. Supp. 2d 1365, supra, is illustrative as to the legitimate non-discriminatory reason for the policy and resulting disciplinary measures. Just as CG&E, Georgia Power instituted a weight guideline program for employees required to use aerial lift devices or bucket trucks which have 300 pound weight limitations for the "stated reason of ensuring the safety of employees whose jobs require them to use these aerial devices." Id. at 1366. In that case, termination for a continuing violation of the policy was upheld. Moreover, the evidence establishes that the temporary Training Crew Lead and Field Supervisor positions were filled utilizing EEOC validated Targeted Selection processes.

### 7.    As A Matter of Law, Plaintiff Is Unable To Demonstrate Pretext.

To demonstrate pretext, the plaintiff must produce sufficient evidence from which the jury could reasonably reject employer's explanation and infer that there was intentional discrimination by the employer. Braithwaite v. Timken, Co. 258 F3d 488 (6th Cir 2001). Unsupported allegations are insufficient to demonstrate pretext. Vaughn v. Watkins Motor Lines, Inc. 291 F3d 900 (6th Cir 2002). Subjective beliefs and feelings are similarly insufficient, as are subjective conclusory allegations. Ngeunjuntr v. Metropolitan Life Insurance Co., 146 F3d 464 (7th Cir 1998); Lomax v. Sears, Roebuck Co., 2000 U.S. App. LEXIS 33884 (6th Cir. 2000) (copy attached hereto); Chappell v. GT&E Products Corp., 803 F.2d 262, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination"); Rin Das v. The Ohio State University, 2003 U.S. App LEXIS 2236 (6th Cir. 2003)(copy attached hereto)(employee failed to produce competent objective materials evidence to prove discriminatory animus and disprove defendant's articulated legitimate business reason for her discharge); Smith v. Legget Wire Company, 220 F. 3d. 752 (6th Cir. 2000)(court observed that "Smith's vague assertion that there was a general attitude of discrimination at Adcom is

insufficient to establish pretext); <u>Wixson v. Dowagiac Nursing Home</u>, 87 F. 3d 164 (6th Cir. 1996) (holding that plaintiffs failed to create issue of fact by alleging numerous instances of disparate treatment and hostile work environment in conclusory terms with no references to names, times and occasions).

Tolbert has failed to demonstrate that the reasons for the discipline and demotion proffered by CG&E were mere pretexts. By his own testimony, the weight limitation is premised on safety concerns and the expectation that an employee be in a position to fully perform the essential job functions of the lineperson job. Moreover, there is no evidence that the selection of other candidates for the various positions was discriminatory based on race. Other than speculation and conjecture, there is no evidence that any other conduct by CG&E in terms of a failure to promote or non-materially adverse discipline was imposed based on race.

**C.   Plaintiff's Racial Harassment Claims Under Title VII Are Not Actionable As A Matter Of Law.**

**1.   Plaintiff Cannot Demonstrate A Hostile Work Environment Or Racial Harassment As A Matter Of Law.**

To establish a <u>prima facie</u> case of hostile work environment harassment based upon race, a plaintiff must establish the following five elements: (1) He was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the employee's work performance by creating an intimidating, hostile, or offensive work environment; and (5) employer knew or should have known of the harassment and failed to implement corrective appropriate action. <u>See</u>, <u>e.g.</u>, <u>Williams v. General Motors Corp.</u>, 187 F. 3d 553 (6th Cir. 1999); <u>Haffer v. Seidner</u>, 183 F. 3d 506, 512 (6th Cir. 1999). A court may not aggregate harassing conduct if it is attributed to separate and distinct motives. <u>Morris v. Oldham County Fiscal Court</u>, 201 F. 3d 784, 792 (6th Cir. 2000).

The United States Supreme Court has elaborated on what type of conduct can constitute harassment and form the basis for a hostile work environment claim. *See,* Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S. Ct. 367 (1993). To prevail, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." See Harris v. Forklift Systems, Inc., supra; Meritor Savings Bank FSB v. Vincent, 477 U.S. 57, 67, 106 S. Ct. 2399 (1986). Conduct that is "merely offensive" will not suffice to support a hostile work environment action. Harris, supra.

In determining whether there was a hostile or abusive workplace environment, courts look to the totality of the circumstances. See, Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275 (1998). Specifically, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, supra at 23; Hafford v. Seidner, 183 F. 3d 506 (6th Cir. 1999). The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788. Finally, the work environment must be both objectively and subjectively offensive. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive is not actionable. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 118 S. Ct. 998 (1998) These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Id. at 81, 118 S. Ct. 1003.

Applying the standard established by the Supreme Court, the Sixth Circuit has granted summary judgment when the conduct is not deemed severe and pervasive and/or fails to demonstrate an objectively and subjectively hostile work environment. See, e.g., Black v. Zaring

Homes 104 F.3d 822 (6th Cir 1997) (nine offensive remarks over 7 month period cannot

reasonably be considered harassment.); Burnett v. Tyco Corp 203 F.3d 980 (6th Cir 2000)(under

the totality of the circumstances, a single battery and two merely offensive remarks over a six-

month period does not create an issue of material fact as to whether the conduct was sufficiently

severe and pervasive to create a hostile work environment); Morris v. Oldham County Fiscal

Court, 201 F.3d. 784 (6th Cir. 2000) (holding that simple teasing, offhand comments and isolated

incident including a sexual advance did not establish a hostile work environment); Bryant v.

Martinez, 2002 U.S. App. LEXIS 18672 (6th Cir. 2002)(attached hereto) (allegedly "harassing

conduct" including (1) ignoring the plaintiff when she was in the room; (2) meeting with

plaintiff's staff members without her knowledge; (3) meeting with two other branch chiefs to

discuss office policy without inviting plaintiff; (4) refusing to return plaintiff's phone calls; (5)

responding to plaintiff's questions in staff meetings in a "disparaging manner;" (6) "humiliating"

plaintiff in front of her subordinates; and (7) refusing to respond to plaintiff's request for

guidance did not constitute racial harassment as a matter of law).

 The Sixth's Circuit decision in Smith v. Leggett Wire Company, 220 F.3d 752 (6th Cir.

2000) is controlling in the instant case. In Smith, the court reviewed allegations far more serious

than those made by Tolbert and concluded that the plaintiff failed to demonstrate a hostile work

environment as a matter of law:

> Smith's evidence – a racial slur in 1974 by an unknown coworker, a racially offensive
> and obscene cartoon passed around in the late 1980's or early 1990's by one who
> was not involved in Smith's termination decision, Bobby Guy's racist joke sometime
> after 1993, and supervisor Ronnie Curry's reference to a black employee as a "gorilla" –
> is simply not "severe or pervasive enough" to create an objectively hostile work
> environment.  Racial animus cannot be inferred from a handful of discriminatory
> comments by low-level employees, most of which were not directed at Smith, over a
> twenty-year span of time. Id. at 760.

 The recent Fourth Circuit decision in Skipper v. Giant Food, Inc. 2003 U.S. App LEXIS

11562 (4th Cir. June 11, 2003)(copy attached hereto) is likewise directly on point. In Skipper, the

Plaintiff complained that he overheard white workers using racial epithets in the warehouse. However, he could not recall the name of even a single employee who uttered the offensive words aside from one incident involving a Giant manager. The court observed that a plaintiff prosecuting a hostile work environment claim must substantiate his claim with reasonable specifics about the alleged incidents in the workplace citing to <u>Carter v. Ball</u>, 33 F.3d 450, 461-2 (4th Cir. 1994). <u>Id</u>. at 13.

Tolbert has failed to establish that any harassment was based on race and/or sufficiently severe and pervasive to be objectively and subjectively hostile as a matter of law. Tolbert can only identify one arguably offensive comment directed to him in the last five years. The few isolated earlier statements date back to the early 1990's, thirteen years ago, and are time barred. The remainder of his testimony is solely based on overheard comments  which he is unable to identify with any reasonable specifics as to what was said and by whom and with what frequency.

## 2.    Defendant, CG&E, Exercised Reasonable Care To Prevent and Promptly Correct Any Harassing Behavior and Plaintiff Failed To Take Advantage of Corrective Opportunities.

Even assuming <u>arguendo</u> for purposes of this motion alone that plaintiff demonstrated that the harassment was based on race and sufficiently severe and pervasive which is expressly denied, plaintiff must establish that the employer bears the responsibility for the harassment. If the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible job action against the employer. <u>See, e.g.</u>, <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 118 S. Ct. 367 (1993); <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765, 118 S. Ct. 2257 (1993). If there was no tangible job action, the employer can avoid liability by establishing (1) that it exercised reasonable care to prevent and promptly

correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of corrective opportunities. <u>Farragher</u>, 524 U.S. at 807; <u>Ellerth</u>, 524 U.S. at 765.

If the alleged harassers were merely co-workers, the employer will be liable only where the plaintiff can demonstrate that the employer knew or should have known of the harassment and failed to take appropriate remedical action. <u>EEOC v. Harbert-Yeargin, Inc.</u>, 266 F.3d 498, 518 (6th Cir. 2001); <u>Courteny v. Landair Transp., Inc.</u>, 227 F.3d 559, 564-65 (6th Cir. 2000).

There is no evidence in the record of Tolbert being harassed by a supervisor culminating in a tangible job action, nor any evidence that the few isolated and most often time barred incidents by co-workers were known or should have been known by CG&E. The fact that CG&E has strong policies and programs and trains employees on workplace harassment including harassment based on race is amply demonstrated by the record and Tolbert's testimony. Tolbert identifies by his own testimony that there was no valid reason for his failure to take advantage of corrective opportunities. (<u>See</u> Statement of Facts, pp. 8-9).

**D.     Plaintiff Likewise Has Failed to Demonstrate A <u>Prima</u> <u>Facie</u> Case of Disability Discrimination As A Matter Of Law.**

In order to establish a <u>prima facie</u> case of disability discrimination under the Americans with Disabilities Act ("ADA"), a plaintiff must show that: (1) he is disabled;  (2) he is qualified to perform the essential job functions of the job , with or without reasonable accommodation; and (3) he suffered adverse employment action based on his disability. <u>See, e.g., Andrews v. State of Ohio</u>, 104 F.3d 803 (6th Cir. 1997).

<u>Coleman v. Georgia Power Company</u>, 81 F. Supp. 2d 1365 is directly on point with the instant case. In <u>Coleman</u>, the plaintiff alleged he was terminated in violation because of his disability, obesity, complicated by knee and back injuries in violation of the ADA. Identical to CG&E, Georgia Power instituted a weight guideline program for employees required to use aerial lift devices or bucket trucks which have 300 pound weight limitations for the "stated

reason of ensuring the safety of employees whose jobs require them to use these aerial devices. Id. at 1366.[17]

The issue before the court was whether plaintiff was disabled within the meaning of the ADA. The court referenced the EEOC guidelines, which note that the definition of impairment does not include physical impairments such as weight. The guidelines also state "except in rare circumstances, obesity is not considered a disabling impairment." Id. at 1368. The court concluded that Plaintiff failed to demonstrate that he was disabled and also that he was substantially limited in any of life's major activities. Moreover, the court observed that there was no evidence that the Company had knowledge or perceived the plaintiff as being substantially limited in any major life activity or precluded from a broad range of jobs. Likewise, there is no evidence whatsoever that CG&E was aware of plaintiff having a history of being substantially limited in any major life activity, nor that CG&E ever regarded Plaintiff as being so limited.

The Second Circuit decision in Francis v. City of Meriden, 129 F.3d 281(2d Cir. 1997) also supports dismissal of these claims. In Francis, the court observed that weight is not a physical impairment under the ADA and concluded that "no cause of action lies against an employer who simply disciplines an employee for not meeting certain weight guidelines." The Plaintiff was suspended as a firefighter for one day without pay for repeatedly failing the weight requirement. It is significant to note that the Francis decision cites and relies on the Sixth Circuit's decision in Andrews v. State of Ohio, 104 F.3d 803 (6th Cir. 1997). The Francis court stated "… we agree with the holding in Andrews that 'physical characteristics' that are 'not the result of a physiological disorder' are not considered 'impairment for the purposes of

---

[17]    Under a 1995 Program, an employee who remained outside of the weight limitation after completing a weight loss program would be demoted to a position not requiring the use of aerial lifts. Under the 1997 version of the Weight Guideline, an employee failing to meet the weight requirement might be demoted or terminated. Identical to Tolbert, the plaintiff was evaluated medically and subject to a recommendation of a loss of two pounds per week with a target to achieve the goal. Plaintiff was compliant on the target date in May 1996 but above the weight limit again in October 1996.

determining either actual or perceived disability.' citation omitted.  Id. at 286. [18] See, also,

McKibben v. Hamilton County, Ohio, 2000 U.S. App. LEXIS 12123 (6th Cir. May 3, 200)(copy

attached hereto) (Court affirmed summary judgment as to correction officer's employment for

noncompliance with a weight program); Fredregill v. Nationwide Agribusiness Insurance

Company, 992 F. Supp. 1082 (S. D. Iowa 1997) (Summary judgment granted on failure to

promote and unfair demotion claims alleging disability discrimination under the ADA based on

weight); Zarek v. Argonne National Laboratory, 1998 U.S. Dist. LEXIS 13444 (N.D. IL. August

27, 1998)(copy attached hereto)(summary judgment granted where employer believed the

employee could control his weight and thus was not seen to have viewed the employee as having

a disability under the ADA); Furst v. State of New York Unified Court System, 1999 U.S. Dist.

LEXIS 22588 (E.D. N.Y., May 12, 1999)(copy attached hereto) (summary judgment alleging

violation of ADA upheld where applicant failed to meet the Court system's weight requirement);

Toll v. American Airlines, Inc., 1998 U.S. Dist. LEXIS 23436 (N.D. Texas February 3, 1998)

(summary judgment granted on the grounds that weight did not constitute a disability under the

ADA and where the record reflected that "defendant repeatedly extended the time for plaintiff's

compliance with the weight deadline even though plaintiff never presented any medical evidence

to support a contention that she was unable to lose weight"); Whaley v. Southwest Student

Transp., L.C., 2002 U.S. Dist. LEXIS 9103(N.D. Texas May 10, 2002)(copy attached hereto)

(Summary judgment granted on the grounds that obesity is not a disability, a physical or mental

---

[18]    As in Francis, there is no evidence that CG&E regarded Tolbert as suffering from a physiological weight-related disorder. To the contrary, CG&E believed that Tolbert could lose the weight. Plaintiff raised the issue of sleep apnea for the first time in February 2000 after having surgery correcting the condition in December of 1999. Moreover, sleep apnea is generally not held to be a disability. See, Cartwright v. Lockheed Martin Utility Services, Inc., 2002 U.S. App. LEXIS 13688 (6th Cir. 2002) (copy attached hereto)(summary judgment upheld where plaintiff failed to provide evidence of the severity of the impairment but merely an inconvenience and failed to demonstrate that sleep apnea substantially limited any major life activity). See, also,  Soranno v. City of Troy, 2001 Mich. App. LEXIS 897 (Ct. App. Mich. 2001)(copy attached hereto)

impairment that substantially limits a major life activity and there was no evidence to support a "regarded as" claim). Accordingly, Tolbert's alleged disability claim fails as a matter of law.

## V.  <u>CONCLUSION</u>

The record clearly establishes that Tolbert's actual employer, CG&E, did nothing more than to enforce a reasonable weight limit based on legitimate and non-discriminatory reasons. Because Tolbert was not a victim of either race or disability discrimination, summary judgment should be granted in favor of Defendant, Cinergy Corp., as to all claims.

Respectfully submitted,


/s/ Jill T. O'Shea_____
Jill T. O'Shea (0034692)
Attorney for Defendant,
Cinergy Corp.
139 East Fourth Street – 25 AT II
P.O. Box 960
Cincinnati, Ohio 45201-0960
(513) 287-2062


/s/ Gregory V. Mersol_____
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740


*Attorneys for Defendant*
*Cinergy Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing pleading was forwarded via ordinary mail this <u>28th</u> day of July, 2004 to:

Paul H. Tobias
David D. Kammer
TOBIAS, KRAUS & TORCHIA, LLP
414 Walnut Street
Suite 911
Cincinnati, OH  45202

David W. Sanford, Esq.
Sanford, Wittels & Heisler, LLP
2120 K Street NW
Suite 700
Washington, D.C.  20037

Barry Vaughn Frederick
Herman Nathaniel Johnson, Jr.
Robert L. Wiggins
Ann K. Wiggins
Susan Donahue
Robert F. Childs
Wiggins, Childs, Quinn & Pantazis, P.C.
1400 South Trust Tower
420 North 20th Street
Birmingham, Alabama 35203

Grant E. Morris
Law Offices of Grant E. Morris
7 DuPont Circle, N.W.
Suite 250
Washington, D.C.  20036

/s/ Jill T. O'Shea_____
Jill T. O'Shea