UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et. al. | : | |
| | : | Case No. C-I-01-378 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| vs. | : | |
| | : | DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, ANTHONY MARTIN |
| Defendant. | : | |
| | : | |

## **MOTION**

Comes now Defendant, Cinergy Corp., pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully moves the Court for an order granting summary judgment in its favor as to plaintiff, Anthony Martin, there being no genuine dispute as to any material fact, and this defendant being entitled to judgment as a matter of law.  This Motion is supported by pleadings; the depositions of Anthony Martin, Vol. I and Vol. II, filed separately herein; the Affidavit of Al Perkins, the Affidavit of Ken Toebbe, the Affidavit of Jay Alvaro RE EEOC Charges and the Affidavit of Rick Beach filed in conjunction with Defendant, Cinergy Corp.'s, Motion to Sever Plaintiffs Claims; the Supplemental Affidavit of Bernadette Reinhard and the Supplemental Affidavit of Jay Alvaro, Esq. RE EEOC Charges filed separately herein, Federal and Ohio law and the within memorandum.

Respectfully submitted,


/s/ Jill T. O'Shea_____
Jill T. O'Shea        (0034692)
Attorney for Defendant,
Cinergy Corp.
139 E. Fourth Street, 25 Atrium II
P.O. Box 960
Cincinnati, OH 45201-0960
Phone:  (513) 287-2062
Fax:  (513) 287-3810


/s/ Gregory V. Mersol_____
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740


*Attorneys for Defendant,*
*Cinergy Corp.*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | : | Case No.    C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | MEMORANDUM OF LAW IN SUPPORT |
| | : | OF DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP. | : | MOTION FOR SUMMARY JUDGMENT |
| | : | AS TO PLAINTIFF, ANTHONY MARTIN |
| Defendant. | : | |

## I.    INTRODUCTION

This case  involving Plaintiff, Anthony Martin, ("Martin"), a Groundperson Driver "A" employed by The Cincinnati Gas & Electric Company ("CG&E"), a subsidiary of Cinerg Corp. ("Cinergy"), arises out of a series of stale and exceedingly vague allegations that he was denied transfers or subject to discrimination on account of his race.  As explained below, summary judgment should be granted in Cinergy's favor because the undisputed evidence, if anything, actually demonstrates that Martin was denied promotion to the Lineperson "C" position pursuant to an EEOC validated process, was treated more than fairly and suffered no adverse job actions due to his race.

## II.    STATEMENT OF FACTS

### A.    Martin's Employment

Martin has never been employed by Cinergy Corp. which is a public utility holding company. Cinergy does not directly employ any personnel. Instead, Martin's employment has been with Cincinnati Gas & Electric Company ("CG&E"), a Cinergy subsidiary. (Beach Affid., ¶ 9; O'Connor ¶¶ 8-9).

Martin began working at CG&E in 1985 as a custodian and was timely promoted to a Cleaner on May 19, 1986. At this time, he worked in the Plant Services department at the Miami Fort Generation Station, a Power Generating Station in North Bend, Ohio and owned and operated by CG&E. Martin was transferred to the position of Construction Helper on October 23, 1989 in the Electric T&D C&M department. Martin has no knowledge that "he was held back because of race." (Martin, Vol. I., pp.48, 53).

Martin acknowledged that he suffered no racial discrimination or harassment. No co-workers engaged in racial discriminatory or offensive behavior. (Martin, Vol. I, pp. 24-26, 54). In 1985, although Martin does not recall, the documents indicate that he asked for a transfer into the gas department because he wanted a job closer to home. (Martin, Vol. I, p.56; Exhibit 22). Martin is unaware whether any positions were open at the time and he does not contend that anyone was selected into an open position, either ahead of him or on the basis of race. Martin does not recall but does not deny that he did not meet testing requirements for any positions in the gas department. (Martin, Vol. I, pp. 59-60).

Likewise, in 1986, although Martin sought a transfer into an entry level electrical department position, he did not meet training requirements or pass necessary tests. (Martin, Vol. I, pp. 33, 62; Exhibits 4 and 26). Martin does not remember these events but does not deny them. He also concedes that to move into the gas department or certain entry level electrical positions, all applicants were required to take written and field tests. He does not contend these tests are racially based or racially applied. (Martin, Vol. I, pp. 33, 37, 60). Martin testified that he was unaware that once testing occurred and the candidate fails, the candidate is ineligible for further testing for a pre-set period of time, despite the documents addressed to him that contained that information. (Martin, Vol. I, p. 38; Exhibit 5). But, Martin does not contend and has no

evidence that these constraints on testing were racially based or discriminatorily applied. (Martin, Vol. I, p. 61).

From 1987 to 1989, Martin repeatedly requested a transfer from his position of Cleaner, each time indicating that he was seeking the transfer not because of any mistreatment, but because he wanted more pay or to work closer to home.  Each time he requested a transfer, Martin was unsure whether there were any openings in the department to which he sought transfer and who, if anyone was chosen. (Martin, Vol. I, pp. 42, 43, 45, 47).   In no instance, did he believe or have any evidence that any Caucasian employee was chosen ahead of him. (Martin, Vol. I, pp. 36, 40, 42, 44, 45-46; Exhibits 5, 7, 9, 11, 13).

CG&E timely promoted Martin to a Groundperson Driver "A" on April 26, 1991. (Martin, Vol. I, pp. 20-23, 47-48, 50-53).  As with other jobs, Martin was required to and, in this case, completed successfully the tests necessary for that position, which again, are subject to no claim or evidence of discriminatory application or content. He has no information that he was delayed from receiving this promotion due to race.  (Martin, Vol. I., pp. 51-53).

**B.     Alleged Failure to Promote**

Martin's allegations relate to his failure to be promoted to the Lineperson "C" position within the Electric T&D C&M Department.[1] (emphasis added)  Martin applied for the Lineperson "C" position in August of 1997 (Posting 97-223), August of 1998 (Posting 98-196) and December of 1998 (Posting 98-404), the latter of which he underwent Field Assessment Testing ("Field Assessment") in January of 1999. (Martin, Vol. I, pp. 122-124; Perkins Affidavit, ¶4).

---

[1]     Martin's allegations in his EEOC charge filed on January 12, 1999 were addresses solely as to his failure to be promoted to the Lineperson "C" position. The Lineperson "C" position is the first job position in the Lineperson sequence of job positions wherein employees are required to climb poles and work from bucket trucks or aerial lifts as part of the essential job functions.

In August 1997, Martin was one of 110 applicants for the Lineperson "C" position. He was one of eighty (80) applicants who did not score high enough on the Field Assessment to receive an interview. Martin earned a "below average score" on the Field Assessment Test and at least thirty-five (35) candidates scored higher than Martin including twenty-seven (27) candidates who scored "above average". Sixteen (16) candidates received Lineperson "C" positions including Fred Logan, an African-American. (Perkins Affid., ¶¶ 5-8). Martin testified that he failed the Field Assessment at this time because he failed the climbing test, clearly an essential function of the Lineperson job classifications. He acknowledged that he was not a good climber. (Martin, Vol. I, p.123; Exhibit 29). He did not thereafter ask anyone for additional training. (Martin, Vol. I, p. 178)  He did not have any knowledge that the Caucasian employees hired at that time were not qualified other than they "did not have more seniority". (Martin, Vol. I, pp. 178-180). [2]

In August 1998, Martin again applied for the Lineperson "C" position, Job Posting 98-196.  Martin was not field assessed or interviewed when he applied in August of 1998 as a result of his poor performance in the 1997 Field Assessment and errors in his resume. Upon subsequent determination that the resume errors were as a result of the facsimile transmission of his resume, Martin was allowed to retest for the December 1998 Lineperson "C" posting, 98-404. (Perkins Affid., 12-15)

Martin was one of twenty-eight (28) candidates who took the validated Field Assessment Test in January 1999 for job posting 98-404 at which time Ron Lewis performed the Field Assessment. Martin failed the Field Assessment and did not receive

---

[2]    The International Brotherhood of Electrical Workers, Local Union No. 1347 (the "Union") filed a grievance on behalf of Martin alleging unjust reasons for the denial of the promotion to the Lineperson "C" position. A third step grievance meeting was held with the Union stating the reasons why Mr. Martin was not selected for the position. The Union did not pursue a fourth step grievance. (Perkins Affid., ¶¶ 9-11; Exh. "A").

an interview for the reason that he received an automatic failure for failing to meet the

minimum competencies for the Working at Heights exercise.  During the January 1999

Field Assessment, thirteen (13) candidates scored higher than  Martin with a "pass" or

"high pass" score.  (Toebbe Affid., ¶¶ 12-18).  Martin could not state that the individuals

acted on reasons based on race.  (Martin, Vol. I, p. 149).

Despite his failure of each test, Martin summarily asserts that he did not do anything

wrong during any of the field assessments for the Lineperson "C" postings. (Martin, Vol. I, p.

193). [3]  However, Martin did not know whether anyone involved in the Field Assessment acted

for reasons based on race or used racial slurs at the workplace. (Martin, Vol. I, p. 149).  Martin

has failed a number of written tests during his employment and was not allowed to retest within a

certain time frame pursuant to retest policies. (Martin, Vol. I, pp. 33, 60-62; Exhibits 4, 24, 26).

###    C.    Alleged Unfair Discipline

Martin was disciplined as a result of an August 27, 1998 electrical contact

incident in which he, Tolbert and Brantley were involved.  Martin disagreed that he

should have received a letter for his involvement in the incident. Martin solely received a

disciplinary letter as a result of the August 27, 1998 electrical contact incident for the

reason that he was a member of the crew and present in the immediate area of the work at

the time of the incident and the crew failed to have a proper job safety briefing. The

---

[3]    Martin's self serving and conclusory opinion that he performed all tasks correctly cannot be utilized to defeat summary judgment.  The testimony of Billy Brantley ("Brantley") demonstrates that Martin did not know how to properly perform the tasks in the assessment notwithstanding his training and years of experience as a Groundperson Driver "A" working with Linepersons. Brantley identified the training given by the Company as to the proper manner in which to perform the various tasks in the Field Assessment.  For example, Brantley testified that the correct procedure to erect a ladder is to use a 4-to-1 ratio from the base of the ladder to the pole.  In this regard, Martin testified that the requirements that he was aware of was to set up a ladder so that it does not shake, set it evenly so that it does not rock and far enough back so that it does not fall backwards and to make sure it is stable. Martin did not know if the Company had any requirements as to how far out to set a ladder from a pole.

   In terms of boring a hole through a pole, Brantley testified that the correct procedure and what employees are trained to do is to drill a straight horizontal hole all the way through the center of the pole. They are trained to clean out the hole, install the bit and brace and crank the drill in a clockwise motion. Employees are trained to tighten all the hardware and install the cross arm square to the pole so that it is suitable for hanging wire. Martin testified that all he knew of the proper installation method for this procedure was to "put it in a pole in the direction you need it to go up on the pole for wire." (Brantley, Vol. II,  pp. 213, 217-219; Martin, Vol. I,  pp. 136, 144, 147).

disciplinary letter was reduced to an oral warning as a result of an internal grievance. (Ward Affid., ¶¶ 6 –7, Exhs. "B" –"C").

###    D.    Alleged Hostile Work Environment

Martin's testimony fails to establish any actionable claim of a hostile work environment and any isolated allegations are time-barred.[4] He has not heard any racial slurs or offensive comments by supervisors or co-workers, nor observed racially offensive items in the workplace as a Cleaner, Janitor or Construction Helper.

As a Groundperson Driver "A", he never heard supervisors make any racial slurs or offensive comments. During his career as a Groundperson Driver "A", Martin further was not subject to any racial harassment or discriminatory treatment by supervisors or co-workers other than in 1991, his first year as a driver, co-workers whom he could not identify "hollered and cussed at him" not using racial slurs but rather because of his lack of experience but this ceased within 4 to 8 months. He never reported this to anyone. (Martin, Vol. I, pp. 93-99, 121). Martin also testified as to two statements made by one co-worker in the "early years" around 1991. The co-worker told him that he would "kick his black ass" if he went into a building too early. That comment was made outside the presence of supervisors and when Martin reported it to his supervisor, he immediately investigated and chastised the co-worker. Martin claims the same co-worker made one other statement which he did not report. (Martin, Vol. I, pp. 71-73, 83-84; see also pp. 84-87 where in Martin concedes he neither used the Hotline nor talked to individuals designated to take complaints, despite that he knew of their existence.).

---

[4]    For example, Martin testified that a piece of equipment was referred to as nigger toes in the early 1990's which he did not report to anyone. He does not recall who told him or to whim it was said. He never heard such a statement himself and never reported it. (Martin, Vol. I,  p. 109). These isolated allegations are time-barred by the statute of limitations and further by Martin's failure to file suit following the Dismissal of his EEOC Charge and Finding of No Probable Cause in 1999.

He never observed any offensive items in the workplace as a Groundperson

Driver "A" other than Martin also saw a banana peel in his truck one month prior to his

October 1, 2002 deposition. (Martin, Vol. I, p. 75, 89).  Martin admitted that he does not

know how it got there, whether it was put there while at work, or if it occurred more than

once. (Martin, Vol. I, p. 89) He did not report it to either his supervisors or HR despite

the fact that he no negative experiences in reporting to his supervisor or any experience in

reporting to HR. (Martin, Vol. I, pp. 76-77). There is a dearth of evidence in support of

Martin's hostile work environment allegations.

### F.    Policies and Failure to Take Advantage of Corrective Opportunities

CG&E has strong policies and programs in place to uphold the Company's commitment

to equal employment opportunity and a harassment free workplace including an Equal

Employment Opportunity Policy, Harassment Free Workplace Policy and Affirmative Action

Statement.  All employees were provided with a copy of the Company's Workplace Harassment

Policy on or about February 6, 2000  which also prohibits inappropriate conduct based on race

and provides employees with several options to address any concerns they may have.  (See, e.g.,

Brantley Exhibit 9).   There was mandatory training for all employees on the policy and Martin

attended a one (1) hour training session on or about September 27, 2000. Martin also received a

copy of the Working Environment Policy Manual which includes both policies and

acknowledged receipt of same on October 17, 2002. (O'Connor Affid., ¶¶21-25, 28-34, Exhs.

"D" and "L").

Martin stated he never really paid no attention to the Company's anti-harassment

policies. He believed that the policies may have been up on the boards and were communicated

to him. (Martin, Vol. I,  pp. 107-109). Martin testified that he could not recall receiving the

company's anti-harassment policy in 2000 or attending mandatory training on that policy, though

he does not deny that both events occurred. (Martin Vol. I,  pp. 79-81, Brantley Exhibit 9).

Later, Martin testified that he was aware of the company's anti-harassment policy and that it had

been in place for some time. (Martin, Vol. I,  p. 109). Martin ultimately conceded that he

attended a workplace harassment training session on September 27, 2000 but does not remember

anything discussed. (Martin, Vol. I, p. 161; Exhibit 31).

## III.    PROCEDURAL POSTURE

On or about January 12, 1999, Martin filed a charge with the EEOC against CG&E

claiming that "[ T]he Company has failed to promote me to the Lineman "C" position although I

have repeatedly applied and tested for the position, most recently in August of 1998…", "[ I ]

believe I have been discriminated because of my race in violation of Title VII and "[ I ]believe

the Company engages in a pattern and practice of race discrimination." The EEOC issued a

Dismissal and Finding of No Probable Cause on June 8, 1999. Martin failed to timely file suit

within 90 days. (Alvaro Affid.,  ¶¶ 5-7). Martin did not file the within Complaint until June 7,

2001, two years and six months later.

On April 11, 2000, Martin filed a second Charge of Discrimination only naming Cinergy

Corp.  and claiming that he was denied promotions because of his race and that promotional

policies adversely impacted him and others.  Martin withdrew that charge and requested a right

to sue letter in December 2000.  (Alvaro Supp. Affid., ¶¶ 15-18).

## IV.    ARGUMENT OF LAW

### A.    Cinergy Corp. Is Not An "Employer" Under Title VII

Title VII of the United States Code, under which Tolbert has sued, applies only to

"employers" as defined at 42 U.S.C. § 2000e (b).  An "employer" is a person "engaged in an

industry affecting commerce who has fifteen or more employees . . ." As an initial matter,

Cinergy should be dismissed from this proceeding. Cinergy has no employees and therefore is

not an "employer". Cinergy's relationship as a parent company to CG&E, which employed Tolbert, does not create liability under the statute. Absent special circumstances, a parent corporation is not liable for the alleged statutory violations of its wholly owned subsidiary. Branham. v. Home Depot et. al., 2002 U.S. Dist. Lexis 18903 (E.D. Mich., 2003) (copy attached hereto); Watson v. Gulf & W. Indus., 650 F.2d 990, 993 (9th Cir. 1991).  Exceptional circumstances exist only where "the parent corporation exercises a degree of control that exceeds that normally exercised by a parent corporation."  Id. * 12, citing  Armburster v. Quinn, 711 F.2d 1332 (6th Cir. 1983).

Cinergy Corp. is a public utility holding company as defined under the Public Utility Holding Company Act of 1935 and the parent company of CG&E. Cinergy Corp. has no employees and thus neither shares management nor control over labor relations with its subsidiaries. Moreover, each subsidiary is operated separately from Cinergy Corp. which has no operational functions such as providing retail electric and natural gas services.  Martin has never been employed by Cinergy Corp. and has at all times been employed by CG&E. CG&E was not named in the Amended EEOC charge and the Complaint. (Beach Affid. , ¶¶ 4, 9 and 11; O'Connor Affid., ¶¶ 4-9;Supp. Alvaro Affid., ¶¶ 15-16; Exhs. "M" – "N").[5]  Thus, Martin's claims against Cinergy are barred as a matter of law.

---

[5]  At this point, plaintiff cannot bring a claim against CG&E under Title VII because he has failed to first file a charge with the EEOC.  Ordinarily, a party not named in an EEOC charge may not be sued under Title VII. Perkins v. Silverstein, 939 F.2d 463, 471 (7th Cir. 1991); Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 126 (7th Cir. 1989). Plaintiff can not escape this rule unless he can show  that (1)  CG&E's role as his employer, could not have been ascertained at the time of filing the EEO charge; (2) the interests of Cinergy Corp. are so similar to CG&E's interests for purposes of voluntary conciliation and compliance, that it would have been unnecessary to include CG&E in the EEOC proceedings; (3) that the absence of CG&E does not result in actual prejudice to CG&E in the EEO proceedings; and (4) that CG&E, in some way represented to him that its relationship with plaintiff was through Cinergy Corp.  Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 907-08 (7th Cir. 1981). With respect to Plaintiffs' Complaint, Defendant denied that Cinergy Corp. was the employer and raised the affirmative defenses of failure to join an indispensable party, Cinergy Corp. is not the real party in interest, the Cinergy Corp. , as the parent Company, was not liable for the alleged tortuous acts of CG&E.

B.    **Plaintiff's Race Discrimination Claims Under Title VII and Ohio Law Are Not Actionable As A Matter of Law.**

1.    **Plaintiff's Claims Are Barred As Untimely**

Title VII requires an employee to file a charge with the EEOC within 300 days of an alleged unlawful employment practice before filing a lawsuit. See 42 U.S.C. § Section 2000e-5(e)(1); Love v. Pullman Co., 404 U.S. 522, 92 S. Ct. 616 (1972); Rivers v. Barberton Board of Education, 143 F.3d 1029, 1032 (6th Cir. 1998); Donahoo v. Ohio Department of Youth Services, 237 F. Supp. 2d 844 (N.D. Ohio 2002). A Title VII plaintiff is also confined to those matters which were made in the charge of discrimination or those charges which are reasonably expected to grow out of the charge of discrimination. Duggins v. Steak and Shake, Inc., 195 F.3d 828-832 (6th Cir. 1999); Donahoo v. Ohio Department of Youth Services, *supra*.

The 90 day limitation period begins running on the 5th day following the EEOC's mailing to the claimant's residential address. Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 560 (6th Cir. 2000) (dismissal of plaintiff's claims for failure to file in time). The Sixth Circuit upholds summary judgment where a Title VII claim was filed more than 90 days after issuance of the right-to sue letter by the EEOC. Matthews v. Kilroy, et al., 1997 U.S. App. LEXIS 17204 (Ct. App. 6th Cir. 1997)(copy attached hereto)

Under federal law, Martin had 300 days from an alleged adverse employment action to file an EEO charge. Because his second charge was filed on April 11, 2000, Martin is precluded from bringing any action based on any alleged failure to promote which is a discrete event and does not fall into the ambit of a continuing violation. Martin failed to timely file an EEOC charge related to the December of 1998 Lineperson "C" (Posting 98-404) in which he underwent Field

Assessment Testing in January of 1999. Accordingly, he failed to timely file a charge within 300 days and his allegations related to same are time barred.[6]

## 2.   Plaintiff Offers No Direct Evidence Of Race Discrimination In Any Employment Action.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or nation origin.  42 U.S. C. 2000e-(2(a)(1).  To prevail in an employment discrimination claim under Title VII, a plaintiff may either provide direct evidence of discrimination or establish a prima facie case as set forth under the burden-shifting method in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Policastro v. Northwest Airlines, Inc. 297 F.3d 535, 538 (6th Cir. 2002).  Martin offers no evidence of statements or actions that require a conclusion the unlawful discrimination was a motivating factor in any decision relating to his employment. Thus, Martin fails to demonstrate any direct evidence of discrimination. (See, Statement of Facts, pp. 1-8).

## 3.   Plaintiff Cannot Demonstrate A Prima Facie Case Of Race Discrimination As A Matter Of Law.

To make a prima facie claim of race discrimination under Title VII, a plaintiff must establish that:  (1) he is a member of a protected group, (2) he was qualified for continuing employment in his position, (3) he suffered an adverse employment action, and (4) he was treated less favorably than a "similarly-situated" person outside of the protected group. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S. Ct. 1089 (1981).[7] : Clayton v.

---

[6]   The EEOC Notice of Dismissal and Finding of No Probable Cause was not forwarded until on or about June 8, 1999. Thus, Martin readily could have timely amended his EEOC Charge to include the December 1998 Lineperson "C" posting before the dismissal and failed to do so as well.

[7]   Plaintiff also has asserted parallel claims under Ohio's anti-discrimination statute, ORC § 4112.02(A). The analysis for claims under the Ohio employment discrimination statute is identical to that for Title VII claims.  See,

Meijer, Inc. 281 F.3d 605, 610 (6th Cir. 2002); Keaton v. State of Ohio, 2002 U.S. Dist. LEXIS

19993 (S.D. Ohio 2002) (copy attached hereto). Tolbert cannot demonstrate a prima facie case

under these requirements.

4.    **Plaintiff Cannot Demonstrate A Prima Facie Case Because He Cannot Demonstrate A Materially Adverse Employment Action.**

It is well settled that to satisfy the second element of the prima facie case, the adverse

employment action must be "materially adverse". Hollins v. Atlantic Co., 188 F.3d 652 (6th Cir.

1999); Bowman v. Shawnee State University, 220 F.3d 456, 461-62 (6th Cir. 2000). The Sixth

Circuit has consistently held that unless employment actions involve some significant detriment,

they are not materially adverse and, thus, not actionable.  See, e.g., Roelen v. Akron Beacon

Journal, 199 F. Supp. 2d 685 (N.D. Ohio 2002) (De minimus employment actions are not

materially adverse and therefore not actionable.); White v Burlington Northern v. Santa Fe Ry.

Co., 310 F.3d 443 (6th Cir. 1999)(De minimus employment actions are not actionable as the

change in employment conditions must be more disruptive that a mere inconvenience or an

alteration of job responsibilities).

The Sixth Circuit and Ohio courts recognize that an adverse employment action "must

materially affect the plaintiff's terms and conditions of employment". See, e.g., Toth v. Ohio

Dept of Youth Services, 113 Ohio Misc. 2d 1, 754 N.E. 2d 305 (2001)(Counseling and

unpleasant working relationship does not rise to level of a materially adverse employment

action.); Bowers v. Hamilton School Board , 2002 Ohio App LEXIS 1356 (Ct. App. 12th App.

Dist. March 25, 2002)(copy attached hereto). (tension and unpleasant working relationship not

sufficient to demonstrate an adverse employment action); Hopkins v. Electronic Data System

Corp., 196 F.3d 655 (6th Cir 1999) (transfer not "material adverse" change when receive same

---

Barnes v. GenCorp., Inc. 896 F.2d 1457 (6th Cir. 1990); Plumbers v. Steamfitters Commt. v. Ohio Civil Rights
Commn. 66 Ohio St. 2d 192, 196, 421 N.E. 2d 128, 131 (1981).

pay and benefits.); <u>Williams v. AP Parts, Inc.</u> 252 F. Supp. 2d 495 (N.D. Ohio 2003) (court observed that discipline can constitute a significant change in employment status if it is a materially adverse change in the terms and conditions of employment, but the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace); <u>Vitt v. City of Cincinnati</u>, 250 F. Supp. 885 (S.D. Ohio 2002) (dearth a case authority to support position that denial of computer training constitutes an adverse employment action and observing the decisions related to same clearly fall within the realm of the employer's business judgment and that plaintiff was free to seek any desired training in free time at own expense).

The Sixth Circuit in <u>Primes v. Reno</u>, 190 F.3d 765 (6th Cir 1990) held that even unsatisfactory performance reviews did not rise to the level of an adverse employment action:

> If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action Title VII would be triggered by supervisor. Criticism or even facial expressions indicating displeasure. Paranoia in the workplace would replace the prima face case se as the basis for a title VII cause of action.

None of the alleged incidents of discipline rise to a level of a **materially adverse employment action** under Federal and Ohio law. Martin solely received oral or written warnings, the substantial majority of which are dated and time barred. He only received a disciplinary letter which was reduced to an oral warning related to the August 1998 incident. (See, e.g., Exhibits 3, 4, 27, 28 and 42; Ward Affid., ¶¶ 6 –7). These alleged incidents of "unfair discipline" fail to constitute materially adverse employment actions and are not actionable. The failure of Martin's proof related to the failure to be promoted to the Lineperson "C" position is addressed above. Thus, Martin's <u>prima</u> <u>facie</u> case fails for the reason that Martin cannot demonstrate a materially adverse employment action.

**5.     Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Because He Cannot Demonstrate That Similarly Situated Employees Were Treated More Favorably.**

In applying the last prong of the <u>McDonnell Douglas</u> analysis, the Sixth Circuit has explained that the plaintiff must show that the "comparables" are similarly-situated in all respects.  <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992).  The <u>Mitchell</u> Court held that, "to be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Id.</u> at 583.

Martin's testimony fails to demonstrate that "similarly situated" individuals not in the protected class were treated more favorably in promotion as to the positions of Lineperson "C" or discipline based on race. (See Perkins, Toebbe and Ward Affidavits) Thus, Martin's <u>prima facie</u> case fails as a matter of law.

**6.      CG&E's Legitimate, Non-Discriminatory Reasons Justified Its Actions As A Matter Of Law.**

If the plaintiff is able to establish a <u>prima facie</u> case of discrimination, the burden of production shifts to the employer to assert a legitimate non-discriminatory justification for its actions.  <u>Ang v. Procter and Gamble Co.</u>, 932 F.2d 540, 548 (6th Cir. 1991).  Once the employer has come forward with evidence of a legitimate reason for its actions, the burden shifts back to the employee to establish that the employer's proffered explanation is a mere pretext for unlawful discrimination.  <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1083 (6th Cir. 1994). CG&E has the burden of production on the issue of its legitimate, non-discriminatory reason, but the burden of persuasion remains with the Plaintiff at all times.  <u>See</u>, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749 (1993).

Assuming <u>arguendo</u> for purposes of this motion alone that Martin is able to demonstrate a <u>prima</u> <u>facie</u> case of race discrimination, which CG&E expressly denies, CG&E is entitled to summary judgment based on its legitimate, non-discriminatory reason for the failure to "promote" Martin to the Lineperson "C" position. In this regard, the evidence demonstrates that the other candidates were selected for the positions utilizing the EEOC validated Targeted Selection Process for the Lineperson Apprentice Program (See Perkins and Toebbe Affidavits). Martin has presented no evidence that the process or selection was unfair or discriminatory as to him or of any discriminatory intent. (<u>See,</u> Statement of Facts, pp. 3 - 5).

### 7.        As A Matter Of Law, Plaintiff Is Unable To Demonstrate Pretext.

If the plaintiff is able to establish a <u>prima</u> <u>facie</u> case of discrimination, the burden of production shifts to the employer to assert a legitimate non-discriminatory justification for its actions. <u>Braithwaite v. Timken, Co.</u> 258 F.3d 488 (6th Cir 2001). Unsupported allegations are insufficient to demonstrate pretext. <u>Vaughn v. Watkins Motor Lines, Inc.</u> 291 F.3d 900 (6th Cir 2002). Subjective beliefs and feelings are similarly as are subjective conclusory allegations. <u>Ngeunjuntr v. Metropolitan Life Insurance Co.,</u> 146 F.3d 464 (7th Cir 1998)<u>; Lomax v. Sears, Roebuck Co.</u> 2000 U.S. App. LEXIS 33884 (6th Cir. 2000); <u>Chappell v. GT&E Products Corp.,</u> 803 F.2d 262, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination."); <u>Rin Das v. The Ohio State University,</u> 2003 U.S. App LEXIS 2236 (6th Cir. 2003)(copy attached hereto) (employee failed to produce competent objective materials evidence to prove discriminatory animus and disprove defendant's articulated legitimate business reason for her discharge); <u>Smith v. Legget Wire Company,</u> 220 F. 3d. 752 (6th Cir. 2000)(court observed that "Smith's vague assertion that there was a general attitude of discrimination at Adcom is insufficient to establish pretext); <u>Wixson v. Dowagiac Nursing Home,</u> 87 F. 3d 164 (6th Cir. 1996) (holding that plaintiffs failed to create

issue of fact by alleging numerous instances of disparate treatment and hostile work environment in conclusory terms with no references to names, times and occasions).

Martin has failed to demonstrate that the reasons for his failure to promote to the Lineperson "C" position or the reasons for any discipline proffered by CG&E were mere pretexts. Other than speculation and conjecture, there is no evidence that any conduct by CG&E in terms of the failure to promote or imposition of non-materially adverse discipline was imposed based on race.

### C.    Racial Harassment Claims Under Title VII

### 1.    Plaintiff Cannot Demonstrate A Hostile Work Environment Or Racial Harassment As A Matter Of Law.

To establish a prima facie case of hostile work environment harassment based upon race, a plaintiff must establish the following five elements: (1) He was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the employee's work performance by creating an intimidating, hostile, or offensive work environment; and (5) employer knew or should have known of the harassment and failed to implement corrective appropriate action. See, e.g., Williams v. General Motors Corp., 187 F.3d 553 (6th Cir. 1999); Haffer v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). A court may not aggregate harassing conduct if it is attributed to separate and distinct motives Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

The United States Supreme Court has elaborated on what type of conduct can constitute harassment and form the basis for a hostile work environment claim. See, Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S. Ct. 367 (1993). To prevail, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." See, Harris v. Forklift Systems, Inc., supra; Meritor

Savings Bank FSB v. Vincent, 477 U.S. 57, 67, 106 S. Ct. 2399 (1986). Conduct that is "merely offensive" will not suffice to support a hostile work environment action. Harris, supra.

In determining whether there was a hostile or abusive workplace environment, courts look to the totality of the circumstances. See, Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275 (1998). Specifically, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, supra at 23.; Hafford v. Seidner, 183 F.3d 506 (6th Cir. 1999). The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788. Finally, the work environment must be both objectively and subjectively offensive. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive is not actionable. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 118 S. Ct. 998 (1998) These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Id. at 81, 118 S. Ct. 1003.

Applying the standard established by the Supreme Court, the Sixth Circuit has granted summary judgment when the conduct is not deemed severe and pervasive and/or fails to demonstrate an objectively and subjectively hostile work environment. See, e.g., Black v. Zaring Homes 104 F.3d 822 (6th Cir 1997) (nine offensive remarks over 7 month period cannot reasonably be considered harassment.); Burnett v. Tyco Corp 203 F.3d 980 (6th Cir 2000)(under the totality of the circumstances, a single battery and two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct was sufficiently severe and pervasive to create a hostile work environment); Morris v. Oldham County Fiscal

Court, 201 F.3d. 784 (6th Cir. 2000) (holding that simple teasing, offhand comments and isolated incident including a sexual advance did not establish a hostile work environment); <u>Bryant v. Martinez</u>, 2002 U.S. App. LEXIS 18672 (6th Cir. 2002) (allegedly "harassing conduct" including (1) ignoring the plaintiff when she was in the room; (2) meeting with plaintiff's staff members without her knowledge; (3) meeting with two other branch chiefs to discuss office policy without inviting plaintiff; (4) refusing to return plaintiff's phone calls; (5) responding to plaintiff's questions in staff meetings in a "disparaging manner;" (6) "humiliating" plaintiff in front of her subordinates; and (7) refusing to respond to plaintiff's request for guidance did not constitute racial harassment as a matter of law)(copy attached hereto)

Martin has failed to demonstrate racial harassment that was sufficiently severe and pervasive to be objectively and subjectively hostile as a matter of law. The sole allegation within the six-year statute of limitations period is the banana peel incident(s) to which Martin cannot even identify that a co-worker was involved. (<u>See</u>, Statement of Facts, pp. 6-7). Thus, Martin's hostile work environment claims fail as a matter of law.

> **2. Defendant, CG&E, Exercised Reasonable Care To Prevent And Promptly Correct Any Harassing Behavior And Plaintiff Failed To Take Advantage Of Corrective Opportunities.**

Even assuming <u>arguendo</u> for purposes of this motion alone that Martin demonstrated that there was sufficiently severe and pervasive harassment based on race, which is expressly denied, plaintiff must establish that the employer bears the responsibility for the harassment.  If the harassing party was the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible job action against the employer.  <u>See, e.g.</u>, <u>Faragher v. City of Boca Raton,</u> 524 U.S. 775, 807, 118 S. Ct. 367 (1993); <u>Burlington Indus., Inc. v. Ellerth,</u> 524 U.S. 742, 765, 118 S. Ct. 2257 (1993). If there was no tangible job action, the employer can avoid liability by establishing (1) that it exercised reasonable care to prevent and promptly

correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of corrective opportunities. Farragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. If the alleged harassers were merely co-workers, the employer will be liable only where the plaintiff can demonstrate that the employer knew or should have known of the harassment and failed to take appropriate remedial action. EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 518 (6th Cir. 2001); Courteny v. Landair Transp., Inc., 227 F.3d 559, 564-65 (6th Cir. 2000).  When an employer responds with good faith remedial action to alleged harassment, it cannot be found in violation of Title VII unless the remedy is so inadequate as to indicate an "attitude to permissiveness that amounts to discrimination." Burress v. Michigan Department of Corrections 225 F.3d 658 (6th Cir 2000) quoting Blankenship v. Parke Care Centers 123 F.3d 868, 873 (6th Cir 1997) cert denied 522 US 1110 (1998).

There is no evidence in the record of Martin being harassed based on race by a supervisor culminating in a tangible job action. With respect to the two isolated 1991 comments by a co-worker, the first was reported and addressed by a supervisor. There is no evidence to demonstrate that the second comment by the same co-worker in 1991(which Martin did not report) was known or should have been known by CG&E.  The fact that CG&E has strong policies and programs and trains employees on workplace harassment including harassment based on race is amply demonstrated by the record. Martin further cannot identify any valid reason why he failed to take advantage of corrective opportunities and report the alleged banana peel incident(s) in 2002.[8]  (See Statement of Facts, pp. 7-8). Thus, Martin failed to take advantage of corrective opportunities and Cinergy is entitled to summary judgment as a matter of law as to Martin's hostile work environment allegations.

---

[8]        Again, Martin cannot even identify that any co-worker was involved in the banana peel incident(s).

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Defendant, CG&E, respectfully request that summary judgment be entered in its favor as to all claims by Plaintiff, Anthony Martin, there being no genuine issue of any material fact and this Defendant being entitled to summary judgment as a matter of law.

Respectfully submitted,


/s/ Jill T. O'Shea
Jill T. O'Shea        (0034692)
Attorney for Defendant,
Cinergy Corp.
139 E. Fourth Street, 25 Atrium II
P.O. Box 960
Cincinnati, OH 45201-0960
Phone:  (513) 287-2062
Fax:  (513) 287-3810


/s/ Gregory V. Mersol
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740


*Attorneys for Defendant*
*Cinergy Corp.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading was forwarded via ordinary mail this 28th day of July, 2004 to:

Paul H. Tobias
David D. Kammer
TOBIAS, KRAUS & TORCHIA, LLP
414 Walnut Street
Suite 911
Cincinnati, OH  45202

David W. Sanford, Esq.
Sanford, Wittels & Heisler, LLP
2120 K Street NW
Suite 700
Washington, D.C.  20037

Barry Vaughn Frederick
Herman Nathaniel Johnson, Jr.
Robert L. Wiggins
Ann K. Wiggins
Susan Donahue
Robert F. Childs
Wiggins, Childs, Quinn & Pantazis, P.C.
1400 South Trust Tower
420 North 20th Street
Birmingham, Alabama 35203

Grant E. Morris
Law Offices of Grant E. Morris
7 DuPont Circle, N.W.
Suite 250
Washington, D.C.  20036

/s/ Jill T. O'Shea_____
Jill T. O'Shea