**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| BILLY BRANTLEY, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. C-1-01-378 |
| | ) | **Judge Susan J. Dlott** |
| CINERGY CORP. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT CINERGY CORP.'S MOTION TO SEVER PLAINTIFFS' CLAIMS

Plaintiffs submit this Opposition to Defendant Cinergy Corp.'s Motion to Sever Plaintiffs' Claims, which requires consideration of each plaintiff's claims, the background from which they arise and the logical relationships between them.

## I.    BACKGROUND

Plaintiffs Billy Brantley, Rodney V. Jones, Anthony Martin, and Todd Tolbert (collectively "Plaintiffs") filed this consolidated action against defendant Cinergy Corp. ("Defendant" or "Cinergy"), on June 7, 2001, averring violations of federal and state civil rights laws. More particularly, the plaintiffs' claims against Cinergy include:

## A.    Promotions Claims

### *Billy Brantley*

Billy Brantley, an African-American male, was hired by Cinergy in 1987 and began working as a Groundperson. Brantley Dep. 13; 20. Brantley was promoted to the following positions: Lineperson C in January of 1989; Lineperson B in 1990; Lineperson A in April 1992; Senior Lineperson in July 1994; and Field Supervisor in June 2002, only after he asserted his claims of

-1-

discrimination over his denial of promotions to other supervisory positions. Id. 83; 106, 108, 111.

Brantley's employment has occurred within the Electric Transmission and Distribution ("T&D") Construction and Maintenance ("C&M") department of the Cincinnati Gas & Electric Company ("CGRE"), a subsidiary of Cinergy

Brantley was denied a promotion to Temporary Training Lead Supervisor in the T&D C&M department in 1997. Id.137-39. In 1999 Brantley applied for a Joint Trench Supervisor position in the T&D C&M department, but he did not receive the position. Defendant alleges that it never received his application. Id.155.

In 1999, Brantley was denied a promotion to Temporary Training Crew Lead Supervisor in the T&D C&M department. Brantley was neither selected nor interviewed for the position. Brantley testified that the positions was filled by Mike Weiss, a white employee with less seniority and who lacked the requisite experience as a Lineman A of three years, a minimum qualification set by Defendant. Id.104, 106.

Brantley was denied a promotion to Field Supervisor within the T&D C&M department in September 1999 (Job Posting 99-347). Brantley's interview process utilized Cinergy's "Targeted Selection Process". The position was awarded to Brian York, a less senior white employee who according to Brantley, was completely devoid of experience in the department. Id.146, 166.

In 2000, Brantley applied for a Field Supervisor position. Brantley did not receive an interview for this position, and Defendant alleges that it never received an application from Brantley regarding the position. Id.160; Deft.'s Resp. to Plf.s' First Interrog. 4.

***Rodney Jones***

Plaintiff Rodney Jones, an African-American male, was employed for Cinergy as a Materials Assistant C, Materials Specialist A & B, and from 1997 to 2001 a Manual Technician in the T&D Projects office of CG&E.

Seven times Jones applied for, but was denied, a Lineperson C position within the T&D C&M department: in August 1997 (Job Posting 97-223),Jones Dep. 110-14; Reinhard Supp. Aff. at ¶ 44;  in August 1998 (Job Posting 98-196),  Jones Dep.127; Reinhard Supp. Aff. ¶ 15-16; in February 1999 (Job Posting 98-404),  Jones Dep. 128-33; Reinhard Supp. Aff. ¶¶ 17-19; in April 1999 (Job Posting 99-115), Jones Dep. 136-40; Reinhard Supp. Aff. ¶¶ 22-24; in August 1999 (Job Posting 99-250),  Reinhard Supp. Aff. ¶¶ 25-27; in January 2000 (Job Posting 99-494), Reinhard Supp. Aff. ¶¶ 28-30; and in April 2000 (Job Posting 00-83). Jones Dep.143-52; Reinhard Supp. Aff. ¶¶ 31-33.

### *Anthony Martin*

Plaintiff Anthony Martin commenced working for CG&E in 1985 as a custodian, and he was promoted to a cleaner position in 1986.  Martin Dep. 20, 22.  He applied for a mechanics position in the late 1980s when he was a cleaner, but he was denied the promotion.  Id. 172-77.  In 1989, Martin obtained a promotion to a construction helper position.  Id. 48.  Martin earned a promotion to a Groundperson Driver A position in the T&D C&M department in 1991.  Id. 49-50.

In 1995, Martin applied for a Lineperson C vacancy in the T&D C&M department, and after taking the qualifying climbing test, he was informed by a safety supervisor, Lynn Dunn, that he could not climb well and, thus, would not receive the promotion.  Martin agreed with Dunn's assessment and improved his climbing skills by practicing during his free time.  Id.122-24;171; 389; 394-95.

Martin applied for the August 1997 Lineperson C Assessment within the T&D C&M department (Job Posing 97-223). Martin was informed that he did not pass the field assessment test and, thus, did not receive the promotion. Id.125-34.

Martin applied for the August 1998 Lineperson C Assessment (Job Posting 98-196). He complained to Al Perkins about not being considered for one of the vacant jobs. Id.153-55; Al Perkins Aff. ¶¶ 13-15. He applied for the February 1999 Lineperson C Assessment (Job Posting 98-404) but was not promoted to the job. Reinhard Suppl. Aff. ¶¶ 17-21.

### *Todd Tolbert*

Plaintiff Todd Tolbert, an African-American male, was hired by CG&E as a Groundperson in the T&D C&M department on August 13, 1990. Tolbert was promoted to Lineperson "C" on December 9, 1991; Lineperson B in 1993; Lineperson A in 1995; and Senior Lineperson A in 2002. Tolbert Dep.19, 21, 88-89, 334.

Tolbert's promotion to a Lineperson C position was delayed for six months because a supervisor, Lloyd Balzheir, alleged that Tolbert was not proficient in the use of company equipment. However, a white employee who had been involved in an incident while driving a company vehicle was promoted to Lineperson C ahead of Tolbert. Id. 25, 33.

Tolbert was demoted in February 2000 from Lineperson A to a Groundperson position. The reason given by his employer was his weight. Tolbert testified that he knew of white employees who were not subject to such adverse employment actions. Id. 231, 392.

Tolbert was denied a promotion to a Temporary Training Crew Lead Supervisor within the T&D C&M department in 1999. Tolbert was told by a white supervisor that his request for the position was denied because of his weight problems. Defendant, however, promoted white

employee Eric Sicby to Field Supervisor despite the fact that he was overweight.  Id.351-52; 393.

Tolbert was denied a promotion to Field Supervisor within the T&D C&M department in September 1999 (Job Posting 99-347).  Ward Aff. ¶¶ 22-26.

**B.     Terms and Conditions of Employment**

### Billy Brantley

In the late 1990's Brantley requested permission from Bill Gatto and Danny Morris, both white supervisors, to participate in company- wide computer training classes.  Brantley was denied this opportunity.   He was told that he was not qualified to take the classes because he was a Lineperson.  However, Ronnie Ayers, a white employee and also a Lineperson, was permitted to participate in the computer training classes.  Brantley Dep. 87-89.

### Anthony Martin

In late 1998, when Plaintiff Tolbert suffered an injury at a jobsite, Martin was disciplined for the incident although he had simply followed the orders of his supervisor and was in the process of leaving the scene.  Martin Dep. 212-13; 238-42; see also Ward Aff. ¶ 6.  At a subsequent union grievance meeting, the company believed that Martin's discipline was appropriate and denied his grievance, yet it offered to reduce Martin's discipline to an oral warning.  Ward Aff. Exh. C.  Martin did not sign the company's offer.  Id.

Contrastingly, the white supervisor who instructed Martin to leave the jobsite, Eric Sibcy, was given only a Record of Counseling that would be removed from his file in six months.  Ward Aff. Exh. D.  More glaringly, several other white  employees were initially given written discipline, as Martin was, for being present at a jobsite where an employee was injured, but at subsequent grievance meetings for the white employees, one individual's disciplinary letter was removed from

his file with the acceptance of coaching and counseling given to him at the accident site, and the coaching and counseling documentation was due to be removed three months after the date of the documentation, barring any further violations of safety rules. Ward Aff. Exhs. F & G. Likewise, the disciplinary letters issued to two other white employees were removed from their files, and oral warnings were issued instead, which were due to be removed from their files three months from the date of the oral warnings, barring any further safety violations. Ward Aff. Exhs. H & K.

While employed in the T&D C&M department, Martin had complained about a dearth of opportunities to work overtime. A white supervisor informed Martin that he had telephoned him to work overtime, but Martin denies ever receiving the calls and brought in his caller id display to demonstrate that he had not received any. Martin Dep. 255-57.

### *Todd Tolbert*

In August 1998, after Tolbert was involved in the electrical contact incident, he received unfair treatment. Tolbert testified that he was under the influence of heavy pain medication at the time he was brought the accident report to review. It was inaccurate as to the events that occurred and what witnesses had said. Id. 82-83.

During Tolbert's service as a Lineperson A, he and other African American employees were not allowed into the office for a one week training session on the responsibilities and duties of Field Supervisors. White employees were provided this training opportunity in other districts. Between 2000 and 2001 Tolbert had requested such training, which was denied. Id. 115-18.

Tolbert was subjected to regularly scheduled weight checks, but other overweight white employees were not. Id. 129-31, 262, 369.

Tolbert was unfairly treated in May 2000, when he was the only employee that was docked

pay for leaving work early for a doctor's appointment. Tolbert had personally witnessed white employees coming in late and leaving early without suffering any dock in pay. Id. 359-61.

## C.    **Hostile Work Environment**

### *Billy Brantley*

Brantley testified that sometime between 1990 and 1994 Don Kramer, a white supervisor, made a comment to Mike Brooks and Todd Tolbert about the way African Americans act. The comment was offensive to both Brooks and Tolbert as well as to Brantley. Brantley Depo. 44.

In the fall of 1998, Danny Morris, a white supervisor, made a comment to Newton Wright that he knew that something was going to happen to "them," which meant Brantley's entirely African-American crew. The remark referred to Tolbert's accident. Id. 46-47.

Prior to the promotion of Roger Reiss, a white employee, to supervisor, he referred to Larry Thompson as a "nigger." Id. 48-49.

It has been reported to Brantley within the last five years by Leroy Brown that the word "nigger" was written on employee lockers. Id. 51.

In 1999, Kenny Willis reported to Brantley that the atmosphere at the M&R station was racially intimidating because of the language used and the pictures that were present. Id. 70, 72.

In the fall of 2001 Carol Hendricks reported to Brantley that there were depictions of nooses at the power plant where she worked. Id. 53, 67.

Charles Alexander, a supervisor at the M&R station, reported to Brantley that he had seen pictures of targets and "KKK" written on them. Id. 54, 55.

### *Rodney Jones*

While Jones was in a truck with two white employees, the employees stated that "there was

some cotton over there" in reference to a cotton field they were passing.  Jones Dep. 54.

Brantley told Jones about the presence of nooses in a CG & E location.  Id. 65-66, 69.

Jones was assigned to clean the substation and clean up behind the male employees' trailer more often than white employees.  Id. 194.

Bruce Headen, an African-American employee, was physically assaulted by white co-workers.  Id. 57, 67.

### *Anthony Martin*

One of Martin's white supervisors in the T&D C&M department, Danny Morris, refused to pay for Martin's meal when his crew was taken out to lunch.  Martin Dep. 243-46.

While employed as a Groundperson, Martin was constantly yelled and cussed at by white employees for not being proficient at his job, although he had received training as to his duties for only one week.  This harassment continued for several months.  Id. 93-98

During the same time period, Rick Cutsinger, a white co-worker, told Martin that he would "kick [his] black ass" if he went into a building earlier than he was supposed to, and that if his [Cutsinger's] daughter brought home a black man, he would disown her.   Id. 70-73.

In the early 1990s Martin heard that some employees referred to certain equipment as "nigger toes."  Id. 90-92.

In 1998 or 1997, Martin suffered disparaging remarks from white employees at a diversity training.  Martin was the only African American at the training, and Caucasian attendees referred to black employees as "them people," "these people," "we wasn't raised like them," and "those people, we're not used to working with those people, they didn't grow up the way we did."  Id. 162, 164-67.

In approximately September 2002, someone discarded banana peels in Martin's CG&E truck. Id. 74-79, 82, 84-87, 88-90.

### *Todd Tolbert*

Between 1990 and 1991, Lloyd Balzhiser, Tolbert's white supervisor, called Tolbert "boy." Tolbert Dep. 31.

Balzhiser also treated Woodward Clark, an African-American co-employee, and Tolbert differently and with less respect than white employees. Id.

Co-worker Richard Bennett stated to a group of African American employees that he wanted to take "diversity days" on "James Earl Ray" day.  Id. 42-43.

 In 1993, Fletch, an African-American employee, informed Tolbert that Ronald Perry, a white employee, had called Fletch a "nigger." Id. 303.

Racially insensitive comments were made about O.J. Simpson's trial and the 2001 riots in Cincinnati.  Id. 44.

Comments were also made about how all "gang-bangers" should be let out of prison and sent to find Osama Bin Laden after September 11, 2001.  Id. 45-46

Tolbert has witnessed confederate flags on employee lockers, hard hats, personal vehicles, and in common work areas.  Id. 94-97.

Tolbert testified that African-American employees, including Ollen Colbert and Randy Haggard, were labeled stupid, ignorant, and dumb by co-employees.  Id. 309.

Tolbert testified that throughout his employment with Cinergy, African Americans have been treated differently, with less respect, and generally talked down to by other employees and supervisors.  Id. 42,70, 269-71, 289-91.

### D.    **Constructive Discharge of Rodney Jones**

Jones resigned his employment at CG&E because, *inter alia*, he was frustrated, depressed, tired of being humiliated, and tired of seeing external hires with less seniority, less experience and fewer qualifications promoted over him.  Jones Dep. 169-70.

## II.    **DISCUSSION**

### A.    **Permissive Joinder Standard**

In its Motion to Sever, Defendant argues that the Plaintiffs' claims do not meet the requirements for permissive joinder.  Federal Rule of Civil Procedure 20(a) provides:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Joinder pursuant to Rule 20(a) promotes judicial economy, trial convenience, and expedites the final determination of disputes.  See  Mosley v. General Motors Corp., 497 F.2d 1330, 1332 (8th Cir. 1974); Bridgeport Music, Inc. v. 11C Music, 202 F.R.D. 229, 231 (M.D. Tenn. 2001); Ohio v. Louis Trauth Dairy, Inc., 856 F.Supp. 1229, 1239 (S.D. Ohio 1994).  The "intent of the rule[] is that all issues be resolved in one action, with all parties before one court, complex though the action may be."  Lasa Per L'Industria Del Marmo Soc. Per Azioni v. Alexander, 414 F.2d 143, 147 (6th Cir. 1969).  "Under the Rule[], the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  United Mine Workers v. Gibbs, 383 U.S. 715, 724 (1966); Mosley, 497 F.2d at 1332-1333 (same).

Permissive joinder is committed to the sound discretion of district courts, see Fisher, 856 F.Supp. at 1239, and is circumscribed by two requirements: (1) a right to relief must be asserted by

each plaintiff relating to or arising out of the same transaction or occurrence, or series of transactions or occurrences; and (2) some question of law or fact common to all the parties must arise in the action.  See Mosley, 497 F.2d at 1333.  In addition, courts retain discretion, even if joinder is proper otherwise, "to order a severance to avoid causing unreasonable prejudice and expense to Defendant[] and to avoid great inconvenience in the administration of justice."  Bridgeport, 202 F.R.D. at 232.  The applicable remedy for misjoinder is severance pursuant to Fed. R. Civ. P. 21.[1]

Pursuant to the foregoing directives, Plaintiffs submit that they are properly joined in all respects.

### B.    Same Transactions/Occurrences

Defendant argues that Plaintiffs' allegations do not arise from the same series of transactions or occurrences.  Relevant case law, however, compels the conclusion that all four Plaintiffs' claims relate to the same series of transactions or occurrences.

As reflected above, Rule 20(a) permits joinder of parties if *any* right to relief relates to the same series of transactions or occurrences.  Although the phrase "same transactions or occurrences," at first glance, presents a certain degree of ambiguity, the Sixth Circuit observed long ago that "'[t]ransaction is a word of flexible meaning . . . [which] may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" Alexander, 414 F.2d at 147 (quoting Moore v. N.Y. Cotton Exchange, 270 U.S. 593, 610 (1926)).  In effect, the "words 'transaction or occurrence' are given a broad and liberal interpretation in order to avoid a multiplicity of suits."  Id.

---

[1]    "Misjoinder of parties is not ground for dismissal of an action . . . .  Any claim against a party may be severed and proceeded with separately."  Fed. R. Civ. P. 21.

Relying on the same authority, the Eighth Circuit's decision in Mosley provides the seminal construction of the terms *vis-a-vis* Title VII claims:

> [A]ll "logically related" events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence. . . . The analogous interpretation of the terms as used in Rule 20 would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *Absolute identity of all events is unnecessary.*

Mosley, 497 F.2d at 1333 (citation omitted) (emphasis added)[2]; accord, Bridgeport, 202 F.R.D. at 231 (Rule 20 "requires that, to be joined, parties must assert rights, or have rights asserted against them, that arise from related activities – a transaction or an occurrence or a series thereof.").

The District Court for the Northern District of Illinois has identified several factors that are determinative of whether discrimination claims in particular are "reasonably related" such that they arise from the "same series of transactions or occurrences":

> [I]n causes of action involving discrimination, Title VII or otherwise, courts look to [1] whether the discrimination took place at roughly the same time, [2] if it involved the same people, [3] whether there is a relationship between the discriminatory actions, [4] whether the discriminatory actions involved the same supervisor or occurred within the same department, and [5] whether there is geographical proximity between the discriminatory actions.

Byers v. Illinois State Police, No. 99 C 8105, 2000 WL 1808558 *4 (N.D. Ill. Dec. 6, 2000); see also Berry v. Illinois Department of Human Services, No. 00C 5538, 2001 WL 111035 *17 (N.D. Ill. Feb. 2, 2001) (adopting Byers factors). Application of the Byers factors here indicate that Plaintiffs' claims are reasonably related so as to comprise the "same series of transactions or occurrences."

---

[2] The Eleventh Circuit has remarked that Mosley is perhaps the leading case on joinder of Title VII plaintiffs under Rule 20. See Alexander v. Fulton County, 207 F.3d 1303, 1323 (llth Cir. 2000).

1.    **Promotions Claims**

Plaintiffs' promotions claims satisfy the <u>Byers</u> factors.  First, the promotional opportunities underlying Plaintiffs' claims all arose from 1997 through 2000, therefore taking place "at roughly the same time."  Indeed, some of the opportunities were sought by more than one plaintiff.  (<u>See</u>, <u>supra</u>, Job Postings 97-223,  98-196, and 98-404 for Lineperson C vacancies sought by plaintiffs Jones and Martin; Job Posting 99-347 for Field Supervisor vacancies  and averments regarding  a Temporary Training Crew Lead Supervisor position in 1999, sought by plaintiffs Brantley and Tolbert.)

That the discrimination "involved the same people" is depicted by more than one plaintiff disputing the selections for similar Job Postings.  Further, Defendant has proffered affiants who have knowledge of selections that apply to more than one plaintiff.  <u>See</u> Ward Aff. ¶¶ 22-29 (discussing knowledge of the selections for Field Supervisor Job Posting 99-347 involving plaintiffs Brantley and Tolbert and including affiant Perkins as a participant in process); Toebbe Supp. Aff. ¶¶ 2-10 (discussing knowledge of selections for Field Supervisor Job Postings 00-226 and 02-038, involving Brantley and including affiant Perkins as a participant in both selections);  Perkins Aff. ¶¶ 3-15 (discussing selections for Lineperson C Job Postings 97-223, 98-196, and 98-404 involving plaintiff Martin); Reinhard Supp. Aff. at ¶¶ 17-33 (discussing knowledge of selections for Lineperson C Job Postings 97-223, 98-196, 98-404, 99-115, 99-250, 99-494, and 00-83 involving plaintiff Martin for the initial three and plaintiff Jones for all).

The "relationship" between the discriminatory promotions arises from the nature of the opportunities sought by the plaintiffs: denied opportunities were identical for at least two  plaintiffs and similar for all.  That is to say, Plaintiffs' promotion claims pertain to selections for the

-13-

Lineperson Apprenticeship Program (particularly the Lineperson C positions denied to plaintiffs Martin and Jones), and for supervisory positions over Linepersons (for which Brantley and Tolbert applied). Indeed, the promotions claims in this case devolve to an analysis of the progression through the Lineperson Apprenticeship Program into supervisory positions. Brantley and Tolbert proceeded through the Program and thereafter sought supervisory promotional opportunities they were denied. Jones and Martin simply sought admission to the Program and were denied entry. All plaintiffs faced racial roadblocks in the same line of progression through Defendant's ranks, which further establishes the "relationship" between all promotion claims. The relationship between the discriminatory denials of promotion are tantamount.

The last two Byers factors are easily established. The discriminatory denials of promotions occurred within the "same department" at CG&E, the T&D C&M department, which also establishes "the geographical proximity" of Defendant's actions, namely within and around the Cincinnati area. As a consequence of the foregoing analysis, one is compelled to find that the plaintiffs' claims are so "logically related" they comprise the "same series of transactions or occurrences" for joiner under Rule 20.

### 2.    Terms and Conditions of Employment

Upon close examination, the claims of discriminatory terms and conditions lodged by plaintiffs Brantley, Martin, and Tolbert are logically related because of where the acts occurred – the T&D C&M department. Brantley avers the denial of an opportunity to train on computers while he was a Lineperson; Martin avers discriminatory discipline arising from the Tolbert accident and the dearth of overtime hours he has been accorded; and Tolbert avers the erroneous portrayal of the accident in which he was injured, the denial of training regarding the duties of Field Supervisors,

the regularly scheduled weight checks which led to a demotion, and the docking of his compensation for leaving work early for a doctor's appointment. The common cloth linking these disparate terms and conditions is the common department at which these plaintiffs worked – the T&D C&M department – and the common supervisors within the department, who meted out discriminatory terms and conditions.

For example, white supervisors William Gatto and Danny Morris both denied Brantley permission to participate in computer training, and they were both involved in the disparate discipline of Martin based on the Tolbert accident. See Brantley Dep. 87-89; Ward Aff. ¶ 6. In addition, Morris refused to give Martin overtime hours to work, Martin Dep. 255-57, and another T&D C&M supervisor, Scott Murrison, refused to give Tolbert an opportunity for Field Supervisor training. Tolbert Dep. 115-18.

The preceding discussion portrays the applicability of the Byers' factors. The discriminatory terms and conditions occurred during roughly the same time frame, and discriminatory acts involved the same people, including acts affecting more than one plaintiff and involving the same supervisory personnel. The relationship between the discriminatory acts is evinced, again, by similarities – all three plaintiffs were denied terms afforded white employees (training denied Brantley and Tolbert, overtime hours denied Martin and paid time off denied Tolbert), while two were subjected to discriminatory discipline (Martin and Tolbert). The discriminatory acts occurred within the same department, and the geographical proximity remains the same. Therefore, the requisite "logical relation" among Plaintiffs' claims of discriminatory terms and conditions has been established.

### 3.    Hostile Work Environment

The logical relation among Plaintiffs' hostile work environment claims arises from the

straightforward observation that Plaintiffs predominantly allege racial harassment within one department: the T&D C& department. The <u>Byers</u> court signaled that a relationship may be further demonstrated by "'multiple instances of harassment.'" <u>Byers</u>, 2000 WL 1808558, at *4 (quoting <u>McCleland v. Montgomery Ward & Co., Inc.</u>, No. 95 C 237, 1995 WL 374185, at *1-*2 (N.D. Ill. June 21, 1995)). Plaintiffs Brantley, Martin, and Tolbert testified to "multiple instances of harassment" they suffered at various times during their employment in the T&D C&M department. In fact, some of the harassment arose from common perpetrators, such as white supervisor Danny Morris. <u>Compare</u> Morris' comment that something would happen to "them," referring to Brantley's entirely African-American crew, Brantley Dep. 46-47, <u>with</u> Morris's refusal to pay for Martin's meal when he took Martin's crew out for lunch, Martin Dep. 243-36, and some harassment took the form of graffiti easily witnessed by many. <u>See</u> assertion by Leroy Brown that "nigger" was written on employee lockers, Brantley Dep. 51; Tolbert's testimony that he had seen confederate flags on employee lockers, hard hats, personal vehicles, and in common work areas. Tolbert Dep. 94-97. Indeed, given the "environmental" nature of a hostile environment claim involving the same department of Defendant, the logical relation among Plaintiffs' claims appears obvious. [3]

### 4.    <u>Constructive Discharge</u>

Plaintiff Jones is the sole plaintiff alleging a constructive discharge claim, but his claim arises, *inter alia*, from the denial of selection for Lineperson C vacancies. Jones' promotion claims,

---

[3] Plaintiffs acknowledge that the harassment suffered by plaintiff Jones may have arisen in a different sub-department of T&D. Yet, Plaintiffs do not believe this observation results in a severance of Jones' hostile environment claim. Based on the overwhelming logical relation among Plaintiffs' other claims, one may ascertain that Jones' hostile environment claim constitutes part of the "multiple instances of harassment" within Defendant's work environment – the T&D department – as to permit joinder.

as already demonstrated, are logically related to the promotions claims of the other three Plaintiffs. By extension, Jones' constructive discharge claim is part and parcel of Plaintiffs' promotions claims and, therefore, should remain joined in this action.

### C.    <u>Common Question</u>

The second mandate of Rule 20 requires Plaintiffs to share *any* common question of law *or* fact. Defendant argues that Plaintiffs' claims will implicate diverging questions of law and fact, but Defendant obfuscates a relatively simple inquiry.

Courts have signaled that the test for a common question of law or fact is easy to satisfy. <u>See</u> <u>Bridgeport</u>, 202 F.R.D. at 231 (in an action against hundreds of music industry companies for violating copyright laws, noting that "the common question test . . . is usually easy to satisfy" and discussing it no further); <u>Fisher</u>, 856 F. Supp. at 1239 (in an action by the State of Ohio against various defendants for a milk price-fixing scheme, finding a common question by simply noting "[t]here is no dispute that common questions of law exist among the claims"); <u>Byers</u>, 2000 WL 1808558, at *2 (simply noting that "[a]ll three Plaintiffs are asserting claims of sexual discrimination and retaliation pursuant to Title VII, as well as First and Fourteenth Amendment claims . . . [and thus] [i]t is clear that there are common questions of law"); <u>accord</u> <u>Mosley</u>, 497 F.2d at 1334 ("common questions have been found to exist in a wide range of contexts").

Furthermore, the seminal <u>Mosley</u> decision determined that the existence of differing effects individuals suffered from alleged discriminatory conduct is immaterial for purposes of whether they share a common question. <u>Id</u>.; <u>see</u>, <u>e.g.</u>, <u>Crutcher v. Kentucky</u>, No. 91-5893, 1992 WL 98020, at *4 (6th Cir. May 11, 1992) (citing <u>Mosley</u> and holding that although two plaintiffs' claims were not all identical and they suffered different effects, the "common threads" to their claims warranted

-17-

joinder).

The foregoing authorities demonstrate that Plaintiffs' claims satisfy the common question requirement. All four allege discrimination in promotions, terms and conditions of employment, and a hostile work environment in violation of Title VII, § 1981 and Ohio state law. The legal standard requires only one common question of law, and Plaintiffs have three. Although Plaintiffs may have suffered different effects from discrimination, the crux of the inquiry rests on the common discriminatory conduct prohibited by law. The fact that promotions claims arose in the same department, for the same positions, and in the same time frame all point decidedly toward the existence of numerous common issues of fact and law.

Defendant's reliance on several cases cited in its Memorandum is misplaced. In Grayson v. K-Mart Corp., 849 F.Supp. 785 (N.D. Ga. 1994), the eleven plaintiffs who alleged their terminations were the result of age discrimination lived in four different states, worked in eleven different stores, were terminated by three different managers, and no single program or procedure affected all of the plaintiffs; thus their claims were severed. Id. at 788-89. Bailey v. Northern Trust Co., 196 F.R.D. 513 (N.D. Ill. 2000) was analyzed in Byers and failed to satisfy the Byers factors: "no single supervisor was implicated in all five of the plaintiffs' claims, . . . the plaintiffs claims extended over a period of fifteen months[,] . . . [and there was] no evidence of a policy which affected each plaintiff, or a causal link between the adverse actions taken with respect to each plaintiff." Byers, 2000 WL 1808558, at *4.

Defendant's primary case, Smith v. North American Rockwell Corp., 50 F.R.D. 515 (N.D. Okl. 1970), was impliedly rejected by the Eighth Circuit in the seminal Mosley case–the district court decision that was reversed in Mosley had followed the reasoning of Smith. See Mosley, 497

F.2d at 1332.  Thus, <u>Smith</u>'s finding that common questions of law and fact did not exist in the context of separate discriminatory acts was refuted by <u>Mosley</u> – again, the <u>effects</u> of discriminatory conduct have no bearing upon the <u>commonality</u> of the conduct for purposes of the common question inquiry.  Furthermore, insofar as <u>Smith</u> holds that a common question of law does not exist solely because plaintiffs bring similar factual claims under the same legal theory, Plaintiffs' authorities cited above expressly refute that assertion.

Finally, <u>Dick v. Consolidated Rail Corp.</u>, No. 97-7962, 1998 U.S. Dist. LEXIS 3575 (E.D. Pa. Mar. 24, 1998) (attached as Exh. J to Motion to Sever) is wholly inapposite: the plaintiffs' claims were improperly joined because although they alleged carpel tunnel syndrome and repetitive trauma injuries, they held different positions, worked on different equipment, and worked in different locations.  Likewise, <u>Brown v. Worthington Steel, Inc.</u>, No. C-2-01-1113, 2002 U.S. Dist. LEXIS 20955 (S.D. Ohio Oct. 9, 2002) stands in the same posture: the court denied a motion to amend a complaint to join a new plaintiff because of lack of any specific facts as to the time frame encompassing the claims, the departments occupied by the aggrieved, or the positions occupied by the aggrieved.

In light of the discussion above, plaintiffs simply submit that their authorities, on this record, are more pertinent and compelling than Defendant's inapposite authorities.

### D.    <u>Prejudice and Confusion</u>

Finally, Defendant underestimates the capability of a jury guided appropriately by this Court's instructions.  Defendant assumes that a jury will not be able to keep track of the different allegations and assertions, but the evidence will not be that complex.  Analysis of several cases where the courts severed parties demonstrates the relative lack of complexity.

In <u>Bailey v. Northern Trust Co.</u>, discussed <u>supra</u>, the court found prejudice warranting severance because the case involved five different plaintiffs and five different factual situations regarding *work performance*. 196 F.R.D. at 518. In <u>Henderson v. AT&T Corp.</u>, the court found prejudice because the case involved five different plaintiffs asserting more than twenty disparate claims. 918 F.Supp. at1061. In <u>Randleel v. Pizza Hut of America, Inc.</u>, 182 F.R.D. 542 (N.D. Ill. 1998), the court found a risk of undue prejudice because a joined action involved two groups of African-American plaintiffs and numerous witnesses. <u>Id</u>. at 545. With respect to two plaintiffs in <u>Morris v. Northrop Grumman Corp.</u>, 37 F.Supp.2d 556 (E.D.N.Y. 1999), the court noted a risk of prejudice because one plaintiff suffered an isolated incident of discrimination in 1993 whereas the other suffered prejudice ranging from 1982 to 1994. <u>Id</u>. at 581, 582. In <u>Delce v. Amtrak</u>, 180 F.R.D. 316 (E.D. Tex. 1998), the court ordered separate trials (though discovery was not separate) based on the risk of confusion facing a single jury, especially because the law of different states likely governed the plaintiffs' respective claims. <u>Id</u>. at 320-21. In <u>Grayson</u>, there were eleven plaintiffs who desired to present testimony concerning their claims at one trial. <u>Id</u>. at 791.

By contrast, in the case at bar, there are only four Plaintiffs, and their claims are interrelated. This case is not even close to being as complex as the cases discussed above. The jury will hardly be confused, and appropriate instructions from the Court can resolve any questions or temper any purported confusion that may affect the jury's deliberations. The risk of prejudice arising from confusion in this uncomplicated case does not rise to an appreciable level.

## III.    <u>CONCLUSION</u>

Wherefore, Plaintiffs respectfully submit to this Honorable Court that Defendant Cinergy's Motion to Sever is due to be denied.

Respectfully submitted,

s/Barry V. Frederick_____

Barry V. Frederick (*pro hac vice*)
Robert L. Wiggins, Jr. (*pro hac vice*)
Ann K. Wiggins (*pro hac vice*)
Robert F. Childs, Jr. (*pro hac vice*)
Susan Donahue (*pro hac vice*)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, AL 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500
bvf@wcqp.com
sgd@wcqp.com

Paul H. Tobias, OH Bar No. 0032415
David D. Kammer, OH Bar No. 0061808
**TOBIAS, KRAUS & TORCHIA**
414 Walnut Street
Suite 911
Cincinnati, Oh 45202
Telephone: (513) 241-8137
Facsimile: (513) 241-7863
tkt@tktlaw.com

David Sanford (*pro hac vice*)
**SANFORD, WITTELS, & HEISLER, L.L.P.**
2121 K St. N.W.
Suite 700
Washington, D.C. 20037
Telephone: 202/942-9124
Fax number: 202/628-8189
dsanford@davidsanford.com

Grant Morris (*pro hac vice*)
**Law Offices of Grant Morris**
2121 K Street, N.W.
Suite 700
Washington, D. C. 20037

Telephone: (202) 331-4707
Fax number: (202) 628-8189
grantmorris@grantmorrislaw.com

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to:

Jill Thompson O'Shea, Esq.
Cinergy Services, Inc.
139 East Fourth Street
P.O. Box 960
Cincinnati, OH 45201

Gregory V. Mersol
Baker & hostetler, LLP
3200 National City Center
1900 East Ninth street
Cleveland, OH 44114-3485

<u>s/Barry V. Frederick</u>
Barry V. Frederick (*pro hac vice*)