**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **BILLY BRANTLEY, et al.** | ) | **Case No. 1-01-378** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Susan J. Dlott** |
| | ) | |
| **vs.** | ) | **PLAINTIFFS' CONSOLIDATED** |
| | ) | **MEMORANDUM IN OPPOSITION** |
| **CINERGY CORP,** | ) | **TO DEFENDANTS' MOTIONS** |
| | ) | **FOR SUMMARY JUDGMENT** |
| **Defendant.** | ) | |

---

Barry V. Frederick (*pro hac vice*)
Robert L. Wiggins, Jr. (*pro hac vice*)
Ann K. Wiggins (*pro hac vice*)
Robert F. Childs, Jr. (*pro hac vice*)
Susan Donahue (*pro hac vice*)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, AL 35203

Paul H. Tobias, OH Bar No. 0032415
David D. Kammer, OH Bar No. 0061808
**TOBIAS, KRAUS & TORCHIA**
414 Walnut Street, Suite 911
Cincinnati, Oh 45202

David Sanford (*pro hac vice*)
**SANFORD, WITTELS, & HEISLER, L.L.P.**
2121 K St. N.W., Suite 700
Washington, D.C. 20037

Grant Morris (*pro hac vice*)
**Law Offices of Grant Morris**
2121 K Street, N.W., Suite 700
Washington, D. C. 20037

***Attorneys for the Plaintiffs***

**RULE 7.2(3)**
**TABLE OF CONTENTS**

I    THE RECORD OF EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    Cinergy Is A Proper Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    Plaintiffs' Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1. Anthony Martin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2. Billy Brantley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    3. Todd Tolbert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    4. Rodney Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III    AS AN "EMPLOYER" OF PLAINTIFFS,
       CINERGY IS A PROPER DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV    PLAINTIFFS' CLAIMS ARE TIMELY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V    SUMMARY JUDGMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.    MARTIN'S CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT . . . . . . . . 33

    1.  Martin's Failure-to-Promote Claim Survives Summary Judgment . . . . . . . . . 34

    2.  Martin's Discriminatory Discipline Claim Survives Summary Judgment . . . . . 41

    3.  Martin's Hostile Environment Claim Survives Summary Judgment . . . . . . . . 42

B.    BRANTLEY'S CLAIMS SURVIVE SUMMARY JUDGMENT . . . . . . . . . . . . . . 44

    1.  Brantley's Promotion Claims Survive Summary Judgment . . . . . . . . . . . . . . . 44

    2.  Brantley's Claims of Discriminatory Terms and Conditions of
        Employment Survive Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    3.  Brantley's Claims of a Racially Hostile Work Environment Survive
        Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

C.    TOLBERT'S CLAIMS SURVIVE SUMMARY JUDGMENT . . . . . . . . . . . . . . . 51

    **1. Tolbert's Failure to Promote Race Claims Survives Summary Judgment** . . . . . 51

    **2. Tolbert's Racial Demotion Claim Survives Summary Judgment** . . . . . . . . . . . 54

    **3. Tolbert's Claim of Other Racially-Disparate Discipline Survives Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    **4. Tolbert's Claim of a Racially Hostile Environment Survives Judgment** . . . . . . 56

    **5. Tolbert's Claim of Disability Discrimination Survive Summary Judgment** . . . . 57

**D.**     **JONES' CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT** . . . . . . . . . . . 59

    **1. Jones' Failure-to-Promote Claims Survive Summary Judgment** . . . . . . . . . . . 59

    **2. Jones' Hostile Environment Claim Survives Summary Judgment** . . . . . . . . . . 64

    **3. Jones' Constructive Discharge Claim Survives Summary Judgment** . . . . . . . . 66

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **BILLY BRANTLEY, et al.** | ) | **Case No. 1-01-378** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Susan J. Dlott** |
| | ) | |
| **vs.** | ) | **PLAINTIFFS' CONSOLIDATED** |
| | ) | **MEMORANDUM IN OPPOSITION** |
| **CINERGY CORP,** | ) | **TO DEFENDANTS' MOTIONS** |
| | ) | **FOR SUMMARY JUDGMENT** |
| **Defendant.** | ) | |

In this action, four Plaintiffs sued Defendant Cinergy Corp. ("Cinergy") for employment discrimination. For each Plaintiff, Defendant filed a separate motion for summary judgment and a separate memorandum. To avoid duplication of legal analysis common to all Plaintiffs, they submit this consolidated memorandum in opposition to Defendant's motions, which should be denied for reasons set forth below. In support of Plaintiffs' opposition, they file their Evidentiary Submission in Opposition to Defendants' Motions for Summary Judgment, attached hereto as an Appendix.

## I. THE RECORD EVIDENCE.

**E.     Cinergy Is A Proper Defendant.**

All four Plaintiffs work or worked directly for Cincinnati Gas & Electric Co. (CG&E), which is wholly owned by Defendant. See, e.g., Def.'s Memo./Martin 9. While Defendant asserts that it is a holding company with no employees, id., innumerable official employment documents regarding Plaintiffs are on Cinergy letterhead, including an on-the-job accident report signed by Plaintiffs Brantley and Tolbert, Brantley Dep. Exh. 32; discipline issued to Plaintiff Martin regarding Tolbert's accident, Tolbert Dep. Exh. 42; a letter to Plaintiff Brantley regarding his short-term disability leave, Brantley Exh. A; a multitude of documents regarding Plaintiff Tolbert's weight

1

concerns, including records of his weight at scheduled weigh-ins, which was recorded on documents bearing the "Cinergy" logo, copies of which the company gave Tolbert, Tolbert Decl. Exh. B; Tolbert Dep.123:20-22; and a letter to Plaintiff Jones' regarding his eligibility to participate in testing for a Lineperson C position, Jones Decl. Exh. A.  Indeed, attached to Cinergy's affidavits, offered in support of its motions, are correspondence to Plaintiffs and other CG&E employees on "Cinergy" letterhead.  See, e.g., Ward Aff. Exh. A.

All resumes for job postings could be sent to "resumes@cinergy.com".  Brantley Decl. Exh. C.  Also, Cinergy has only one human resources department and a manager for compliance services. Brantley Dep. 79:4-19; see, e.g., O'Connor Aff. Exh. I.  That information was posted company-wide in a letter dated July 1, 1999 discussing Cinergy's "policy," signed by James E. Rogers, President and Chief Executive Officer of Cinergy.  Brantley Dep. 79:4-13.  A 1998 e-mail to Cinergy's Human Resources employees addressed brainstorming ideas about how Cinergy could promote diversity in employment, and it advised recipients that they needed to be "on the same page" with CEO Rogers.  Brantley Decl. Exh. E.  Finally, regarding the "Workplace Harassment" policy referenced in one of Defendant's proffered affidavits, Cinergy admits it has employees.  O'Connor Aff. ¶ 34 & Exh. L.  It specifically states: "Cinergy expects that all of **its employees** . . . ." (Emphasis added).  See also O'Connor Aff. Exh. N, which refers to "[e]ach Cinergy employee."

As further examples, see various exhibits to Jim O'Conners' affidavit:

(1)  Exhibits A-C –  which are attendance sheets for Cinergy meetings on diversity in employment, attended by Plaintiffs,  O'Connor Aff. 17-18;

(2)  Exhibit G – Cinergy's E-Mail/Voice Mail/Internet Policy "issued to all employees" and which speaks to "Cinergy employees" about Cinergy's systems, property and business, and for

which there is an "Employee's Acknowledgment" form reflecting receipt of the "Cinergy Corp. Employee Handbook"; and

(3) Exhibits H-L, N-Q – which set forth Cinergy employment policies and include three Plaintiffs' signed forms acknowledging their receipt of Cinergy's "Working Environment Policy Manual," which is full of references to Cinergy as the employer, Cinergy's workplace and Cinergy's employees.

## F.    Plaintiffs' Employment.

### 1.    Anthony Martin.

Plaintiff Anthony Martin ("Martin") began working for CG&E in 1985 as a custodian, and he was promoted to a cleaner position in 1986. Martin Dep. 20:12-17; 22:5-7. Martin applied for a mechanic position in the late 1980s when he was a cleaner, but his application was denied for alleged "attendance" problems, although Martin says the attendance write-ups were minor. Id. 176:24-177:2. In 1989, Martin obtained a promotion to a construction helper position. Id. 48:6-15. During Martin's employment as a custodian or cleaner, his supervisor, Bob Fink, suspected him of drinking and took him to a downtown facility for alcohol testing. The results were negative, and Martin testified that Fink did not suspect white employees of drinking. Fink's test of Martin occurred before CG&E's use of random drug testing. Id. 24:9-25:4.

Martin earned a promotion to a Groundperson Driver A position in 1991. Id. 50:13-21. While employed as a Groundperson, Martin has been subjected to racial harassment. At the outset, Martin was constantly yelled and cussed at by white employees for not being proficient at his job, although he received training as to his duties for only one week. This harassment occurred for several months. Id. 93:7-98:17; Pl. Martin's Resp. to Def.'s 2nd Set of Interr. # 1.

3

During the same time period, Rick Cutsinger, a white co-worker, told Martin that he would "kick [his] black ass" if he went into a building earlier than he was supposed to, and that if his [Cutsinger's] daughter brought home a black man, he would disown her. Martin complained to his supervisor, John Huwel, about the first statement, and Huwel instructed Cutsinger not to talk that way again. Martin did not complain about the second statement. Martin Dep. 70:20-73:8. In addition, in the early 1990s Martin heard that some employees referred to certain equipment as "nigger toes." Id. 91:2-6.

In 1997 or 1998, Martin suffered disparaging remarks from white employees during diversity training. Martin was the only African-American at the meeting, and white attendees referred to black employees as "them people," "these people," "we wasn't raised like them," and "those people, we're not used to working with those people, they didn't grow up the way we did." Id. 162:9-13; 164:20-167:24. Martin did not complain to anyone about the statements. Id. 168:10-13. More recently, in approximately September 2002, someone discarded banana peels in Martin's CG&E truck. Martin testified he did not complain because he did not believe anything would be done about it. Id. 74:17-75:2; 82:12-18.

Martin also received disparate treatment and harassment from his supervisors. On one occasion, Dan Morris, Martin's supervisor (who is white), refused to pay for Martin's lunch when Martin's other crew members, all white, were treated to a meal for reporting a safety violation by sub-contractors. Id. 243:4-17. In addition, when Martin complained about a dearth of opportunities to work overtime, Morris informed him that he had telephoned him to work overtime, but Martin denies ever receiving the calls and brought in his caller id display to demonstrate to Morris that he had not received any calls. Id. 255:12-256:21.

4

Martin suffered disparate discipline vis-a-vis other white employees for similar actions. In late 1998, when Todd Tolbert suffered an injury at a jobsite, Martin was disciplined for the incident although he had simply followed the orders of his supervisor and was in the process of leaving the scene. Id. 212:12-20; see also Ward Aff. ¶ 6 & Exh. B. Dave Ward, Danny Morris and other company officials were responsible for the discipline meted out for the incident. Martin Dep. 383:10-17; Ward Aff. Exh. B. At a subsequent union grievance hearing, the company believed that Martin's discipline was appropriate and denied his grievance, yet it offered to reduce Martin's discipline to an oral warning without offering to later remove documentation of the warning from Martin's file. Ward Aff. Exh. C. Martin did not sign the company's offer. Id.

Contrastingly, Morris disciplined the white supervisor who instructed Martin to leave the jobsite, Eric Sicby, with only a record of counseling that was "to be removed from the employeesfile [sic] in 6 months from The [sic] above date if no further incident of this nature takes place." Ward Aff. Exh. D. More glaringly, several other white employees were initially given written discipline, as Martin was, for being present at a jobsite where an employee was injured, but at subsequent grievance meetings for the white employees, one individual's disciplinary letter was removed from his file with his acceptance of the coaching and counseling given to him at the accident site, and the coaching and counseling documentation was due to be removed three months after the date of the documentation, barring any further violations of safety rules. Ward Aff. Exhs. F & G. Likewise, the two other white employees' disciplinary letters were removed from their files and oral warnings were issued instead, which were due to be removed from their files three months from the date of the oral warnings, barring any further safety violations. Ward Aff. Exhs. H - K.

In addition, Martin disputes a September 1998 vehicle accident report lodged by the

5

company against him.  The report stated that Martin struck and dragged a boulder with his company truck and sustained extensive damage to the vehicle, yet Martin claims that the "boulder" was actually a rock, and the vehicle did not reveal extensive damage upon his inspection.  Martin believes that supervisor Morris was involved in lodging the accident report.  Martin Dep. 226:18-235:15.

As a Groundperson, Martin served on work crews with Linepersons, observe them performing their tasks, and assists them with their duties.  Id. 125:13-16.  He sought promotions to Lineperson C vacancies.  Id. 126:8.  In 1995, Martin applied for a Lineperson C vacancy, and after taking the qualifying climbing test, he was informed by a safety supervisor, Lynn Dunn, that he could not climb well and, thus, would not receive a promotion.  Martin agreed with Dunn's assessment and endeavored to improve his climbing skills by practicing during his free time.  Id. 123:1-13; 171:19-21.

Martin reapplied for vacant Lineperson C positions in 1997.  Martin initially passed the written test for the position.  Id. 127:2-7.  However, Martin allegedly did not pass the field assessment test for the position because he "earned a 'below average score'" and at least 35 other candidates scored higher than him.  Perkins Aff. ¶ 7.  Martin denies that he performed improperly on the field assessment test, particularly as noted on his score sheet.  Martin Dep. 127:16-134:1; see also Martin Decl. Exh. A.  Furthermore, white employee Gary Nasto received a Lineperson C position, although he arrived for the climbing test not wearing any shirt and was asked by a tester, Mike Markesbery, whether he could lose weight due to his excess poundage.  Martin Dep. 263:10-269:4; 348:12-349:1.

Martin applied for more Lineperson C vacancies in August 1998; he complained to

6

supervisor Al Perkins about not being considered for one of the vacancies. Id. 153:10-155:7. Initially, Perkins stated that Martin's alleged poor performance on his August 1997 candidacy, Martin's discipline for the Tolbert accident, and spelling errors on Martin's resume contributed to the failure to test him for a vacancy in 1998. Perkins Aff. ¶¶ 12-13; Pl. Martin's Resp. to Def's 2nd Set of Interr.; Martin Dep. 336:22-337:16. Upon discovering the errors in the resume were due to problems with the company's facsimile transmission, it allowed Martin to apply for Lineperson C positions vacant in December 1995. Martin Dep. 154:7-155:18; Perkins Aff. ¶¶ 14-15.

Martin applied for, but was denied the vacant positions. The company alleges that Martin scored a 60 on his field assessment test, that he automatically failed "as a result of failing the Working at Heights Exercise," and that 14 candidates who were not hired scored higher than Martin. Reinhard Supp. Aff. ¶¶ 17-21. Martin complained to Dave Ward and General Manager Jim Stanley about faulty scoring on his field assessment test, but they did not do anything in response. Martin Dep. 82:19-83:12. Martin testified that white Groundpersons with less seniority than him received promotions to Lineperson C vacancies, id. 237:9-13, and that he knew more about the company and line work. Id. 178:22-82:23. Martin instructed some of the successful Lineperson candidates how to perform certain tasks after they obtained their promotions, and he also instructed them constantly as to safety and efficiency concerns. Id. 333:22-334:22; Pl. Martin's Resp. to Def.'s 2nd Set of Interr. #2. In addition, Martin witnessed two white supervisors, Dan Morris and Mark Markesbury, giving white individuals opportunities to train for the field assessment tests and assisting them with their training. Id. 340:10-346:23; Pl. Martin's Resp. to Def.'s 2nd Set of Interr. #3.

In June 1999, the company made an offer to Martin acknowledging that it would retest him on the Working at Heights exercise for a Lineperson C position, provided he withdraw his union

grievances and that his retest would constitute his last attempt to enter the Lineperson C Apprentice Program. Martin refused to sign the offer and was denied an opportunity to reapply ever again for Lineperson C vacancies. Martin Dep. 353:14-354:19; Pl. Martin's Resp. to Def.'s 2nd Set of Interr. Martin is aware of a white employee, Rod Carter, who took the Lineperson A test three times before he passed and obtained a promotion. Martin Dep. 110:17-111:13. In addition, Martin is aware that Bill Wilson, a white employee, turned over a bucket truck and was nonetheless subsequently promoted. Id. 206:7:11.

Martin filed a charge of discrimination with the EEOC in January 1999. Martin subsequently filed another charge of discrimination in April 2000, and an amended charge of discrimination in August 2000.

## 2. **Billy Brantley.**

Plaintiff Billy Brantley ("Brantley"), an African-American, was hired as a Groundperson for CG&E in 1987. Brantley Dep. 13:21; 20:11-15.[1] In January of 1989, Brantley was promoted to Lineperson C. Brantley Dep. 83:10-13. He was promoted to Lineperson B in 1990, Lineperson A in April 1992, Brantley Dep. 106:15-19, and Senior Lineperson in July 1994.[2] Brantley Dep. 108:23-24. Afer he was denied promotions to various supervisory positions and complained about discrimination, Brantley was selected for a field supervisor position in June 2002. It is the position he currently occupies. Brantley Dep. 111:9-11.

In 1987, while Brantley was serving as a Groundperson, Brantley's white supervisor required

---

[1]Billy Brantley's deposition testimony is reported in two volumes, necessitating citation to the volume before the page citation.

[2]Brantley testified that the role of a Senior Lineperson is one of leadership. Brantley Dep. 303:18-19.

8

him to dig holes to get overtime work. Brantley Dep. 58:102. White employees were not given any prerequisite for overtime work. Brantley Dep. 58:23-24; 60:8-18. Danny Morris was Brantley's supervisor while Brantley was a Groundperson. Brantley Dep. 29:1-5.

During Brantley's service in 1990-92 as a Lineperson B, his white supervisors, including Roger Reiss, denied him opportunities to gain experience in bucket truck work. Brantley Dep. 92:6-11; 101:9-15. In order to gain skills essential to being promoted to Lineperson A, an employee had to perform bucket truck work. Brantley Dep. 99:1-5. At Cinergy, this work was typically given only to white employees. Brantley Dep. 101:9-12.

As a Senior Lineperson, in 1995-1996, Brantley was denied, by white supervisor Bill Gatto and others, the opportunity to serve on one of Cinergy's corporate committees. Brantley Dep. 132:4011. Gatto told Brantley that the union decided who would serve on committees, however Brantley later learned from co-employee Craig Helsinger that this was not true, id., that supervisors decided who were on the committees, and that Helsinger was aware of the selection process because he served on one of the overtime committees. Brantley Dep. 132:17-24. Committee positions were given to white employees, including Craig Helsinger and Ron Ayers. Brantley Dep. 135:2-9. This was a material action because in 1999, when Brantley was denied promotions to positions of Field Supervisor and Temporary Training Crew Lead, he was told by Lou Frith and David Ward that demonstration of leadership and service on company committees were essential elements considered in such promotions. Brantley Dep. 300:3-9; 303:22-23; 340:10-16.

In the late 1990's Brantley requested permission from Bill Gatto and Danny Morris, both white supervisors, to participate in company-wide computer training classes. Brantley, however, was denied this opportunity. Brantley Dep. 87-88:17-5. Brantley was told that he was not qualified

to take the classes because he was a Lineperson. Brantley Dep. 88:22 - 89:17. Ronnie Ayers, a white employee and also a Lineperson, was permitted to participate in the computer training classes. Brantley Dep. 89:21-23. This action was material because when Brantley was later denied promotions to Temporary Training Crew Lead Supervisor, Lou Frith told him that computer training was an essential element for promotion into supervisory positions. Brantley Dep. 304:23. Frith further told Brantley that he would have to take the necessary computer classes on his own time in order to fulfill the requirement. Brantley Dep. 304:23-24.

In 1997, Brantley was denied a promotion to Temporary Training Crew Lead Supervisor. Brantley Dep. 138:19-20. Brantley was not told why he did not receive the position or what the necessary qualifications were to fill the position. Brantley Dep. 139:20-22. He inferred that he did not receive the position based on his lack of seniority because the employees selected were more senior than Brantley. Id.

In 1998, supervisory positions of Temporary Training Lead Crew were not posted. Brantley spoke with white supervisors, Kenny Auchberger and Neil Schnecker, about qualification for the positions, but neither would give him a substantive answer regarding same. Brantley Dep. 140:12-21; 141:1-13. Brantley did not receive either position and was never told why he was not considered. Brantley Dep. 143:13-22. The positions were awarded to Greg Stitt and Paul Schulte, both less senior white employees.

In approximately 1998-99 the Field Supervisor position in the Electrical Trouble Department was not posted. Brantley Dep. 226:17-24. The position went to Bill Wilson, a white co-employee. Brantley Dep. 226:3-9. Brantley learned second-hand from co-employee Newton Wright that supervisor Jean Barber informed Wilson of the opening. Brantley Dep. 228:14-17. When Wilson

10

was promoted, Brantley had not seen any job postings for Field Supervisor either in the workplace or on Cinergy's job posting page located on its website. Brantley Dep. 227:8-17.

In 1999, Brantley applied for, but was denied a promotion to Joint Trench Supervisor. Brantley submitted his application online but did not receive an interview or any feedback regarding his application for the position. Brantley Dep. 345:4-18. Brantley spoke with Cliff Zorb regarding his application, but he does not recall any response from Zorb. Brantley Dep. 347:2-10.

Also in 1999, Brantley was denied a promotion to Temporary Training Crew Lead Supervisor. Brantley was not interviewed for the position. Brantley Dep. 296:11-12. The position was given to Mike Weiss, a white employee withy less seniority and who lacked the experience as a Lineman A of three years, a prerequisite set by the company.[3] Brantley Dep. 296:21-297:2; Brantley Decl. Exh. F. Brantley had been told by Lou Frith that he would make a good lead person and to keep trying for the position. Brantley Dep. 299:18-19. Brantley was not given specific reasons as to why he was denied the promotion, but Lou Frith and later Dave Ward indicated that he lacked leadership skills and that he needed computer training courses. Brantley Dep. 300:3-9; 303:22-23; 304:23; 340:10-16. Brantley testified that no one had even inquired into what his computer skills were. Brantley Dep. 305:6-12.

In September 1999, Brantley was denied a promotion to Field Supervisor. Brantley was interviewed for the position by Dave Ward, Tony Plats, and Kenny Auchberger. Brantley Dep. 335:24. The interview process was Cinergy's "Target Selection Process." Brantley Dep. 336:2-6.

---

[3]In Defendant's answer to Plaintiffs' first interrogatories, it did not even list Mike Weiss as a qualified candidate for the position. Defendant only stated that Brantley was not selected to undergo the Temporary Training Lead Person Simulation Assessment. Deft.'s Resp. to Plfs.' First Interrogs. 4[15-31].

As evidenced by the format of the process, it is a purely subjective – supervisors score the interviewee based on their views about the adequacy of the employee's responses. Brantley Decl. Exh. G at 2. The position was awarded to Brian York, a less senior white employee who, according to Brantley, was completely devoid of experience in the department. Brantley Dep. 356:10-14. Further, Brantley testified that Cinergy had to spend the entire next year training York for the position. Brantley Dep. 356:12-14.

In 2000, the position of Joint Trench Supervisor was not posted. Brantley Dep. 230:1-4, 16-19. Brantley learned, second-hand, that white supervisor Cliff Zorb informed white employees Jim Hornsby and William Duffy about the opening and told them to apply. Brantley Dep. 231:5-8. Brantley does not know who filled the positions. Brantley Dep. 231:24.

Also in 2000, Brantley applied for a Field Supervisor position but was not even interviewed for it. Brantley Dep. 350:3. Defendant alleges that they never received an application from Brantley regarding the position. See, e.g., Defendant's Memo./Brantley 4. Brantley submitted his resume, Brantley Dep. 349:6-12; defendant simply states it has "no record" of it. Toebbe Aff. ¶ 4. The position was awarded to Doug Jackson, a white employee. Brantley Dep. 157:15-16, 162:5-6, 163:24-164:1.

In addition to denied training and denied promotions, Brantley suffered from a racially hostile work environment. The list of racially offensive comments and/or depictions is lengthy. First, sometime between 1990 and 1994, Don Kramer, a white supervisor, made a comment to Mike Brooks and Todd Tolbert about the way African-Americans act, which was offensive to both Brooks and Tolbert as well as to Brantley. Brantley Dep. 44:2-19.

In the fall of 1998, Danny Morris, a white supervisor, made a comment to Newton Wright

that he knew that something was going to happen to "them;" "them" was intended to mean Brantley's entirely African-American crew. Brantley Dep. 46:18-47: 17. The reference was to Todd Tolbert's accident. Brantley Dep. 46:24. Prior to Roger Reiss (a white employee) being promoted to supervisor, he referred to Larry Thompson as a "nigger." Brantley Dep. 48:21-23; 49:1-2. This was offensive to Brantley and occurred sometime between 1995 and 1999. Brantley Dep. 49:19. It has been reported to Brantley within the last five years by Leroy Brown that the word "nigger" was written on employee lockers. Brantley Dep. 51:20; 52:8-9.

In 1999, Kenny Willis reported to Brantley that the atmosphere at the company's M&R station was racially intimidating because of the language used and the pictures that were present. Brantley Dep. 260:12-13; 262:15-16. In the fall of 2001, Carol Hendricks reported to Brantley that there were depictions of nooses at the company power plant where she worked. Brantley Dep. 53:6-10; 257:11-12. Last, Charles Alexander, a supervisor at the M& R station, reported to Brantley that he had seen pictures of targets and "KKK" written on them. Brantley Dep. 54:14-24; 55:22-24.

One African-American employee, Bruce Headen, represented to Brantley that he was scared and intimidated because his predominantly white work crew frequently called him names and ridiculed him. Brantley Dep. 221:12-17. The crew was all white except for Headen and B. Allen, who supported Headen's account. Brantley Dep. 222:13-24. Brantley viewed all of these incidents as racially offensive and hostile. Brantley Dep. 42:22-43:2; 46:1-5; 48:15-20; 51:6-12: 52:22-53:3; 53:14-18.

Brantley testified that co-employees were reporting discriminatory conduct to their supervisors. For instance, Carol Hendrick reported nooses at the power plant to her supervisor, but Brantley did not know if anything was done about the situation. Brantley Dep. 54:8-11. Brantley

13

testified that Rodney Jones approached human resources representative Suzanne Bradley (responsible for minority relations) about the hiring of African-Americans. Brantley Dep. 206:7-12. Ms. Bradley reported to Jones that there was nothing she could do about the situation. Id. Often times, incidents were not reported to anyone because the racially hostile work environment discouraged such reporting. Brantley knew that there were people to report incidents to, but he felt that reporting them would be a futile effort and nothing would be done in response to his concerns. Brantley Dep. 74:13-23.

### 3.    Todd Tolbert.

Plaintiff Todd Tolbert ("Tolbert") is an African-American hired by CG&E as a Groundperson on August 13, 1990. Tolbert Dep. 19:18. Tolbert was promoted to Lineperson C on December 9, 1991, Tolbert Dep. 21:13-16; Lineperson B in 1993, Lineperson A in 1995, Tolbert Dep. 88:24-89:2; and his current position of Senior Lineperson A in 2002, Tolbert Dep. 334:10.

During Tolbert's service as a Groundperson, he was subject to disparate working conditions. Tolbert was delayed in being promoted to Lineperson C for six months because Supervisor Lloyd Balzheir alleged that Tolbert was not proficient in the use of company equipment, including driving company vehicles.[4] Tolbert Dep. 25:6. However, a white employee had been involved in an incident while driving a company vehicle but was promoted to Lineperson C ahead of Tolbert. Tolbert Dep. 33:12-14.

Also during the time Tolbert was serving as a Groundperson, he was denied the opportunity to continue working on Lou Frith's truck. Tolbert Dep. 56:20-57:7. Frith requested that Tolbert not

---

[4]This claim is time-barred; however, it is being offered as background information to support Tolbert's discrimination claim. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

be put back on his truck, which hindered Tolbert in developing necessary skills associated with Lineperson positions.  Tolbert Dep. 56:20-24.  Tolbert had also experienced disparate treatment from white supervisors, Danny Morris and Tim Hodges, who sent Tolbert and an African-American co-employee to pick up trash during training sessions with white Groundperson employees.  Tolbert Dep. 72:8-12; 73:6-9.

Tolbert experienced disparate treatment from supervisor, Donald Kramer, during his employment as a Lineperson B.  On one occasion, Kramer told Tolbert and African-American co-worker Mike Brooks that they were not allowed to talk anymore while they were working.  Tolbert Dep. 90:8-16.  Kramer would not speak directly to Tolbert and African-American co-workers; Kramer had other employees instruct African-American employees on their tasks for the day.  Tolbert Dep. 104:8-10.  Kramer also gave Tolbert lower evaluations and made negative comments about Tolbert based on what other employees had reported to Kramer.  Tolbert Dep. 105:14-19.  Prior to working with Kramer, Tolbert's evaluations had been average in all areas, but Kramer consistently gave Tolbert below average marks on his evaluations.  Tolbert Dep. 105:22-106:4.

In August, 1998, after Tolbert was involved in an electrical control accident, he received unfair treatment from supervisor Scott Morris.  Tolbert Dep. 82:19-83:5.  Morris took the accident report to Tolbert for his review, but Tolbert was at home at the time, suffering from electrocution and under the influence of heavy pain medication.  The report was inaccurate as to the occurrence of the events and what the witnesses had said, but Tolbert could not determine that given his condition.  Tolbert Dep. 82:22-83:5.

During Tolbert's service as a Lineperson A, he and other African-American employees were not allowed a one week training session on the responsibilities and duties of Field Supervisor.

15

Tolbert Dep. 115:22-116:2.  Tolbert testified that this opportunity never came to his district but that he knew of other districts where such training had taken place.  Tolbert Dep. 116:4-23.  White employees Eric Sibey, Craig Helsinger, Eric Rosser, and Ted Tedeschi were all provided with this training opportunity at other districts.  Tolbert Dep. 118:13-16.  Between 2000 and 2001, Tolbert requested such training, but his requests were denied.  Tolbert Dep. 118:6-9.

Tolbert was subject to disparate treatment on the basis of his race as well as his disability. Tolbert Dep. 275:20-24.  Tolbert was subjected to regularly-scheduled weight checks, but overweight white employees were not.  Specifically, Tolbert viewed Paul Dennis, Gary Nasto and Eric Sibey to be similarly overweight, and they were not placed on a weighting schedule.  Tolbert Dep. 262:23-263:3.  Also, when Gary Nasto was hired, the company asked him what his weight was and  brought in an exercise bike to help him lose his excess weight.  Tolbert Dep. 129:19-135:5. Tolbert was not provided the same treatment.  Additionally, once Nasto reached the desired weight, the company never weighed him again, which was not the case with Tolbert because he was weighed regularly.  Tolbert Dep. 131:4-17.  Tolbert testified that Nasto is still overweight.  Tolbert Dep. 369:19-24.  Tolbert was the only person being singled out and harassed about his weight issues when supervisors had discretion to weigh whomever they thought was overweight.  Tolbert Dep. 262:16-22.

Tolbert was further subjected to disparate treatment, in that he was the only employee who was docked pay for leaving early for a doctor's appointment.  Tolbert Dep. 359:4-6.  Tolbert was docked pay in May of 2000, but he personally witnessed white employees coming in late and leaving early without suffering any dock in pay.  Tolbert Dep. 359:8-10.  Specifically, Danny Haller was almost two hours late to work; Mr. Backscheider was an hour and a half late to work; Steve Whitley

16

left early from work; and Terry Hardin left early.  Tolbert Dep. 359:15-361:6.  See also Tolbert Dep. Exh. 85.

Tolbert was denied a promotion to Temporary Training Crew Lead Supervisor in 1999. Tolbert Dep. 351:5-7.  Tolbert testified that he was told by white supervisor Glen Neidlinger that his request for the position was denied because of his weight problems.  Tolbert Dep. 352:3-5.  The company, however promoted white employee Eric Sicby to Field Supervisor despite the fact that Sicby was overweight.  Tolbert Dep. 393.

Also in 1999, Tolbert was denied a promotion to Field Supervisor.  Ward Aff. ¶¶ 22-26.  The vacancies were awarded to four white employees,   Ward Aff. ¶ 29, supposedly because of unfavorable evaluations of two supervisors – Glenn Neidlinger and Cliff Zorb.  Ward Aff. ¶ 26. Cinergy's answers to Plaintiffs' interrogatories, however, state that Tolbert was evaluated by Neidlinger, not Zorb, who was described as having evaluated Brantley, not Tolbert.  Plfs' Interrog. 4 on page 11, 3rd para. under "Posting For Temporary Training Crew Lead Closed 5/7/99."

Tolbert was demoted in February 2000 from Lineperson A to Groundperson.  The reason given was his weight.  Tolbert Dep. 231:3-8.  White employees that were not subject to such adverse employment actions.  Tolbert Dep. 392:7-9.  Specifically, Eric Sibey was an overweight Lineperson, but Sibey was recently promoted, not demoted.  Tolbert Dep. 125:20-21; 393:24.  The company made special accommodations for white overweight employees such as Mike McCurie, who was permitted to continue working in other capacities in his department and was not demoted like Tolbert.  Tolbert Dep. 365:13-15.

In 2000, Tolbert was supposed to have been restricted to only scheduled overtime as part of his discipline for his weight problem, although he nonetheless worked some unscheduled overtime.

17

Tolbert Dep. 381:12-17.   Tolbert knew of no other employee who was restricted from working unscheduled overtime because of their weight.   Tolbert Dep. 221:9-12.

In addition to the discrimination described above, Tolbert was otherwise continually subjected to a racially hostile work environment.   Tolbert Dep. 42:15.   Specifically, sometime between 1990 and 1991, Lloyd Balzhiser (Tolbert's white supervisor) called Tolbert "boy."   Tolbert Dep. 31:13-16.   Balzhiser also treated Tolbert and an African-American co-employee differently and withy less respect than white employees.   Tolbert Dep. 31:21-24.   Next, co-employee Richard Bennett stated to a group of African-American employees that he wanted to take "diversity days" on James Earl Ray day.   Tolbert Dep. 42:21-43:6.   In 1993, an African-American employee named Fletch informed Tolbert that Ronald Perry, a white employee, had called Fletch a "nigger."   Tolbert Dep.303:20-23.

Throughout Tolbert's employment, white employees, including Richard Bennett, have made racist comments in Tolbert's presence.   These comments include racist comments about O. J. Simpson's trial and the 2001 riots in Cincinnati.  Tolbert Dep. 44:14-15.   Comments were also made about how all "gang-bangers" should be let out of prison and sent to find Osama Bin Laden after September 11, 2001. Tolbert Dep. 45:15-46:2. Tolbert has witnessed confederate flags on employee lockers, hard hats, personal vehicles, and in common work areas.   Tolbert Dep. 94:24-95:3; 95-97.  African-American employees were labeled stupid, ignorant, and dumb by co-employees.   Tolbert Dep. 309:3-14.   Tolbert testified that throughout his employment, African-Americans have been treated differently, with less respect, and generally talked down to by other employees and supervisors.   Tolbert Dep. 42:15; 70:19-22; 269-71; 289-91.

Tolbert testified that he did not report such incidents because it would be useless.   Tolbert

18

felt that the general attitude of supervisors was anti-minority, and it was pointless to report racial discrimination. Tolbert Dep. 36:12-16; 52:12-16. For example, Tolbert testified that Fletch reported being called a "nigger" to his supervisor Gerry Seiters, but the supervisor only told both employees involved that if the employees did not leave the area he would have to fire them both. Tolbert Dep. 305:8-12.

Regarding Tolbert's claim of disability discrimination, Tolbert's obesity was associated with a sleep disorder – sleep apnea. Tolbert Dep. 236:15-18. Tolbert's obesity has substantially limited his ability to participate in a variety of physical activities including climbing stairs and hills, and has even precluded him from performing simple household chores due to the strain on his body. Tolbert Decl. ¶ 2. Cinergy recognized that Tolbert's weight substantially limited him in his ability to work, as evidenced by its prohibiting him from working on single bucket trucks and ladders. Tolbert Dep. Exh. 16. Because Tolbert's obesity was unresponsive to the ordinary treatment of diet and exercise, and because his weight posed serious threats to his long-term health, Tolbert was recently forced to undergo gastric bypass surgery. Tolbert Decl. ¶ 3. This major surgery was performed in an effort to combat his obesity and to improve his quality of life by benefitting his long-term physical health. Id.

**4.    Rodney Jones.**

Rodney V. Jones ("Jones") is an African-American who began working for CG&E as an assistant building cleaner on December 11, 1989, when he was 26 years old. Jones Dep. 5:11-12; 13:5-7. He transferred to the position of Materials Assistant C in April 1990. Jones Dep. 14:1-6. Jones was promoted to Materials Specialist b in October1990, id. 29:18-21; 31:1-5, and to Materials Specialist A in October 1991. Id. 33:10-13. While he was a Materials Specialist , Jones never

19

received any disciplinary actions.  Id. 31:24-32:2; 35:9-11; 40:3-5.

As a result of downsizing in the Materials Management department, effective September 1, 1997, Jones was moved into a Manual Technician position in the Overhead department at the Fairfield office.  Id. 42:19-43:5; 44:6-9; 45:2-6.  When Jones accepted the position, supervisors told him the job was a "dead-end" job and lower paying, but that it was still a job with the company.  Id. 93:19-22; 95:7-12.   Jones was further told that the company was not hiring anyone else into the Manual Technician position, but the company was not going to eliminate the position.  Id. 94:14-20; 95:2-6.  Supervisors told Jones that there was no way to progress in the job, get raises or get assigned more duties.  Id. 95:9-12.

Based on his performance evaluations, Jones understood that Cinergy regarded him as an outstanding employee.  Id. 234:11-15.  For these reasons and because he was familiar with the job duties of a lineperson, Jones began applying for the Lineperson C position in August 1997.  Id. 98:3-6, 100:1-6.  Between August 1997 and Jones' resignation on July 31, 2001, he applied for the Lineperson C position at least seven times, and each time he was denied the position.  Id. 157:24-158:3; 225:1-9; 240:20-241:10.  Jones had to work, as he states:

> year after year and knowing that I'm capable of doing the job and seeing people come in off the streets with less–less experience and training them–them to do the job and then sometime–sometime the supervisor asked me to tag along with this individual and watch over him and make sure he don't get into any kind of trouble or do anything wrong.

Id. 223:20-224:2.  Jones suffered  frustration, depression and stress due to the humiliation of applying for the Lineperson C position so many times to no avail.  Id. 169:15-24.  It has been emotionally damaging for Jones to be denied promotions to positions for which required to train

20

white employees who were hired from outside the company and who were less qualified and less experienced in the operation. Id. 223:17-224:9. Jones suffered humiliation in front of numerous co-workers who told him that they could not believe that he had not been given the Lineperson C position. Id. 203:16-206:3. Jones also suffered humiliation in front of his friends and his family, including his two sons, as a result of not being promoted out of his "dead-end" job" when white applicants with less experience were being hired for the jobs Jones sought. Id. 240:20-241:15. Jones' resignation was a direct result of the toll on his mental and physical health because, after repeatedly applying for a position for which he was qualified, he was not promoted while less qualified white applicants were given the position. Id.169:13-24.

Specifically, Jones applied for the position of Lineperson C on the following occasions and was denied a promotion every time:

(1) August 1997–Job Posting 97-223 (Reinhard Supp. Aff.¶ ¶ 13-14; Jones Dep. 109:9-110:15);

(2) August 1998–Job Posting 98-196 (Reinhard Supp. Aff. ¶ ¶ 15-16; Jones Dep. 79:5-11; 127:3-9);

(3) February 1999–Job Posting 98-404 (Reinhard Supp. Aff. ¶ ¶ 17-19 & Exh. A; Jones Dep. 130:8-10);

(4) April 1999–Job Posting 99-115 (Reinhard Supp. Aff. ¶ ¶ 22-24 & Exh. B; Jones Dep. 135:15-17);

(5) August 1999–Job Posting 99-250 (Reinhard Supp. Aff. ¶ ¶ 25-27 & Exh. C);

(6) January 2000–Job Posting 99-494 (Reinhard Supp. Aff. ¶ ¶ 28-30 & Exh. D); and

(7) April 2000–Job Posting 00-83 (Reinhard Supp. Aff. ¶ ¶ 31-33 & Exh. E; Jones Dep.

21

151:4-10).

Jones was qualified for the Lineperson C position. The job duties of a manual tech, the position he held, and Lineperson C were similar. Id. 216:13-19. Both jobs require putting down guy lines, operating the boom truck in a high voltage area, setting poles, and helping to string wire. Id. Furthermore, Jones was asked to do Lineperson C duties on occasion. Id. 217:8-218:4. For example, he operated the boom truck during outages in emergency situations and connected street lights. Id. Jones also helped connect and disconnect wires to the houses, id., and he put guy lines down around 60-100 times. Id. 218:8-13. This was done in the ordinary course of business. Id. 218:14-16. He operated the boom truck in high voltage areas about 15-20 times during the ordinary course of business. Id. 218:21-24. In non-emergency situations, he set poles 50-60 times, id. 219:1-4, strung wire about 60-70 times, and connected and disconnected wires to houses about 15-20 times. Id. 219:5-12. In emergency situations, Jones has connected and disconnected wires about 5 times. Id. 219:13-15.

On one occasion, Jones was asked by his white supervisor, Ron Stewart, to watch over Lineperson Ron Brownstead, a co-worker who is white. Id. 84:22-85:21. Stewart asked Jones to make sure that Brownstead did not do anything wrong or dangerous. Id. 85:10-14. Jones and Brownstead began putting down guy lines, which was not part of Jones' job description. Id. 87:7-10. Once Jones got his guy line down, he was asked by Stewart to go and finish Brownstead's down guy. Id. 87:12-15. Brownstead had been hired in over Jones when Jones applied for the Lineperson C position. Id. 87:20-21. Brownstead was hired off the street and therefore had less experience on the job than Jones and was less qualified for the job than Jones. Id. 87:21-88:1.

On his last attempt to secure the Lineperson C position, Jones was told by Bob Atkins, a

white supervisor who was one of the interviewers on Jones' assessment for the first two days of the three-day process, that Atkins thought Jones had gotten the job. <u>Id</u>. 144:14-145:5. Atkins told Jones that his scores had improved in the assessment. <u>Id</u>. To Atkins' dismay, Jones was not given the job. <u>Id</u>. After Jones' final attempt to secure the Lineperson C position, Atkins stated to Jones that he could not believe Jones had stuck around as long as he had. <u>Id</u>. 200:6-201:4. Atkins was Jones' immediate supervisor at the time. <u>Id</u>.

Jones knew of white individuals hired into the company off the street who were less qualified for the Lineperson C positions Jones sought. <u>Id</u>. 88:8-12. Jones was as qualified or more qualified for the position than Ron Brownstead, Danny Morris, Jr., Bernadette Reinhard's husband (whose name Jones does not recall), Scott Chipman, Barry Doll, Paul Ferrara, Greg Halloran, and Ralph Hetterick, all of whom are white. <u>Id</u>. 88:2-7; 90:1-4; 90:19-91:1; 163:6-164:22; 165:2-9; 165:20-166:1; 1662-3; 166:4-5. An external hire with no electric linework experience is less qualified than Jones for the Lineperson C position. <u>Id</u>.164:19-22.

On several occasions, Jones asked supervisors why he was not successful in his attempts to secure a Lineperson C position. Jones knows that his score was negative on the field assessment for his August 1997 application for Lineperson C position. <u>Id</u>. 116:3-6. After his third or fourth attempt, Jones called Bernadette Reinhard to inquire what he was doing incorrectly. <u>Id</u>. 116:18-20 She told him that he had done well in his field assessment but that the interview process was lacking. <u>Id</u>. 116:20-23 Even though Jones asked for the information, Reinhard did not give him any details about how his interview process was lacking or how he could improve his skills. <u>Id</u>. 116:20-117:4. Reinhard would notify Jones when he had not gotten the positions. <u>Id</u>.118:6-8. Reinhard has told Jones that the supervisors who conduct the assessment of candidates talley the scores on the tests

and discuss the candidates when evaluating them. Id. 201:24-202:11. Jones asked Reinhard to see the results of the test, but she replied that those documents were not allowed to distributed because they were part of the legal process. Id.119:21-120:6. Jones thought Reinhard's comments were not forthcoming enough. Id.134:3-5. He believes that Reinhart was not completely respectful of him when he made these inquiries. Id. 133:18-134:2. Other African-Americans who have applied for jobs have stated to Jones that Reinhard had a "nasty attitude." Id. at 134:8-12.

Sometime between 1998 and 2000, Jones contacted Suzanne Bradley, a Human Resources representative, about the lack of minorities being hired into the company. Id.172:10-14. Bradley stated that she would check into the matter. Id. Around this time, Jones also inquired with Bradley about his applications for Lineperson C positions. Id. 172:15-18. Jones told Bradley that he was an African-American, an internal employee trying to be promoted, and that he felt he was being overlooked in favor of external white applicants who were less qualified. Id. 172:23-173:3. Jones alerted Bradley to the fact that there were very few minority persons being hired into the department. Id. Bradley told Jones that she would look into the situation, but a couple of weeks later all she said was that more minorities needed to apply. Id. 173:8-14. Bradley did not have anything to say about Jones' situation. Id. 173:22-174:3. Jones contacted her because he had been told that she worked in the Human Relations department and dealt with minority issues. Id. 171:20-172:1.

In addition to denied promotions, Jones has been subject to racially offensive statements while at work. For example, sometime between 1999 and 2000, Jones was driving in a line truck with two white co-workers past cotton fields. Id. 53:8-12. One of his co-workers made a joke about there being cotton over in the fields. Id. Jones did not report this statement because he felt that nothing would be done about it. Id. 54:7-9. Further, Jones has heard from Bill Brantley that a

female employee had seen a noose hanging from the ceiling in her work area. Id. 64:19-65:1. About seven months before Jones quit, Bruce Headen, who is African-American, told Jones that he had been jumped by two white employees. Id. 56:19-57:2. One was Bill Humbert, a white co-worker, and Jones cannot remember the name of the other person. Id. 66:13-17. Headen had gone to supervisors about the incident. Id. 57:1-2. Jones prepared a statement about Todd Tolbert's accident because he felt that race played a part in the accident. Id. 71:23-24. Jones spoke with Al Perkins, Jones' white supervisor, sometime around September or October of 1998 about Tolbert's accident. Id. 72:18-22. The conversation took place after a safety meeting. Id. 73:7-8. Perkins asked Jones if he was sure he wanted to be a Lineperson C after what happened to Todd Tolbert. Id. 73:18-21. Perkins knew that Jones had been trying to get the job for quite some time. Id. 73:16-18. Jones took the statement by Perkins to be racially offensive and threatening. Id. 75:12-13. Before the accident, Perkins had never said any such thing to Jones after other accidents. Id. 75:22-76:2. Jones believed that Perkins said this because he Jones and Tolbert are African-Americans. Id.

Additionally, Jones felt discriminated against because of his race because he was assigned to disfavored tasks more frequently than his white co-workers. Id. 193:2-14. Jones had to clean the substation and clean up behind his co-workers more often than white employees. Id. Jones also believes that he has been denied overtime based on his race. Id. 220:23-221:3. Around April 1999, during the "Blue Ash" storm, Jones called his white supervisor, Ron Lewis, and volunteered to work, but Lewis told Jones that he was not needed. Id. 221:4-20. Weeks later, while he was at work, Jones discovered that almost everyone had been given the opportunity to work overtime after that storm except for him. Id. 222:1-2. White co-workers with less seniority than Jones had bene

given the opportunity to work. <u>Id</u>. 222:3-11. These people were all of the new Lineperson C employees. <u>Id</u>.

Another factor that lead Jones to conclude that race was the reason he was not promoted is that Cinergy has not been hiring African-Americans in the Lineperson C department. <u>Id</u>. 168:8-11. Throughout all of the time Jones had applied for Lineperson C, only one African-American was ever hired. <u>Id</u>. 168:17-18. Jones looks at the company and sees many more white employees in higher positions than African-American employees. <u>Id</u>.188:5-7.

The overall treatment Jones received while working at Cinergy took a toll on his health. <u>Id</u>. 194:18-195:2. This includes his mental health, which then affected his physical health. <u>Id</u>. In June 2001, Jones went to his doctor, Dr. Cobb, about his stress from work. <u>Id</u>.189:10-18. Jones reported that he was feeling stressed, depressed and frustrated. <u>Id</u>. Jones' doctor recommended that he take a day off of work and return the following day. <u>Id</u>.189:22-190:2. Jones experienced shortness of breath and rapid heartbeat before leaving Cinergy. <u>Id</u>. 190:24-191:12. Jones also reported that his physical strength was affected because he was worrying about his situation at work. <u>Id</u>. 195:5-6.

Jones formally announced his resignation on July 31, 2001 via a letter of resignation. <u>Id</u>. 168:11-14. Jones resigned because he was frustrated, depressed, tired of being humiliated, and tired of seeing external individuals with less seniority, experience and fewer qualifications be hired off the street, into positions over him that had repeatedly been denied to him, and then having to train new hires. <u>Id.</u> 169:13-24. Jones was stuck in a "dead end," low-paying job with no chance for advancement. <u>Id</u>. Jones' resignation letter states that African-Americans were treated differently than whites. <u>Id.</u> 188:1-4. He based this statement on his personal experience of seeing more white

employees in higher positions than African-American employees.  <u>Id</u>. 188:5-7 Jones did not consult

with any of his supervisors or with the Human Resources department before his resignation, because

he did not see any point in doing this.  <u>Id</u>. 171:4-9.