## II.  SUMMARY JUDGMENT STANDARD.

"Under Rule 56(c), summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c)).  The party moving for summary judgment "bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." Pierce v. Commonwealth Life Insur. Co., 40 F.3d 796, 800 (6th Cir. 1994).  Thereafter, the nonmovant must "produce specific facts demonstrating a genuine issue of fact for trial." Id.

At this stage, the court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). Obligated to disregard "all evidence favorable to the moving party that the jury is not required to believe," the court "must view the entire record in a light most favorable to the party opposing summary judgment, and draw all reasonable inferences in that party's favor." Dews v. A.B. Dick Co., 231 F3d 1016, 1020 (6th Cir. 2000).

## III.  AS AN "EMPLOYER" OF PLAINTIFFS, CINERGY IS A PROPER DEFENDANT.

Cinergy's proclamation that it is not Plaintiffs' direct employer (indeed, that it has no employees) hardly absolves Cinergy of potential liability, even if it was undisputed.  The record evidence, however, gives rise to a genuine issue of fact even as to whether Cinergy, itself, is Plaintiffs' employer.  Personnel documents regarding Plaintiffs, ranging from correspondence to or

27

about Plaintiffs, a report of one Plaintiff's on-the-job accident, disciplinary documentation and more, see pp.1-3 supra, are on Cinergy letterhead and Cinergy forms. Job postings refer to Cinergy positions. Plaintiffs were denied promotions under a "Targeted Selection Process" that, as stated on its face, is Cinergy's selection process. Even employment policies such as the "Workplace Harassment" policy, on which Defendant relies and which was distributed to Plaintiffs and other "CG&E" employees, describe standards for them to follow as employees of Cinergy. Having considered and treated Plaintiffs as its employees, Cinergy should not be heard to claim the contrary for summary judgment purposes. Its own personnel documents and employment policies refute its position, at the very least creating a genuine issue of fact over whether Cinergy, itself, is Plaintiffs' employer.

Regardless, Cinergy does not have to be Plaintiffs' immediate, direct employer for purposes of liability under laws that prohibit employment discrimination. The Sixth Circuit has long recognized the "single employer" test for determining whet her a parent company, such as Cinergy, may be liable for the unlawful employment practices of its wholly-owned subsidiary, such as CG&E. See Armbruster v. Quinn, 711 F.3d 1332, 1336 (6th Cir. 1983). Under this test, the parent corporation's liability depends on "sufficient indicia of an interrelationship" with its subsidiary "to justify the belief on the part of the aggrieved employee that the [parent] corporation is jointly responsible to the acts of the [subsidiary] immediate employer." Id. 1337 The test analyses whether the parent corporation exercised a degree of control beyond the level of control normally exercised by a parent corporation that is separate and distinct from the subsidiary corporate entity. Id. Once a sufficient degree of control is shown, the two separate corporate entities may be given "single employer" status.

Applying the test, courts evaluate the following factors: (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership.  See, e.g., NLRB v. Borg Warner Corp., 663 F.2d 666 (6th Cir. 1982).  While all four factors are indicative of interrelatedness, there is no requirement that all four factors be present, and control over labor relations is a central concern.  In re Metropolitan Detroit Bricklayers Dist. Council, 672 F2d 580, 584 (6th Cir. 1982).  Essentially, the Sixth Circuit has held that the issue of whether a parent and subsidiary corporation can be considered as a "single employer" is an issue of fact determined on a case-by-case basis.  Id.

In the case at bar, it is undisputed that Cinergy is the parent corporation of CG&E.  (Def. Mo. Sum. Judg. P. 11 ¶ 1-2).  Also undisputed is the fact that Cinergy is the owner of CG&E.  Id.  The first factor in the non-exclusive four-part test applies to the interrelatedness of the operations of Cinergy and CG&E.  Interrelatedness of the two entities is evidenced by the fact that all Personnel documents were on "Cinergy" letterhead and forms.  Resumes for job postings were directed to "resumes_@cinergy.com," and "Cinergy's goals" were the subject of diversity meeting and employment policies.  See pp. 1-3 supra.  All show interrelatedness of the entities as well as Cinergy's common management and central control of labor relations at CG&E.

Any doubt about sufficient indices of Cinergy's interrelatedness with CG&E should be completely resolved by even a cursory review of exhibits to Cinergy's proffered affidavits.  For example, attached to Jim O'Connor's affidavits are:

(1)  Exhibits A-C –  which are attendance sheets for Cinergy meetings on diversity in employment, attended by Plaintiffs,  O'Connor Aff. ¶ ¶ 17-18;

29

(2) Exhibit G – Cinergy's E-Mail/Voice Mail/Internet Policy "issued to all employees" and which speaks to "Cinergy employees" about Cinergy's systems, property and business, and for which there is an "Employee's Acknowledgment" form reflecting receipt of the "Cinergy Corp. Employee Handbook"; and

(3) Exhibits H-L, N-Q – which set forth Cinergy employment policies and include three Plaintiffs' signed forms acknowledging their receipt of Cinergy's "Working Environment Policy Manual," which is full of references to Cinergy as the employer, Cinergy's workplace and Cinergy's employees.

There is no need to regurgitate the mass of similar evidence in exhibits to other affidavits proffered by Cinergy. Suffice it to say that Cinergy's own evidence undermines its argument. At a minimum, there is a genuine factual issue over whether Cinergy and CG&E are a "single employer" and, as such, both liable for unlawful employment discrimination against plaintiffs.[1]

## IV.    PLAINTIFFS' CLAIMS ARE TIMELY.

This action was filed on June 7, 2001. In their Complaint, Plaintiffs asserted claims of employment discrimination under federal and state law. As such, their claims are viable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 e et seq. as well as 42 U.S.C. § 1981, which "affords a federal remedy against racial discrimination in private employment." Anthony v. BTR Automotive Sealing Syst., Inc., 339 F.3d 506, 512 (6th Cir. 2003). Recently, the United States Supreme Court has held that the Civil Rights Act of 1991's amendments to § 1981, which expanded

---

[1]The same evidence also, at a minimum, raises a genuine issue of fact as to whether CG&E's supervisors and managers were agents OF Cinergy for purposes of Plaintiffs' employment, which would also give rise to liability of Cinergy's part for their unlawful employment discrimination against Plaintiffs.

§ 1981's prohibition against discriminatory hiring, see Patterson v. McClean Credit Union, 491 U.S. 164 (1989), to prohibit past-hire employment discrimination, are subject to the four-year "catch-all" statute of limitations in 28 U.S.C. § 1758.  See Jones v. R. R. Donnelly & Sons Co., 541 U.S. 1845 (2004).  Thus, Plaintiffs' post-hiring discrimination claims under § 1981 are subject to a four-year statute of limitations, which extends back to June 7, 1997.[2]

The statute of limitations goes back even further for Plaintiffs' claims under Ohio law, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Plaintiffs' claims under Ohio Rev. Code § 4112.99, which sets forth Ohio's prohibition of employment discrimination, are subject to the six-year statute of limitations in Ohio Rev. Code § 2305.07.  See Bolls v. South-

_____

[2]Defendant may argue that Plaintiffs did not allege § 1981 claims in their complaint, but principles of "notice pleading" and case law dictate otherwise.  Rule 8 of the Federal Rules of civil Procedure provides that plaintiffs shall set forth "short and plain" statements of claims, and all "pleadings shall be construed as to do substantial justice."  At various points with the complaint, Plaintiffs averred the they have "been denied equal employment opportunity for . . . promotion . . . and other terms and conditions of employment"; they have "been denigrated, humiliated, and prohibited from enjoying privileges as white male employees"; this is a lawsuit to "redress deprivations . . . of rights, privileges, and immunities secured by . . . the laws of the United States"; and that "the actions taken by Defendant were in violation of . . . Federal . . . law."  Complaint 2, 3-4, 6.  The foregoing language from the complaint closely parallels the terms of § 1981 and represents "short and plain" statements of Plaintiffs' claims pursuant to that statute.

Furthermore, Plaintiffs invoke the jurisdiction of this Court pursuant to 42 U.S.C. § 1343.  Complaint 3.  As the Sixth Circuit has held, § 1343 "'specifically limits district court jurisdiction to cases in which the plaintiff alleges a violation of a right secured by the Constitution or by a federal statute 'providing for equal rights' or 'civil rights.'" Berger v. City of Mayfield Heights, 265 F.3d 399, 404 (6th Cir. 2001) (quoting Maher v. Gagne, 448 U.S. 122, 129 n.11 (1980)).  Because Plaintiffs may not properly claim the violation of a Constitutional right in this case, the invocation of jurisdiction under § 1343 pertains to claims for violation of § 1981.  Accord Bowers v. Campbell.  505 F.2d 1155, 1157 n.2 (9th Cir. 1974) (failure to specifically cite § 1981 in complaint of no consequence; "attempt to evoke outmoded technical pleading rules is fruitless"; all of the facts required to state a claim under § 1981 were alleged; and plaintiff was not required to specifically plead the statutory provision).

Western Thomson Learning, 311 F. Supp. 2d 643, 651 (S.d. Ohio 2003).  Thus, timely claims under

Ohio law go back to June 7, 1995.

Moreover, Plaintiffs may recover for racial harassment outside the limitations period as long

as one hostile act occurred within the limitations period and all acts were part of the same hostile

environment.  See National R. R. Corp. v. Morgan, 536 U.S. 101, 117-21 (2002).

Defendant's timeliness arguments are limited to Title VII and make no mention of the much

longer limitations periods under § 1981 and Ohio law.[3]  Regardless of differing limitations periods,

substantive standards of liability under Title VII, § 1981 and Ohio Rev. Code § 4112 are the same

in this case.  See Dews, 231 F.3d at 1021 n.2.

## V.    SUMMARY JUDGMENT ANALYSIS.

## A.    MARTIN'S CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT.

The burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), applies to claims relying upon circumstantial evidence of discrimination, as in this case.

Under this approach, Plaintiffs bears the initial burden of setting forth a *prima facie* case of

discrimination.  Anthony, 339 F.3d  515.  If a *prima facie* case is presented, Defendant may rebut

the showing by articulating some legitimate, nondiscriminatory reason for an adverse action.

---

[3]Defendant claims that Plaintiff Martin does not have any timely Title VII claims for failure to file suit within Title VII's 90-day limitations period.  See Def's Mem./Martin, 10-11. Defendant's proffered evidence, however, is not sufficient to prove its point.  The EEOC right-to-sue letter submitted by Defendant gives rise to confusion and concomitant questions.  Aff. Exh. E.  The document appears to bear two different dates, and it is otherwise marred by poor copying.  Furthermore, Defendant has not proffered sufficient evidence that Martin's subsequent EEOC charges were dismissed.  Defendant has simply appended a copy of a letter from the Ohio Civil Rights commission acknowledging that Martin has requested a right-to-sue letter, but it has not appended one to its submissions to the Court.  Supp. Aff. Exh. P.

Defendant's burden is one of production, not persuasion, id., but it remains an essential step in the analysis.

If Defendant provides a legitimate nondiscriminatory reason, Plaintiffs must demonstrate that the reason is a pretext.  Id.  Plaintiffs may demonstrate pretext by showing (1) that the employer's reason had no basis in fact; ( 2) the proffered reason did not actually motivate the adverse action; or (3) the proffered reason was insufficient to motivate the action.  Id. 516; see also Zambetti v. Cuyahoga Community Coll., 314 F.3d 249, 258 (6th Cir. 2002).  A "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves, 530 U.S. 148; see also Dews, 231 F.3d 1021.  "Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff."  Id.

Applying the foregoing McDonnell Douglas framework to Martin's claims will show that the defendant's Motion for Summary Judgement should be denied.

### 1.    **Martin's Failure-to-Promote Claim Survives Summary Judgment.**

In this case, Plaintiff Martin claims that Defendant discriminatorily failed to promote him to Lineperson C vacancies.  The general standard of proof applicable to a *prima facie* case for a failure-to-promote claim requires evidence that (1) Martin is a member of a protected class; (2) he applied for, and did not receive, a promotion; (3) he was qualified for the promotion; and (4) a similarly-situated person not in Martin's protected class received the promotion.  Anthony, 339 F.3d 515; see also Dews, 231 F.3d at 1020-21 (same).  However, one should not be inflexibly wedded to the McDonnell Douglas framework to the exclusion of other means of establishing an inference of discrimination.  See Talley v. Bravo Pitino Restaurant, Ltd.,61 F.3d 1247 (6th Cir. 1995)

33

(sanctioning the use of other evidence raising an inference of discrimination in lieu of establishing a prong of the *prima facie* standard) (citing <u>Shah v. General Elec. Co.</u>, 816 F.3d 264, 270 (6th Cir. 1987)); <u>see also</u> <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 801 (6th Cir. 1994) (the <u>McDonnell Douglas</u> standard "should be modified to accommodate different employment discrimination contexts"); <u>Zambetti</u>, 314 F.3d at 255.  As an illustration, the Sixth Circuit provides that the fourth prong of the *prima facie* standard may be replaced with a demonstration that a "'a comparable non-protected person was treated better.'" <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 350 (6th Cir. 1998), <u>r'hrg & sugg. for r'hrg en banc denied</u> (quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582-83 (6th Cir. 1992)); <u>see also</u> <u>Talley</u>, 61 F.3d at 1246 (citing <u>Mitchell</u>, 964 F.2d 582-83).

As set forth in Defendant's Memorandum, the sole prong of the *prima facie* promotion case that Defendant contests is the fourth.  Def.'s Mem./Martin 14. Defendant argues that Martin cannot "demonstrate that similarly situated employees were treated more favorably."  However, before addressing that prong, Plaintiffs will address the others out of abundance of caution.

As to the first two prongs, there is no dispute that Martin passes muster:  he is African-American and thus within a protected class, and he sought but was denied promotions to Lineperson C.  The third prong, whether Martin is qualified for the job, is readily established by examining Martin's experience.  He has years of experience as a Groundperson, during which he observed the tasks and duties of Linepersons.  As Martin testified, he knows the work of a Lineperson, he has performed the tasks and duties of the job, he engages in safe work practices, and he understands the materials utilized.  Martin Dep. 390.  That Martin trained some newly-hired Linepersons to do their

34

tasks merits substantially in his favor. Indeed, Defendant admits that Groundpersons and Linepersons share some duties.[4]

Nonetheless, close scrutiny of the fourth prong may actually devolve to the inquiry into whether Martin met the requirements for promotion to Lineperson C. As described by one of Defendant's affiants, an applicant for a Lineperson C vacancy must qualify through a series of tests. First, one must pass a "Manual Battery" written test, and upon doing so, one takes the field assessment test. The field assessment test includes the "Working at Heights" component, which must be passed or one is automatically disqualified from participating further as a candidate. If a candidate passes the "Working at Heights" component and demonstrates "minimally acceptable performance" on the overall field assessment test, then he or she is interviewed. The scores from the field assessment test and the interview are weighted equally, and the average constitutes the applicant's final score. See Reinhard Suppl. Aff. ¶¶ 4-11.

The qualification prong should focus on objective criteria, see Anthony, 339 F.3d 516, (citation omitted), and in the Sixth Circuit this factor requires a demonstration that an individual "was meeting the employer's legitimate expectations and was performing to the employer's satisfaction." Dews, 231 F.3d 1022. When using that guidance in the present context, careful analysis reveals that the qualification prong merges with the fourth prong. That is, demonstrating that a successful white candidate scored similarly as Martin on the Lineperson C tests shows not only that a comparable individual in a nonprotected class was treated more favorably than Martin,

---

[4]As an additional consideration, Defendant has not proffered any serious deficiencies in Martin's work history, there exists no disparagement of his work performance; and the circumstances surrounding the Tobert accident, and the incident regarding running his truck over a sizeable rock contains murky, disputed details.

but also that Martin was as qualified for the position as the successful candidate.  Cf., Anthony, 339 F.3d 515 ("A plaintiff should not be required to prove that he is qualified to meet the stated requirements for a position where the selected candidate likewise does not meet the requirements."); Ercegovich, 154 F.3d 352 (a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects") (emphasis in original))[5]

The record demonstrates that Martin was treated differently from comparable white candidates for Lineperson C vacancies, and thus was equally (or more) qualified for the position. Plaintiffs will review the December 1998 vacancies first.  Martin passed the written test for the December 1998 vacancies.  While Defendant's affiant asserts that Martin scored lower than other candidates and failed his "Working at Heights" exercise, see Reinhard Suppl. Aff. ¶¶ 20-21, yet the record does not support Defendant's contentions.

First, Plaintiffs note the facial discrepancy in Exhibit A to Reinhard's Supplemental Affidavit: Plaintiff Martin and four other "fail" candidates are listed in a different format than the other applicants on the first page of the exhibit.  In addition, the other four candidates scored far lower than Martin on the field assessment test.  See id.  Further, Exhibit C to Reinhard's Supplemental Affidavit demonstrates that those candidates who failed the "Working at Heights"

---

[5]In Ercegovich, the Sixth Circuit cautioned against rigid adherence to the narrow test of "similarly situated" set forth in Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992), a case on which Defendant heavily relies that dealt with discriminatory discipline.  Def's Mem./Martin 14. The court explained that adherence to Mitchell in a case of discriminatory promotions "would undermine the remedial purpose of the anti-discriminatory statutes."  Ercegovich, 154 F.3d 352-53.

exercise actually were accorded a score of "0" on the candidate score sheets and even had the notation "Failed Heights" included in the "Comments" column of the sheets. Those candidates who had field assessment scores in the 50s and below did not have any scores tallied in the "Interview" and "Total" columns. See id. Martin did not have either designation in his score report in Exhibit A to Reinhard's Supplemental Affidavit.

Subsequent Exhibits D and E to Reinhard's Supplemental Affidavit denote the finding "Failed Heights" in the "Field" score column rather than a "0," and the "Score Total" columns are left blank. Furthermore, Exhibits D and E include the notation "Failure" next to the scores in the "Field" column for those candidates who ostensibly passed the "Working at Heights" exercise yet still failed the field assessment test, and the field test scores for applicants who failed that test are included in the "Score Total" columns. Martin did not have either designation in his score report in Exhibit A to Reinhard's Supplemental Affidavit.

Remarkably, all of the field test scores denoted "Failure" in Exhibits D and E to Reinhard's Supplemental Affidavit were lower than Martin's "60" on his field assessment test. Indeed, Defendant admits that a score of "60" on the field assessment test is not a failing score. See Alvaro Aff. Exh. 3. In addition, several white candidates who scored similarly to Martin on the field assessment test were afforded interviews in the selection process, even some who scored below the passing grade of "60." See Reinhard Suppl. Aff. Exh. A (Art Heber scored a "57"; Jason Burkle scored a "55.8"; Jim Harrell scored a "55.2"); Exh. C (Ronald Simpson scored a "61.2"; Thomas Padgett scored a "64"; Terrance Hanks (African-American) scored a "61.4"); Exh. D (Jason Buerkle scored a "65.6"; Luke Cox scored a "64"; Wayne Jordan scored a "65.2"; Jon Hater scored a "64"; John McWilliams scored a "65.2"); Exh. "E" to Reinhard Suppl. Aff. (David Britton scored a "60";

37

Jerry Sheridan scored a "64.6"; William Kaufman scored a "62.2"; Jason Stapleton scored a "60.4"; Gary Bezold scored a "61.4"; Jason Allen scored a "62.2"; Russell Pheanis scored a "60").

In sum, the only conclusion one may muster, and at the very least a reasonable inference is, that Martin did not fail his field assessment test for the December 1998 vacancies. Martin's test results do not contain the desultory notations reflected in other failing scores: there is no designation "Failed Heights" or even "Failure" listed for his field assessment test. Indeed, some white candidates who scored below the passing grade of "60" on the field assessment test were still interviewed for promotions. Further, the other four individuals who ostensibly failed the field assessment test scored significantly lower than Martin, and Martin declared more than once in his deposition that his test was improperly scored. If Martin would have been allowed to proceed with an interview, as other comparable candidates were, it is conceivable that Martin would have scored high enough on the interview to achieve an "above average" total score. However, due to Defendant's discriminatory actions, Martin was denied an opportunity to proceed to proceed to achieve such a score.

With the preceding analysis in tow, demonstrating a *prima facie* case for the other two contested Lineperson vacancies is quite straightforward. The same *prima facie* standard applies for those vacancies, so the analysis of the prongs applies with equal force. Martin testified that he was scored wrongly on the August 1997 test, and the record reveals that although his results contained comments that he "can't follow directions, climbers on backwards, drilled hole backwards," a "white male" who was hired for a Lineperson C vacancy had the comment "problem with heights." Martin was at least comparable to that individual, and Martin also identified another white comparator who

arrived at the 1997 field assessment test not wearing a shirt and with a supervisor questioning his weight.

Regarding the August 1998 vacancy, Martin was not even tested because of Defendant's faulty facsimile transmission. Defendant initially proffered other reasons for Martin's non-consideration, including the results of his 1997 candidacy and his discipline for the Tolbert incident, but the prompt acquiescence in allowing Martin to sit for the December 1998 vacancy due to the faulty facsimile transmission totally discredits Defendant's assertions. In sum, the balance of the evidence regarding all three contested vacancies compels an inference of discrimination in promotion opportunities.

In an effort to satisfy its burden of producing a justification for the adverse actions suffered by Martin, Defendant simply states that candidates were selected for the Lineperson C vacancies pursuant to the "EEOC validated" process, see Def.'s Mem. re: Martin SJ 15, and that Martin "acknowledged that he was not a good climber." Id. 4.

Although Defendant's rebuttal burden is one of production, not persuasion, it hardly meets that limited bar. Nevertheless, Plaintiffs have already demonstrated sufficient pretext as to the defendant's "justifications." First, Martin's 'acknowledgment' "that he was not a good climber" referred to his initial 1995 test for a Lineperson C vacancy, not his subsequent tests for the 1997 and 1998 vacancies, which are the vacancies at issue here. Defendant's other "justification" – that the successful white candidates for the 1997 and 1998 vacancies were properly selected pursuant to its 'EEOC validated' process[6] – was effectively debunked by the foregoing analysis of Martin's *prima*

---

[6] The defendant's "EEOC validated" process represents a misnomer that may mislead the Court. The process was "validated externally in accordance with EEOC Guidelines," but such phrasing does not mean that the process was validated by the EEOC. See Ward Aff. ¶ 22.

*facie* case.  It is clear that Martin's field assessment test score was comparable to similarly-situated white candidates who were allowed to interview for vacancies.  In addition, Martin repeatedly testified that his tests were wrongly scored by his assessors.  That testimony, alone, is sufficient to establish pretext.

Moreover, considering all of the other evidence presented above -- i.e., Martin's experience and work history as a Groundperson, his passing of the written test, the disparate discipline accorded him regarding the Tolbert accident, and Defendant's attempt to limit him to one more test while allowing white employees multiple opportunities to qualify for the Lineperson program -- characterizing Defendant's articulation as pretext is easily established.  Thus, the demonstration of pretext, coupled with the *prima facie* case established above, creates genuine issues of material facts that warrant denial of summary judgment on Martin's failure-to-promote claims.

### 2.    Martin's Discriminatory Discipline Claim Survives Summary Judgment.

Martin's discriminatory discipline claim arises from his disparate treatment regarding the Tolbert accident vis-a-vis the treatment of white comparators in a similar incident.  Utilizing the same McDonnell Douglas framework set forth above, Martin establishes a *prima facie* case of discrimination in discipline by showing "(1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees."  Mitchell, 964 F.2d at 583

The first prong is not disputed.  Record evidence satisfies the second prong.  As depicted previously, Martin was disciplined for an incident in which he had been instructed by his white supervisor to leave the scene and in which he was in the process of departing (thus, with his back

to the scene of the accident).  Company officials initially gave Martin written discipline, but they offered to reduce it to an oral warning in response to a union grievance.  By comparison, during the same time frame several white employees were accorded written discipline for a similar incident, but the company response to their union grievances constituted a reduction in the discipline to respectively an on-site coaching and counseling or oral warnings, <u>with</u> the additional benefit of removal of the reduced disciplinary documents after three months of good behavior.  Comparatively, Martin was never offered the benefit of removal of disciplinary documentation from his personnel record.  This discrepancy represents different treatment for similar conduct that satisfies the second prong of the *prima facie* standard.

Furthermore, <u>Mitchell</u>'s "same supervisor" requirement, that disparate discipline claims must involve the same supervisor, <u>see</u> <u>Mitchell</u>, 964 F.2d 582, is satisfied by Dave Ward's involvement in all of the discipline meted out to Martin and his white comparators.  <u>See</u> Ward Aff.

While Defendant contends that documented discipline, kept in an employee's personnel file, is somehow not an "adverse action," Defendant cites no case for that particular proposition.  The only case cited by Defendant that addresses discipline suggests otherwise.  <u>See</u> <u>Williams v. AP Parts, Inc.</u>, 252 F. Supp.2d 495 (N.D. Ohio 2003).  Such discipline is an ongoing, even permanent mark on an employee's record that places the employee in jeopardy of worse progressive discipline for future transgressions and otherwise affects the employer in any of a myriad of contexts in which the company compares an employee who has a disciplinary record with other employees who lack a disciplinary record.  In the very real world of the workplace, such discipline is an adverse employment action.

41

Regarding its rebuttal burden of producing a legitimate, non-discriminatory reason for Martin's disparate treatment, Defendant proffers absolutely no justification whatsoever. That fact alone commands summary judgment for Martin on his disparate discipline claim. At the very least, there exists genuine issues of material fact compelling a finding that Plaintiff Martin's disparate discipline claim should go to trial.

### 3.    Martin's Hostile Environment Claim Survives Summary Judgment.

To demonstrate a hostile environment claim, a plaintiff must prove that (1) he is in a protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition, or privilege of employment. Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078 (6th Cir. 1999). "Harassment affects a 'term, condition or privilege of employment' if its is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment." Id. 1079 (citations omitted). "[T]he plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job." Id. (citations omitted). Once the hostile environment has been demonstrated, a plaintiff must additionally establish that "the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." Id.

Here, evidence demonstrates the hostile environment Martin suffered. In addition to suffering racially-disparate discipline and repeatedly denied promotions, Martin was the victim of several harassing incidents within the federal and state limitations periods stretching back, respectively, to June 7, 1997 and June 7, 1995. Martin's supervisor, Dan Morris, refused to pay for

42

Martin's meal when his crew was taken out to lunch, and Morris lied to Martin when he stated he called him to earn overtime work.  Martin also was subjected to disparaging remarks about African-Americans by white employees at company-sponsored diversity training, and he has discovered banana peels discarded in the back of his truck.  Outside of the limitations period, Martin suffered harassment from a white co-employee, Cutsinger, who threatened Martin in racial tones and remarked that he would disown his daughter if she "brought home" a black suitor.  Martin also was treated hostilely by white employees upon initially obtaining his Groundperson position, and he has heard that some employees referred to certain work equipment as "nigger toes."  To Martin, these incidents demonstrate a severe and pervasive hostile work environment.

Defendant knew of Cutsinger's threat to Martin, and it certainly was aware of the remarks made by white employees during diversity training, as the company sponsored the event.  Morris, a company supervisor, had to be aware of the his own conduct towards Martin, and the company was well aware of the racially-disparate discipline and denied promotions that contributed to the hostile environment.  Finally, mentioning the banana peel incidents during Martin's deposition put the company on notice of that incident.  Therefore, the company knew or should have known of the harassment Martin suffered, and there is no evidence that it did anything about it.  Plaintiff Martin submits that Defendant does not deserve summary judgment on this issue.

**B.**    **BRANTLEY'S CLAIMS SURVIVE SUMMARY JUDGMENT.**

    **1.**    **Brantley's Promotion Claims Survive Summary Judgment.**

Defendant limits its factual discussion and legal arguments to Plaintiff Brantley's 1999 denial of the Training Crew Lead position and the denials of Field Supervisor position in 1999 and

2000.  Def.'s Mem./Brantley 2-4, 12, 16-17.  Defendant does not place at issue Brantley's timely

claims concerning 1997 and 1998 denials of Training Crew Lead positions, a 1998-99 denial after

an unposted Field Supervisor position, a 1999 denial of a Joint Trench Supervisor position, and a

2000 denial of an unposted Joint Trench Supervisor position.  Thus, summary judgment as to those

claims should be denied without further ado.[7]

As to the denied promotion claims contested by Defendant, it challenges only the fourth

prong of Brantley's *prima facie* case.  Def.'s Mem./Brantley 16.  It does so based on Mitchell's strict

"similarly-situated" requirement, strict adherence to which the Sixth Circuit later cautioned against

in cases involving promotion claims.  See Ercegovich, 154 F.3d 352-53.

Contrary to Defendant's bare-boned summary conclusion that Brantley somehow fails to

demonstrate more favorable treatment of similarly-situated white who received the promotions at

issue, the record is full of evidence that satisfies the fourth prong.  Brantley was denied Temporary

Training Crew Lead Supervisor in 1999 in favor of equally or less qualified white employees,

including Michael Weiss.  Brantley was told by his white supervisors that he did not receive the

position because he lacked computer training and needed to show more leadership; however, Weiss

did not even possess the minimum qualification of three years service as a Lineperson A, and his

inexperience pales compared to Brantley's leadership role as a Senior Lineperson for four years.

Brantley was denied a Field supervisor position in 1999 in favor of less qualified white

employees, including Brian York, who was a less senior employee completely devoid of experience

in the department.  Defendant spent the entire next year training York for his new position.  Brantley

---

[7]It is too late for Defendant to move for summary judgment on those claims.  Certainly, Defendant's reply memorandum is not an appropriate vehicle to address those claims for the first time.

already knew the job, having been entrusted by Defendant to serve as Field Supervisor on a temporary basis during the years 1994-1999. Brantley Dep. II, 154:21-23. It is highly unlikely that Defendant would allow an employer who lacked leadership skills and necessary qualifications to supervise other employees while they worked on power lines, a potentially deadly job.

A similar analysis applies to Brantley's denial of a Field Supervisor position awarded to white employer Dave Jackson in 2000. In addition, it is apparent that Defendant did not even consider Brantley for the position in light of Defendant's assertion that it has no record of the resume Brantley submitted for it.

As Defendant's only asserted reason for promoting others instead of Brantley, Defendant states that "the other candidates were selected for the positions utilizing the EEOC validated Targeted Selection Process . . . and the top scorers were the selected candidates." Def.'s Mem./ Brantley 17. In support, Defendant cites the Toebbe and Ward Affidavits, which say precisely t hat, but tellingly, nothing more. Nowhere does Defendant or its affiants actually state that the white comparators were promoted <u>because</u> they were the top scorers. Defendant apparently wants the Court to infer that proposition from a correlation between top scorers and successful candidates, but all inferences must be drawn against Defendant and in favor of Brantley. There is a racial correlation, as well, that remains unexplained.

Failing to articulate any non-discriminatory reason why it promoted white comparators instead of Brantley, Defendant has not met its burden of production. See generally I.M.P.A.C.T. v. Firestone, 893 F.2sd 1189, 1193-94 (11th Cir. 1990) (explaining defendant's burden of producing "admissible evidence of the actual reason for the action taken"). Moreover, Affiants Toebbe and Ward cannot articulate any actual reason for Defendant's actions, because their affidavits establish

that neither was Defendant's actual decision maker in the selection process.  Ward Aff. ¶ 28 ("Upon reasonable information and belief, Jim Stanley was involved in the final selection process."); Toebbe Supp. Aff. ¶ 10 (same).  Thus, Defendant's attempted articulation is further deficient because it is not supported by any individual even "involved" in the final selections, id., and the absence of proof from the only final decision-maker identified by Defendant's affiants is, itself, totally unexplained.  See Burton v. Ohio, 798 F.2 164, 166 (6th Cir. 1986).

Moreover, as to the 2000 Field Supervisor positions, the simple statement in Toebbe's affidavit that Defendant has "no record" of Brantley's resume, Toebbe Supp. Aff. ¶ 4, which Brantley submitted, falls far short of any articulation of why Brantley was not considered, whether for that reason or others.  Nor does it articulate any explanation of what happened to the resume Brantley submitted.

Finally, Defendant's attempted articulation fails as to the 1999 Training Crew Lead position for yet another reason.  Upon review of the affidavits of Ward and Toebbe, neither so much as mention the promotion at issue or how, much less why, white comparators were promoted instead of Brantley.

Even if Defendant had met its burden of production, the record evidence creates a genuine issue of fact as to whether Defendant's attempted articulation is pretextual.  It is inconsistent with the reasons Brantley's supervisors gave him for the denial of Training Crew Lead in 1999 (a lack of computer training, and a need to show more leadership) and the denial of Field Supervisor in 1999 (Ward told Brantley of Ward's concern that Brantley would present himself in a professional manner, that Brantley lacked necessary leadership skills and that he needed to add things to his resume and volunteer).  Brantley Dep. I, 147:16 - 149:24.  Such inconsistencies with Defendant's

current attempted articulation are evidence of pretext. They support a finding of discrimination under <u>Carter</u>, in that they reveal no basis that Defendant simply cannot seem t o make up its mind. <u>See</u> 349 F.3d 273.

Defendant's complete failure to consider Brantley for the 000 Field supervisor job further smacks of pretext, especially Defendant's inability to account for the resume Brantley submitted. The same is true of Defendant's inconsistent posting practice, with non-posted vacancies awarded to white comparators without even giving Brantley an opportunity to apply for the promotions. <u>See generally</u> <u>Harris V. Birmingham Bd. of Edu.</u>, 712 F.2d 1377 (11th Cir. 1983) (failure to post precludes employer from relying on plaintiff's presumed lack of interest in job not sought).

Also supporting Brantley's position that Cinergy's reason was merely pretext are the circumstances surrounding the "Targeted Selection Process." As evidenced by the format of the testing procedure, it is a purely subjective testing mechanism by which supervisors score the interviewee based on the adequacy of the employee's responses.

**2.**     **<u>Brantley's Claims of Discriminatory Terms and Conditions of Employment Survive Summary Judgment.</u>**

In addition to a variety of disparate treatment beyond any applicable statute of limitations, which is nonetheless admissible as relevant background evidence, <u>see</u> <u>Robinson v. Runyon,</u> 149 F.3d 507 (6th Cir. 1998), Brantley timely complains of denied opportunities to participate in computer training and serve on company committees. Defendant contexts these claims solely by arguing that they do not constitute adverse employment actions. Def's Mem./Brantley 14-15. While that may

be true in the abstract, in this case the record evidence establishes that a lack of computer skills and service on company committees were among the reasons given Brantley for denied promotions. The denial of a promotion is, obviously, an adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559 (6th Cir. 2000). The denial of a prerequisite to a promotion, when the lack of the prerequisite leads to the denial of a promotion, is equally adverse.

Uncontested (and un-contestable) on any other ground, these claims should survive summary judgment.

### 3.    Brantley's Claims of a Racially Hostile Work Environment Survive Summary Judgment

To determine whether a hostile work environment exists, the Court must look at the totality of the circumstances. Harris v. Forklift Systems, Inc., 510 U.S. 17, (1993). Circumstances to be evaluated include: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether or not the conduct resulted in physically threatening or humiliating actions versus a comment that was merely offensive; and (4) whether the discriminatory actions unreasonably interfere with the employees conduct. Id..

In viewing all of the evidence in this, Brantley has established a genuine questions of fact as to whether a racially hostile work environment existed. Defendant's contention that no racially offensive remarks or items in the workplace were ever viewed or heard directly by Brantley is immaterial. Farmer v. Cleveland Public Power, 295 F.3d 593, 605 (6th Cir. 2002). The Sixth Circuit has called "such a myopic view of harassment unacceptable." Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999):

48

particularly in light of the directive in *Harris* that courts are to

consider 'all of the circumstances' in determining whether a hostile

work environment exists. Under the 'totality of the circumstances'

approach, a 'district court should not carve the work environment

into a series of discrete incidents and then measure the harm

occurring in each episode.'"

Id.   The court went on to say that "when a lower court disaggregates the claims of a plaintiff

alleging a hostile work environment, contrary to the 'totality of circumstances' approach, it robs the

incidents of their cumulative effect, and '[o]f course, when the complaints are broken into their

theoretical component parts, each claim is more easily dismissed.'...[t]o consider each offensive

event in isolation would defeat the entire purpose of allowing claims based upon a 'hostile work

environment' theory, as the very meaning of 'environment' is '[t]he surrounding conditions,

influences or forces which influence or modify.' Black's Law Dictionary 534 (6th ed.1990). In

implicit accordance with these principles, we have emphasized that offensive comments need not

be directed at a plaintiff in order to constitute conduct violating Title VII.  191 F.3d 647, 660 (6th

Cir. 1999)." Id.

The list of racially offensive comments and/or depictions is lengthy.  All of the reports to

Brantley about racially offensive statements and pictures were offensive to Brantley, and any

reasonable person would find such conduct offensive, hostile, and abusive.

Defendant also incorrectly states that during Brantley's employment with Cinergy, he has

not  observed or heard of any threatening or intimidating behavior.  Brantley testified that Bruce

Headen reported to Bradley that Headen was intimidated and scared because the predominantly white crew with whom he worked would frequently call him names and ridicule him.

As correctly stated in defendant's Motion for Summary Judgment, the legal standard for holding an employer liable is (1) plaintiff's claim will only stand against his employer if he can demonstrate that his employer knew or should have known of the hostile work environment; and (2) the employer failed to take prompt and effective remedial action.

Defendant alleges that Brantley has failed to identify *any* incidents if harassment based on race and that there is no evidence demonstrating that any incident involving a co-worker was known or should have been known by Cinergy. (Deft. Mo. for Summ. Judg. p.19).

This statement by Defendant is incorrect and without merit. There are statements by Brantley indicating that he was aware of co-employees reporting to supervisors regarding discriminatory conduct. For instance, the incident involving Carol Hendricks seeing nooses at the power plant, Brantley testified that she reported the incident to her supervisor but he did not know if anything was done about the situation. (See Stmt.. of Facts p. 9). Also, Brantley testified that Rodney Jones approached Suzanne Bradley about the lack of hiring of African-Americans and she said there was noting she could do. Id. Often times, however, incidents were not reported to anyone because the racially hostile work environment created by Cinergy discouraged such reporting. Brantley testified that he did not report problems or feelings of racial discrimination because he felt that it was useless. Id. Nonetheless, Defendant knew or should have known of the hostile environment based on the fact that it was so pervasive Brantley knew about it. Brantley thus believes that Defendant does not deserve summary judgment on this claim.

**C.    TOLBERT'S CLAIMS SURVIVE SUMMARY JUDGMENT.**

50

### 1.    Tolbert's Failure to Promote Race Claims Survives Summary Judgment.

Defendant's challenge to Tolbert's *prima facia* case of race discrimination in denied promotions is limited to the fourth prong.  Def.'s Mem./Tolbert 14-15.  Again, Defendant heavily relies on Mitchell's "similarly situated" requirement, strict adherence to which the Sixth Circuit later cautioned against in cases involving promotion claims.  See Ercegovich, 154 F.3d 352-53.

Defendant argues that Tolbert's "weight issue' should define his similarly-situated comparators, Def.'s Mem./Tolbert 15, but that is the reason Defendant asserts to justify his denial of promotions.  The Sixth Circuit, however, has deemed it improper to consider, at the *prima facia* stage, the reasons a defendant proffers to justify its adverse actions against an employee.  Harrison-Pepper v. Miami University, 2004 WL 1532251 (6th Cir. 2004) (copy attached).

The court relied on the reasoning in Thomas v. Denny's, Inc., in which the court explained that "relying on a defendant's reasons for the adverse action as a basis for ruling against a plaintiff at the *prima facie* stage raises serious problems under the McDonnell-Douglas framework because it frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual." 111 F.3d 1506, 1510 (10th Cir. 1997); see also Cline v. Catholic Diocese of Toledo, 206 F.3d 651 (6th Cir. 2000).  Therefore, it would be improper for the Court to grant summary judgment in favor of Defendant based on the fact that Tolbert's weight purportedly precluded him from being promoted to Temporary Training Leading Crew supervisor, because the issue of Tolbert's weight should be evaluated at the pretext, not the *prima facie*, state under the McDonald-Douglas framework.

However, regardless, Tolbert knows of at least six white linemen, dating back to 1996 when the issue first became a problem, who exceeded the 275 pound limit but did not receive any adverse

treatment for their weight. Specifically, Paul Dennis, Gary Nasto, Eric Sibcy, Donald Kramer and Rick Cutsinger all appeared to be over the weight limit set by Defendant. Donald Kramer, Paul Dennis, Gary Nasto and Eric Sibcy are still over the weight limit but have not received any adverse treatment. In fact Donald Kramer was overweight as a Lineperson prior to his **promotion** to Supervisor. Tolbert Dep. 126:16. Eric Sibcy was promoted despite being overweight. Tolbert Dep. 393:21-24.

Additionally, Tolbert was treated less favorably than similar overweight white employees in that he was subject to frequent weight checks by defendant. Prior to 2003 when Defendant implemented its company-wide policy that all employees be weighed, Defendant allowed supervisors to subjectively decide who should be weighed and Tolbert was singled out in this regard. Tolbert Dep. 262:16-22. Tolbert testified that he was the only person weighed on any type of schedule from 1994-2001. Id. Tolbert was weighed on a constant and continuous basis. This is significant because Gary Nasto, a fellow white Lineperson who was overweight, was not treated in this manner. Nasto was asked his weight by Defendant when he began working as a Lineperson. Tolbert Dep. 129:19-22. Defendant instructed Nasto to keep his weight under control and even went so far as to provide Nasto with an exercise bike so that he could control his weight issues. Tolbert Dep. 130:3-5. These accommodations were never offered or provided to Tolbert. Tolbert Dep. 129-131. Nasto was not weighed until he returned to work following medical leave almost three years after starting as a Lineperson. Tolbert Dep. 130:6-10. Nasto was overweight, he was given three months to meet his weight requirement, which he did, but once he met weight he was never weighed again. Tolbert Dep. 130:20-21. Nasto told Tolbert that he had only been weighed two to three times ever by Defendant, whereas Tolbert was weighed on a frequent schedule. Tolbert Dep. 131:4.

Tolbert complied with the weight requirements on August 20, 1996.  Tolbert Dep. 154-55:23-4.
Tolbert again complied with Cinergy's weight requirements on September 11, 2001 and on February
15, 2002.  Tolbert Dep. 254 :12-15; 265:13-15.  If Cinergy had treated Tolbert in the same manner
as Nasto, he should not have been weighed again after August 20, 1996.

The foregoing reflects that Defendant has treated Plaintiff less favorably than similarly-
situated overweight white employees.   Tolbert has established a *prima facie* case under the
McDonnell Douglas standard, and now Defendant has the burden of showing that it had a legitimate,
non-discriminatory reason for its actions.

As to the training Crew Lead position in 1999, Defendant cites Tolbert's testimony for its
articulated reason why he was denied the job –  "because of ongoing weight violations and not his
race."  Def.'s Mot./Tolbert.  2.  That is not quite what he said: "During the time I applied for a lead
person position – and I was denied because of a weight issue.", Tolbert Dep. 120:21-22; "I don't
have any information on that [whether the denial "was based on race."].  Tolbert Dep. 121:14-15.

Regardless, Defendant's conduct of promoting other white employees who were also
overweight indicates that Tolbert's weight was not the actual reason for denying him the position.
Specifically, Eric Sicby was promoted despite his weight issues, as was Donald Kramer.  Based on
the similarities in weight issues between Tolbert and the white employees that were promoted, it
seems more likely than not that Defendant's decision was motivated by race and not Tolbert's
weight The evidence creates a genuine issue of fact over whether Defendant's proffered reason was
pretextual because it did not necessarily motivate Defendant in denying Tolbert the position.  Carter,
349 F.3d 273.

Defendant has not articulated any reason in why it denied Tolbert a promotion to Field Supervisor in 1999. The only record evidence of an articulated reason is in Affiant Ward's affidavit at Paragraph 26: "the fact that he received an unfavorable supervisor evaluation from supervisors, Cliff Zorb and Glenn Neidlinger." That articulation is insufficient on its face, because it is based on "reasonable information and belief," not Ward's personal knowledge. It is also inconsistent with Cinergy's answers to Plaintiffs' interrogatory number 4 (on the eleventh page of Cinergy's answer, in the third paragraph under "Posting For Temporary Training Crew Lead Closed 5/7/99"), which states that Zorb evaluated Brantley, not Tolbert, who was evaluated only Neidlinger.

Again, Defendant's inconsistent articulations, alone or coupled with Tolbert's evidence of white comparators who received more favorable treatment, raises a genuine issue of material fact about pretext.

**2.    Tolbert's Racial Demotion Claim Survives Summary Judgment.**

Tolbert was demoted in 2000 from Lineperson A to Groundperson. Tolbert Dep. 237:2-3. To prevail on this claim Tolbert must show that he suffered a materially adverse employment action and that he was treated less favorably than a "similarly-situated" person outside the protected group. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002). Tolbert can show both.

A demotion with a decrease in wages is a materially adverse employment action. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996). In this case, Plaintiff was demoted to Groundperson which is a materially adverse employment action because his pay was cut by eight or nine dollars per hour and he was demoted. Tolbert Dep. 399:10-13.

54

Tolbert also must show that he was not treated in the same manner as white employees in all relevant aspects. Knox v. Neaton Auto Products Mfg., Inc., 375 F.3d 451 (6th Cir. 2004). The relevant issue here is Tolbert's weight problem. Tolbert was not treated the same as similarly situated white employees because he was demoted due to his weight issues while white employees with weight issues were promoted and Other white linemen who were over the 275 pound limit did not receive any adverse treatment for their weight issues.

Thus, the burden shifts to Defendant to assert a legitimate non-discriminatory reason for Tolbert's demotion. Defendant asserts Tolbert's weight as its legitimate non-discriminatory reason. Def.'s Mot./Tolbert 4. Tolbert was overweight at the time of this demotion, but other white employees were not subject to the same treatment, which shows pretext. See Carter, 349 F.3d 273.

**3.    Tolbert's Claim of Other Racially-Disparate Discipline Survives Summary Judgment.**

Tolbert suffered from a materially adverse employment action because his opportunity to engage in unscheduled overtime was revoked by Glen Neidlinger in 1999. The denial of overtime work to Tolbert resulted in a loss of income to Tolbert and, thus, constituted a materially adverse employment action. Burlington Inds, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

The analysis described above about Tolbert's demotion claim applies equally to this claim. For the same reasons, it survives summary judgment.

4.    **Tolbert's Claim of a Racially Hostile Environment Should Survive Summary Judgment.**

The racially offensive comments and/or depictions to which Tolbert has been subjected span the course of his employment with Cinergy.  First, in 1990-1991 Tolbert was referred to as "boy" by his white supervisor, Llyod Balzhiser. Balzhiser treated African-American employees with less respect than white employees.  In 1993, Tolbert was aware of African-American employees being referred to as "nigger."  Id.  Throughout Tolbert's employment, white employees have made racist comments in his presence.  Additionally, Tolbert has witnessed confederate flags on employee lockers, hard hats, personal vehicles, and in common work areas.  Tolbert also testified that African-American employees were labeled stupid, ignorant, and dumb by co-employees.

Collectively, Tolbert's entire employment experience with Cinergy Corp. has been touched or otherwise blemished by racial harassment and discrimination.  Tolbert Dep. 406:19-20.  It is both objectively and subjectively clear that Tolbert has been subjected to a hostile work environment at Cinergy for years.

To hold an employer liable for its misconduct the plaintiff must show: (1) employer knew or should have known of the hostile work environment; and (2) the employer failed to take prompt and effective remedial action.

There is testimony by Tolbert indicating his awareness of co-employees reporting to supervisors regarding discriminatory conduct.  For instance, regarding the incident involving Fletch being called a "nigger," Tolbert testified that Fletch reported the offense to his supervisor, Gerry Seiters, but the supervisor only told both employees involved that if the employees did not leave the

56

area he would have to fire them both.  Tolbert Dep. 305:10-12.  Often times, however, incidents were not reported to anyone because the racially hostile work environment created by Cinergy discouraged such reporting.  Tolbert specifically testified that he did not report problems or feelings of racial discrimination because he felt that it was useless and that nothing would be done in response to his concerns.

Regardless, the hostile environment was so pervasive Tolbert was well aware of it, and Defendant should have known of it too.  The analysis applicable to Brantley's claim of a racially hostile environment applies equally to Tolbert's claim.  Tolbert believes that Defendant, which did not s top the problems, does not deserve summary judgment on this claim.

**5.    Tolbert's Claims of DisabilityDiscrimination Survive Summary Judgment.**

The ADA also provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, of discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. 12112(a).  Further, the Act defines "disability" as (A) a physical or mental impairment that substantially Limits one or more of the major life activities of such individual; (B) having a record of such impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2).  In order to be deemed disabled, plaintiff must establish at least one of these criteria, and

the determination should be made on a case-by-case basis.  Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999).

In the case at bar, Tolbert can show that he suffered from a physical impairment within the definitions of ADA under the first definition of "disability," and Cinergy unlawfully discriminated against him for the same.  Tolbert was obese, and his weight problems were associated with sleep apnea.  Tolbert's doctor reported to him that sleep apnea was hindering his weight loss efforts.[8]

Tolbert's physical impairment substantially limited one or more of his major life activities.  A "major life activity" has been defined to include "such functions as caring for oneself, performing manual tasks, seeing, hearing, and working."  Saw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469 (E.D. Va. 1994).  As established by Tolbert's Declaration, his impairment substantially limited Tolbert in many major life activities in his personal life, including running, climbing and even performing household chores.  It also limited him in his ability to work, affecting that "major life activity" by rendering him unable to work in an array of occupations.  Even Cinergy recognized that Tolbert could not hold any position that required his use of a ladder, or a weight-restricted lifting device.

Cinergy's restrictions on Tolbert's use of ladders and single-bucket trucks establishes that Cinergy regarded Tolbert as disabled, which satisfies the ADA's third definition of "disability."  The many records Cinergy made, monitoring his condition, satisfies the ADA's second definition of "disability."  Thus, Tolbert has satisfied the first prong of his *prima facie* case under the ADA.

_____

[8]The fact that Tolbert eventually had corrective surgery for sleep apnea hardly meant that he could lose his excess weight right away.

Tolbert was otherwise qualified for his job, with or without reasonable accommodation, as evidenced by his service as a Lineperson from 1991-1995 and his previously-described qualifications for promotions. Thus, the second prong of his *prima facie* ADA case is satisfied.

The last prong is satisfied, as well. Tolbert suffered from materially adverse employment actions based on his disability. He was demoted, denied employee compensation in the form of raises and loss of regularly scheduled overtime; and denied promotions to supervisory positions based on his disability. Cinergy has not offered any explanation or evidence that all of the adverse employment actions taken against Tolbert were based on anything but this disability.

Defendant proffers that the adverse employment actions taken against Tolbert were done in the interest of safety and the legitimate business expectation that Tolbert be able to fully preform the activities of the job. Tolbert submits that Defendant's articulated reason is pretextual, based on Defendant's more-favorable treatment of white overweight employees, as well as Defendant's failure to provide reasonable accommodations to Tolbert.. As previously mentions, Cinergy provided an exercise bike to a white overweight employee when he began as a Lineperson. Also, Cinergy had double-bucket trucks (cherry-pickers) with a maximum allowable weight of 600 pounds, Tolbert Dep. 134:16-19, to which white employees without weight issues were routinely assigned. Tolbert Dep. 134:7-13. It would have been of little consequence for Cinergy to assign a double-bucket truck to Tolbert, which would have eliminated his problem wit h lower weight limitations of other lifting devices. At a minimum, these considerations raise genuine issues of fact that warrant denial of summary judgment on Tolbert's ADA claims.

**D.    JONES' CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT.**

**1.    Jones' Failure-to-Promote Claims Survive Summary Judgment.**

Defendant's proffered affidavits do not place at issue or even address Jones' claims over denied promotions to Lineperson C positions in 1997 and 1998. Thus, summary judgment as to those claims should be denied without further ado.[9]

Plaintiff Jones claims that Defendant discriminatorily failed to promote him to Lineperson C vacancies. Defendant contests only the fourth prong of his *prima facie* case, arguing that he cannot "demonstrate that similarly situated employees were treated more favorably." Def.'s Mem./Jones 11. Before addressing that prong, Jones addresses the other three out of an abundance of caution.

As to the first two prongs, Jones is an African-American and, therefore a member of a protected class, who applied for the jobs at issue. The third prong, whether Jones was qualified for the promotion, may readily be established by examining Jones' experience. In fact, Defendant does not contest that Jones is qualified for the promotion. Jones developed years of experience as a Manual Technician during which he observed the tasks and duties of Linepersons. In addition, Jones had performed the tasks and duties of a Lineperson, had engaged in safe work practices, and understood the materials utilized. Jones even trained some newly-hired Linepersons to do their tasks, which merits substantially in his favor. Defendant has not offered any serious deficiencies in Jones' work history. There is no disparaging discipline as to Jones work performance.

As one of Defendant's affiants states, an applicant for a Lineperson C vacancy must qualify through a series of tests. First, an applicant must pass a "Manual Battery" written test, and upon doing so, the applicant takes the field assessment test. The field assessment test includes the

---

[9]Again, it is too late for Defendant to move for summary judgment on these claims. Certainly, Defendant's Reply memorandum is not an appropriate vehicle to address these claims for the first time.

"Working at Heights" component, which must be passed or the applicant is automatically disqualified from participating further as a candidate.  If a candidate passes the "Working at Heights" components and demonstrates "minimally acceptable performance" on the overall field assessment test, then the applicant is interviewed.  The scores from the field assessment test and the interview are weighted equally, and the average constitutes the applicant's final score.  Reinhard Supp. Aff. at ¶¶ 4-11.

The record demonstrates that Jones was treated differently from comparable white candidates for Lineperson C vacancies, and was, in fact, qualified for a position, but for racial discrimination. Of the seven times Jones applied for a Lineperson C position, the record as currently developed contains his test scores,  as well as the test scores for the other candidates, for five of the occasions when he applied.  Jones' average score (the average of his field assessment and interview scores) for these five occasions  never fell below "61."  Jones' field assessment scores for these five applications are as follows:

> 58.4 (February 1999–Reinhard Supp. Aff. Exh. A);
>
> 61.7 (April 1999–Reinhard Supp. Aff. Exh. B);
>
> 61.7 (August 1999–Reinhard Supp. Aff. Exh. C);
>
> 70.6 (January 2000–Reinhard Supp. Aff. Exh. D);
>
> 82.6 (April 2000–Reinhard Supp. Aff. Exh. E).

Looking at Jones' field assessment scores, his qualification for the position is apparent.  Defendant admits that a score of "60" on the field assessment test is not a failing score.  See Alavara Aff. bottom first page of Exh. 3 to Exh. D.  Thus, the record is clear that Jones did not fail his field assessment test for at least four of these five times he applied for the position.  In fact, Jones'

determination to be promoted to Lineperson C is clearly demonstrated by his consistent improvement in this score.

Jones' interview scores, together with his testimony regarding his interviews, suggest a different experience. Jones' interview scores for these five occasions ions are as follows:

> 63.6 (February 1999–Reinhard Supp. Aff. Exh. A);
>
> 54.4 (April 1999–Reinhard Supp. Aff. Exh. B);
>
> 52.4 (August 1999–Reinhard Supp. Aff. Exh. C);
>
> 62 (January 2000–Reinhard Supp. Aff. Exh. D);
>
> 65.6 (April 2000–Reinhard Supp. Aff. Exh. E).

Bernadette Reinhard told Jones that the interview portion of the selection process was holding him back. In fact, during his last attempt, Bob Atkins, Jones' white supervisor, who was one of Jones' interviewers during the first two days of the three-day selection process, thought that Jones had gotten the job, but after the final interview scores were averaged, Jones' total score of 74.1 fell lower than his field assessment score of 82.6.

The scores on other occasions make it more clear that Jones' interview scores were holding him back. Looking at the scores for April 1999, the candidates hired were those whose average score ranged from 94.2 to 72.8. Reinhard Supp. Aff. at ¶ 23. Jones' average score was 61.7. Id. Yet, Mark McCane and Katherine Messer, who are white, scored nearly identically to Jones on the field assessment (McCane at 71.2, Messer at 73 and Jones at 71) and were considered "hireable" because their interview scores pulled their field assessment score into the "hireable" range (McCane at 83.6, Messer at 72.6, but Jones at 52.4). Similarly, during the August 1999 selection, Shawn Akers, a successful white candidate scored 76.8 on his field assessment and 89.4 on his interview,

62

giving him a total score of 83.1. Jones received a comparable 71 on his field assessment, but his interview score of 52.4 was considerably suppressed, thus making it impossible for him to receive a "hireable" score.

The clearly subjective nature of the "scored" question-and-answer interview process, with interviewers who were white, resulting in a suspect but perhaps not surprising headwind with the force of a hurricane for Jones, supports a reasonable inference of racial motives in Jones' denied promotions, absent a legitimate nondiscriminatory explanation from Defendant.

Furthermore, Jones testifies that several white candidates were hired "off the street" and, therefore, did not have the experience on the job that he had acquired. It is Jones' testimony that such candidates were less qualified than he was for the Lineperson C position. Additionally, once these successful white candidates were hired, Jones was required to train them to do tasks a Lineperson C that he could already do. From this, which happened time and time again, one may reasonably infer a racial motive absent a legitimate nondiscriminatory explanation from Defendant.

Thus, in its effort to satisfy its burden of producing a justification for the adverse actions suffered by Jones, Defendant's simple statement that candidates were selected for the Lineperson C vacancies pursuant to the "EEOC validated" process and that "the top scorer were the successful candidates," see Def.'s Mem/Jones12, does not pass muster, for reasons set forth as to Brantley's denied promotions. Although Defendant's rebuttal burden is one of production, not persuasion, the defendant's "justification" is nothing more than a correlation, not a "cause and effect" explanation of why successful candidates were chosen instead of Jones. Moreover, Defendant's attempted articulation is effectively debunked by the foregoing analysis of Jones' *prima facie* case.

It is clear that Jones was qualified for the Lineperson C position.  It is similarly clear that Jones' field assessment test scores were comparable to similarly situated white candidates who received the position.  In addition, the record is replete with statements that it was the interview process that was holding up Jones' promotion.  The subjective interview process, although a "structured" one in which scores are awarded for answers given, also involved discussion among the interviewers after the interview was conducted as to who scored the highest.  Considering all of the other evidence presented above – i.e., Jones' experience and work history as a manual technician, his improving scores in both his field tests and his interviews, the fact that he scored similarly or above on his field tests as compared to white candidates who were given the position – all characterize the defendant's justifications a pretextual.  Thus, the demonstration of pretext, coupled with the *prima facie* case established above, exhibit genuine issues of material fact sufficient to warrant denial of summary judgment for the Defendant on Jones' failure-to-promote claims.

### 2.     Jones' Hostile Environment Claim Survives Summary Judgment.

The record demonstrates the hostile environment that Jones suffered.  Jones was the victim of several harassing incidents within the limitations period.  Jones has been subject to racially offensive statements while at work.  Sometime between 1999 and 2000, Jones was the butt of a racial joke made by a white co-worker when he and Jones were driving in a line truck with another white co-worker.  The joke was about there being cotton over in the fields with the reference suggesting that this was particularly significant for Jones because of his race.  Jones has heard from another black co-worker, Billy Brantley that a female employee had seen a noose hanging from the

64

ceiling in her work area. Jones knew of the incident in which Bruce Headen, an African-American, had been physically assaulted by two white co-workers. Jones testifies that he believes that race played a role the circumstances surrounding Todd Tolbert's accident and its aftermath. Jones felt that the comment made by Al Perkins sometime around 1998 about Tolbert's accident in which Perkins asked Jones if he still wanted to be a Linesperson C after what happened to Tolbert had racial content and carried an implicit threat. Perkins had never made any such comment to Jones after other accidents.

Additionally, Jones was assigned to disfavored tasks while at work more frequently than were his white co-workers. Jones believes that he had to clean the substation and clean up behind his co-workers more often than did white employees. Jones also believes that he has been denied overtime based on his race. White co-workers with less seniority than he had were given the opportunity to work during the "Blue Ash" storm sometime around April 1999. All of these incidents demonstrate a severe and pervasive hostile environment at CG&E. Jones testifies that the racial hostility at work, including the racially discriminatory aspects of the repeated denials of the Lineman C position, sickened him mentally and physically such that he was no longer able to do his job.

Defendant knew of Jones' concerns about the disfavored way that African-Americans were treated at CG&E. He spoke to Suzanne Bradley about the lack of minorities being hired into the company. Defendant knew that Todd Tolbert considered race to be a factor in his accident and the aftermath. Defendant knew that Jones, one of the few African-Americans to even take the Lineperson C assessment, had done so at least 7 times and repeatedly was denied the position, based almost entirely on the interview process. All of these incidents could have alerted Defendant that

65

Jones was being discriminatorily treated. In fact, the record indicates that Jones would have been a prime candidate for the mentoring suggested by the company's much touted diversity programs given Jones' record of no disciplinary actions during his entire tenure at CG&E, his dedication to bettering himself by continually improving his field assessment score and, (to a lesser extent) his interview score, and by his obvious interest in developing his skills and his value for the company. In fact, Al Perkins' Jones' white supervisor's comment that he was surprised that Jones had stuck it out as long as he had speaks, in part, to Jones' determination to better his position and his value to the company. Of course, implicit in Perkins' comment is the recognition that Jones was facing an uphill battle and one that he was doomed to lose. For these reasons, the company knew or should have known of the harassment Jones suffered, and Jones believes that Defendant does not deserve summary judgment on this issue.

### 3.    Jones' Constructive Discharge Claim Survives Summary Judgment.

A finding of constructive discharge requires a determination that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Held v. Gulf Oil Company, 684 F. 2d 427, 432 (6th Cir. 1982) (internal citation omitted). Under this standard, Jones' constructive discharge claim clearly survives summary judgment.[10]

---

[10]Defendant's cited cases are either reasonably distinguishable from the facts in Jones' case or more properly support Jones' claim of constructive discharge. Moore v. Kuka Welding Systems, 171 F.3d 1073 (6th Cir. 1999) affirms constructive discharge under similar facts as Jones', including the plaintiff's increasing isolation and lack of communication on the job which could lead a reasonable person to infer the defendant's intention for plaintiff to quit. Davis v. Washington County Open Door, Home, 2000 U.S. Dist. LEIS 20007 (S.D. Ohio 2000) (J. Holschuh) denying constructive discharge because plaintiffs only suffered a change in position

Jones testifies that when he assumed the position of Manual Technician in August 1997, he was told that the job was a "dead-end" job. Jones was told that the company was not hiring anyone else into the manual technician position, but the company was not going to eliminate the position. In effect, then, CG&E created a special, isolated category of employment in which Jones was allowed to work. Supervisors told Jones that there was no way to progress in the job, get raises or get assigned more duties. Knowing he was in a dead-end job, knowing that he never had received a bad evaluation and was considered an excellent employee, and knowing that he was familiar with the tasks and duties of a lineperson, Jones began applying for the Lineperson C position. Jones applied for this position at least seven times in the ensuing three years. Every time, Jones was denied the promotion despite the fact that he was as qualified for the position or more qualified than the white candidates who were hired or promoted to the job.

Coupled with the discouragement of being denied a job for which he was qualified or more qualified than the successful white candidates, Jones experienced racial hostility from his white co-

---

that was not a "dead-end" position as was Jones', and plaintiffs suffered "cold-shoulder" at work, not blatant race discrimination as did Jones. Similarly, in Vannoy v. OSCEA Local 11, 36 F. Supp. 2d 1018 (S.d. Ohio 1999) (J. Marbley) and in Spires v. The Ohio State University, 2001 U.S. Dist. LEXIS 24036 (S.d. Ohio, April 25, 2001) (J. Smith), Jones' case is distinguishable from the plaintiffs in those cases because Jones was not given an option of improving his situation and then decided to quit as with the plaintiff Vannoy, nor was Jones offered a job more in keeping with a compromised physical ability and then quite as with the plaintiff in Spires. In Wilson v. Firestone Tire & Rubber Co., 932 F. 2d 510 (6th Cir. 1991), the plaintiff, unlike Jones, was not offered a "dead-end" alternative to early retirement. Rather, Wilson was offered another legitimate position within the company, but chose early retirement. Finally, King v. State Farm Mutual Auto Insurance Co., et al., 112 Ohio Appl 3d 664, 669 (Ohio Ct. Appl 6th Dist. 1996) is easily distinguishable because, as has been demonstrated, CG&E clearly knew that Jones sought a promotion into a position for which he was qualified, but was being denied the job continually. Jones's supervisors, co-workers, and the Human Resources department knew of Jones' dilemma. Upon hearing of Jones' resignation, his immediate supervisor exclaimed that he did not know how Jones had "stuck it out" as long as he had.

workers and white supervisors. When he contacted the Human Relations department about his concern that few minorities were being hired, he received the dismissive and cursory comment that more minorities needed to apply. When Jones attempted to understand why he was not succeeding in his bids to be a Lineperson, Bernadette Reinhard, a white Human relations representative, spoke perfunctorily and harshly to him, giving him only minimal answers to his concerns. All of the foregoing were the company's deliberate acts (they were hardly negligent acts).

Jones testifies that over the year, he became mentally and physically ill from the burden of knowing he could do the job he sought but was repeatedly denied and which was repeatedly given to others with less experience and training, and with Jones being asked to train them for the job. Finally, he felt that the frustration, depression and stress surround his situation had to end, and he announced his resignation on July 31, 2001 with a letter of resignation.

It seems that what Jones was told when he accepted the Manual Technician job in 1997 was exactly right. Jones was in a dead-end job in which he would never get additional duties or a chance to improve himself or his value to the company. Any reasonable person in Jones' shoes would have resigned under such intolerable circumstances. In fact, Al Perkins, Jones' white supervisor, made the cryptic comment to Jones after Jones' last Lineperson C assessment, that he, Perkins, did not know how Jones had held out as long as he had. In a sense, Perkins' statement reflects the response of a "reasonable" person. It certainly reflects Jones' ultimate realization that his job circumstances were intolerable, that Defendant had created a place in the company from which he would not escape except through his own resignation. Under such conditions, Defendant's unlawful intent is reasonably inferred, and Jones' resignation constitutes a constructive discharge. Jones should survive summary judgment on this claim.

Respectfully submitted,


s/Barry V. Frederick_____
Barry V. Frederick (*pro hac vice*)
Robert L. Wiggins, Jr. (*pro hac vice*)
Ann K. Wiggins (*pro hac vice*)
Robert F. Childs, Jr. (*pro hac vice*)
Susan Donahue (*pro hac vice*)
**WIGGINS, CHILDS, QUINN & PANTAZIS**
The Kress Building
301 19th Street North
Birmingham, AL 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500
bvf@wcqp.com
sgd@wcqp.com

Paul H. Tobias, OH Bar No. 0032415
David D. Kammer, OH Bar No. 0061808
**TOBIAS, KRAUS & TORCHIA**
414 Walnut Street
Suite 911
Cincinnati, Oh 45202
Telephone: (513) 241-8137
Facsimile: (513) 241-7863
tkt@tktlaw.com

David Sanford (*pro hac vice*)
**SANFORD, WITTELS, & HEISLER, L.L.P.**
2121 K St. N.W.
Suite 700
Washington, D.C. 20037
Telephone: 202/942-9124
Fax number: 202/628-8189
dsanford@davidsanford.com

69

Grant Morris (*pro hac vice*)
**Law Offices of Grant Morris**
2121 K Street, N.W.
Suite 700
Washington, D. C. 20037
Telephone: (202) 331-4707
Fax number: (202) 628-8189
grantmorris@grantmorrislaw.com

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to:

Jill Thompson O'Shea, Esq.
Cinergy Services, Inc.
139 East Fourth Street
P.O. Box 960
Cincinnati, OH 45201

Gregory V. Mersol
Baker & hostetler, LLP
3200 National City Center
1900 East Ninth street
Cleveland, OH 44114-3485

<u>s/Barry V. Frederick</u>
Barry V. Frederick (*pro hac vice*)