UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et. al., | : | Case No. C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Michael H. Watson |
| | : | |
| vs. | : | |
| | : | DEFENDANT, CINERGY CORP.'S, |
| CINERGY CORP., | : | REPLY MEMORANDUM IN |
| | : | SUPPORT OF MOTION FOR |
| Defendant. | : | SUMMARY JUDGMENT |
| | : | <u>AS TO PLAINTIFF, ANTHONY MARTIN</u> |

**I.    INTRODUCTION**

Plaintiff, Anthony Martin ("Martin" or "Plaintiff"), cannot identify a single discriminatory statement by any supervisor who made any decision affecting his employment. He can point to no actionable discipline, and relies entirely upon guess work and recrafting of Defendant's promotion procedures to attack his hiring claims. Because there is no admissible evidence of any discriminatory treatment, summary judgment should be granted in Defendant's favor.

**II.    MARTIN'S ALLEGED "FACTS" DO NOT CREATE ANY MATERIAL DISPUTE**

  **a.    The Alleged Unfair Discipline Claim Is Time-Barred and Meritless**

Martin's claim of unfair discipline rests upon a single incident in the **1980's**, well beyond the statute of limitations, in which Bob Fink, his supervisor at Miami Fort, suspected him of

134455                                                    1

alcohol use. No discipline, however, was ever issued after Martin tested negative.[1] Martin could not state that the incident was based on race, and suffered no materially adverse job action. (*see, e.g.,* p. 27:13-24; p 28:1-24; p. 29:1-18; p. 31:14-24; p. 32:1-24; p. 33:1-24; p. 35:1-24; p. 36).

Other than the Todd Tolbert's August 27, 1998 electrical contact incident and an incident involving damage to a company vehicle (see pages 5-6), Martin could not identify any other alleged instance of "unfair discipline" while employed at Electric T&D C&M from 1991 to the present. (p.384:2-6). Both of those incidents, however, fall far short of demonstrating discrimination.

With respect to the damage to a company vehicle, Martin conceded at his deposition that he had driven a truck forward onto a rock and dragged it some distance and that the rock could not be extricated without a tow truck. (p. 227:1-24; 234:10-13; p. 338:8-24). He could not identify any coaching or counseling, oral warning or written discipline given to him as a result of this incident. (p. 235:12-15). Martin confirmed that the Company requires that a Motor Vehicle Accident Report be prepared when a company vehicle is damaged and that he had no knowledge of accident reports not being prepared involving Caucasian employees. (p. 232:19-22; p. 233:20-24; p. 234:16-19). In the face of these admissions, Martin's repeated reliance on unfounded or immaterial assertions is exemplified on page 6 where he relies on his testimony that "I didn't think it was this much damage". However, he did not look at the damage to the vehicle after it had been removed by the tow truck; did not know if the truck was damaged as listed in the report; had no knowledge who did the estimate; and did not know if any were involved in the estimate. (p. 228:10; 230:1-24; p. 231:1-2; p. 232:5-7)

The August 27, 1998 incident arose out of Martin's involvement in an electrical contact incident which was reduced to an oral warning as discussed on pages 5 and 6 of Defendant's

---

[1] Martin mistakes his testimony that "Fink did not suspect white employees of drinking on p. 3. He testified as follows Q: Do you believe that he ever had occasion to believe anyone else had come into the workplace after having consumed alcohol or drugs? A: Not that I know of. (p. 25: 5-8)

134455                                                    2

Motion for Summary Judgment.[2] Although Martin tries to marshall this minor discipline into evidence of discrimination based upon a comparison with another employee, he conceded at his deposition that he in truth had no knowledge of the incident of the other person other than hearsay statements of a co-worker. He admitted that he knows "very little of the circumstances" such as what the employees were doing and where they were located at the time of the incident. (p. 212:5-11, 20-24; p. 213:14-24; p. 214:1-8; *see, also*, arguments on pages 11 and 12 herein).

Martin's assertions of "disparate treatment and harassment from his supervisors" on page 4 is a likewise a red herring. Martin relies on a single incident in which his supervisor, Morris, did not buy him lunch on one occasion. Martin conceded at his deposition, however, that the purpose of the lunch was to commend Bill Thompson's crew for reporting a contractor performing an unsafe act. Martin confirmed he was not a member of the crew or present at the time the report was made. He further admitted that he did not know if Morris acted based on race,[3] and could not state the Morris acted based on race and also acknowledging Morris never made a racial slur, derogatory or offensive statement to him or in his presence. (p. 254:8-15; p. 7070:1-19)[4] There is no evidence of discriminatory intent as to either allegation, nor could they be viewed as materially adverse actions.

      **b.**     **The Alleged Hostile Work Environment Is Without Merit**

Martin's allegations of "racial harassment" on pages 3 and 4 are time barred, isolated and most often fail to identify any racial animus or discriminatory intent. No supervisors or co-workers at Miami Fort made offensive racial comments or threatening statements, nor were there

---

[2] Plaintiff confirmed that the Union did not pursue a fourth step grievance (p. 252:24; p. 253:1-4).
[3] Morris was not the individual who invited Plaintiff to lunch on that occasion. (p. 24:6, 17-21)
[4] Plaintiff further misstates on page 4 that he complained "about a dearth of opportunities to work overtime" on page 4. Rather, Martin questioned whether Morris called him in for overtime on "several occasions" (1 to 3 times).(p. 255:20-24; 256:1).

134455                           3

any racially offensive items in the workplace at any time when Martin worked there. (p. 25:21-24; p. 26:1-21).

Martin relies on two time-barred statements by a co-worker in **1991** when he first started his employment as a construction helper in the Brecon overhead department. Martin went to his supervisor, John Huwell ("Huwell"), about the first statement related to "kicking my black ass." Huwell interviewed the employee, warned him never to make such statements again, and his co-worker never did it again.[5] (p. 71:6-24; p. 72:1-9). With respect to a second comment made by the same co-worker sometime thereafter in **1991** as to disowning his daughter if she married a black man, Plaintiff did not bring this to the attention of Huwell. There were no other occasions of racial comments in the workplace by supervisors or co-workers during the entirety of his employment in Electric T&D C&M in the **13 years** from 1991 to the present. (p. 65:14-24; p. 66:1-20; p. 70:15-19; p. 74:1-6).

The remaining statements are not only time-barred but based on inadmissible hearsay. Martin references a double hearsay statement from someone he cannot identify who heard some employees referred to certain equipment as 'nigger toes' " in the early **1990**'s. (p. 99:24; p. 91:1-24; p. 92:1-7). Martin again relies on dated, time barred and inadmissible hearsay testimony that when he first became a groundperson driver at Electric T&D at Brecon in **1991**, co-employees, whom he could not identify; yelled and cussed at him for a period of time.[6] Martin, however, conceded at his deposition that they did NOT use racial slurs at any time. He also could not state that they yelled at him in front of a supervisor. When asked why he did not bring this to anyone's attention; Martin responded "just never did." (p. 94:1-24; p. 95:1-24; p. 96:2-17; p. 98:2-17; p. 327:22-24; p. 328:1-3).

---

[5]  In fact, the incident occurred in 1993 and Cutsinger was disciplined and per Plaintiff's testimony, it never occurred again. (Suppt. Toebbe Affidavit, ¶4; Exhibit "A"; p.72:9-10) .

[6]  He was not sure how long the yelling and cursing lasted. When questioned, he believed more than four to six months but was not sure if it lasted six to eight months (p. 96:18-24; p. 97:1-24; p. 98:1-8).

Martin's reliance (on p. 4) on statements made at a diversity program is likewise a red herring especially where he could not identify which program and confirmed that the purpose of the Company's diversity programs was to "promote cooperation and respect between all employees" including minorities.[7] The diversity program also included a film of Caucasian and African-Americans going to school with one another and working to get along. Martin never raised the comments with the commentator of the program or anyone in the Company.[8] (p. 165:24; p. 166:1-3; p. 167:8-24; p. 168:6-16; p. 168:17-24; p. 169:1-23)

With respect to the "banana peel" in the truck incident(s) which Martin raised for the first time at his October 1, 2002 deposition, Martin testified only that he observed one banana peel in the back of his truck. Martin did not know how many times this occurred other than it was more than once but "did not know if it was two, three or four times." He had no knowledge of anyone being involved from the Company. Despite his knowledge of the Harassment Free Workplace Policy, Martin filed no complaint, and made no report to any supervisor, human resources employee or the employee 1-800 hot-line. (p. 89:1-24; p. 90:4-6; p. 74:17-24; p. 75:3-24; p. 76:2-24; p. 319:18-24; p. 320:1-24).

    **c.**    **Martin's Failure to Take Advantage of Corrective Opportunities**

The record is uncontroverted and Martin confirmed that the Company communicated that it disfavored harassment based on race dating back some years (p. 108:11-24; p. 109:1-15) and that the Company's policies were communicated to employees and posted on boards.[9] Yet, he testified he never reported harassment based on race and could not say that the company would have done anything other than to treat such a complaint seriously. For example, he never went to

---

[7] It must be observed that although immaterial, Plaintiff never identifies that the reference to "those people" was directed specifically at African-Americans.

[8] Plaintiff was aware that Tolbert and Brantley were members of the Hartwell diversity but did not involve himself in any diversity efforts.

[9] For example, Plaintiff acknowledged that he signed the list for Workplace Harassment training on September 27, 2000 (p. 160:5-24; p. 161:1-14; Exhibit 31).

134455                    5

HR or Compliance Services consistent with the policy, and had no experience with either which caused him not to report. He knew of the 1-800 employee hot-line but never used it. When asked why not, Martin testified "I did not feel there was a need to." (p. 85:1-24; p. 86:1-24; p. 87:1-20).[10] Martin cannot challenge the case law cited at pages 18 and 19 of Defendant's motion that these admissions bar his claim.

### d.     The Alleged Failure to Promote Claim Is Without Merit

Martin's failure to promote claims are likewise not actionable and wholly without merit. His claim of a failure to be transferred to a mechanic position in the **late 80's** is long since time-barred under any arguable statute of limitations. Moreover, Martin made no reference to it in his January 12, 1999 EEOC Charge (Exhibit 40) and thus it is also time barred for his failure to assert it in the charge. Martin was hired as a janitor at Miami Fort, a power plant, on May 6, 1985 and was timely promoted with no delay (no one was promoted ahead of him) to a cleaner on May 19, 1986. (p. 22:5-24; p. 23:1-4). He summarily asserts on p. 3 that his **application** (actually request for transfer) for a mechanic position in the late 1980s, albeit time barred, was denied for alleged "attendance problems".[11] Martin, however, specifically could not state the discipline was based on race. (p. 31:2-11; p. 36:1-5). Martin also did not recall and could not deny that he failed a number of written tests with the Company. He could not dispute that the tests applied to all employees and retesting requirements applied to all employees. (p. 37:13-24; p. 38:1-14). Martin could not state his failed testing or lack of eligibility for re-testing was based on race (p. 39:1-8).

---

[10]     Plaintiff relies on testimony on p. 4 that he did not complain because he did not believe anything would be done about which omits his testimony that he had no reason not to report. Moreover, it is based on his immaterial conclusory speculation "I guess I used the assumption that wasn't nothing going to be done anyway" which he acknowledged was a double assumption based on his experience with the Union, not the Company (p. 77:13-18; p. 78:20-24; p. 85:1-24; p. 86:1-24; p. 87:1-20)

[11]     Plaintiff could not recall the circumstances of discipline, *i.e.*, in October of 1986 for quality of work, absenteeism, etc. (p. 28:2-24; p. 29:1-18).

134455                                                                  6

Martin's alleged failure to promote to the Lineperson "C" positions dating back to 1995, 1997 and 1998 (see pages 3, 6 and 7) are time barred for his failure to timely file a charge and/or suit following the EEOC's dismissal on June 8, 1999. (*see* page 8 of Motion for Summary Judgment.) The December 1998[12] posting is likewise time-barred from failure to file an EEOC charge within 300 days.[13]

Further, with respect to the failure to promote to the Lineperson "C" allegations, Martin omits his deposition testimony that he had no knowledge that the people involved in the field assessment acted on reasons based on race at any time. (p. 148:20-24; p. 149:1-21). Rather, he acknowledged he is relying on an inadmissible assumption that field assessors were not recording mistakes being made by Caucasians even though he testified he testified that had no information or knowledge that that was ever taking place. (270:12-16; p. 349:8-12). He also testified that other Groundperson Drivers "A", including an African-American, qualified up to the Lineperson "C" (p. 333:10-21).[14]

With respect to the 1995 application, Martin admitted that he was not a good climber, an admission that is consistent with the reason given for his failure in the field assessment test. He also confirmed that he had no knowledge that his failure to promote was based on race. (p. 123:1-24; p. 124:1-7' p. 328:9-14).

Martin applied twice for Lineperson "C" in 1997 and did not know, for example, the number of applicants or the number who scored high enough on the field assessments to get interviews. He could not state that the findings of the field assessment, such as the scores of the November 26, 1997 assessment (Exhibit 29), were based on race. (p. 134:2-5). He did not know

---

[12] With respect to the December 1998 Lineperson "C" posting, Plaintiff did not know, for example, how may applied or how may were hired (. 221:3-12; p. 242:15-24)
[13] The second EEOC charge was not filed until April 11, 2000 (see page 8 of Statement of Facts).
[14] Plaintiff's reliance on less seniority is again a red herring and fails to create a genuine issue of material fact.

134455                                      7

why the Union did not pursue a fourth step grievance related to the 1997 positions. (p. 156:8-13).

Lacking any evidence that anything about the assessments had anything to do with race, Martin speculates about Gary Nasto's (sic) weight on page 6, a matter which is immaterial as to his score on the field assessment (*see*, Exhibit 29). Nastold being provided a shirt and slipping once does not constitute evidence that he was not one of the top scorers in the field assessment, nor evidence of racially discriminatory intent.

Likewise, Martin's subjective belief that he did well on the tests on pages 6 and 38 are inadmissible as subjective conclusory beliefs and fail to create a material issue of fact. Martin acknowledged that the Company trained employees as to work procedures, but that he, for example, did not know the requirements of how far to set out a ladder, while Plaintiff Brantley testified that the correct procedure, on which employees are trained, is to erect a ladder using a 4 to 1 ratio from the base of the ladder. (Martin p. 135:22-24; p. 136:1-24; p. 143:9-24; p. 144:1-15; p. 161:15-21; Brantley, p. 213:8-10; p. 218:1-13).[15] Martin further testified that he had no knowledge of requirements as to the diameter of a hole to be dug for a pole whereas Brantley testified that the diameter is not to be less than 18 inches and not greater than 20 inches in the field assessment consistent with the "set up guidelines in the assessment to grade the people." (Martin, p. 145:2-24; p. 145:1; Brantley, p. 215:6-24). Thus, Martin's subjective conclusory assertions that he was qualifies because of his experience with the Company and opportunity to observe the work or his belief that he performed well on the field assessment are inadmissible and have no materiality especially where Martin does not know the proper procedures notwithstanding his training on work procedures as a Groundperson Driver "A".

---

[15]   *See, also*, Martin's testimony compared to Brantley as to proper installation of a lag bolt (Martin, p. 147:4-24; Brantley p. 217:21-23; p. 218:1-24; p. 219:1-4).

134455                                                             8

Plaintiff's reliance on complaints to Jim Stanley ("Stanley"), Vice President of Electric T&D C&M, on page 7 is likewise a red herring especially since he acknowledged that he did not make any complaints to Stanley based on race discrimination (p. 318:1-6). His complaint to Dave Ward related to the 1997 application in the context of the grievance wherein Plaintiff did not raise race discrimination. (*see, e.g,,* Exhibit 30).

### III.    ARGUMENT OF LAW

####    a.    Plaintiff's Claims are Barred As Untimely

As set forth on pages 10 and 11 of Defendant's Motion for Summary Judgment, many of Martin's claims are time-barred. Although Martin now seeks to rely upon 42 U.S.C. Section 1981, he asserted no such claim in the Complaint. Even if the Complaint were amended, only one claim, the December 1998 failure to promote allegation, would be timely.

####    b.    Plaintiff Offers No Direct Evidence of Race Discrimination in Any Employment Action

Plaintiff does not controvert the failure of proof regarding any direct evidence of discrimination. He has no evidence of any discriminatory remarks, any racist comments by supervisors, or any other direct evidence that race played any role in the decisions that affected him.

####    c.    Plaintiffs' Hostile Work Environment Claim is Not Actionable As A Matter of Law

Likewise, there is no competent evidence of any actionable harassment. Martin summarily asserts on page 42 that he "was the victim of several harassing incidents within the federal and state limitations periods stretching back, respectively to June 7, 1997 and June 7, 1995" wholly failing to identify what he is referencing on those dates. As set forth above, however, each of the alleged incidents had nothing to do with race discrimination or harassment.

134455                                                              9

None of these alleged incidents constituted an incident of racial harassment within the "statute of limitations" period to even arguably consider alleged incidents outside the statue of limitations period. None constituted conduct sufficiently severe or pervasive to alter the conditions of the victim's employment. None created an objectively and subjectively hostile environment as a matter of law under <u>Harris</u> or Sixth Circuit precedent such as <u>Black</u>, <u>Burnett</u>, <u>Morris</u>, and <u>Bryant.</u> Martin does not even mention, let alone address, any of these cases even though they were cited on pages 17 and 18 of Defendant's Motion for Summary Judgment and are fatal to his claims.

        **d.    Plaintiff Cannot Demonstrate A Prima Facie Case of Unfair Discipline Based on Race Discrimination Because He Cannot Demonstrate A Materially Adverse Employment Action and/or Pretext As A Matter Of Law.**

Plaintiff's receipt of an oral warning based on legitimate business reasons identified on pages 5-6 of Defendant's Motion for Summary Judgment is not a materially adverse employment action as a matter of law. Plaintiff wholly fails to address the case law cited by Defendant on pages 12-13 of its Motion for Summary Judgment as to the requirements of a materially adverse job action.[16]

   Contrary to Plaintiff's assertion on page 41, <u>Williams v A.P. Parts, Inc.</u>, 252 F. Supp. 2d 495, supports the conclusion that an oral warning does not constitute a materially adverse job action as a matter of law. In <u>Williams</u>, the court affirmed summary judgment and concluded that "Defendant's two write-ups of plaintiff do not constitute adverse employment action." <u>Id</u>. at 498. Plaintiff's speculation on page 41 that "in the very real world of the workplace, such discipline is an adverse employment action" is not supported by the record in this case or the law. By his own testimony, Plaintiff was working as a member of a crew with Plaintiff, Brantley, the senior lineperson performing the work of transferring a head guy with Plaintiff, Tolbert, when Tolbert

---

[16] Plaintiff's unfair discipline allegations are also barred by his failure to timely file an EEOC charge and/or failure to timely file suit.

134455          10

came into contact with a high voltage line and was injured. The incident occurred as Martin "tuned to go and walk away from Todd and Bill" (p. 195:17-18).[17]

Moreover, The Sixth Circuit holds that "[t]o be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Erceqovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)); Palmer v. Potter, 2004 U.S. App. LEXIS 7340 (6th Cir. 2004) (fourth element of prima facie case not satisfied where not similarly situated for the reason that the conduct was not qualitatively comparable and the employee's status were not similar); Clayton v. Meijer, Inc., 281 F.3d 605, 612 (6th Cir. 2002) ("similarly situated" element not satisfied where misconduct was "qualitatively more serious" and observing than an "employer's mere severe treatment of more egregious circumstance simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination"); Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1116 (6th Cir. 2001) (prima facie case fails where plaintiff "produced no evidence showing that [the other] employees were similarly situated with respect to the severity and frequency of their performance errors"); Braithwaite v. Timken Co., 258 F.3d 488, 497 (6th Cir. 2001) ("similarly situated" element not satisfied where plaintiff broke more serious company rule).

In this case, the involvement of different immediate supervisors and management render the comparisons dissimilar as a matter of law. Dan Morris was the immediate supervisor as to the

---

[17] Plaintiff conveniently ignores that Brantley was the Senior Person performing the work with Tolbert at the tine of the incident. On the contrary, Sibcy, the Caucasian employee upon which Plaintiff repeatedly asserts instructed him as to the work, was not in the immediate are or involved in the actual transfer of the head guy at the time of the incident. (p. 241: 6-24; p. 242: 1-3)

134455                                            11

Tolbert incident and William Gatto was the immediate supervisor as to the Bennett incident. Jim Stanley, Vice President of Electric T&D C&M, was involved in the grievance and signed the grievance letter as to Martin (see Exhibit "C" to Affidavit of Ward) whereas William Gatto signed the disciplinary letters as to the Bennett incident and a different Vice President, Ron Monson, Vice President of T&D Projects was the Vice President was carboned copied.

The situations on which Martin relies also arose under different circumstances especially where the Union, not the Company, decided not to pursue a fourth step internal grievance as to Martin. Martin does not even respond to the Company's arguments relating to his time-barred complaints about incidents in which he received no discipline (alcohol testing in the 1980's) and the accident report related to damage to a Company vehicle. .

In addition, "[a] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that reason was false and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2752, 125 L. E. 2d 407 (1993); Pierce v. Commonwealth Life Ins. Co. 40 F.3d 796 (6th Cir. 1994) (summary judgment affirmed where failed to prove comparator was similarly situated and provided no evidence that the proferred explanation was false or a pretext for discrimination). Martin fails to demonstrate pretext or racially discriminatory intent as to the oral warning issued as a result of his involvement in the August 27, 1998 electrical contact incident.

  e.  **Plaintiff Cannot Demonstrate A <u>Prima</u> <u>Facie</u> Case Of Failure to Promote Based on Race Discrimination or Pretext As A Matter Of Law.**

On page 34 of his memorandum, Martin premises his entire argument upon the erroneous premise that 'the sole prong of the prima facie case that Defendant contests is the "fourth" pretext. Defendant, however, has consistently asserted Martin could not satisfy the <u>prima</u> <u>facie</u> case as well because he was not qualified for the positions he sought.

134455             12

Martin has presented no competent evidence that he was qualified, but, instead, relies upon his own subjective belief that he should have gotten the jobs he wanted. An employee's subjective perception of his own qualifications or performance, however, does not create an issue of material fact. *See, e.g.*, Ost v. West Suburban Travelers Limousine, Inc., 88 F.3d 435 (7th Cir. 1996) (plaintiff's own opinions about work performance or qualifications does not sufficiently demonstrate pretext); Anderson v. Baxter Health Care Corp., 13 F.3d 1120, 1125 (7th Cir. 1994) (mere submission of materials from co-workers that employee's performance is satisfactory does not create an issue of material fact); Olsen v. Marshall & Isley Corp., 267 F.3d 597, 602 (7th Cir. 2001) (employee's perception of own performance does not create an issue of material fact).

In this case, Martin imposes his own view of what criteria the Company should have used, ignores the fact that the EEOC has validated the Company's selection process, and then repeatedly relies on subjective beliefs as to his qualifications. (*e.g.*, "[I]he third prong, whether Martin is qualified for the job, is readily established by examining Martin's experience" on page 34). Disregarding the Company's validated selection criteria, he then again relies on experience (seniority only) working with Linepersons and observations of the work in support of his subjective belief that he is qualified. His reliance on his alleged "training"[18] of others on the bottom of page 35 again has no materiality as to the top scorers in the Lineperson "C" EEOC externally validated targeted selection process, let alone any evidence as to an intent to discriminate based on race in the Lineperson "C" selection process. Martin cannot satisfy the third prong of the test by substituting his subjective beliefs for the Company's lawful selection criteria.

---

[18] This is especially true where Martin testified that individuals asked questions but he could not identify what they asked or who they were and that he "stopped others" because of the "potential for problems" but again could not identify who they were or what they were doing. (p. 334:1-24; p. 335:1-8). A change in written format for later job postings as relied upon by Martin on page 37 likewise has no materially or relevance as well as to racial discrimination.

134455                                    13

As to the 1997 testing, Martin solely relies on his subjective belief that he performed well on the testing on pages 39 and 40 of his memorandum which does not create a genuine issue of material fact per the holdings of <u>Ost</u>, <u>Anderson</u> and <u>Olsen</u>, above.[19] This is especially true where the record demonstrates by the sworn testimony of his co-worker, Plaintiff Brantley, that despite training as to work methods, Martin did not know the proper procedure as to tasks in the field assessment. (see page 7 of Statement of Facts herein).

With respect to the August 1998 posting, contrary to Plaintiff's misrepresentation without citation to the record, the record is uncontoverted that Plaintiff was on the crew and in the immediate area of the electrical contact incident involving Tolbert on August 27, 1998 and that his resume was subject to a faulty facsimile transmission which was brought to the company's attention in the context of the grievance. Thus, there is no evidence that the reasons were false or any evidence of discriminatory intent. The fact that the Company allowed Plaintiff thereafter to retest in December 1998 is evidence of the Company's good faith in the grievance process, not the contrary and certainly in no manner "totally discredits Defendant's assertions" as asserted on page 39 of his memorandum.

With respect to the Job Posting 98-404 in December 1998, Martin's assertions as to the fourth prong of disparate treatment on pages 36 though 40 fail to demonstrate a <u>prima facie</u> case and/or pretext of race discrimination. His reasoning is so convoluted on pages 36 through 38 of his memorandum as to be nonsensical. Moreover, his blatant misrepresentations on page 36 "yet the record does not support Defendant's contention" and on page 38 "[I]n sum, the only conclusion one may muster, and at the very least a reasonable inference is, that Martin did not fail his field his field assessment test for the December 1998 vacancies" is unsupported and totally without merit. Exhibit "A", the score sheet for the job posting at issue, 98-404, expressly

---

[19]    Plaintiff's immaterial assertions as to his observations of one co-employee, Gary Nastold, at a testing (and not even identified as the time Nastold was a successful candidate) is addressed on page 7 of Statement of Facts.

list the five candidates who failed the working at heights component on a separate sheet with the designation "Fail" consistent with Bernadette Reinhard's sworn affidavit testimony. Since Martin and the four others failed the working at heights component (which is, for obvious reasons, an automatic fail for candidates seeking to become line workers), there would necessarily be no scores listed in this separate sheet under the interview and total average columns. [20] The use of a common sense requirement that applicants for jobs that require working at heights actually be able to work at heights, and the use of that requirement as part of an EEOC validated process is not race discrimination. Martin's assertion that notation of "Failure" on Exhibits "D" and "E" references the Final Score sheets for the 2000 Lineperson "C" job posting, 00-83, for which Martin did not even apply and thus their format or differing notations is immaterial.[21] Similarly, there was nothing unlawful about Defendant's use of objective field assessment scores in selecting candidates. (Reinhard Suppt. Affidavit; ¶ 11, 19-20; Exhibit "A").

Martin does not dispute that he scored lower overall than the total combined scores of the successful candidates for the jobs he sought. Rather, he devotes pages 37 and 38 of his response to comparing snippets of different scores by different candidates (i.e., compare solely the interview score or solely the field assessment scores versus the combined total scores used in the selection), seeking to rewrite the Company's EEOC-validated selection procedure. This speculation and second-guessing of a lawful hiring process creates no genuine issue of material fact.

---

[20] The fact that the other individuals who failed the working at heights exercise had lower scores again is immaterial and fails to demonstrate pretext or racial intent. His speculation that if interviewed, he might have been selected on p. 38 is immaterial and fails to create a material issue of fact, let alone racial animus. He then relies on the mere allegations of his Complaint on page 38 that "However, due to Defendant's discriminatory actions, Martin was denied an opportunity to proceed to proceed (sic) to achieve such a score." without citation to the record because none exists.

[21] Martin proffers the same irrelevant assertion as to Exhibit "C" which are the Final Score Sheets (again in a different slightly different listing format than Exhibits "D" and "E" ) for the job posting in August 1999 for which Plaintiff was not tested.

Not only does Martin fail to establish a prima facie case, he also fails to satisfy the Hicks and Pierce requirements cited on page 12 herein that pretext is not demonstrated unless it is shown both that reason was false and that discrimination was the real reason. Martin fails to offer any evidence of discriminatory intent, and discriminatory remarks, or any other evidence that race played any role in the selection process. In fact, Martin conceded at his deposition that he had no knowledge that the people involved in the field assessment acted on reasons based on race at any time. (p. 148:20-24; p. 149:1-21).

Thus, Martin has failed to demonstrate a prima facie case as to his failure to promote into the Lineperson "C" program or that the reasons for his failure to promote to the Lineperson "C" position were mere pretexts. Moreover, other than inadmissible subjective beliefs and conjecture, Martin has failed to demonstrate any racially discriminatory intent as to his alleged failure to promote.

**IV.    CONCLUSION**

Martin has no evidence of race discrimination but, instead, simply relies upon his own inadmissible subjective beliefs as to his qualifications, that seniority or "experience" should have the criteria. Because mere subjective belief and feelings do not create genuine issues of material fact, summary judgment should be granted in Defendant's favor as to all of Plaintiff's claims.

Respectfully submitted,

*/s/* Jill T. O'Shea
Jill T. O'Shea    (0034692)
Attorney for Defendant, Cinergy Corp.
139 E. Fourth Street, 25 Atrium II
P.O. Box 960
Cincinnati, OH 45201-0960
Phone:  (513) 287-2062
Fax:  (513) 287-3810

/s/ Gregory v. Mersol (JTO)
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading was served via ordinary mail this 28th day of October 2004 to:

Paul H. Tobias
David D. Kammer
TOBIAS, KRAUS & TORCHIA, LLP
414 Walnut Street
Suite 911
Cincinnati, OH  45202

David W. Sanford, Esq.
Sanford, Wittels & Heisler, LLP
2121 K Street, N.W.
Suite 700
Washington, DC  20037

Grant E. Morris
Law Offices of Grant E. Morris
2121 K Street, N.W.
Suite 700
Washington, DC  20037

Barry Vaughn Frederick
Robert L. Wiggins, Esq.
Ann K. Wiggins, Esq.
Susan Donahue, Esq.
Robert F. Childs, Esq.
Wiggins, Childs, Quinn & Pantazis, P.C.
1400 South Trust Tower
420 North 20th Street
Birmingham, AL  35203

/s/ Jill T. O'Shea
Jill T. O'Shea