IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BILLY BRANTLEY, et al., | : | Case No.     C-1-01-378 |
| | : | |
| Plaintiffs, | : | Judge Michael H. Watson |
| | : | |
| vs. | : | |
| | : | DEFENDANT, CINERGY CORP.'S, |
| | : | REPLY MEMORANDUM |
| CINERGY CORP., | : | IN SUPPORT OF |
| | : | MOTION FOR SUMMARY JUDGMENT |
| Defendant. | : | AS TO PLAINTIFF, BILLY BRANTLEY |

## I.    INTRODUCTION

Plaintiff, Billy Brantley ("Brantley"), can identify no discriminatory statements from any decision-maker who affected his employment, can point to no equal or lesser qualified white candidate who received any position he sought, and all but concedes that he neither witnessed, nor experienced any racially hostile workplace conduct.  Instead, he seeks to conceal these matters beneath a smokescreen made up of dated and isolated incidents (well beyond the six year statute of limitations), misstatements of the record, and reliance on inadmissible and incompetent testimony. Because Brantley's memorandum fails to establish any genuine issue of material fact on his claims of race discrimination in the terms and conditions of employment, failure to promote and/or a hostile work environment, summary judgment should be granted against him as to all claims.

II.    **PLAINTIFF RELIES UPON TIME-BARRED EVENTS AND HEARSAY REMARKS.**

a.    **Plaintiff Solely Relies On Dated And Isolated Incidents Which Are Time-Barred Under The Statute Of Limitations As To Alleged Different Terms And Conditions Of Employment**

Despite his uncontroverted testimony that he was promoted **timely** through the lineperson job progression, Brantley relies on dated incidents (time barred under any arguable statute of limitations) on pages 8 and 9 of his memorandum. For example, he relies on allegations related to digging holes as part of overtime work in **1987**.[1] He summarily asserts on page 9 that "[I]n order to gain skills essential to being promoted to Lineperson "A", an employee had to perform bucket truck work" referring to the **1990-1992** timeframe.[2] However, by his own testimony, Brantley was promoted rapidly from Lineperson B to Lineperson A and no one was promoted ahead of him.  (Vol. I, p. 98:16-24; p. 99:6-12; p. 104:20-22; p. 107:6-21).

Brantley relies on a single request to be on a committee dating back to **1995-1996** although he can not even identify the committee he requested to be on or what the committee did. (p.130:21-24; p.131:3-5, 13-24; p.132:1-3; p.212:7-10).[3]  Brantley's time-barred assertions do not constitute materially adverse job actions and fail to demonstrate racially discriminatory intent. He fails to controvert Defendant's factual and legal arguments as to alleged unfair discipline on pages 7-8 and 13-15 of its Motion for Summary Judgment. Thus, there is no evidence of disparate treatment in the terms and conditions of Brantley's employment.

---

[1]    Yet, Brantley was not denied overtime assignments; testified "we all dug holes"; and could not recall if other groundmen dug holes during overtime. (p. 58:6-24; p. 61:19-24).

[2]    Plaintiff relies on sketchy testimony as to bucket truck work opportunities as a Lineperson in **1990-1992** although he could not state these opportunities were not offered to African-Americans; how many times he requested bucket work (other than more than five times); or how many times he was not immediately rotated over. (p. 92:6-11; p. 96:6-24 p. 97:19-24; p. 98:1-7; p.100; p.94:20-24). Brantley further misstates his testimony on p. 9 that "this work was typically given only to white employees".  He could only identify two Caucasian employees who were given more bucket work than him. (p. 101:1-5)

[3]    He relies on an inadmissible hearsay statement made by a co-worker that the Company selected him for a different committee. Brantley never confirmed with the Union if the Union selected the members of the committee to which he requested. (p. 132: 17-21; p. 134: 6-9; p. 135:1-9, 18-21).

###### b.    Brantley's Case Law Is Inapposite

Brantley concedes on page 45 that the alleged conduct is beyond the applicable statute of limitations, i.e., digging holes in overtime in **1987**; bucket truck opportunity in **1990-1992** which in no manner affected his timely promotion to Lineperson "C"; and the request to be on a committee (which he can not identify) dating back to **1995-1996**. Faced with obviously time-barred facts, he relies (on page 47) upon <u>Robinson v. Runyon</u>, 149 F. 3d 507 (6th Cir. 1998), for the proposition that "a variety of disparate treatment beyond the statute of limitations is "nonetheless admissible as relevant background evidence." The <u>Robinson</u> case, however, involved a fake employment application entitled "Nigger Employment Application" that was widely circulated around the workplace with management's knowledge without any action being taken against those responsible. The case does not stand for the proposition that time-barred evidence is admissible.

###### c.    Plaintiff Relies Upon A Decision That Is Not Actionable

The only alleged disparate treatment within the statute of limitations period is the denial of two requests to take computer classes as a lineperson "A" on Company time "somewhere in the late 90's". Brantley did not seek to take the courses through the Company's tuition assistance program on his own time, but desired that the Company both pay for the course and for his time in taking the course. The decision in <u>Vitt v. City of Cincinnati,</u> 250 F. Supp. 2d 885 (S.D. Ohio 2002), cited on page 15 of Defendant's Motion for Summary Judgment is directly on point. In <u>Vitt</u>, the court observed that the denial of computer training is not a materially adverse employment action and falls within the employer's business judgment. The court noted that the plaintiff, like Brantley in this case, was always free to seek any desired training in his free time at own expense. <u>Id.</u> at 892. This case is even more sympathetic for the Company in this case

because Brantley could have obtained payment for tuition had he chosen to take the course, or any other courses suggested by management, through the Company's tuition assistance program. None of the alleged "employment actions," even if considered improperly outside the statute of limitations period, constitute "materially adverse" actions.[4] None constituted disparate treatment based on race to satisfy the elements of a <u>prima facie</u> case, let alone pretext. [5]

### III. BRANTLEY'S HOSTILE ENVIRONMENT CLAIM IS WITHOUT MERIT

Brantley wholly fails to identify any incidents of a racially hostile work environment in which he was personally involved.   He does nothing to controvert his own testimony cited on page 9 and 10 of Defendant's Motion for Summary, underscoring the lack of any harassing conduct. Brantley further testified he never experienced or observed supervisors or co-workers acting in a threatening or intimidating manner at any time. (Vol. II, p.219:21-24; p.220:1-6). Brantley apparently concedes that any discipline issued to him was not a materially adverse tangible job action or racially discriminatory.[6]

### a. Brantley Cannot Rely Upon Hearsay To Support His Claim

Faced with his own fatal admissions, Brantley relies upon a "lengthy" and unreliable[7] list that reads more like a catalog of inadmissible evidence than as a valid opposition to summary

---

[4]      Brantley concedes "while that may be true in the abstract" that they do constitute adverse employment actions on page 48 of his memorandum. Plaintiff attempts to create a material issue of fact that committee assignment and computer class were essential elements for a promotion or identified as the reasons for the denial of promotions. (blatant misrepresentation of testimony addressed on pages 12 and 13). However, Plaintiff's identification of the activities in which he was involved (stepping up to the plate) prior to his April 2002 promotion to Field Supervisor establish that there were many opportunities to demonstrate leadership apart from a computer class or committee assignment and that Plaintiff failed to take advantage of numerous opportunities notwithstanding suggestions to do so by supervisory personnel dating back to 1999.

[5]      Plaintiff's belief that Ayers, a Caucasian, took a computer class not knowing if it was the same class or who authorized the class and when he took it in no manner demonstrates a <u>prima facie</u> case of discrimination based on race or pretext.  (see citation, Footnote 4)

[6]      Brantley wholly fails to address and concedes Defendant's factual and legal arguments as to Plaintiff's unfair discipline allegations on pages 7 – 9 and 13-15 of Defendant's Motion for Summary Judgment.

[7]      The unreliability of the inadmissible and unsworn hearsay testimony is evidenced by the hearsay report by a co-worker that Roger Reis (when he was not a supervisor) made a statement "nigger, I am not getting such and such for you". Although Brantley could not recall the exact time frame, he testified it was made between '95 and '99. (p. 48:22-24; p. 49: 49:1-24; p. 50:1-7). The incident occurred in **1982** and was made in response to the

judgment.  The list is based on inadmissible hearsay, and often double or triple hearsay[8]; incompetent or immaterial assertions involving different departments, events taking place in very different work locations such as a power plant and involving different supervisors, employees, and circumstances. [9] As a last gasp, Brantley resorts to hearsay-laden "general conversations" that occurred in recent years after having contacted counsel and/or after filing suit.[10] The uncontroverted record fails to establish a subjectively and objectively hostile work environment that interfered with the terms and conditions of Brantley's work performance.

Brantley concedes that he neither viewed nor heard any racially offensive remarks or items in the workplace.  Instead, he relies solely on inadmissible hearsay of "reports" of alleged conduct involving others.[11] The court should disregard and strike any such arguments under Rule 56(e) of the Federal Rules of Civil Procedure. *See, e.g.,* <u>Evans v. Toys R Us Ohio, Inc.,</u> 2000

---

African-American employee calling Reis a dickhead and was investigated and Reis was disciplined (subject to a union grievance). (Reis Declaration, ¶__. )

[8]    Brantley could not recall the exact time frame other than he was a lineperson A between '90 and '94 when co-workers reported that a supervisor, Kramer, although he could not "recall the exact words but he made a reference to the way African-Americans act" although he had no other knowledge of same. (p.43:21-24; p.44:1-24; p. 45:1-16;46:9-13). A co-worker reported to him sometime in the fall of '98 that Dan Morris, a supervisor, stated "something to the effect that I knew this was going to happen to them." He relies on the assumption that "them" was a reference to African-Americans. (p.46:6-8;18-24;47:1-22). Other than those two hearsay reports, he had no knowledge of any supervisors or his immediate supervisors making racially offensive comments in the workplace. (p.47: 22-24; p. 48:1-5).  He had no knowledge of district supervisors or managers ever making a racial slur. (p. 50:8-21)

[9]    As an example, Plaintiff testified that he never observed anything racially offensive in the workplace. In a "general conversation" with Carol Hendricks in the fall of 2001, she told him that she observed a noose in the power plant (separate department and work location), and that she reported it but he did not know when she observed the noose or what if anything was done in response by the Company. (p. 53:6-13; 54:8-11). In "general conversation" with Charles Alexander ("Alexander") (in a different department and work location) a month prior to his deposition in October of 2002, Alexander reported that there were picture(s) (not know if one or more) with people with targets on their heads although Brantley did not know if African-Americans were in the picture(s). Alexander also reported a picture of people with KKK written on them but Brantley did not know if it was a picture or pictures. He also did not know the time frame the picture(s) were in the workplace or if Alexander reported them. (p. 54:12-24; p. 55:1-24; p. 56:1-17).

[10]    Plaintiff first contacted an attorney in the spring/summer of 1999, filed the within suit in July 2001 and was involved in a survey of African-American employees in ___. (p. 182:19-23; p. 184:10-24; p. 185:1-24; p. 186:1-24; p. 187:1-24; p. 188:1-7; Exhibit 16). As an example, the "general conversations" in Footnote 9 occurred in the fall of 2001 and October 2002 (the latter immediately prior to his noticed deposition) occurred within the time frame of the pending lawsuit. Plaintiff did not even raise the inadmissible. Headen and Willis hearsay reports (pp. 13 and 50) until the November 5, 2002 continuation of his deposition.

[11]    Inadmissible hearsay within hearsay cannot be used to controvert summary judgment *see, e.g.,* <u>Knox   v. Neaton Auto Products Mfg., Inc.,</u> 375 F.3d 451 (6th Cir 2004) (testimony as to co-worker overhearing statement by

U.S. App. LEXIS 14076 (6th Cir. 2000) (attached hereto) ("evidence" based on inadmissible hearsay statements attributed to other employees who did not file affidavits or supporting depositions (i.e., manager had "disdain" for minorities") fails to controvert summary judgment in a failure to promote claim); <u>Reese v. State of Ohio</u>, 1998 U.S. Dist. LEXIS 17187 (S.D. Ohio 1989) (attached hereto) (Plaintiff's reliance on inadmissible hearsay statements that she heard manager did not want any black employees in the furniture store with no proffered affidavit or other evidence to support her assertion fails to demonstrate racial harassment); <u>Wilson-Simmons v. Lake County Sheriff's Dep't</u>, 982 F. Supp. 496 (N.D. Ohio 1997) (reliance by plaintiff on hearsay with no first-hand knowledge of alleged racist e-mail and affidavit by co-worker "fraught with hearsay" were considered  a "complete dearth of admissible and reliable evidence" of adverse employment actions and summary judgment was affirmed on racial discrimination claim).

The decision in <u>Edwards v. Wallace Community College</u>, 49 F.3d 1517 (11th Cir. 1995), is particularly analogous to this case.  The plaintiff in that case relied upon a series of events that she did not even learn of until after her termination, as well as other incidents that were purely speculation and others that concerned statements made to third parties by fourth parties.  The court further observed that even "apart from hearsay problems; they were insufficient as to when the statements were made, how knowledge of them was acquired and when Edwards was informed of them (if she was)." <u>Id</u>. at 1522.[12]  As in <u>Edwards</u>, Brantley is relying on inadmissible hearsay statements, not sworn or affidavit testimony, and has no first hand knowledge of when they occurred, the circumstances, whether they were reported or the company's response.

---

supervisor inadmissible as hearsay within hearsay); <u>Moore v. Holbrook</u>, 2 F.3d 697, 699 (6th Cir. 1993) (court cannot rely on unsworn inadmissible hearsay when ruling on summary judgment).

[12]    The court observed in <u>Jackson</u> that "plaintiff's statement of facts, consuming more than half of her brief, is a mixture of facts and arguments and inferences. It is larded with allegations, hearsay, hyperbole and pejoratives." <u>Id</u>.

Undaunted by the lack of evidence of harassment, Brantley (at. p. 48) cites the decisions in <u>Farmer</u> and <u>Jackson</u> for the proposition that "Defendant's contention that no racially offensive remarks or items in the workplace was ever reviewed or heard directly by Brantley is immaterial." Unlike Brantley, however, the plaintiff in <u>Jackson</u> personally experienced racial slurs;[13] and personally observed racial graffiti in the workplace[14] Other witnesses in the case **testified under oath** at trial related about the widespread use of racial slurs in the workplace by managers and coworkers alike.[15] (emphasis added). The decision in <u>Jackson</u> related to a workplace characterized by "persistent racial slurs and graffiti" coupled with both involvement and a "a pattern of unresponsiveness" by management and the company's failure to investigate or to respond effectively, more often not at all, to complaints.

Unlike the plaintiff in <u>Jackson</u>, Brantley relies on inadmissible hearsay, not sworn testimony. The hearsay also involves different departments, work locations and supervisors versus a single factory floor with the same supervisors at issue in <u>Jackson</u>. Moreover, Brantley can not identify the specific dates, circumstances, whether the incident was reported and to whom and the Company's response, etc. of the reported hearsay versus the demonstrated pattern of non-responsiveness in <u>Jackson</u>.

If this court were to accept Brantley's premise that no conduct involving him was required, that would serve to eliminate the subjectively and objectively hostile requirement of an actionable hostile work environment claim. *See, e.g.*, <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 118 S. Ct. 998 (1998). It would also abrogate the requirement that the conduct must be

---

[13]    (i.e., supervisor's statement to her assistant "you're working  for a nigger now, boy did you get screwed"; statement by a supervisor opening a routine meeting "were are up to our asses in nigger sludge"; and co-worker called her a "nigger bitch" and physically assaulted her during an argument in <u>Jackson</u>)

[14]     (i.e., graffiti comparing penis sizes of white and black males in women's restroom and graffiti on a door of the plant stating "Blacks out plant" in <u>Jackson</u>)

[15]        (i.e., two supervisors discussing their desire to fire minority employees and putting a star on helmet for each minority fired; statement by supervisor in derogatory manner about African-American people wearing bags on their heads in <u>Jackson</u>)

so severe and pervasive so as to interfere with the terms and conditions of employment. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 114 S. Ct. 367 (1993); <u>Hafford v. Seidner</u>, 183 F.3d 506 (6th Cir. 1999). Essentially, an employee could merely canvas other employees as to any isolated instances of alleged conduct (in this instance after having consulted with an attorney in 1999, being involved with employees in other lawsuits and gathering these hearsay statements in "general conversation" during the pendency of a lawsuit) in order to allege an actionable claim. Such is not envisioned by Federal or Ohio law, nor does Plaintiff cite to any case finding an actionable hostile work environment claim with no harassing conduct directly involving the Plaintiff.

To the contrary, <u>Owens v. Commercial Testing & Engineering Co., Inc.</u>, 1998 U. S. Dist LEXIS 18147 (S.D. Al. 1998)(attached hereto), addresses such circumstance and observed that a hostile environment claim cannot rest solely on secondhand observation of allegedly offensive comments or purely secondhand sexual harassment. *See, also*, <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 2004 U.S. App LEXIS 18593 (4th Cir. 2004)(attached hereto) (court concluded individual complaint of discrimination involves whether the employer discriminated against the plaintiff in a specific instance and is not actionable where there was no evidence in the record that the Plaintiff's supervisor or anyone else directed any racially offensive remarks at the Plaintiff and solely relied on treatment of others and a hearsay statement); <u>Knox v. Neaton Auto Products Manufacturing, Inc.</u>, 375 F.3d 451 (6th Cir. 2004) (summary judgment affirmed in hostile environment sexual harassment case on the grounds that the alleged conduct was not sufficiently severe or pervasive to affect the terms, conditions or privileges of employment and observing that miscellaneous comments were not directed to her personally); <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822 (6th Cir. 1997), <u>cert. denied,</u> 522 U.S. 865, 118 S. Ct. 172 (1997) (conduct was not severe enough to create an objectively hostile environment where most of the comments were

not directed at plaintiff). Finally, Brantley's proof, albeit inadmissible under Rule 56(e), fails to satisfy the Harris "totality of the circumstances" test as well.

### b. Brantley's Claims Are Barred Because He Failed To Complain

Even if Brantley could demonstrate that a hostile work environment existed, which is expressly denied, he would then be required to prove that the employer "tolerated or condoned the situation" or "that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action. <u>Davis v. Monsanto Chemical Corp.</u> 858 F.2d 345, 349 (6th Cir. 1988). In this case, Brantley concedes that he has no knowledge if the "hearsay" conduct were reported in most instances, and, of course, of the company's response. Moreover, Brantley's summary assertion that he did not report under the Company's policies because "he felt it was useless" (pp. 14 and 50) again relies on a partial excerpt of his testimony and inadmissible hearsay.[16] Brantley conveniently omits his testimony that he never made a report of racial discrimination, harassment or a hostile work environment to a supervisor, district manager, area manager, HR or to anyone within the Company so that he did not know how they would react. He never made a report under the Harassment Free Workplace Policy such as to Rose Abi Radi of Compliance Services identified in the policy or to the 1-800 hot line and acknowledged that there was no reason why not. (p.71:3-24; p.72:1-24; p.73:1-24; p.76:5-11;p.273:20-24, p. 274:1). Thus, Brantley's claims are barred because he unreasonably failed to take advantage of corrective opportunities.

### IV.  BRANTLEY'S FAILURE TO PROMOTE CLAIMS ARE INVALID

Brantley's allegations relating to his failure to promote claims (specifically to the jobs of Training Crew Lead, Joint Trench Field Supervisor and Electric T&D Field Supervisor) are

---

[16]    Plaintiff solely relies on inadmissible hearsay and specifically the subjective belief of a third party (whom he could not even identify at his original September 29, 2002 deposition) as to effectiveness of the response by Suzane Bradley, one employee in the Company, to a reported concern by the third party.  (p. 74:15-24; p. 75:1-24; 76:1-4).

equally invalid.  At the outset, Brantley has heard NO statements by anyone in management including Vice President level, intermediate managers or field supervisors evidencing an intent to discriminate in terms of hiring and promoting of African-Americans, nor has he observed same. No one ever discouraged Brantley from seeking a different job or promotion. (Vol. II, p. 219:6-16; p. 236:5-10).  To the contrary, Brantley admits that he received good advice from company supervisors about how to develop his career and that once he took that advice and "stepped up to the plate", promotion came swiftly.

### a. There Is No Evidence That Any Of The Unsuccessful Bids Had Anything To Do With Race.

### 1. Training Crew Lead

The 1997 training crew lead position, the first claimed by Brantley is a red herring and demonstrates that the Company did not discriminate in its selection of Training Crew Leads.[17] John Huwell, a Caucasian supervisor, demonstrated a desire to help Brantley by approaching him in 1997 to see if he was interested to train new hires in Indiana. Brantley declined, and responded that he would to like to be considered if the Lead position was at Brecon, the district in which he worked.  (p.136:19-22; p.137:18-24; p.138:1-7,18-20; p. 139:14-17).  With respect to subsequent crew leads, Brantley spoke separately to Kenny Auchberger ("Auchberger") and Neal Schnecker ("Schnecker") as to the criteria to go to Indiana sometime in 1998 (but could not identify when).[18]  There was no evidence that any of these individuals treated Brantley differently because of his race.

---

[17]      Four Caucasians with more seniority were selected which Plaintiff did not believe was discriminatory.

[18]      Contrary to Plaintiff's misrepresentation on p. 10, there is no testimony that this was a "supervisory position" or that the training lead position was or was not posted. Brantley testified that he did not get much of a response from Schnecker other than he would get back to him and Brantley **did not follow up with him**.  Brantley could not recall the response of Auchberger and **did not follow up with him**. (p. 139:24-34; p. 140:1-6, 12-24; p.141:1-13; p. 143:13-22).

Brantley can not and does not dispute that the Temporary Training Lead Person hiring process was validated internally in accordance with EEOC Guidelines. (Reinhard Affid.,¶ 10). Brantley had no knowledge as to who was involved in or the criteria for selection of the Training Crew Leads. Brantley applied for Training Crew Lead in 1999[19], but did not know the number or identity of the applicants, who was interviewed or who received the training crew lead. (p. 295:2-19; p. 296:12-15; p. 317:4-7).  Brantley argues about Mike Weiss's lack of experience on page 11 of his memorandum, but he expressly acknowledged in his testimony that he "did not know if he got it or what decision was made." Brantley also did not know much about Weiss because he had not worked with him and did not know his leadership and interpersonal skills and initiative.

### 2.    Electric Trouble Department Field Supervisor

Brantley's emphasis on his not seeing the posting for the 1988-99 Field Supervisor position in the Electric Trouble department on pages 10-11 of his memorandum is likewise a red herring.  As to the position in "either '98 or '99, Brantley testified "I don't recall seeing it, No." Yet, Brantley confirmed that he has never applied for an Electric Trouble supervisor position at any time.[20] Brantley did not know how many applicants there were for the job, how many submitted resumes, how many were interviewed or who was involved in the interview process. (p. 226:5-7; p. 228:2-12, 16-21; p. 327:9-15).  Thus, Plaintiff failed to demonstrate a prima facie case of racial discrimination and/or pretext as a matter of law as to this position.

### 3.    Joint Trench Field Supervisor

Brantley "believes" he applied for a Joint Trench Supervisor position at the end of 2000, beginning of 2001 and that he submitted a hard copy to someone at Human Resources whom he

---

[19]    With respect to the 1998 training crew lead position, Brantley relies solely on the assertion that Stith and Schulte had less seniority on page 10 of his memorandum. As Brantley acknowledged, he did not know the criteria for selection. Lesser seniority alone fails to constitute evidence of race discrimination in the selection for training crew lead especially where Brantley was the senior lineperson and crew lead involved in transferring a guy wire where Todd Tolbert came into contact with a 7200 phase wire and was injured on August 27, 1998 (p. 144:6-8; p. 150:21-24).

can not identify. [21] (p. 358:15-24; p. 359:1-10). Although Brantley represents on page 12 of his memorandum that the position was not posted, he testified to the contrary in his deposition:

Q:    Was that posted?
A:    Yes, I do believe that it was. (p. 344:5-6)

Brantley, in fact, expressly testified that the job was posted on the Internet. (p. 230:1-4).

The only posting for this position during the alleged time frame was job posting 00-407 in November 2000 for which neither Plaintiff or Defendant has a record of Brantley applying. (Reinhard Affid., ¶¶ 4, 5, 6, 10).[22] Thus, Brantley has failed to demonstrate that he applied or that any equally or lesser qualified white employee was hired, let alone demonstrated racial discrimination or pretext as to the Joint Field Supervisor position in 2000.

### 4.    Electric T&D C&M Field Supervisor

Brantley could not identify any time where the position of Electric T&D C&M Field Supervisor was not posted.   He first applied for that job, Job Posting #99-000347, **September 1999** (p. 326:12-22; p. 327:16-24; p. 328:1-9).[23] Unable to dispute the higher scores of the successful candidate, Brantley speculates and makes the conclusory assertion (on page 12) that the format used was "purely subjective," and therefore somehow suspect. Yet, Brantley can not

---

[20]     Brantley relies on inadmissible double hearsay pursuant to Rule 56(E) of a "second hand statement" related to one Caucasian being told about the job and could not even recall when the statement was made. (p. 227:13-20)

[21]     Plaintiff misstates that Plaintiff applied for Joint Trench Supervisor in 1999 based on confusion as to his testimony in response to the question "Q: What was the next job that you applied for after field supervisor in June – I  mean, in September of 1999? A: "I believe it was the joint trench" on page 344 of his deposition. His subsequent testimony identifies in late 2000, early 2001.

In addition, Plaintiff relies on acknowledged second, third or fourth hand inadmissible hearsay that two Caucasian employees were told about the job (although he confirmed that neither got the job) and testified "I know the position stayed open for – or came up twice and right now I don't know who has it or if it's been filled."  (p. 230:5-24; p. 231:7-11).

[22]     *See* noted in Footnote 1 on page 4 of Defendant's Motion for Summary Judgment, Brantley never produced any resume he submitted during discovery and has never produced one since then Brantley again has no knowledge as to the number of applicants or the number of individuals interviewed. (p. 344:9-18; p. 359:1-22).

[23]     Brantley was provided with the Targeted Selection materials in advance to review but he could not even identify how much time he spent reviewing the materials and preparing answers.  Brantley did not know how many applicants there were for the September 1999 position or how many people were interviewed. He did not know who was involved in the final selection, who the successful candidates were or if the successful candidates were less qualified (p. 334:12-18; p. 335:5-7; p. 340:12-15; p. 341:4-21).

and does not dispute that the Targeted Selection Interview Process, that was used for the job, has been validated externally in accordance with EEOC Guidelines. Moreover, Brantley expressly testified that he could not state that the content of the Targeted Selection Materials were unfair or discriminatory. Moreover, he expressly testified that he had no problems with or objections to the Targeted Selection interview process. (Reinhard Affid., ¶4; p.336:4-11;p.340:16-24;p. 341:1-3).    Selection by a process agreed by both the EEOC and the plaintiff to be fair and nondiscriminatory simply is not discrimination.

Brantley then speculates that his failure to receive an unspecified committee assignment in 1995-1996 (a committee that he can not even identify) and denial of computer training **on Cmpany time** in the "late 1990's" were material and caused him not to get the promotion to Field Supervisor. (emphasis added)   To bolster this fallacy, he repeatedly misrepresents (on pages 9-10 and 44-48) that Lou Frith ("Frith")[24] and Dave Ward ("Ward")[25] stated that these were essential elements for promotion or the reasons for the denial (see, e.g., "Lou Frith told him that computer training was an essential element for promotion into supervisory positions" on page 10, "Brantley was told by his supervisors that he did not receive the position because he lacked computer training and needed to demonstrate more leadership" on page 45 without any citation to the record)

---

[24]    Plaintiff's misrepresentations are disproved by his testimony (p. 301:19-24; p. 302:1-4; p. 319:22-24; p. 320, 1-5) and the documentation (Exhibits 22 and 23) as to his discussions with and documentation provided by Frith regarding suggested areas of improvement on June 1, 1999 and June 11, 1999. Frith's recommendations, as an example, included a recommendation that "If you want you could possible attend class for leadership especially on your own time it will always carry more weight."

[25]    Plaintiff's discussion with Ward related to the opportunity for Indiana training crew leads. Ward responded that those selected "maybe they have leadership and things of the nature. Ward discussed with Brantley the perception that coming to work with his boots untied, hat on backwards and holes in his jeans but could not recall if they discussed this as leading by example. Brantley further testified that Ward suggested adding "some more things on my resume" like "volunteer things and things like that." There is no testimony that computer training or serving on committee were essential elements in a promotion or the basis for his failure to promote to Field Supervisor or any other position. (p. 336:24; p, 337 1-24; p. 338, 1-6, 13-21; p. 339:8-21; p. 340:2-11; p. 341:22-24; p. 342:1-3).

Yet, Brantley never enrolled in a computer class after June 1, 1999, even though it would have been reimbursed under the Company's tuition reimbursement program. Brantley also did not enroll or attend the CG&E sponsored Supervisor Job Fair in 1999.[26] When asked if he implemented any of Ward's suggestions, Brantley believed he changed his resume. He did **not** volunteer for any additional work or committees or groups in the organization to add to his resume. Brantley, in fact, never took advantage of the Company's tuition reimbursement program in the sixteen years of his employment until August, 2002 (after his promotion to Field Supervisor) at which time he enrolled in a Dale Carnegie course. (p. 14:13-23; p. 342:18-24; p. 343:1).

Brantley believes that he next applied for Electric T&D C&M Field Supervisor in **June of 2000**, yet another position for which NEITHER of the parties has any record of his applying. Again, Brantley did not know the number of applicants, the numbers interviewed, who conducted the interviews or was involved in the final selection. He did not follow up with his supervisors or HR why he did not get an interview. (p. 346:13-17; p. 348:21-24; p. 349:1, 11-16; p. 352: 11-15).

Against this backdrop of incompetent testimony, Brantley asserts on page 12 that "the position was awarded to Doug Jackson ("Jackson"), a white employee" as ostensible evidence of disparate treatment. However, Brantley omits that Tony Moran ("Moran"), an African American, and Joiner Wical ("Wical"), a Caucasian, were also made Field Supervisor at the time.[27] Brantley testified that Moran had more time and experience and that Jackson came in around the same

---

[26]    Plaintiff believes that he was on vacation at this time and may have missed the announcement of "T&D Construction & Maintenance Field Supervisor Job Fair (Exhibit 25) in Cinergy Now. He could not recall if he ever saw the announcement and could not deny that it was posted. Other than a brief conversation with Tony Moran where they discussed the program for less than five minutes, he did nothing further to follow up or obtain the materials from the program. (p. 303:23-34; p. 304:1-3; p. 322:6-24; p. 323:1-14, 19-22; p. 324:6-21; p. 325:5-9; Exhibit 25).

time so he was not able to say anything about his qualifications. He testified that Joiner Wical did not have as much seniority (less experience because less time on the job), but could not say he was less qualified for any other reason. Brantley further expressly acknowledged the obvious - that time in the job is not the sole criteria in a promotion to supervisor. (Reinhard Affid., ¶ 5; p. 350:3-5; p. 352:4-22; p. 353:23-24; 354: 1-11).

Brantley acknowledged that in 2001 he "stepped up to the plate" and became involved in activities that would enhance his ability to become a supervisor.  Among other things, he became involved in a company diversity initiative known as the Hartwell Diversity Team.  He then volunteered for the Career Opportunity Fair in October and November of 2001 and also helped create the Company's Career for Recruitment video in November of 2001.[28]  Brantley also solicited help from a handful of supervisors, John Huwell and Les Blackburn, on topics including management expectations, goal setting and creating a resume which were helpful. (Brantley, p. 286:2-24; p. 287:1-24; p. 359:22-24; p. 360:1-12; p. 361:3-21).

Not surprisingly, these efforts paid off.  Brantley next applied for a supervisory position **in June 2002 and was promoted to Field Supervisor** in the Electric T&D Projects East effective July 1, 2002.[29]  Brantley has **NOT** been subjected to any unfair or discriminatory conduct based on race in the years since his promotion.[30]

---

[27]    Brantley's document production and discovery responses do not include resumes for the Field Supervisor position in 2000 or the Joint Trench Supervisor Position in 2000 consistent with the Company's lack of documentation.

[28]    Plaintiff cites to no citation in the record in support of their conclusory allegation and summary assertion on page 8 "after (sic) he was denied promotions to various supervisory positions and complained about discrimination, Brantley was selected for a field supervisor position in June 2002" because none exists. Rather, by his own testimony, he had finally stepped up to the plate as of April of 2002 consistent with recommendations by Frith and Ward dating back to 1999.

[29]    Anthony Moran, an African-American, was previously promoted to Field Supervisor in Electric T&D C&M in June of 2000. Ed Chapman is another African-American supervisor in the underground department of T&D C&M. (p. 197:16-20; p. 198:23-24; p. 199:1-4, 15-20l; p. 200:7-13).

[30]    As an example, he has experienced no problems with Toebbe, the hiring manager in Electric T&D Projects, to whom he reports.

> **b.**    **Plaintiff Cannot Demonstrate A <u>Prima Facie</u> Case Of Failure To Promote Based On Race And/Or Pretext As A Matter Of Law**

Brantley fails to demonstrate virtually every critical element of his claims. He cannot show that he was as qualified as the successful white applicants; that similarly situated employees were treated disparately based on race; that there was any racially discriminatory intent; or that the reasons given by the Company were pretextual as a matter of law. [31]

At the outset, Brantley's reliance on his subjective perception of his own qualifications fails to create a genuine issue of material fact. *See, e.g.*, <u>Evans v. Toys R Us Ohio, Inc.</u> 2000 U.S. App. LEXIS 14076 (6th Cir. 2000) (Court observed "even if one construes Evan's strong performance reviews to mean he was qualified for promotion, his qualifications alone do not show that other non-African American employees were promoted ahead of him because of race); <u>Ost v. West Suburban Travelers Limousine, Inc.</u>, 88 F.3d 435 (7th Cir. 1996) (plaintiff's own opinions about work performance or qualifications does not sufficiently demonstrate pretext); <u>Anderson v. Baxter Health Care Corp.</u>, 13 F.3d 1120, 1125 (7th Cir. 1994) (mere submission of materials from co-workers that employee's performance is satisfactory does not create an issue of material fact); <u>Olsen v. Marshall & Isley Corp.</u>, 267 F.3d 597, 602 (7th Cir. 2001) (employee's perception of own performance does not create an issue of material fact).

Brantley repeatedly relies on his subjective belief and conclusory assertion that less <u>seniority</u> necessarily means less <u>qualified</u> for a supervisory position although he expressly acknowledged that seniority is not the sole criteria. (p. 354:8-11). For example, Brian York's lack of experience within the particular Electric T&D C&M department does not demonstrate

---

[31]    Plaintiff again blatantly misstates that Defendant limited its factual and legal arguments to positions in 1999 and 2000 and "does not place at issue" the 1997 and 1998 training crew lead positions. Defendant addressed the 1997 and 1998 training crew lead positions on pages 2 and 3 in its original statement of facts and requested summary judgment as to all claims of Plaintiff.

that he was less qualified or that his scores in the targeted selection process were not higher than Plaintiff in the selection of Field Supervisor position in 1999. [32]

Plaintiff must also demonstrate that he was qualified and treated less favorably than similarly situated, non-minority employees because of his race.  *See, e.g.,* Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir. 1998). Plaintiff cannot satisfy that "similarly treated in all relevant aspects" prong. For example, Plaintiff summarily asserts on page 44 that he was denied training crew lead position "in 1999 in favor of equally or less qualified white employees, including Michael Weiss."   Yet, Plaintiff testified that he did not know who received the training crew lead; "did not know" if Mike Weiss got it; and that he did not know much about Weiss because he had not worked with him and did not know his leadership and interpersonal skills and initiative. (p. 295:2-19; p. 296:12-15; p. 317:4-7). Plaintiff further attempts to create an issue of fact under the "similar analysis" prong on page 45 of his memorandum that the "Brantley's denial of a Field Supervisor position to white employer (sic) Dave (sic) Jackson in 2000."[33] However, Plaintiff omits that Tony Moran, (an African American whom he could not state were less qualified) received the Field Supervisor position at this time as well. (p. 350:3-5; p. 352:4-22; Reinhard Affid, ¶5).

 With respect to the Joint Trench Supervisor the end of 2000, beginning of 2001 and Electric T&D C&M Field Supervisor position in 2000, Plaintiff fails to produce an application for this position for which the Defendant consistently has no submittal well notwithstanding that Plaintiff had contacted a lawyer as early as 1999 (p. 182:18-21), yet failed to produce the resume

---

[32]       Plaintiff also ignores that he was involved in a serious electrical contact incident as the Senior Lineperson and crew lead in August 1998. and failed to implement the various suggestions that his supervisors recommended for promotion before that time.

[33]       With respect to Doug Jackson, Plaintiff stated he came in around the same time and could not state anything about his qualifications.  (p. 353:23-24; 354:1-7).  Plaintiff believed that Joiner Wical received the Field Supervisor position as well at this time and stated other than less seniority, he could not say less qualified for any other reason) (p. 353:2-22) Wical, however, was actually selected for the 1999 Field Supervisor position (See Plaintiff 's Exhibit 5 to Appendix ).

he submitted these job postings which is consistent with the Company's lack of documentation as to any application by Plaintiff. Plaintiff's speculation on page 47 of his memorandum "Defendant's inability to account for the resume" is evidence of discriminatory pretext fails especially where Brantley cannot produce the alleged submitted resumes as well. [34]

As Brantley acknowledges, Defendant has presented sworn testimony that it relied upon the EEOC validated Targeted Selection Process and that it selected the top scoring candidates for promotion. Exhibit 5 to its Appendix filed herein are Defendant, Cinergy Corp.'s, Response to Plaintiffs' First Set of Interrogatories which are consistent with the sworn affidavit testimony. Brantley wholly fails to present evidence that the successful candidates were not the top scorers or of any racial animus in the Targeted Selection process. Because Defendant satisfied its burden of demonstrating a legitimate and non-discriminatory reason, the burden shifted to Brantley to demonstrate pretext.

To demonstrate pretext, Brantley is required to show by a preponderance of the evidence either (1) that the preferred reasons had no basis in fact, (2) that the preferred reasons did not actually motivate the employment action or (3) that they were insufficient to motivate the employment action. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994); see also, Anthony v. BTR Automotive Sealing Systems, Inc., 339 F.3d 506 (6th Cir 2003) (summary judgment affirmed on failure to promote claim were plaintiff failed to present any evidence that employer's reason were not based in fact or the real reason and only presented "his own qualification on the issue of pretext, and this is insufficient and court rejected argument that experience and background made him as well qualified as other candidates with a degree.").

---

[34] Plaintiff blatantly misstates that Defendant had inconsistent posting policies on page 47 of his memorandum. By own testimony, the Electric T&D C&M supervisory positions for which he applied were posted. The only one he did not believe he saw was Electrical Trouble Dept position in "either 98 or 99" although acknowledging that he has never applied for the position at any time.

Brantley has no evidence that would satisfy is burden to demonstrate pretext, but relies, instead, upon the novel proposition that legitimate, non-discriminatory reasons are automatically pretextual if they are "subjective" in nature. Nothing in Title VII, however, prohibits the use of subjective evaluation criteria, and courts have emphasized their importance, particularly in the area of supervisory promotions. S*ee, e.g*., Sattar v. Motorola, Inc., 138 F.3d 1164, 1170 (7th Cir. 1998); Denney v. City of Albany, 247 F. 3d 1172, 1186 (11th Cir. 2001) ("[I]t is inconceivable that Congress intended anti-discrimination statutes to deprive an employer if the ability to rely on important criteria in its employment decision merely because those criteria are only capable of subjective evaluation"). The Sixth Circuit has specifically held that "[T]he use of subjective criteria is permissible in the selection of employees in **management positions**. (emphasis added) Smith v. City of Dayton, 1994 U.S. App. LEXIS 27880 (6th Cir. 1994) (attached hereto); Canham v. Oberlin College, 666 F.2d 1057, 1061 (6th Cir. 1981), cert. denied, 456 U.S. 977, 102 S. Ct. 2242 (1982) (an employer has "discretion to choose among candidates with different but equally desirable qualifications). In Odom v Frank, 3 F.3d 839, 847, (5th Cir 1993), the court stressed that to establish pretext by showing losing candidate had superior qualifications, the losing candidate's qualifications must "leap from the record and cry out to all who listen that he was vastly – or even clearly -- more qualified for the subject job." There is no such proof in this case.

Brantley has no evidence that the EEOC validated Targeted Selection Process for Field Supervisor "is a purely subjective testing mechanism" or that it is discriminatory in any fashion. Instead, he relies upon the unsupported allegations of his Complaint, allegations that are belied by his own testimony that he could not state that the content of the Targeted Selection Materials were unfair or discriminatory and could not identify any problems with or objections to the

Targeted Selection interview process. (Reinhard Affid., ¶4; p. 336:4-11; p. 340:16-24; p. 341:1-3).

Undaunted by the lack of evidence, Brantley next relies on his own speculation and conjecture that "there is a racial correlation, as well, that remains unexplained" on page 45 of his memorandum. This contention not only lacks any support in the record, but is again refuted by Brantley's own testimony that, among other things, he has not observed and is not aware of a racial animus or intent to discriminate in terms of hiring and promoting of African-Americans by anyone involved in the Targeted Selection Process; no-one has ever discouraged him from seeking a different job or promotion, and he was given good advice on how to advance himself in the company by numerous supervisors. (p. 219:6-16; p. 236:5-10). Further, there is a dearth of evidence as to discriminatory animus on behalf of the Company, particularly in light of Brantley's own testimony that he was quickly promoted after he had "stepped up to the plate" and demonstrated leadership potential.  Thus, Brantley's failure to promote claim is not actionable as a matter of law.

## V.    <u>CONCLUSION</u>

Brantley's testimony demonstrates that he was not subjected to any discrimination at work.  Because even Brantley admits that he was not subjected to any harassing conduct, because he can point to no discriminatory decision affecting his employment, and because he failed to use the Company's complaint procedure without valid excuse, summary judgment should be granted against him as to all claims.

Respectfully submitted,


/s/ Jill T. O'Shea_____
Jill T. O'Shea (0034692)
Attorney for Defendant,
Cinergy Corp.
139 East Fourth Street – 25 AT II
P.O. Box 960
Cincinnati, Ohio 45201-0960
(513) 287-2062


/s/ Gregory V. Mersol_____
Gregory V. Mersol (0030838)
John B. Lewis (0013156)
BAKER & HOSTETLER LLP
3200 National City Center
1900 East Ninth St.
Cleveland, OH  44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Attorneys for Defendant*
*Cinergy Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing pleading was forwarded via ordinary mail this <u>28th</u> day of October, 2004 to:

Paul H. Tobias
David D. Kammer
TOBIAS, KRAUS & TORCHIA, LLP
414 Walnut Street
Suite 911
Cincinnati, OH  45202


David W. Sanford, Esq.
Sanford, Wittels & Heisler, LLP
2121 K Street NW
Suite 700
Washington, D.C.  20037


Barry Vaughn Frederick
Herman Nathaniel Johnson, Jr.
Robert L. Wiggins
Ann K. Wiggins
Susan Donahue
Robert F. Childs
Wiggins, Childs, Quinn & Pantazis, P.C.
1400 South Trust Tower
420 North 20th Street
Birmingham, Alabama 35203

Grant E. Morris
Law Offices of Grant E. Morris
2121 K Street NW
Suite 700
Washington, D.C.  20037


/s/ Jill T. O'Shea_____
Jill T. O'Shea