Service: **Get by LEXSEE®**
Citation: **2005 u.s. app lexis 645**

*2005 U.S. App. LEXIS 645, ***

HELEN KAY SMITH, CYNTHIA BROOKS, Plaintiffs-Appellants, v. SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 79, AFL-CIO; TOM WOODRUFF; DAVID MOTT; DEBBIE SCHNEIDER, Individually and in Their Official Capacities, Jointly and Severally, Defendants-Appellees.

No. 03-1916

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2005 U.S. App. LEXIS 645

January 12, 2005, Filed

**NOTICE: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Michigan.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, two former African American female employees, appealed from the grant of summary judgment by the U.S. District Court for the Eastern District of Michigan in favor of defendant employer, a union local, in an employment race discrimination case brought under 42 U.S.C.S. § 2000e-2 of Title VII of the Civil Rights Act of 1964, and Mich. Comp. Laws Ann. § 37.2101 (2004) of the Michigan Elliott-Larsen Civil Rights Act (ELCRA).

**OVERVIEW:** On appeal, one employee pursued her discrimination claims relating to (1) the local's decision to hire her in 2000 as a senior organizer in training rather than as a senior organizer, (2) its decision not to promote her in 2001 to organizing coordinator, and (3) its termination of her employment in 2001. The second employee pursued only her claim that the local unlawfully discriminated against her by terminating her employment in 2002. The McDonnell Douglas burden shifting approach applied to the case under both Title VII and the ELCRA. On appeal, the first employee pursued her first claim only under the ELCRA. The court found that she did not meet her burden of proving that the local's legitimate nondiscriminatory reasons were pretextual. On her second claim, the court found that she did not raise a genuine issue of material fact to establish that she was treated differently than a similarly situated nonprotected employee. Next, as to her discharge claim, she did not show that she was replaced by a nonprotected person or that a

similarly situated nonprotected employee was treated more favorably. With regard to the second employee's termination, she failed to show pretext.

**OUTCOME:** The grant of summary judgment was affirmed.

**CORE TERMS:** organizer, organizing, senior, coordinator, hired, training, similarly situated, summary judgment, termination, promotion, region, affiliate, local union, prima facie case, permanent housing, pretextual, protected class, honest belief, fellow employees, genuine issue of material fact, discharging, proffered, discharged, coworkers, promoted, staff, nurse, hire, nondiscriminatory reason, racial discrimination

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards of Review

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN1* An appellate court reviews de novo the district court's grant of summary judgment. Summary judgment is appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis

Labor & Employment Law > Discrimination > Racial Discrimination > Other Laws

Labor & Employment Law > Discrimination > Title VII

*HN2* Where a plaintiff does not present direct evidence of racial discrimination, the McDonnell Douglas burden shifting approach applies to a case under both Title VII of the Civil Rights Act of 1963 and the Michigan Elliott-Larsen Civil Rights Act. Under the McDonnell Douglas framework, the plaintiff faces the initial burden of presenting a prima facie case of discrimination. The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to articulate some legitimate, nondiscriminatory reason for taking the challenged adverse employment action .If the defendant is able to satisfy this burden, the plaintiff must then prove that the proffered reason was actually a pretext to hide unlawful discrimination.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis

*HN3* An employee may demonstrate pretext with evidence of how the employer treated similarly situated employees outside the protected class. To show that an employee was similarly situated, a plaintiff must prove that all of the relevant aspects of her employment situation were nearly identical to those of another employee's employment situation. A plaintiff cannot survive summary judgment by relying only on subjective statements that she was more

qualified than someone else to receive a certain position. Instead, the plaintiff must show that there is a genuine issue of material fact as to whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis 

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions 

HN4 To establish a prima facie case of racial discrimination based upon a failure to promote, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions 

HN5 For two employees to be considered similarly-situated, the similarities between the plaintiff and the other employee must exist in all relevant aspects of their respective employment circumstances. Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions 

HN6 In order to establish a prima facie case of discriminatory discharge, a plaintiff must show that (1) she is a member of a protected class, (2) she was terminated from her employment, (3) she was qualified for the position in question, and (4) she was replaced by a nonprotected person or a similarly situated nonprotected employee was treated more favorably. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits 

HN7 Bald assertions are insufficient to create a genuine issue of material fact. Fed. R. Civ. P. 56(e). A summary judgment motion may not rest merely upon conclusory and unsupported allegations, rooted in speculation. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis 

HN8 A plaintiff can meet his burden of showing pretext by producing evidence that the employer's proffered reason for his discharge was false. The U.S. Court of Appeals for the Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. The employer has an honest belief in its reasons if the employer reasonably relied on the

particularized facts that were before it at the time the decision was made. More Like This Headnote

**COUNSEL:** For HELEN KAY SMITH, CYNTHIA BROOKS, Plaintiff -- Appellant: Bernadine B. Trout, Southfield, MI.

For SERVICE EMPLOYEES, INTERNATIONAL UNION, LOCAL 79, AFL-CIO, Defendant -- Appellee: Leon Dayan, Bredhoff & Kaiser, Washington, DC; Samuel C. McKnight, Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI.

For TOM WOODRUFF, DAVID MOTT, DEBBIE SCHNEIDER, Defendant -- Appellee: Samuel C. McKnight, Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI.

**JUDGES:** Before: GUY and ROGERS, Circuit Judges; DOWD, District Judge. *

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINIONBY:** RALPH B. GUY, JR.

**OPINION: RALPH B. GUY, JR., Circuit Judge.** Plaintiffs, Helen Kay Smith and **[*2]** Cynthia Brooks, appeal from the grant of summary judgment in favor of defendant, Service Employees International Union, Local 79, AFL-CIO (SEIU), in this employment race discrimination case brought under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws Ann. § 37.2101 (2004). After review of the record, the arguments, and the applicable law, we affirm.

**I.**

Smith and Brooks, African American women, were both employed at SEIU. On appeal, Smith pursues her race discrimination claims relating to (1) SEIU's decision to hire Smith in 2000 as a senior organizer in training rather than as a senior organizer, (2) SEIU's decision not to promote her in 2001 to organizing coordinator, and (3) SEIU's termination of her employment in 2001. Brooks pursues only her claim that SEIU unlawfully discriminated against her by terminating her employment in 2002.

SEIU is a labor organization that serves as the umbrella organization for separate, autonomous local union affiliates. SEIU employs approximately 200 field organizers and support staff throughout North America. The **[*3]** SEIU organizers work with the separate organizing staffs of the local union affiliates. Smith and Brooks were employed in SEIU's central region that is composed of 12 Midwestern states, including Michigan and Illinois.

There are four nonsupervisory organizer positions at SEIU: (1) organizer in training, an entry-level position; (2) organizer, the basic, line-level organizing position; (3) senior organizer in training, a position typically one year in length designed to train organizers how to, among other things, manage larger and more complex organizing campaigns; and (4) senior organizer, a position for those expected to play a leadership role in managing larger and more complex campaigns in coordination with the staff and elected officers of the local union affiliates. All of these positions are considered nonmanagerial, and they are covered by a collective bargaining agreement

between SEIU and the Union of Union Representatives, an independent union representing SEIU's employees.

The next two positions in the organization chart are the organizing coordinator and then the regional director of organizing, both of which are supervisory, nonbargaining unit positions.

At the times **[*4]** relevant to this case, Tom Woodruff was the executive vice president of SEIU and was responsible for overseeing all activities of the central region. Debbie Schneider was the assistant to the executive vice president and functioned as staff director or chief of staff of the central region. Tony Condra was the regional director of organizing for the central region.

## A. Factual History Relating to Smith

Prior to working at SEIU, Smith worked as the assistant business agent, an intern organizer, assistant director of organizing, and then organizing director for one of SEIU's local union affiliates. In May 2000, Condra recommended Smith be hired by SEIU as a senior organizer. Smith, however, was hired as a senior organizer in training. SEIU provided evidence that Smith was brought in at this lower position because (1) she had only three years and four months of professional organizing experience, n1 (2) her experience was at a local affiliate with an uneven record of training and developing organizers, and (3) her experience was limited to nursing homes. SEIU felt that Smith's experience best qualified her for the even lower organizer position, but decided to hire her as a senior **[*5]** organizer in training based on Condra's recommendation. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Smith claims she had five years of experience, but over a year and a half was in an unpaid capacity. SEIU does not view volunteer work as a substitute for full-time paid organizing experience for hiring and promotion purposes.

n2 SEIU offered evidence that two white applicants with more experience than Smith were hired as organizers. Maria Wickstrom was hired as an organizer in 1999. She had seven years of professional organizing experience with the AFL-CIO. Stella Lindsay was hired as an organizer six months before Smith was hired. Lindsay had 12 years of professional organizing experience with the International Ladies Garment Workers Union and the Union of Needletrades Industrial & Textile Employees.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Smith claims that Condra recommended Smith be given a two-step promotion to organizing coordinator in March 2001, when she was still a senior organizer in training. n3 Condra then recommended Smith be given a one-step promotion to senior organizer, **[*6]** which she received in July 2001. In August, Robin Clark, a white woman, was placed in a coordinator position for the central region. SEIU offered evidence that the coordinator position was opened to allow Clark to return to her previously held coordinator position after serving with an SEIU local union affiliate for one year.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The parties dispute the particulars of the recommendation. SEIU claims Condra asked Woodruff to authorize the creation of a "roving" organizing coordinator position that he would want either Smith or Gabe Morgan to fill. Woodruff states he rejected the idea of such a new position. Smith claims approval for a roving organizing coordinator was not necessary because travel was an expected part of all coordinator positions.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On September 28, 2001, Smith's employment was terminated. The termination letter gave numerous reasons for the termination, including:

> You acted disrespectfully and high-handedly with coworkers, to the point that your coworkers asked for a meeting with the Central [*7] Region Organizing Director this past July to discuss problems they were having with you. The most glaring example of your inappropriate behavior occurred on July 13, when you got in to [sic] verbal altercations with co-workers Rashida Khermohamed and Demetrius Davis. When Rashida stated that she wanted to talk to her supervisor, Tony Condra, you pointed your finger in her face saying, "Bitch, this is my Mother Fucking man . . . and if you want to talk to Tony, you have to go through the chain of command. Talk to me and I'll talk to Tony. I'm your Mother Fucking supervisor and this is my Goddamn man, so you better talk to me." When Demetrius Davis tried to intercede, you then turned on him. Your treatment of both Rashida and Demetrius was totally unacceptable. Furthermore, you were not Rashida's supervisor, and she was not required to go through you if she wanted to talk to Tony.

The termination letter also stated that Smith had misrepresented information about Khermohamed to Byron Hobbs. As a result, Hobbs wrote a memorandum to SEIU on July 31, 2001, asking that Khermohamed be removed from his local affiliate. After he learned Smith's representations were false, he rescinded [*8] the memorandum. Smith's termination letter stated: "Your conduct not only was dishonest, but also undermines your relationship with coworkers and your and SEIU's relationship with locals."

Finally, the letter accused Smith of failing to participate in training programs or discuss her development plan, failing to work honestly and respectfully with leaders and staff of the Local 73HC, and failing to cooperate and meet with Nancy Cross, who was investigating the July 13 and other incidents on behalf of SEIU.

When Debbie Schneider made the decision to terminate Smith's employment, she had the following information available to her: (1) Cross's report, which concluded that there was "no credible information as to what was said to whom" on July 13; (2) a letter of complaint from Khermohamed describing the July 13 incident; (3) a letter

from Davis corroborating Khermohamed's account; (4) a memorandum signed by five organizers who contradicted Smith's allegation that Khermohamed accused Hobbs of sex discrimination; and (5) a tape recording made by Davis of a telephone conversation between Davis and Condra in which Condra asked Davis to give a false account of what had occurred on July 13. [*9] n4 In the taped conversation Condra told Davis "there's two things I want you to deny . . . and I'll cover your ass." Condra wanted Davis to "put a letter together . . . and say that you never had a controversy or a conversation with [Smith], or any kind of disruption with [Smith] -- (inaudible) -- that day . . . and you are clueless that you don't know what's going on. . . ." Later, Condra corroborated Smith's statement that Davis was the aggressor in the incident.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Smith does not challenge SEIU's claim that the tape is admissible in federal court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Sharon Nelson, an African American woman, was hired as a senior organizer after Smith was discharged. Smith claims that Nelson was promoted to senior organizer with less experience than Smith had when she was hired as a senior organizer in training.

**B. Factual History Relating to Brooks**

Brooks was hired at SEIU in 1998 as an organizer in training and promoted to organizer in 1999. She worked out of the Detroit office of the central region. On October 23, 2001, Brooks [*10] received a permanent transfer to the Chicago office effective November 2, 2001. Brooks grieved the transfer. As a result, she received a one-month extension of time to transfer.

On November 25, 2001, Brooks asked Schneider for permission to carry 30 days of 2001 vacation leave over into 2002 so that Brooks could take off work from January 2 through February 4, 2002. After learning that Brooks had just taken two weeks off, Schneider discussed the request with Brooks. Brooks said the two weeks had not been for vacation but to look for a place in Chicago. Brooks told Schneider that she had found a place ready to move into during the first week of December.

On December 5, 2001, Judith McCullough, SEIU's Operations Manager, sent a letter to Brooks stating the following:

> I am writing to confirm that you have accepted a permanent transfer to Chicago. You told SEIU that you had found permanent housing effective December 4, 2001. SEIU will make your permanent transfer to Chicago effective on that date.

In fact, however, Brooks had not obtained permanent housing in Chicago. Instead,

Brooks lived with a cousin in Chicago, at times sleeping on the floor. She states that she did not want **[*11]** to give up her house in Detroit until the arbitrator made a decision on her transfer grievance. Brooks did not correct SEIU's understanding of her agreement to the transfer or her permanent housing situation.

Brooks took two extended, paid, sick leaves and did not work in the month of December 2001. She also used the carried-over vacation days and did not work in the month of January 2002.

Brooks's Michigan physician provided a note stating that Brooks could return to work on "2/4/02 with no restrictions," but Brooks did not report for work on February 4. On February 5, Brooks worked but said she would be out two days because she was sick. The local union organizing leader reported to Schneider that Brooks said she was commuting from Michigan and would not be able to routinely work on weekends. Brooks then provided a doctor's note dated February 8 saying that Brooks could work only 40 hours a week (seven to eight hours a day) with two days off a week. Brooks states that she took the last two weeks of March off as earned compensation time, which was approved by Schneider.

Schneider scheduled a meeting with Brooks and a union representative on April 1, 2002, and asked Brooks to bring **[*12]** documentation of her move to Chicago. At the meeting, Brooks told Schneider that she would not give up her house in Detroit until the arbitration of the grievance was completed.

On April 5, 2002, Debbie Schneider notified Brooks that she was being discharged. The termination letter stated that Brooks was discharged because (1) Brooks fraudulently misled SEIU into believing she had relocated her personal residence to Chicago in order to collect paid leave she otherwise would not have received, (2) Brooks had refused to do work an organizer is routinely expected to do, (3) Brooks failed to work effectively with the last major organizing local in the central region that was willing to work with her.

**C. Procedural History**

Plaintiffs filed their complaint on May 20, 2002, alleging race discrimination in violation of Title VII and the ELCRA by SEIU, Tom Woodruff, Debbie Schneider, and David Mott. n5 They also claimed retaliation, common law wrongful discharge, and defamation. Plaintiffs later dismissed or abandoned all claims except the discrimination claims against SEIU. The district court granted SEIU summary judgment, and this appeal followed.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Mott was the staff director who oversaw SEIU's program to recruit and train organizers.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*13]**

II.

*HN1* We review *de novo* the district court's grant of summary judgment. *See, e.g.,*

Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

HN2⚓Because neither Smith nor Brooks presented direct evidence of racial discrimination, the McDonnell Douglas burden shifting approach applies to this case under both Title VII and the ELCRA. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Hazle v. Ford Motor Co., 464 Mich. 456, 628 N.W.2d 515, 520-21 (Mich. 2001). Under the McDonnell Douglas framework, the plaintiff faces the initial burden of presenting aprimafacie case of discrimination. Vaughn v. Watkins Motor Lines, Inc., 291 F.3d 900, 906 (6th Cir. 2002). The establishment of a primafacie case creates [*14] a rebuttable presumption of discrimination and requires the defendant to articulate some legitimate, nondiscriminatory reason for taking the challenged adverse employment action. Id. If the defendant is able to satisfy this burden, the plaintiff must then prove that the proffered reason was actually a pretext to hide unlawful discrimination. Id.

**A. Smith -- Failure to Hire as Senior Organizer**

The district court held that Smith's Title VII claim that SEIU unlawfully discriminated against her when it failed to hire her as a senior organizer was time barred. On appeal, Smith pursues this claim only under the ELCRA. We find that Smith did not meet her burden of proving that SEIU's legitimate nondiscriminatory reasons for hiring her as a senior organizer in training were pretextual.

HN3⚓An employee may demonstrate pretext with evidence of how the employer treated similarly situated employees outside the protected class. Lytle v. Malady, 458 Mich. 153, 579 N.W.2d 906, 917 (Mich. 1998). To show that an employee was similarly situated, the plaintiff must prove that all of the relevant aspects of her employment situation were nearly identical to those of another employee's [*15] employment situation. Town v. Mich. Bell Tel. Co., 455 Mich. 688, 568 N.W.2d 64, 70 (Mich. 1997). A plaintiff cannot survive summary judgment by relying only on subjective statements that she was more qualified than someone else to receive a certain position. Hazle, 628 N.W.2d at 527-28. Instead, the plaintiff must show that there is a genuine issue of material fact as to whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent. Id. at 527.

Smith states that seven other employees were hired or promoted to the senior organizer position with equal or fewer qualifications than she had. Karen Backus, Tanya Boone, Renee Watkins, Mary Beth Tinker, Greg Maron, Joseph Geevarghese, and Robin Clark. SEIU offered unrebutted evidence that Backus, Watkins, and Tinker were not hired as senior organizers. Backus was hired as an international representative; Watkins and Tinker were hired as nurse specialists. All three received these positions because of their experience and training as nurses. Smith argues that it is appropriate to compare the senior organizer position to the international representative [*16] and nurse specialist positions because the salaries were all paid out of the same budget. We don't find this argument to be persuasive. In any event, Smith was not similarly situated to these three employees because she was not a

nurse.

Smith also was not similarly situated to Boone, Maron, and Clark because they had more professional organizing experience. Smith had only a little more than three years of professional organizing experience. Boone and Maron had five years of professional experience. Clark had four years of professional organizing experience; and, in addition, she had worked with a large national union, as opposed to a local organization.

Finally, Geevarghese, an Asian-American male, had a few months less professional organizing experience than Smith, but he had worked for seven months with the SEIU, as opposed to a local organization, before being hired as a senior organizer. Thus, he also was not similarly situated to Smith because of his prior tenure at SEIU. The district court, therefore, properly granted summary judgment on this claim.

### B. Smith -- Failure to Promote

Smith also claims racial discrimination in SEIU's failure to give her a two-step promotion [*17] from senior organizer in training to organizing coordinator. **HN4** To establish a *prima facie* case of racial discrimination based upon a failure to promote, Smith must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time Smith's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000).

SEIU argues that Smith failed to establish a *prima facie* case because there were no vacant coordinator positions in March 2001. Thus, SEIU claims Smith never applied for and was never denied a promotion. Smith responds that a position must have been open which she was denied because in August 2001, Clark was placed in a coordinator position in the central region. Even if we accept Smith's reasoning, Smith has not established a *prima facie* case because Clark was not similarly situated.

**HN5** For two employees to be considered similarly-situated, the similarities between the plaintiff and the other employee [*18] must exist "in all relevant aspects of their respective employment circumstances." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) (internal quotation marks and citation omitted). Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. Id.

We conclude that Clark was not similarly situated to Smith because Clark had previous experience as an organizing coordinator. Thus, Clark was not promoted to the coordinator position. Instead, she was returning to a position she held before leaving to work for a local union affiliate. Because Smith failed to present evidence sufficient to raise a genuine issue of material fact to establish that she was treated differently than a similarly situated nonprotected employee, we affirm the district court's grant of summary judgment on Smith's failure-to-promote claim.

### C. Smith -- Discharge

**HN6** In order to establish a *prima facie* case of discriminatory discharge, Smith must

show that (1) she is a member of a protected class, (2) she was terminated from her employment, (3) she was qualified for the position in question, and (4) she [*19] was replaced by a nonprotected person or a similarly situated nonprotected employee was treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

We affirm the grant of summary judgment on Smith's discriminatory discharge claim because she failed to submit sufficient evidence to establish the fourth element of a *prima facie* case. Smith does not argue that a similarly situated employee was treated more favorably, and she failed to prove that she was replaced by someone outside the protected class. Smith asserts that Nelson's promotion to organizer was a sham and an attempt by SEIU to appear racially neutral in terminating Smith. She fails to point to any evidence in the record, however, regarding Nelson's qualifications or experience. *HN7* Bald assertions are insufficient to create a genuine issue of material fact. FED. R. CIV. P. 56(e); *Bryant v. Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974) (holding that an opponent to a summary judgment motion may not rest merely upon "conclusory and unsupported allegations, rooted in speculation").

Even if she had established a *prima* [*20] *facie* case, summary judgment was nonetheless proper because Smith failed to show that SEIU's proffered reasons were pretextual. Schneider stated that one of the reasons for Smith's discharge was her disrespectful treatment of fellow employees. One of the specific examples Schneider cited was the July 13 incident with Khermohamed. Smith argues that the overwhelming evidence shows that she was not involved in an altercation with Khermohamed.

*HN8* A plaintiff can meet his burden of showing pretext by producing evidence that the employer's proffered reason for his discharge was false. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 147 L. Ed. 2d 105, 120 S. Ct. 2097(2000). We have adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* The employer has an honest belief in its reasons if the employer reasonably [*21] relied "on the particularized facts that were before it at the time the decision was made." *Id.* (internal quotation marks and citation omitted).

Schneider relied on the following particularized facts in making the termination decision: (1) Khermohamed and Davis signed statements accusing Smith of verbally abusing Khermohamed on July 13; (2) Condra had asked Davis to falsely report the July 13 incident, which undermined his credibility when he gave a statement stating that Davis, not Smith, was being verbally abusive that day; (3) a meeting had been called by coworkers to discuss complaints about Smith's treatment of fellow employees; and (4) several organizers signed a statement denying that Khermohamed ever accused Hobbs of sex discrimination. Smith has failed to present any evidence to refute Schnieder's honest belief that Smith engaged in inappropriate conduct toward her fellow employees that justified her discharge.

Smith argues that Khermohamed's letter should have been discounted because she was a disgruntled employee, n6 and it was unreasonable to discount Condra's eyewitness account of the July 13 incident. Even if we were to accept this reasoning, this is not enough [*22] to prove that Schneider's decision to terminate Smith for

inappropriate treatment of fellow employees was unreasonable or pretextual. Smith does not discount the evidence of her false statements to Hobbs and the complaints of other organizers about her mistreatment of them. This information supports Schneider's decision to terminate Smith because of her inappropriate treatment of her fellow employees. Moreover, it was not unreasonable for Schneider to question the credibility of Condra's statement in the face of not only Khermohamed's statement but also Davis's statement, as well as the tape recording where Condra asked Davis to lie about what happened on July 13. Because Smith failed to meet her burden of proving SEIU's proffered reasons for her termination were pretextual, we affirm the grant of summary judgment.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Condra attempted to discharge Khermohamed on August 6, the day she wrote her letter describing the July 13 incident, but Condra's decision was overruled by his superiors.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### D. Brooks -- Discharge [*23]

In response to Brooks's unlawful discrimination claim, SEIU offered evidence that one of its reasons for terminating Brooks's employment was that she misled SEIU into believing that she had relocated to Chicago in order to collect paid leave she otherwise would not have received. Brooks argues that the evidence in the record reveals that she never told anyone she had acquired permanent housing in Chicago. She argues that the district court impermissibly made a credibility determination. The question is not whether Brooks's evidence was credible. The question is whether SEIU honestly believed in its proffered nondiscriminatory reason for discharging Brooks. *Majewski*, 274 F.3d at 1117.

The undisputed evidence shows that during a telephone conversation Brooks told Schneider that she had found a place in Chicago that would be available on December 5. She now explains that while she said she had found a house that would be available on December 5, she never said that she had actually purchased that house. On December 5, however, SEIU sent a letter to Brooks confirming that Brooks had told SEIU that she had found permanent housing. Brooks never corrected what she has now [*24] shown was a misunderstanding. Brooks's assertion that she did not actually tell anyone that she had permanent housing in Chicago is insufficient to call into question SEIU's honest belief that she did. No credibility determination is needed to reach this conclusion. Nor are we persuaded by Brooks's contention that SEIU should have known she had not purchased a home in Chicago because she did not apply for a moving expense benefit or stipend. Because we find that Brooks has not met her burden of raising a genuine issue of material fact as to whether SEIU's reasons for discharging her were pretextual, we affirm the grant of summary judgment. n7

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n7 In the statement of facts, Brooks alludes to two arguments that she does not develop in the argument section of the brief. First, she states that a white female, Stella Lindsey, applied for and received multiple weeks of medical leave, decided not to transfer, and was laid off rather than discharged. SEIU responds that Lindsey was not similarly situated because there was no evidence that Lindsey misled SEIU with respect to her transfer decision. Second, Brooks challenges the statement in her termination letter that she was not welcomed at any central region locals. She does this by arguing that the letters must have been solicited by Schneider because the letters from the locals were all written within a few weeks of each other just before Brooks's termination. Schneider stated in an affidavit that she asked for written confirmation from the locals after receiving information verbally in prior meetings.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*25]**

**AFFIRMED.**

Service: **Get by LEXSEE®**
Citation: **2005 u.s. app lexis 645**
View: Full
Date/Time: Friday, March 10, 2006 - 3:44 PM EST



About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.