IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Billy Brantley, et. al.,                          Case No. 1:01cv378

                    Plaintiffs,                   Judge Michael R. Barrett

        v.

Cinergy Corp.,                                    ORDER GRANTING IN PART AND
                                                  DENYING IN PART DEFENDANT'S
                                                  MOTION FOR SUMMARY
                    Defendant.                    JUDGMENT AND DENYING
                                                  DEFENDANT'S MOTION TO SEVER

        This matter comes before the Court on Defendant Cinergy Corp's ("Cinergy's"[1]

Motions for Summary Judgment as to Plaintiffs Billy Brantley (Doc. 82), Rodney Jones

(Doc. 86), Anthony Martin (Doc. 84), and Todd Tolbert (Doc. 83); and Defendant's Motion

to Sever Plaintiffs' Claims (Doc. 91). For the reasons below, Cinergy's Motion to Sever

(Doc. 91) is **DENIED**, and Cinergy's Motions for Summary Judgment (Docs. 82, 83, 84, 86)

are **GRANTED, IN PART, AND DENIED, IN PART**.

## I.    BACKGROUND

        Billy Brantley, Rodney Jones, Anthony Martin and Todd Tolbert (collectively

"Plaintiffs") sued Cinergy in 2001, alleging they were all subjected to racial discrimination

in employment and a racially hostile work environment in violation of the federal

Constitution and provisions of federal and state statutory law including Title VII of the

federal Civil Rights Act of 1964. (See generally Doc. 1.) Jones further alleges he was

---

[1]Although the Court is aware that Cinergy has now become Duke Energy for
purposes of this Order the Defendant will be referred to as Cinergy.

constructively discharged on the basis of his race, while Tolbert alleges that Cinergy subjected him to unlawful disability discrimination in violation of the federal Americans with Disabilities Act.  (See, e.g., Doc. 101 at 57-59, 66-68.)  Cinergy seeks summary judgment on all claims.

### A.    Plaintiffs' Employment Histories and Individual Allegations

#### 1.    Billy Brantley

Billy Brantley has been working at Cincinnati Gas & Electric Company ("CG&E"), a Cinergy subsidiary, since November 1987.  He spent much of his career in the Electric T&D C&M Department, where he began as Groundperson and was promoted to Lineperson C in 1989, Lineperson B in 1990, Lineperson A in 1992, and Senior Lineperson in 1994.  In the summer of 2002, Brantley transferred to his current Field Supervisor position in the Electric T&D Projects East Department.

Brantley contends that throughout his employment at CG&E, he has been treated differently because of his African-American race.  His first major allegation is that CG&E supervisors have blocked or impeded his access to important professional development opportunities available to white employees.  Brantley alleges that as a Groundperson, he was required to dig holes in order to qualify for overtime assignments, while "[w]hite employees were not given any prerequisite[s] for overtime work."  (Doc.  101 at 9.)  He contends that while serving as a Lineperson B in the early 1990s, he was "denied . . . opportunities to gain experience in bucket truck work" that "was typically given only to white employees."  (Id.)  Brantley further alleges that as a Senior Lineperson in 1995 and 1996, he was "denied . . . the opportunity to serve on one of Cinergy's corporate committees,"

while "[c]ommittee positions were given to white employees." (Id.) Finally, Brantley alleges that in the late 1990s, he was not allowed to participate in company computer training classes. (Id.) Brantley says his supervisors told him he was "not qualified" to take the classes "because he was a Lineperson," but that at least one white Lineperson was allowed to participate. (Id. at 9-10.)

Brantley contends that many of the denied opportunities above materially impeded his progress through CG&E's ranks. Specifically, he alleges that the bucket truck work he allegedly sought as a Lineperson B built "skills essential to being promoted to Lineperson A"; that the committee service he was denied as a Senior Lineperson was "essential" for promotion to either Field Supervisor or Temporary Training Crew Lead, positions he was denied in 1999; and that computer training was "essential" for promotion to Temporary Training Crew Lead and other "supervisory positions." (Id. at 9-10.)

Brantley's second major allegation is that his CG&E supervisors repeatedly failed to inform him of new job openings and associated hiring criteria, and then favored less senior and/or white employees in filling those openings. Brantley first alleges that when denied a promotion to Temporary Training Crew Lead Supervisor in 1997, he "was not told why he did not receive the position or what the necessarily qualifications were." (Id. at 10.) Brantley acknowledges, however, that the employees selected for this initial opening "were more senior" than he was. (Id.) Brantley alleges that two additional openings for the same position in 1998 were "not posted," that two white supervisors refused to give him "substantive answer[s]" when he asked about required qualifications, and that he was "never told why he was not considered." (Id.) This time, according to Brantley, both positions went to "less senior white employees." (Id.) Brantley further contends that he

3

never saw a 1998 or 1999 Field Supervisor opening posted in either his workplace or on Cinergy's online jobs bulletin, and that the position was awarded to a white co-employee who was tipped off by a supervisor.  (Id. at 10-11.)

Brantley alleges that his 1999 application for a Joint Trench Supervisor opening was denied without an interview or other feedback, other than a conversation with supervisor Cliff Zorb from which he does not recall receiving any response.  (Id. at 11-12.)  Brantley contends he was also never interviewed for a 1999 Temporary Training Crew Lead Supervisor position, even though that position was ultimately given to a less senior "white employee" who lacked a "set" perquisite of three years' Lineman A experience (Id.) Brantley says that he was never given "specific reasons" for being passed over for the position.  (Id.)  Brantley acknowledges that Lou Frith and Dave Ward later suggested that he had insufficient leadership skills and computer training, but contends that "no one had ever inquired" into his computer skills.  (Id.)  Brantley was interviewed for a 1999 Field Supervisor opening, but alleges that the interview process was "purely subjective" and that the position went to a "less senior white employee" so lacking in department experience that he had to be retrained for a year.  (Id. at 11-12.)

Brantley also alleges that in 2000, CG&E failed to post another job opening, this time for Joint Trench Supervisor.  (Id. at 12.)  He does not know how the position was filled, but emphasizes that a white supervisor informed at least two white employees about the position and invited them to apply for it.  (Id.)  Finally, Brantley reports that he applied but was never interviewed for a 2000 Field Supervisor opening that went to a white employee. (Id.)  While Brantley was eventually promoted to Field Supervisor in 2002, he suggests he was only selected for the position after he "complained about discrimination."  (Id. at 8.)

Brantley's third major allegation is that he was subjected to a racially hostile work environment of offensive, racially tinged comments or images that CG&E never remedied. With respect to comments, Brantley contends that sometime between 1990 and 1994, a white supervisor, Don Kramer, "made a comment to Mike Brooks and Todd Tolbert about the way African-Americans" act that Brantley, Brooks, and Tolbert all found offensive. (Id.) He also alleges that in the fall of 1998, another white supervisor, Danny Morris, told Newton Wright – apparently a crewmate of Brantley's – that "something was going to happen to them." (Id. at 12-13.) Brantley alleges that "them" was "intended to mean Brantley's entire African-American crew," and that the "something" was in reference to Todd Tolbert's accident, discussed at Part I.A.4, below. (Id.) Brantley further alleges that sometime between 1995 and 1999, Roger Reiss – a white employee later promoted to supervisor – referred to Larry Thompson as a "nigger." (Id. at 13.) Finally, Brantley contends that another African-American employee, Bruce Headen, told him he was subjected to frequent name-calling and ridicule by his predominately white work crew. (Id.) Headen's account was allegedly corroborated by the crew's only other nonwhite member, B. Allen. (Id.) With respect to racist images, Brantley recalls Leroy Brown telling him, sometime in the last five years, that the word "nigger" had been written on employee lockers. (Id.) He also reports hearing from Kenny Willis, in 1999, that "language used" and pictures present at the company's M&R station had created a racially intimidating atmosphere there, and that station supervisor Charles Alexander reported seeing pictures of target emblazoned with the initials "KKK." (Id.) Brantley further alleges that in fall 2001, Carol Hendricks told him that there were "depictions of nooses" at the power plant where Henricks worked. (Id.)

5

Brantley contends that while he knew he could report these incidents to others at the company, and was aware of co-employees who did report, he personally regarded reporting as futile and felt that the hostile environment generally "discouraged" it. (Id. at 13-14.) He alleges that his co-Plaintiff Rodney Jones approached the human resources representative for minority relations, Suzanne Bradley, about the company's hiring of African-Americans, only to have Bradley tell Jones there was "nothing she could do about the situation." (Id.) Brantley also alleges that Carol Hendricks reported the power plant noose incident to her supervisor, but does not know whether "anything was done" about it. (Id. at 13.)

### 2.    Rodney Jones

Rodney Jones worked at CG&E from December 1989 to July 2001, when he resigned. (Id. at 19, 26.) He began as an assistant building cleaner, moved to a Materials Assistant C position in early 1990, and was subsequently promoted to Materials Specialist B (fall 1990) and Materials Specialist A in (fall 1991). (Id. at 19.) Jones reports that in September 1997, due to downsizing in Materials Management, he was moved to a lower-paying Manual Technician position in the Overhead department. (Id. at 20.) He contends that his supervisors described this as "dead-end" job with no opportunities to "progress, get raises, or get assigned more duties." (Id.) Jones served as Manual Technician until his July 2001 resignation. (Id.)

Like Brantley, Jones contends that he was denied job opportunities and promotions because he is African-American. With respect to job opportunities, Jones alleges that he was "assigned to disfavored tasks," such as cleaning, more frequently than white co-workers and that he was one of a very few employees denied the opportunity to work

overtime during a spring 1999 storm despite calling his white supervisor, Ron Lewis, to volunteer his services.  (Id. at 25.)  He later learned that less senior white employees had been allowed to work.  (Id. at 25.)

With respect to promotions, Jones contends that between August 1997 and July 2001, he applied for and was rejected for a Lineperson C position "at least seven times," while Cinergy hired "less qualified and less experienced" whites from "outside the company" in his stead.  (Id. at 20-21; see also id. at 22 (naming eight white individuals hired as Linepeople that Jones alleges were less or no more qualified than Jones.)  Jones alleges that he was kept in a "'dead-end" Manual Technician job despite performance evaluations suggesting he was an "outstanding employee" and his general familiarity with the Lineperson position.  (Id at 20-21.)  More specifically, Jones alleges that his Manual Technician duties were similar to those of a Lineperson C and that he was in fact asked to perform "Lineperson C duties," including boom truck operation, wire and guy line connection and stringing, and pole setting, in the course of his work.  (Id. at 22.)  Jones further alleges that he was occasionally called upon to operate the truck and connect or disconnect wires in emergency outage situations.  (Id.)  Jones also reports that his white supervisor, Ron Stewart, once asked Jones to oversee and complete a guy wire job assigned to one of the white Linespersons, Ron Brownstead, who Jones alleges was "hired off the street" with less experience and fewer qualifications than Jones.  (Id.)

Jones alleges that on several occasions, he asked supervisors why he was having trouble securing a Lineperson C position.  (Id. at 23)  He acknowledges that the field assessment portion of his first, August 1997 application was "negative," but contends that supervisor Bernadette Reinhard told him on his third or fourth application that his

assessment[s] had improved. (Id.) Jones reports that Reinhard described Jones' "interview process" as "lacking," but did not explain this observation or explain how Jones could improve his performance. (Id.) He also says Reinhard refused his request to disclose certain test results used to evaluate candidates, that she was "not completely respectful" of and "insufficiently forthcoming" with him, and that other African-American employees who had applied to jobs described Reinhard as having a "nasty attitude." (Id. at 23-24.) Jones further reports that sometime between 1998 and 2000, he contacted Suzanne Bradley to complain about the "lack of minorities being hired into the company." (Id. at 24.) He says he also asked Bradley about his Lineperson C positions, sharing his suspicion that he was "being overlooked" in favor of less qualified white applicants," noting that there were "very few minority persons being hired into the department." (Id.) He reports that Bradley agreed to look into the situation, but ended up telling him only that "more minorities needed to apply" to the disputed positions. (Id.)

Jones also alleges that during his final application for a Lineperson C position, Bob Atkins – a white employee then serving as both Jones' immediate supervisor and an interviewer for the new Lineperson C opening – told Jones on the second day of Jones' three-day assessment period, that Jones' assessment scores had improved and that he thought Jones had "gotten the job." (Id. at 22-23.) Jones contends that when he was declined, a "dismayed" Atkins told Jones that he couldn't believe Jones had stayed at Cinergy as long as he had. (Id. at 23.) Jones also alleges, that only one African-American has been hired into the Lineperson C department in the years he spent applying for openings there, leading him to conclude that Cinergy has "not been hiring" African-Americans into that department. (Id. at 26.) Jones notes that there appear to be "many

more white" than African-American employees in higher positions throughout the company. (Id.)

Jones, like co-Plaintiff Brantley, also alleges that he was exposed to racially offensive comments at work.  (Id. at 24.)  He recalls passing some cotton fields in a line truck with two white co-workers in 1999 or 2000, and hearing one of them joke about "there being cotton over in the fields."  (Id.)  Jones says he did not report this incident because felt "nothing would be done" about it.  (Id.)  Jones also alleges that Brantley told him that a female employee – presumably Carol Hendricks – told Brantley she had seen a "noose hanging from the ceiling in her work area."  (Id. at 25.)   Another African-American employee, Bruce Headen, allegedly told Jones he had been "jumped" by two white employees and had reported the incident.  (Id.)  Jones also alleges that he prepared a statement about Todd Tolbert's accident, discussed at Part I.A.4, infra, because he felt that "race had played a part" in it.  (Id.)  He says he also attempted to discuss Tolbert's accident with a white supervisor, Al Perkins, after a safety meeting in fall 1998, only to have Perkins ask Jones if he "still wanted the Lineperson C" job after what had happened to Tolbert. (Id.)  Jones believes the comment was racially motivated, alleging that Perkins was aware Jones had been seeking the Lineperson C job for some time and had never made similar comments after other accidents.  (Id.)

Jones alleges that the restricted professional options and racially hostile environment he experienced during his Cinergy career left him feeling frustrated; humiliated in the eyes of coworkers, family and friends; and mentally and physically drained.  (Id. at 20-21, 26.)  He avers that during his last months at Cinergy, he felt stressed and depressed and experienced shortness of breath, rapid heartbeat, and

diminished physical strength.  (Id. at 26.)  In his July 31, 2001 letter of resignation, Jones described his personal frustration at seeing less senior, less qualified whites from outside the company being hired in his stead, and alleged that African-American and white employees are treated differently at Cinergy.  (Id.)  He says he did not consult with his supervisors or Human Resources before resigning, because he did not "see any point." (Id. at 26-27.)

### 3.    Anthony Martin

Anthony Martin has worked at CG&E since 1985.  (Id. at 3.)  He began as a custodian and was promoted to cleaner in 1986, construction helper in 1989, and Groundperson Driver A in 1991.  (Id.)  Like Brantley and Jones, Martin alleges that he has been denied job opportunities and promotions and subjected to a hostile work environment because he is African-American.

With respect to job opportunities, Martin claims that his white supervisor, Dan Morris, treated Martin's white crewmembers to lunch after the crew reported a safety violation, but refused to pay for Martin's meal.  (Id. at 4.)  Martin also alleges that he was denied opportunities to work overtime and that Morris denied receiving at least one telephone call from Martin about these opportunities.  (Id.)  Martin further contends that he was subjected to harsher discipline than his white colleagues.  He reports that Morris, Dave Ward and other company officials unfairly disciplined him after co-Plaintiff Tolbert's 1998 accident, discussed at Part I.A.4, infra.  The company later offered to reduce the discipline to an oral warning, but did not offer to remove documentation of that warning from Martin's employee file.  (Id. at 5.)  Meanwhile, according to Martin, Eric Sicby – Martin's white supervisor at the time of the Tolbert accident – was disciplined with a record of counseling

that was to be removed from his employee file after a six-month period of good behavior. (Id.) Martin also contends that other white employees initially disciplined for the Tolbert accident also saw their charges reduced to warnings coupled with temporary employee file entries. (Id.) Finally, Martin alleges that a September 1998 accident report, one he believes Morris helped lodge, exaggerates the extent of damage Martin caused in hitting a rock or (according to the report) boulder with his company vehicle. (Id. at 6.)

Like co-Plaintiff Jones, Martin also claims he was repeatedly denied promotions to the position of Lineperson C despite being qualified for the job. Martin alleges that as Groundsperson, he served on the same work crews with Lineperson Cs and was able to assist and observe their support. (Id.) He began applying for Lineperson C openings in 1995. (Id.) He contends that after safety supervisor Lynn Dunn told Martin he had not performed well on the qualifying climbing test for this initial application, he began practicing climbing in his free time. (Id.) He reapplied for a Lineperson C position in 1997. This time, Martin suggests he was improperly denied the position on the basis of what he was told was a "below average" score on the written field assessment test. (Id.) Martin contends that he passed the test. He also alleges that a white employee, Gary Nasto, was improperly granted a position despite reporting for the climbing test shirtless and being asked by the tester whether he could lose "excess poundage." (Id.) Martin applied for another Lineperson C job in August 1998, but alleges that supervisor Al Perkins told him he was not formally "considered" at that time due to poor performance in his previous application, his discipline from the Tolbert accident, and resume errors. (Id. at 6-7.) Martin states that he was allowed to reapply after the resume errors were traced to the company's facsimile transmission system, only to be denied again. (Id. at 7.) According to Martin,

11

CG&E attributed this third denial to his field assessment test score of 60 and automatic failure at the "Working at Heights" exercise, and told Martin that 14 other unsuccessful candidates had scored higher than him. (Id.) Martin also contends he complained to Dave Ward and General Manager Jim Staley about potentially "faulty scoring" of his own field assessment, but received no response. (Id.) In June 1999, Martin reports that CG&E offered him to retest the "Working at Heights" exercise on the condition that Martin drop his union grievances and forgo future applications to the Lineperson C program. (Id. at 7-8.) Martin refused the offer, but was denied the opportunity to reapply for Lineperson C positions anyway. (Id. at 8.)

Like Jones, Martin alleges that white employees with less seniority and less knowledge of the company and line work were rewarded with Lineperson C jobs even as CG&E denied his applications. (Id.) Also like Jones, Martin contends that he was required to supervise and even train these employees after their promotions. (Id.) Martin also suggests that white employees enjoyed greater support and lenience throughout the application process. He alleges that he observed Morris and another white supervisor, Mark Markesbury helping white employees train for the Lineperson C field assessment. (Id. at 7.) He also contends that a white employee, Rod Carter, was allowed to take the Lineperson A test three times before passing, and that Bill Wilson, another white employee, was promoted after "turning over a bucket truck." (Id. at 8.)

Martin, like co-Plaintiffs Brantley and Jones, also contends that he was subjected to racial hostility in the workplace. He alleges that in the first few months after his 1991 promotion to Groundperson A, white employees constantly "yelled and cussed" at him for "not being proficient at his job," even though he received training only once a week. (Id.)

12

He also alleges that a white coworker, Rick Cutsinger threatened to "kick" Martin's "black ass" if Martin went into a building earlier than he was permitted to, and also commented that he would disown his daughter if she "brought home" a black man.  (Id. at 4.)  After Martin complained to his supervisor, John Huwel, about the first of these statements, Huwel told Cutsinger not to talk that way again.  (Id.)  Martin says he overheard fellow employees refer to certain equipment as "nigger toes" in the early 1990s.  (Id.)  He also claims he overheard white attendees at a 1997 or 1998 diversity training claim, in apparent reference to African-American employees, that "we wasn't raised like them," "we're not used to working with those people," and "they didn't grow up the way we did."  (Id.)  Finally, Martin alleges that around September 2002, someone left banana peels in his work truck.  (Id.)  He says he did not complain about any of these incidents, other than the Cutsinger comment, because he thought "nothing would be done."  (Id.)

### 4.    Todd Tolbert

Todd Tolbert was hired as a CG&E Groundperson in 1990 and promoted to Lineperson C in December 1991, Lineperson B in 1993, and Lineperson A in 1995.  (Id. at 14.)  Since 2002, he has been serving as a Senior Lineperson A.  (Id.)  Like his three co-Plaintiffs, Tolbert contends he was denied job opportunities and harassed because he is African-American.  In addition, Tolbert alleges that he has been subjected to unlawful disability discrimination on account of his obesity and an associated sleep disorder.  (Id. at 19.)

Like Brantley, Jones, and Martin, Tolbert contends he was repeatedly been denied promotions and other valuable job opportunities that were extended to less or (at best)

equally qualified white counterparts.  Tolbert alleges that when he was a Groundperson, white supervisors Dan Morris and Tim Hodges sent Tolbert and a fellow African-American employee to pick up trash while white Groundspeople attended training sessions.  (Id. at 15.)  He also alleges that he was improperly denied the opportunity to work on Lou Frith's truck, apparently at Frith's request, and was therefore hindered in his development of necessarily skills associated with Lineperson positions.  (Id. at 14-15.)  Tolbert further alleges that his initial promotion from Groundperson to Lineperson C was delayed for six months because his supervisor Lloyd Balzhizer[2] said he was not sufficiently proficient in driving company vehicles, even as a white employee who had been involved in an incident with a company vehicle was promoted ahead of Tolbert.  (Id.)

Tolbert further contends that his Lineperson B supervisor, Donald Kramer, forbid Tolbert and African-American co-worker Mike Brooks to talk during work, never spoke directly to Tolbert or Brooks, and consistently gave Tolbert – who contends he had previously been "average in all areas" – "below average marks" on his employee evaluations.  (Id. at 15.)  Tolbert also alleges that supervisor Scott Morris treated him unfairly regarding the August 1998 electrical control accident in which Tolbert was electrocuted.  Morris forced Tolbert to review the report for this accident while he was still recovering from the electrocution and on heavy pain medication, and that Tolbert was consequently unable to spot and correct inaccuracies in the report.  (Id.)  Tolbert contends that while serving as a Lineperson A, he and other African-American employees were not

---

[2]This name is spelled different ways in the pleadings.  Since the Court is not sure which verison is correct, for the sake of clarity, the Court will use this spelling throughout this Order.

allowed to travel to another district to attend a one-week Field Supervisor training never offered in their district, even though four white employees were permitted to do so.  (Id.) He also reports that he was denied a promotion to Field Supervisor in 1999 – a promotion awarded to four white employees – on the basis two unfavorable supervisor's evaluations, one of which he contends was actually of Brantley.  (Id.)

Like his co-Plaintiffs, Tolbert further alleges that he was frequently subjected to a racially hostile work environment.  He reports that his white supervisor, Lloyd Balzhizer, once referred to him as "boy" and generally treated him and his African-American coworkers differently and with less respect.  (Id. at 18.)  Tolbert contends that white coworkers have also made racist comments in his presence, citing remarks about the O.J. Simpson trial and the 2001 Cincinnati race riots and a remark after September 11, 2001 to the effect that "all 'gang-bangers' should be let out of prison and sent out to find Osama Bin Laden."  (Id.)   Tolbert also contends that fellow African-American employees have been subjected to racist remarks, although it is unclear whether Tolbert personally witnessed these remarks.  Tolbert alleges that one coworker told a group of African-American employees that he wanted to "take 'diversity days' on James Earl Ray" day, see id., in apparent reference to the murderer of Reverend Martin Luther King, Jr.  He also alleges that an African-American coworker of his named Fletch told him that Ronald Perry, a white employee, had called Fletch a "nigger."  (Id.)  Tolbert also reports seeing confederate flags displayed on employee lockers and in common work areas, on hard hats, and on personal vehicles, being labeled – with his African-American counterparts – as "stupid, ignorant, and dumb," and being "treated differently, with less respect, and generally talked down to" by fellow employees and supervisors alike.  (Id.)  Tolbert says he did not

15

report any of these incidents because he felt that reporting to a management he perceived as "anti-minority" would be futile. (Id. at 19.) He alleges that his friend Fletch reported the "nigger" incident to his supervisor, only to have the supervisor tell him and a fellow employee to leave the area or be fired. (Id.)

Unlike his co-Plaintiffs, Tolbert further alleges that he was discriminated against because of his weight. Tolbert contends that his obesity is associated with sleep apnea, a sleep disorder, is unresponsive to diet and exercise, and has significantly limited his ability to perform physical activities including simple household chores. (Id. at 19.) He acknowledges that Cinergy has "recognized" that this weight problem makes it difficult for him to perform certain job duties, such as "working on single bucket trucks and ladders," and has consequently prohibited Tolbert from working in those capacities. (Id.) He further contends, however, that he has been unfairly subjected to special conditions not imposed on overweight *white* employees and denied special accommodations extended to those employees. (Id.)

Tolbert alleges that at least three white coworkers he believed to be of similar weight – Paul Dennis, Gary Nasto, and Eric Sicby[3] – were not subjected to the regular weigh-ins Tolbert was required to undergo. (Id. at 16.) He further alleges that when Nasto was hired, he was given an exercise bike to help him lose "excess weight" and – apparently unlike Tolbert – was allowed to stop reporting for weigh-ins once he reached a target weight. (Id.) Tolbert also contends that he was "singled out" and had his pay docked after leaving early for a May 2000 doctor's appointment, while white employees have missed time without

---

[3]Plaintiffs also spell this name various ways. However, for clarity the Court will use this spelling throughout the Order.

similar sanctions.  (Id. at 16-17.)  He alleges that his white supervisor, Glen Neidlinger, denied him a promotion to Temporary Training Crew Lead Supervisor in 1999 on account of his weight, even as Neidlinger promoted Sicby, an overweight white employee, to the position.  (Id. at 17.)  Tolbert further alleges that he was subsequently *demoted* to Groundperson in February 2000 for weight-related reasons, while Sicby was promoted and at least one other overweight white employee – Mike McCurie – was allowed to continue working "in other capacities in his department" in lieu of demotion.  (Id.)  He also alleges that he is the only employee he knows of that was officially restricted to scheduled overtime in 2000 on account of his weight.  (Id.)

## B.    Procedural Background

Plaintiffs filed their joint complaint against Cinergy on June 7, 2001, alleging that Cinergy has denied them "equal employment opportunity for initial job assignments, promotion, wages, and other terms and conditions of employment," subjected them to "reprimands, threats, and other intimidating conduct," and excluded them from "supervisory, managerial, and professional jobs" on account of their race.[4]  (Doc. 1 at 1-3.) Plaintiffs further contend that Cinergy follows a general "policy and practice of discrimination in employment against African Americans" by maintaining segregated "jobs, classifications, departments and sub-departments;" "depressin[ing] . . . wages" by prohibiting African Americans from rising "through the ranks" to managerial, supervisory, and professional positions; and subjecting African Americans to disproportionately severe

---

[4] More specifically, Plaintiffs alleged that they "sought to be promoted are [*sic*] transferred to better job positions but were denied such promotion and transferred solely because of their race," while Cinergy has "continued to assign white employees with less seniority to better job positions than Plaintiffs."  (Id. at 3.)

disciplinary policies "leading to discharge." (Id. at 2-4.) While Plaintiffs have never formally amended their complaint, it is clear from the papers that they have substantially refined and expanded their claims over the course of this litigation. All four Plaintiffs are pursuing claims for racially discriminatory failure to promote and/or demotion, disparate discipline and related issues, and subjection to a racially hostile work environment based on the allegations above. In addition, however, Plaintiff Jones is pursuing a claim for constructive discharge, and Plaintiff Tolbert a claim for disability discrimination..

Cinergy filed its pending motions for summary judgment against Plaintiffs on July 29, 2004. (Docs. 82, 83, 84, 86.) A week later, Cinergy moved to sever Plaintiffs' claims. (Doc. 91.) Plaintiffs oppose both motions on the merits. (Docs. 99, 101, 129.)[5]

## II.    JURISDICTION

The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

## III.    MOTION TO SEVER PLAINTIFFS' CLAIMS[6]

---

[5] After filing their initial responsive memorandum in opposition to summary judgment, Plaintiffs moved to strike certain of Defendants' exhibits in support of summary judgment and/or file a sur-reply in opposition to summary judgment. (Docs. 114, 118.) Defendants moved to strike Plaintiffs' motions. (Docs. 115, 119.) On February 9, 2006, the Court denied Defendants' motion (Doc. 115) and partially granted Plaintiffs' motion (Doc. 114), thus permitting Plaintiffs to file a sur-reply. (Doc. 128.) The Court also denied both parties' other motions (Docs. 118, 119) as moot. (Doc. 128.) After Plaintiffs filed their sur-reply (Doc. 129), Defendants filed a "Supplementation of Authority" (Doc. 130). The Court does not consider the Supplementation to the extent it cites cases decided before October 28, 2004, when Defendants filed their reply memoranda on summary judgment. (See Docs. 108, 109, 111, 112.)

[6] Both parties submitted rather lengthy briefs that draw heavily (if not exclusively) on district opinions from other circuits. As it happens, Cinergy's motion is easily resolved by reference to the language of Rules 20 and 21 and controlling authority on

The Court first considers Cinergy's Motion to Sever (Doc. 91).  Federal Civil Rule 21 allows courts to sever parties or claims "at any stage of the action and on such terms as are just."  See Fed. R. Civ. P. 21.  Cinergy contends that Plaintiffs' cases must be severed under Rule 21 because they do not "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" and are therefore *mis*joined under the permissive joinder standards of Rule 20.  (Doc. 91 at 12-13; see also Fed. R. Civ. P. 20(a), 21.)  Plaintiffs respond that their allegations and claims are closely intertwined, and that–in any event–courts enjoy broad discretion to try multiple parties and claims together wherever judicial economy is served.  (Doc. 99 and 101.)

The application of Rules 20(a) and 21 in cases of alleged misjoinder is committed to this Court's sound discretion.  See, e.g., Michaels Building Co. v. Ameritrust Co., 848 F.2d 674, 682 (6th Cir. 1988).  Rule 20(a) allows multiple plaintiffs to join in one action "if they assert *any* right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if *any* question of law or fact common to all these persons will arise in the action."  Fed. R. Civ. P. 20(a) (emphasis added).  Most allegations in this case involve racial discrimination and hostile work environment claims that are common to all four Plaintiffs.  While each Plaintiff alleges some unique facts in support of his claims, Plaintiffs also make some parallel or overlapping allegations relating to Cinergy's general work environment and employment practices.  See, e.g., Doc. 101 at 13, 24-25 (reports of nooses in work areas) and 6-8, 23-25 (denials of promotions to Lineperson C).  These legal and factual parallels suggest both

---

their application.

19

that Plaintiffs' claims are appropriately joined under Rule 20(a)[7] and that severing them under Rule 21 would seriously undermine judicial economy.  Cinergy's Motion to Sever (Doc. 91) is therefore **DENIED**.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

Cinergy focuses its summary judgment motions on the race-based discrimination claims common to all four Plaintiffs, but also challenges Jones and Tolbert's individual claims of constructive discharge and disability discrimination.  (See generally Docs. 82, 83, 84, 86)

With respect to Plaintiffs' common claims, Cinergy first argues that it is not a Title VII "employer" and therefore not a proper party to this litigation.  (See, e.g., Doc. 84 at 8-9.) It further asserts that Plaintiffs' Title VII and state-law racial discrimination claims are untimely and that Plaintiffs have failed to state a *prima facie* discrimination case or demonstrate that Cinergy's reasons constitute pretext.  (Id. at 10-16.)  Finally, Cinergy argues that Plaintiffs' Title VII racial harassment claims are unsupported because Plaintiffs have failed to show that they were subjected to a hostile or harassing work environment and, in the alternative, failed to "take advantage" of Cinergy's reasonable efforts to correct any potential problems.  (Id. at 16-18.)  Cinergy also asserts that it is entitled to summary judgment on the individual claims of Plaintiffs Tolbert and Jones, claiming that Tolbert has failed to state a prima facie ADA disability discrimination case and that Jones has not

---

[7] The fact that the Court must also consider Jones' and Tolbert's legally distinct constructive discharge and disability discrimination claims does not alter this conclusion, because the majority of claims in the case are held in common and it is not essential for each co-Plaintiff to "be interested in obtaining . . . all the relief demanded." Fed. R. Civ. P. 20(a).

established the elements of his constructive discharge claim.  (Doc. 83 at 21-23; Doc. 86 at 16-18).

For the reasons below, the Court **DENIES** Cinergy's motion for summary judgment as to all Plaintiffs' common claims and Jones' constructive discharge claim, **GRANTS** Cinergy's motion as to the disability claim of Tolbert, and **GRANTS, IN PART, AND DENIES, IN PART,** as to Cinergy's timeliness claims.

### A.    Standard of Review

Summary judgment is appropriate where there remain no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  The moving party has the burden of showing that there are no genuine issues of fact; the evidence, together with all inferences that can permissibly be drawn from that evidence, must be read in the light most favorable to the opposing party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

The evidence a court relies on to resolve a summary judgment motion should be admissible in its *content*, but need not be submitted in a *form* admissible at trial.  Bailey v. Floyd Cty. Bd. Of Ed., 106 F.3d 135, 145 (6th Cir. 1997) (emphasis in original) (citing Celotex Corp v. Catrett, 477 U.S. 317, 324 (1986)); see also Fed. R. Civ. P. 56(e) (emphasis added) (requiring affidavits and other supporting documents to "set forth such

*facts as would be admissible* in evidence"). Irrelevant evidence and hearsay not covered by exceptions "must be disregarded." <u>U.S. Structures, Inc. v. J.P. Structures, Inc.</u>, 130 F.3d 1185, 1189 (6th Cir. 1997).

**B.    Threshold Issues (Jurisdiction, Timeliness and Scope)**

Before the Court proceeds to the merits of Plaintiffs' claims, it must address Cinergy's threshold arguments that it is not a proper party, that Plaintiffs are barred from alleging discrimination under statutes other than Title VII, and that some of the unlawful discrimination alleged in this case is no longer actionable. (<u>See, e.g.</u>, Doc. 82 at 11-13.)

**1.    Cinergy as Proper Party**

Cinergy first argues that it is not a proper party to this suit, noting that Title VII binds only "employers," or "person[s] engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person. <u>See</u> 42 U.S.C. 2000e (b). It asserts that Cinergy is a public utility holding company with no employees of its own, that Plaintiffs' actual employer is CG&E, a Cinergy subsidiary, and that Plaintiffs' claims must be dismissed because neither their complaint nor their EEOC charge named Cinergy. (<u>See e.g.</u>, Doc. 84 at 8-9.)[8] Plaintiffs do not dispute that they were CG&E employees when the alleged Title VII violations occurred, contending instead that Cinergy and CG&E constitute a "single employer" for purposes of this case. (<u>See</u> Doc. 101-2 at 27-30.) They note that Cinergy is the corporate parent and sole owner of CG&E and that CG&E often

---

[8] This legal argument, like the other arguments Cinergy raises against all four Plaintiffs, appears in virtually identical form in each of Cinergy's four opening briefs on summary judgment. For simplicity's sake, the Court cites to a single representative brief.

refers to itself as "Cinergy" in employee manuals, forms, presentations, job postings, and other official records and employee communications. (Id. at 1-3, 28-30.) Cinergy does not challenge these facts on reply. (See, e.g., Doc. 111 at 15.)

As Plaintiffs note, a parent company may be liable for the unlawful employment practices of its subsidiary wherever a court finds "sufficient indicia of an interrelationship" to conclude that the parent and subsidiary effectively operate as a "single employer." Armbruster v. Quinn, 711 F.2d 1332, 1337 (6th Cir. 1983)(overruled on other grounds). In making this determination, the Court must "assess[] the degree of (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. Id. at 1337. The Sixth Circuit has emphasized that no single factor is "conclusive," that "[a]ll four criteria need not be present in all cases," and that the single-employer doctrine may sometimes be applicable "even when no evidence of common control of labor relations is presented." Id. at 1338.

Because CG&E is wholly owned by Cinergy, common ownership is clearly established. See, e.g., id. at 1338. The other facts set forth by Plaintiffs suggests some degree of interrelated operations, common management, and centralized control of labor relations. Indeed, it is hard to understand how Cinergy's labor relations could be meaningfully distinct from CG&E's, when Cinergy – by its own characterization – has no "employees" of its own. Cinergy's own affidavits in support of summary judgment indicate that not only CG&E managers but also employees of the overarching Cinergy Services, Inc. subsidiary have been involved in the investigation and defense of this action. (See, e.g., Docs. 85-5, 85-6, 85-9 (affidavits of CG&E supervisors); Docs. 85-2, 85-7, 85-8, 85-10 (affidavits of Cinergy Services, Inc. manager, consultant, attorney, and specialist)). These

facts strongly suggest that Cinergy and CG&E function as a "single employer" for purposes

of the employment activities and policies challenged in Plaintiffs' complaint, and that–by

extension–Plaintiffs need not have specifically named CG&E in their EEOC charge or civil

complaint in order to maintain the present action.[9]

The Court concludes that Cinergy is a proper party to this suit, and **DENIES**

Cinergy's motion for summary judgment on this ground.[10]

_____

[9] Because Cinergy and CG&E may be fairly regarded as a single party for purposes of this case, the Court need not address Cinergy's alternative argument, on persuasive authority, that "a party not named in an EEOC charge may not be sued under Title VII" unless a four-factor exception applies. (See Doc. 84 at 9 n.5.)  In any event, the facts set forth above suggest that this action falls within the stated exception. Because CG&E referred to itself as Cinergy in at least some internal employee communications, it is appears that CG&E did – for some practical purposes – represent itself as relating to its employees through Cinergy. (Id., factor 4).  For the same reasons, it is far from clear that Plaintiffs could easily have ascertained, at filing, that they were employees of CG&E and not Cinergy. (Id., factor 1).  Cinergy's collaboration with CG&E management throughout this litigation suggests that the entities' interests are aligned "for purposes of voluntary conciliation and compliance." (Id., factor 2.)  That collaboration also suggests that CG&E has had ample notice of and opportunity to defend itself against this action, and thus has not been materially prejudiced by Plaintiffs' failure to formally name CG&E as a party. (Id., factor 3.)

[10] In a footnote on reply, Cinergy suggests that Plaintiffs have abandoned their claim that CG&E and Cinergy functioned as a single employer by failing to amend their complaint to respond to Cinergy's "affirmative defenses in this regard." (See, e.g., Doc. 111 at 15 n. 10.)  Cinergy does not cite any legal authority for this proposition, which appears to be spurious.  The affirmative defense requirement of Rule 8(c) is generally understood as a means of giving plaintiffs adequate notice of certain arguments defendants may raise in the course of the lawsuit.  See, e.g., Moore, Thomas, Owen & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir. 19983) (internal citations omitted).  One corollary rule is that _defendants_ who fail to raise certain affirmative defenses in their answers may be deemed to have abandoned those defenses for purposes of ongoing litigation.  See, e.g., Haskell v. Washington, 864 F.2d 1266, 1273 (6th Cir. 1988);  _cf_. Moore, 992 F.2d at 1445 (noting exceptions to rule).  However, affirmative defenses must typically be (re)presented in motions to dismiss or (where the facts underlying the defense are not apparent on the face of the pleadings) for summary judgment, and tested in opposing pleadings, before they are adopted by the court.  See, e.g., Blonder-Tongue Labs. v. Univ. Of Illinois Found., 402 U.S. 313, 348 (1971) (referring to defense

##         2.        Timeliness and Statutory Scope of Plaintiffs' Claims

Title VII plaintiffs in Ohio must generally file an EEOC charge within 300 days of the

allegedly "unlawful employment practices" they seek to challenge, and civil complaints

within approximately[11] 90 days of receipt of a "right to sue" letter from the EEOC.  42

U.S.C. § 2000e-5(e)(1), (f)(1); National Railroad Passenger Corp. v. Morgan, 536 U.S. 101,

109 (2002); Graham-Humphreys v. Memphis Brooks Museum of Art, 209 F.3d 552, 557-58

(6th Cir. 2000); Donahoo v. Ohio Dept. Of Youth Servs., 237 F. Supp. 2d 844, 861 (N.D.

Ohio 2002).  Plaintiffs' civil allegations are typically limited to charges raised in the EEOC

proceedings culminating in the right-to-sue letter, or reasonably related to those EEOC

charges.  Donahoo, 237 F. Supp. 2d at 861 (citing Duggins v. Steak n' Shake, 195 F.3d

828, 832 (6th Cir. 1999)).

Cinergy contends that at least some of Plaintiffs' racial discrimination claims are

time-barred under these rules.  Specifically, Cinergy argues that because Plaintiffs filed

charges with the Ohio Civil Rights Commission (OCRC) and EEOC on April 11, 2000, they

cannot raise failure-to-promote claims arising from discrete events before June 1999 (or

roughly 300 days earlier).  By Cinergy's calculations, Brantley cannot raise any failure-to-

promote claims arising before "his 1999 applications for the positions of Training Crew

_____

that should have been "pleaded affirmatively and determined by pretrial motion for
judgment on the pleadings or summary judgment.")  Therefore, Plaintiffs could not have
abandoned their single-employer counter-argument before Cinergy filed these
dispositive motions.

[11] In the Sixth Circuit, this 90-day term "begins running, on the fifth day following
the EEOC's mailing" of a right-to-sue letter.  Graham-Humphreys v. Memphis Brooks
Museum of Art, 209 F.3d 552, 557-58 (6th Cir. 2000).  The 90-day period may also be
equitably tolled, see, e.g., Matthews v. Kilroy, 1997 U.S. App. LEXIS 17204 (6th Cir. July
3, 1997), but Plaintiffs have not claimed that equitable tolling should apply here.

Lead and Field Supervisor (Doc. 82 at 12), and Martin cannot raise any claims[12] regarding

the December 1998 "Lineperson C" position (Doc. 84 at 10-11).  Cinergy repeats this

contention for Plaintiffs Jones and Tolbert, without reference to any specific allegations.

(Docs. 86 at 8; 83 at 11.)

Plaintiffs, in response, appear to concede that the challenged racial discrimination

claims are untimely under Title VII itself.  (See Doc. 101 at 30-32.)  They contend that they

should nonetheless survive summary judgment because their allegations also state claims

under 42 U.S.C. § 1981 and O.R.C. § 4112, both of which impose the same "substantive

standards of liability" as Title VII over extended limitations periods.  (Id. at 31-32; see also,

e.g., Jones v. R.R. Donnelley & Sons, 541 U.S. 369, 382 (2004) (applying 4-year statute

established in 28 U.S.C. § 1658 to certain 42 U.S.C. § 1981 claims) and Bolls v. South-

Western Thomson Learning, 311 F. Supp. 2d 643, 646, 651 n.1 (applying 6-year statute

to employment discrimination and retaliation claims under O.R.C. §4112)).  Cinergy

responds that Plaintiffs should not be permitted to rely on substantive statutes not

specifically mentioned in their complaint to resuscitate otherwise untimely claims.[13]  (See

---

[12] Cinergy further suggests that all Martin's Title VII discrimination claims are
time-barred because Martin's EEOC right-to-sue letter was issued more than 90 days
before Plaintiffs filed their federal civil suit on June 7, 2001.  (See Doc. 84 at 10; Doc.
101 at 32 n. 3.)  However, the EEOC-related records submitted by Cinergy do not
include a "Notice of Right to Sue" document addressed to Martin, and other documents
regarding Martin's charges suggest Martin was still in the process of requesting such a
letter as late as early February 2001.  (See Doc. 85-8 Exhbs. O, P.)  Therefore, there
remains a dispute of material fact as to whether Martin's Title VII discrimination claims
are entirely time-barred.

[13] Plaintiffs' complaint also omits any specific reference to the above-cited anti-
discrimination provisions of Title VII, although it does cite–in its jurisdictional
allegations–a section of the Civil Rights Act barring discrimination in federally assisted
programs.  (See Doc. 1 at unnumbered 3 (citing 42 U.S.C. § 2000d).)  Because Cinergy

Doc. 111 at 16.)  Plaintiffs counter that their complaint's claims of discrimination in violation of "state" and "federal" laws, and federal jurisdiction under (*inter alia*) 42 U.S.C. § 1343, essentially invoke the provisions of sections 1981 and 4112 and thus satisfy the liberal standards of Federal Rule of Civil Procedure 8.  (Doc. 101 at 30-31.)

While Plaintiffs' reasoning is questionable, their position is essentially correct.  The Court disagrees that Defendants should be expected to simply divine, from the relatively generic references to state and federal law in Plaintiffs' complaint, discrimination claims under 42 U.S.C. § 1981 and O.R.C. § 4112.  More to the point, however, the "'theory of the pleadings' doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has effectively been abolished under the federal rules."  Colonial Refrigerated Transp., Inc. v. Worsham, 704 F.2d 821, 825 (6th Cir. 1983) (internal citations omitted).  In modern practice, a complaint must simply allege facts that would support a claim to relief under *some* applicable legal theory, so as to "give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved."  Id.  Litigants may refine their legal theories as cases develop, so long as those refinements do not unduly prejudice opposing parties.  See, e.g., 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219 at 281-84 (3d. ed. 2004); Smith v. Sushka, 117 F.3d 965, 969 (6th Cir. 1997) (affirming decision to allow defense to introduce estoppel theory in second motion for summary judgment).

Although Plaintiffs' complaint does not cite O.R.C. § 4112, Cinergy's opening briefs

---

does not appear to challenge this aspect of the complaint, however, the Court considers Cinergy's argument only as it applies to Plaintiffs' putative 42 U.S.C. § 1981 and O.R.C. §4112 claims.

on summary judgment plainly characterize Plaintiffs' racial discrimination claims as predicated on both Title VII and Ohio law.  (See, e.g., Doc. 86 at 8.)  O.R.C. § 4112 is Ohio's general anti-discrimination statute, and Title VII and O.R.C. § 4112 claims are frequently pleaded together in cases involving Ohio employers, so it is likely that Cinergy had at least constructive notice that Plaintiffs would be making a section 4112 claim.  See, e.g., Dews v. Dick, 231 F.3d 1016, 1017, 1020 (6th Cir. 2000) (pairing Title VII and O.R.C. § 4112 racial discrimination claims); Noble v. Brinker Int'l, Inc., 391 F.3d 715, 719 (6th Cir. 2004) (same); Zambetti v. Cuyahoga Cmty. College, 314 F.3d 249, 252 (6th Cir. 2002) (same).  Moreover, because Title VII and O.R.C. § 4112 claims are generally subject to the same substantive legal standards, see Dews, 231 F.3d at 1020 n.2, Cinergy should be able to reapply much of the factual and legal research underlying its Title VII defense to its O.R.C. § 4112 defense.

Cinergy's opening briefs do *not* mention 42 U.S.C. § 1981, so it appears Cinergy did not expect Plaintiffs to raise this claim.  Like O.R.C. § 4112 claims, however, section 1981 claims are often paired with – and subject to the same substantive standards as – Title VII claims.  See, e.g., Dews, 231 F.3d at 1017, 1020 n.2.  Therefore, Cinergy could reasonably have anticipated a section 1981 claim and should already be somewhat prepared to defend against it.  Finally, to the extent that allowing Plaintiffs to rely on O.R.C. § 4112 and 42 U.S.C. § 1981 exposes Cinergy to allegations that are too old to be actionable under Title VII itself, Cinergy will not be unduly prejudiced.  Plaintiffs' complaint does not confine its racial discrimination allegations to any specific time period or to Title VII *per se*, see generally Doc. 1, so Defendants had good reason to expect that a range of anti-discrimination statutes and statutes of limitations might apply in this case.

28

In short, the Court disagrees that Plaintiffs should be barred, as a Rule 8 matter, from seeking relief from Cinergy's alleged race discrimination under O.R.C. § 4112 and 42 U.S.C. § 1981 as well as Title VII.  Although the case law is not crystal-clear on this point, the weight of recent authority appears to support Plaintiffs' contention, see Doc. 101-2 at 31-32, that race discrimination claims under O.R.C. subsection 4112.99 of O.R.C. § 4112 are subject to a six-year limitations period.  See, e.g., Koval v. Dow Jones & Co., No. 02-3620, 86 Fed. Appx. 61, 64 n.3 (6th Cir. Jan. 6, 2004) (citing Cosgrove v. Williamsburg of Cincinnati Mgt. Co., 638 N.E.2d 991 (Ohio 1994)) (applying six-year statute to 4112.99 race discrimination claims); Harrison v. City of Akron, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (same); Nelson v. General Electric Co., No. 99-4043, 2 Fed. Appx. 425, 429 (6th Cir. Jan. 17, 2001) (same); but cf., e.g.,. Williams v. General Electric Co., No. 04-3540, 145 Fed. Appx. 535, 538 (6th Cir. Aug. 11, 2005) (citing in part Oker v. Ameritech Corp., 729 N.E.2d 1177, 1178-79 (Ohio 2000)) (suggesting, in age discrimination suit under subsection 4112.14, that all section 4112 discrimination claims should be subject to 180-day limitations period).  The Court therefore finds that any otherwise viable race discrimination claims involving discrete acts occurring before June 7, 1995, or six years before Plaintiffs filed their federal complaint on June 7, 2001, are now time-barred.[14] See, e.g., Harrison, 43 Fed. App. 903 (tying limitations period to federal filing date).

Defendants' motion for summary judgment is therefore **GRANTED, IN PART, AND**

---

[14] This six-year period includes any events that might give rise to a viable section 1981 claim, because 42 U.S.C. § 1981 claims are–by Plaintiffs' own admission–subject to a limitations period of four years.  (Doc. 101-2 at 31; R.R. Donnelley, 541 U.S. at 383 (applying four-year period to section 1981 actions for "racial harassment relating to the conditions of employment")).

**DENIED, IN PART** so as to bar relief for discrete instances of racial discrimination occurring before June 7, 1995 on the state law claims and before June 16, 1999 (i.e., 300 days before the filing of the EEOC complaint) on the Title VII claims.

### C.    Common Claims (Brantley, Jones, Martin, and Tolbert)

Plaintiffs all claim that Cinergy has refused them promotions or (in Tolbert's case) demoted them on account of their race.  (See generally Doc. 101-2 at 33-40, 43-47, 51-54, 59-63.)    Plaintiffs Bradley, Martin and Tolbert also claim they were subjected to disproportionately severe discipline or otherwise racially "discriminatory terms and conditions of employment."  (See generally id. at 40-42, 47-48, 55 )  Finally, Plaintiffs all claim they were exposed to a racially hostile work environment.  (See generally id. at 42-43, 48-50, 56-57, 64-66.)

### 1.    Statutory Framework

Plaintiffs contend that Cinergy has violated Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq.; the Ohio Civil Rights Act, O.R.C. § 4112; and 42 U.S.C. § 1981 as amended by the federal Civil Rights Act of 1991.[15]  Title VII makes it illegal for employers:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . .

---

[15] As discussed at Part A.2.a, infra, Plaintiffs may seek relief under all three statutes.

30

42 U.S.C. § 2000e-2(a)(1), (2); see also § 2000e-5(f) (providing for civil enforcement suits).

42 U.S.C. § 1981, which gives "all persons within the jurisdiction of the United States" "the

same right to make and enforce contracts" "as is enjoyed by white citizens," also provides

a federal remedy for racial discrimination in private employment.  42 U.S.C. §§ 1981(a)-(c);

see also, e.g., Anthony v. BTR Automotive Sealing Sys., 339 F.3d 506, 511-12 (6th Cir.

2003) and Jones v. R.R. Donnelley & Sons, 541 U.S. at 382.  Ohio's Civil Rights Act bars

"any employer, because of the race . . . of any person, to discharge without just cause, to

refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure,

terms, conditions, or privileges of employment, or any matter directly or indirectly related

to employment."  O.R.C. § 4112.02(A); see also § 4112.99 (providing for civil enforcement

suits).

        Because Plaintiffs' Title VII, O.R.C. § 4112 and 42 U.S.C. § 1981 discrimination

claims are governed by essentially the same substantive standards, the Court may resolve

these claims by reference to Title VII case law.  See, e.g., Dews, 231 F.3d at 1020 n.2.[16]

The Court bases its analysis and conclusions exclusively on discrete instances of conduct

occurring on or after June 7, 1995, or continuing violations beginning before but continuing

past that limitations date.  See Part III.B.2, supra.

---

[16] While the *prima facie* elements of Title VII/O.R.C. § 4112 and 42 U.S.C. § 1981 claims are the same, § 1981 claims are subject to some additional requirements and/or restrictions.  See, e.g., Keaton v. Ohio, No. C2-00-1248, 2003 U.S. Dist. LEXIS 19993, at *44-46 (S.D. Ohio June 9, 2002).  These requirements are not discussed by either party and do not appear to be at issue for purposes of the present motions.

## 2.    Promotion and Disparate Discipline Claims

The Court begins with Plaintiffs' promotion and disparate discipline claims, which are analyzed under the same general framework, and then turns to Plaintiffs' hostile work environment claims at Part IV.B.3., infra.  Cinergy argues that it is entitled to summary judgment on the former claims because Plaintiffs have not produced any direct evidence of racial discrimination or established a *prima facie* discrimination case based on circumstantial evidence, let alone proven that Cinergy's preferred nondiscriminatory justifications for its conduct are pretextual.  (See, e.g., Doc. 82 at 12-18.)

### a.    Plaintiffs' Direct Discrimination Case

Defendants first contend that Plaintiffs have no direct evidence of racial discrimination.  (See, e.g., Doc. 82 at 13.)  In fact, the Sixth Circuit has found that racial slurs similar to those Plaintiffs recount in their depositions may – to the extent they are admissible under the federal hearsay rules – constitute "direct evidence" of Title VII discrimination.  See, e.g., Talley v. Bravo Pitno Rest., 61 F.3d 1241, 1249-50 (6th Cir. 1995).  Plaintiffs, however, appear to concede Cinergy's point by focusing their summary judgment response on the *prima facie* discrimination theories discussed below.  (See Doc. 101-2 at 32, 44, 51, 60.)  Because this issue appears to have been abandoned – or, at the very least, inadequately briefed – the Court declines to resolve it on the merits and moves directly to Plaintiffs' *prima facie* case.

### b.    Plaintiffs' *Prima Facie* Discrimination Case

A Title VII plaintiff who lacks direct evidence of racial discrimination may make a

*prima facie* discrimination claim by showing that (1) he is a member of a protected minority group; (2) was subject to an adverse employment decision; (3) was qualified for the relevant position; and (4) was either replaced by a person outside the protected group or–in disparate treatment cases–was treated differently from "similarly situated" individuals outside the group.  See, e.g., Carter v. Univ. Of Toledo, 349 F.3d 269, 272-73 (6th Cir. 2003); Policastro v. Northwest Airlines, Inc., 297 F.3d 535 (6th Cir. 2002); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Plaintiffs satisfy the first prong of the McDonnell Douglas test because they are African-American, and Cinergy has not challenged their *prima facie* case under the third, or qualifications, prong.  See, e.g., Farmer v. Cleveland Pub. Power, 295 F.3d 593, 603-604 (6th Cir. 2002); Doc. 82 at 14-16. Therefore, the Court need only examine Plaintiffs' showing under the second and fourth prongs.  Plaintiffs' burden is "not onerous" at this stage; to prevail, they must simply produce circumstantial evidence "sufficient to create an inference of discrimination." Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 263 (1981); Talley v. Bravo Pitno Rest., 61 F.3d at 1246 (citing in part Shah v. General Elec. Co., 816 F.2d 264, 268 (6th Cir. 1987)).

### i.    Adverse Employment Changes

To satisfy the second prong of McDonnell Douglas, Plaintiffs must point to materially adverse changes in their terms or conditions of employment.  See, e.g., Policastro, 297 F.3d 535, 539 (internal citations omitted).  These must be "more disruptive than a mere inconvenience or an alteration of job responsibilities;" *de minimus* changes are not actionable. Hollins v. Atlantic Co., Inc., 188 F.3d 652, 662 (6th Cir. 1999) (internal citations

omitted); <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 462 (6th Cir. 2000). "For the purposes of Title VII, a failure to promote is an adverse employment action." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 562 (6th Cir. 2000). Other changes commonly regarded as adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." <u>Hollins</u>, 188 F.3d at 662 (internal citations omitted). The Sixth Circuit has emphasized that this list is nonexclusive, so other employment changes or actions may prove adverse in "particular situation[s]." <u>Id</u>.

### (a).    Denied Promotions and Demotion

Cinergy broadly asserts that Plaintiffs have not been subjected to any employment change "adverse" enough to be actionable in a discrimination claim. (<u>See, e.g.</u>, Doc. 82 at 14-16.) That assertion is not supported by the record. As a threshold matter, Cinergy's alleged demotion of Tolbert, and its alleged failures to promote all four Plaintiffs, were presumptively "adverse" unless Plaintiffs lacked established prerequisites for the new jobs they were seeking – itself a disputed issue.[17] <u>Nguyen</u>, 229 F.3d at 562; <u>Hollins</u>, 188 F.3d at 662; <u>Kocsis v. Multi-Care Mgt</u>., 97 F.3d 876, 883 (6th Cir. 1996). By extension, Cinergy's

---

[17] While Cinergy has suggested that Plaintiffs were less qualified than those against whom they were competing for promotions, it does not support this assertion with any concrete evidence. (<u>See, e.g.</u>, Doc. 82 at 3 (alleging simply that Plaintiff Brantley was not aware of whether successful candidates for September 1999 Field Supervisor position were *less* qualified, without setting forth facts showing successful candidates were in fact *more* qualified); <u>see also</u> Doc. 112 at 1.) Moreover, as noted above, Cinergy has not directly challenged Plaintiffs' showing under the third or qualifications prong of the *prima facie* test. (<u>See, e.g.</u>, Doc. 82 at 14-16 (discussing adversity and similar situation prongs).) There remains–at the very least–a genuine dispute of material fact as to whether Plaintiffs were sufficiently qualified and/or endowed with the appropriate prerequisites for the challenged promotions.

alleged denials of professional development opportunities – including the ability to perform certain tasks or train with certain coworkers on the job, serve on company committees, or participate in training courses – are also arguably "adverse."  Plaintiffs allege, and Cinergy does not directly dispute, that specialized training and committee service were often informal prerequisites for internal promotions.  To the extent Plaintiffs were excluded from overtime work or assignments to more challenging, desirable or educational tasks in the course of their everyday work, they lost job "benefits" and "responsibilities."  See, e.g., Hollins, 188 F.3d at 662.  While certain denials may not ultimately prove "significant" or "material" enough to be separately actionable in light of additional facts, see id., the current record does not establish that any of them are necessarily de minimus as a matter of law.

### (b).    Other Allegedly "Adverse" Actions

Plaintiffs' allegations that certain Cinergy supervisors frequently forced them to perform particularly "disfavored tasks," refused to communicate directly with them or other African-American coworkers or subjected them to disproportionately heavy discipline, see Doc. 101 at 4-5, 25, may also describe "adverse" employment actions.  As Cinergy observes, job transfers unaccompanied by changes in wages or other benefits are – like unspectacular performance evaluations – rarely "adverse" in themselves.  See, e.g., Hopkins v. Elec. Data Sys., 196 F.3d 655, 662 (6th Cir. 1999); Bowman, 220 F.3d at 461-62; Hollins, 188 F.3d at 662; Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999).  In some circumstances, however, a job action may be deemed "adverse" simply because it is "within the special province of [a] supervisor" empowered to bring the "official powers of the enterprise to bear" on a subordinate, and results in significant difference or diminishment

35

in that subordinate's "material responsibilities" or "status." See Burlington Indus. v. Ellerth, 524 U.S. 742, 761-62 (1998); Hollins, 188 F.3d at 662.  In light of these authorities, Plaintiffs have preserved a genuine dispute of material fact as to whether Cinergy supervisors took "adverse" action against them in circumstances not directly connected to a promotion or demotion, but still bearing on Plaintiffs' material job responsibilities or status.

### ii.    Favoring of "Similarly Situated" White Employees

To satisfy the fourth McDonnell Douglas prong, Plaintiffs must show that Cinergy favored white employees who were "similarly situated" to Plaintiffs.  See, e.g., Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 351-52 (6th Cir. 1998).  Such comparisons need not be perfect; Plaintiffs must prove only that their employment situations were, in all "relevant aspects," "nearly identical" to those of white coworkers who received more favorable treatment.  Id. (internal citations omitted).   Where an employee alleges differential *discipline*, coworkers are not "similarly situated" unless they have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toldeo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).  Where an employee alleges *other* disparate treatment, however,[18] courts may make "independent determinations" as to the value of particular comparisons and should not insist on "exact correlation[s]" between allegedly disfavored and favored

---

[18] In its papers, Cinergy discusses only the Mitchell test.  (See, e.g., Doc. 82 at 16.)

employees.  Ercegovich, 164 F.3d at 352.

Cinergy complains that Plaintiffs do not offer facts to support their assertions that the white employees promoted in their stead were not more qualified, or (more broadly) lacked any "differentiating or mitigating circumstances that would distinguish their conduct or CG&E's treatment of them."  (See, e.g., Doc. 82 at 16; Doc. 83 at 15.)  However, Cinergy cites few specific facts that support its *own* counter-assertions that the referenced white employees were better qualified than Plaintiffs or otherwise not "similarly situated" in relevant respects.[19]  The Court accordingly concludes that Plaintiffs may stand on their allegations and associated deposition testimony, and that there remains a dispute of material fact as to whether Cinergy favored "similarly situated" white employees over Plaintiffs in considering promotions, demotions, and other potentially "adverse" employment actions.

In sum, because there remain disputes of material fact on the second and fourth prongs of the McDonnell-Douglas test, and Plaintiffs' showings on the other prongs are not disputed, Plaintiffs have made out a *prima facie* case of employment discrimination.

## c.    Non-Discriminatory Reason or Pretext

Once a plaintiff has made out a *prima facie* discrimination case, the burden shifts

---

[19] For example, Brantley has specifically alleged that CG&E awarded the Training Lead Crew Supervisor position he applied for in 1999 to a less senior white employee who, unlike Brantley, lacked experience in the relevant department.  (Doc. 101 at 11-12.)  Cinergy contends that Brantley has no actual "information or knowledge" that those appointed to Training Crew Lead or other positions were less qualified than he was.  (Doc. 82 at 16.)  But Cinergy does not actually compare Brantley's qualifications or other circumstances with those of the successful candidates, let alone cite any record evidence on this point.

to the defendant-employer, who must "articulate some legitimate, non-discriminatory reason" for its challenged conduct.  See, e.g., Burdine, 450 U.S. at 253 (citing McDonnell Douglas, 411 U.S. at 802.)  If the employer satisfies this burden, the plaintiff can prevail only by establishing that "the legitimate reasons offered by defendant were not its true reasons, but were [instead] a pretext for discrimination."  Id. (citing McDonnell Douglas, 411 U.S. at 804).  Pretext can be established by showing either that the articulated reason is "unworthy of credence," or that the employer was "more likely motivated" by discrimination.  Thurman v. Yellow Freight Sys., 90 F.3d 1160, 1166 (6th Cir. 1996) (citing Burdine, 450 U.S. at 256).  A plaintiff bears the ultimate burden of proving intentional discrimination and cannot survive summary judgment by cursorily dismissing an employer's plausible, nondiscriminatory rationale.  Burdine, 450 U.S. at 253.  However, the fact-finder may infer discrimination from the elements of a *prima facie* case, coupled with its disbelief of the rationale articulated by the employer.  Thurman. 90 F.3d at 1166-67.  Because "an employer's true motivations are particularly difficult to discern" from the paper record, discrimination disputes are often "unsuitable for disposition at the summary judgment stage" once an employee-plaintiff has made out his *prima facie* case.  Singfield, 389 F.3d at 564.

Cinergy's opening memorandum on summary judgment offers alternative rationales for some, but not all, of the denied promotions, demotions, disparate discipline and other materially adverse employment actions alleged by Plaintiffs.  With respect to all four Plaintiffs, Cinergy avers that the disputed positions were consistently awarded to the "top scorers" in Cinergy's "EEOC validated Targeted Selection Process."  (See, e.g., Doc. 82

at 17; Doc. 83 at 22; Doc. 84 at 15; Doc. 86 at 12.)  With respect to Tolbert, Cinergy further asserts that to the extent he was denied work opportunities, those denials flowed from CG&E's implementation of a standard "weight guideline program for employees required to use aerial lift devices or bucket trucks."  (Doc. 83 at 16.)

Brantley contends that Cinergy's proferred nondiscriminatory rationale is incomplete, reasoning that Cinergy must also show that "white comparators were promoted <u>because</u> they were the top scorers," rather than for other reasons.  (Doc. 101 at 19 (emphasis in original).)  He suggests that any legitimate, nondiscriminatory hiring decision would have turned on other criteria – such as work experience in the relevant departments – on which he outshone his comparators.  (<u>Id</u>. at 18-19.)  Jones not only argues that he was more experienced than certain comparators, but also asserts that the majority of below-average or failing scores he received on various applications flowed from an interview component he contends was inherently subjective and racially biased.  (<u>Id</u>. at 63.)  Martin also questions the objectivity of CG&E's testing, pointing to certain discrepancies in CG&E's records and asserting that white candidates who scored below him on field assessments were – unlike him –allowed to move into the interview phase of the selection process.  (<u>Id</u>. at 9-14.)  Tolbert disputes Cinergy's contention that it enforced its weight limitations consistently across employees, noting that a number of white employees were promoted despite exceeding the 275-pound weight limit, were offered exercise equipment, and were not forced to undergo weigh-ins as frequent as those he was subjected to.  (Doc. 101 at 51-53.)

Cinergy responds that the EEOC evaluation process has been "validated" as "fair

and nondiscriminatory," see, e.g., Doc. 112 at 10-13, but does not set forth facts establishing that Cinergy applied that process exclusively and impartially in filling disputed job openings.[20]  With respect to Tolbert, Cinergy adds that he has not proven that any alleged favored employees were as overweight as he was at the time of his adverse employment decisions, but offers no facts of its own to counter Tolbert's assertions. (Doc. 103 at 6-7.)

A reasonable jury construing the record in the light most favorable to Plaintiffs could conclude that Cinergy's explanations are either incomplete or pretextual.  Because Cinergy has failed to eliminate a material factual dispute as to whether it subjected Plaintiffs to employment discrimination and disparate discipline in violation of Title VII, O.R.C. § 4112, and 42 U.S.C. § 1981, its summary judgment motion as to those claims is **DENIED**.

### 3.    Harassment and Hostile Work Environment Claims

The Court next turns to Plaintiff's claims that Cinergy subjected them to racial harassment and a racially hostile work environment.  To prevail on these claims, Plaintiffs must demonstrate that (1) they were in a protected racial group; (2) they suffered unwelcome harassment; (3) that the harassment was based on race; (4) that the

---

[20] Cinergy does not specifically address all of Plaintiff's arguments on this point. For instance, with respect to Martin's claims that individuals with lower field assessment scores were allowed to interview, Cinergy suggests only that Martin's conclusion is based on a selective reading of the score data.  (Doc. 109 at 15.)  Cinergy does take issue with Plaintiffs' contentions that CG&E's promotions of less experienced employees were necessarily discriminatory, observing that less experienced employees may in fact be more qualified when other relevant criteria, like interview performance or the "ability to work at heights" are taken into account.  (Id.; see also, e.g., Doc. 112 at 16-17.)  While this proposition may be true, it does not establish – in itself – that Cinergy applied its chosen criteria fairly and nondiscriminatorily.

harassment affected a term, condition, or privilege of their employment; and (5) that Cinergy knew or should have known about the harassment and failed to take action. Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078 (6th Cir. 1999). In establishing these claims, unlike their racial discrimination claims, Plaintiffs are not entirely limited to conduct occurring on or after June 7, 1995. Rather, so long as "an act contributing to the claim occur[ed] within the filing period," the Court may consider "the entire time period of the hostile environment . . . for the purposes of determining liability." See, e.g., National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).

To give rise to a hostile work environment claim under Title VII, racial harassment must be "sufficiently severe or pervasive to alter the conditions of the plaintiff's employment . . . ." Id. (citing Harris v. Forklift Sys., 510 U.S. 17 (1993)). Isolated conduct, such as the "mere utterance" of racial epithets, will not support a claim where it is not widespread enough to create an "objectively hostile or abusive work environment." Harris, 510 U.S. at 21. Moreover, even *objectively* offensive conduct may not support a claim where the putative victim "does not *subjectively* perceive" his working environment to be hostile or abusive. Id.(emphasis added). However, a showing of actual psychological harm to an employee is not always required. Id. at 22-23. Rather, courts determine whether a given working environment is "hostile" by considering "all of the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance." Id.; see also Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999).

Conduct may give rise to a hostile work environment even where it does not alter

an employee's formal "terms" and "conditions" of employment.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  Where challenged conduct does not trigger any "tangible job action" against an employee, an employer can establish an affirmative defense to Title VII liability by establishing both (1) that it "exercised reasonable care to prevent and promptly address" any hostile or harassing behavior and (2) that plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities."  Id. at 807; see also Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  However, the "mere existence of a grievance procedure and a policy against discrimination, coupled with a respondent's failure to invoke that procedure," will not necessarily insulate an employer from Title VII liability, especially where the facts suggest the procedure and policy were not reasonably "calculated to encourage victims of harassment to come forward."  Meritor Savings Bank v. Vinson, 477 U.S. 57, 72-73 (1986).

Cinergy contends that Plaintiffs have failed to set forth any reliable, admissible evidence that they experienced any racially harassing conduct "severe" or "pervasive" enough to support a Title VII hostile work environment claim.  (See, e.g., Doc. 82 at 20-21; Doc. 83 at 26; Doc. 84 at 21; Doc. 86 at 17; Doc. 112 at 4-5.)  It further contends that CG&E exercised "reasonable care" to address any hostile conduct it was made aware of, and suggests that to the extent these efforts were unsuccessful, Plaintiffs are to blame for unreasonably failing to take advantage of its internal reporting procedures.  (See, e.g., Doc. 82 at 21-22; Doc. 108 at 16; Doc. 111 at 5; Doc. 112 at 9.)

Cinergy's contentions are unsupported by the record.  Plaintiffs accurately observe that the list of "racially offensive comments and/or depictions" alleged here "is lengthy," and

that many items on the list would strike a reasonable person as "offensive, hostile and abusive." (Doc. 101 at 23.) It does appear that many of these remarks and/or depictions were directed at Plaintiffs, and that Plaintiffs may have learned about some of them retrospectively through fellow employees and be unfamiliar with certain particulars. The Sixth Circuit, however, has repeatedly "credited evidence of racial harassment directed at someone other than plaintiff where the plaintiff [knows] a derogatory term [has] been used," reasoning that even secondhand knowledge "of a racially derogatory comment or joke by a fellow employee or supervisor can impact" a plaintiff's work environment. Jackson, 191 F.3d at 661 (citing in part Moore, 171 F.3d at 1079); see also id. ("racial epithets need not be hurled at a plaintiff"). Clearly, evidence that racial jokes and slurs "were part of the every-day banter on the shop floor," that an employer "knew about the jokes and slurs," "did little to correct this problem," and may have participated in or "implicitly condoned the conduct," could support a hostile work environment claim. Moore, 171 F.3d at 1079. Plaintiffs have established, and Cinergy has failed to eliminate, a genuine dispute of material fact[21] as to whether these circumstances existed at CG&E in the relevant time period.

Plaintiffs have further alleged that – whatever Cinergy's formal reporting procedures

---

[21] Cinergy also objects to Plaintiffs' reliance on the experiences of other employees on the grounds that the only apparent evidence of those experiences is inadmissible hearsay. (See, e.g., Doc. 112 at 5-9.) Evidence submitted in support of summary judgment briefing need not be in a form directly admissible at trial, so long as it includes content that would be admissible in some form. Bailey v. Floyd Cty. Bd. of Ed., 106 F.3d 135, 145 (6th Cir. 1997); see also Part IV.A, supra There is no apparent reason to assume, at this early stage of the proceedings, that Plaintiffs would be unable to produce appropriate sworn third-party testimony or other substitute evidence on points they could not testify to directly.

for racial harassment – CG&E supervisors failed to adequately address certain incidents brought to their attention and that employees were consequently discouraged from reporting other incidents. (See, e.g., Doc. 101. at 24.) Cinergy has failed to eliminate a material dispute of fact as to these allegations, from which a reasonable jury could infer that CG&E's formal procedures were not adequately calculated to encourage harassed employees to seek redress. Because there remains a dispute as to whether Plaintiffs' alleged disregard of Cinergy's complaint procedures was "unreasonable," Cinergy is not entitled to an affirmative defense under Faragher, 524 U.S. 775, or Ellerth, 524 U.S. 742.

In short, Plaintiffs' allegations – considered in light of all surrounding circumstances –more than suffice to establish hostile work environment claims under the standards articulated above. Because Cinergy has failed to eliminate a dispute of material fact as to the truth of those allegations, and has also failed to establish that it is entitled to any affirmative defense, the Court **DENIES** its motion for summary judgment on Plaintiffs' hostile work environment claims.

### 4.    Conclusion (Common Claims)

In sum, Plaintiffs Brantley, Jones, Martin and Tolbert have all amply demonstrated that there remain genuine issues of material fact as to whether Cinergy failed to promote, demoted, or otherwise subjected them to disparate treatment on the basis of their race. All four Plaintiffs have also shown that there are genuine issues of material fact as to whether Cinergy subjected them to a racially hostile work environment. Summary judgment as to Plaintiffs' common claims under Title VII, 42 U.S.C. § 1981 and O.R.C. § 4112 is therefore **DENIED**.

44

D.     **Individual Claims (Plaintiffs Jones and Tolbert)**

Cinergy also seeks summary judgment on Plaintiff Anthony Jones' claim that he was constructively discharged or terminated in violation of Title VII and Plaintiff Todd Tolbert's claim that he was subjected to disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  For the reasons below, the Court **DENIES** summary judgment as to Jones' constructive discharge claim but **GRANTS** summary judgment as to Tolbert's disability discrimination claim.

1.     **Jones' Constructive Discharge Claim**

Jones contends that CG&E constructively discharged him by limiting him to a "special, isolated category of employment" and ultimately a "dead-end" Manual Technician position that offered no opportunities to advance, expand his substantive responsibilities or even use his full range of knowledge and skills.  (See generally Doc. 101 at 66-68.)  To state a constructive discharge claim, Jones must show that Cinergy (1) "deliberately create[d] intolerable conditions" (2) "with the intention of forcing" him to quit.  Moore, 171 F.3d at 1080.[22]  A constructive discharge analysis requires an inquiry "into both the objective feelings of the employee and the intent of the employer."  Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987).  "Intent can be shown by demonstrating that quitting was a forseeable consequence" of Cinergy's conduct.  Moore, 171 F.3d at 1080.  However, Jones' statement of a Title VII hostile work environment claim against Cinergy is not sufficient, in itself, to support a constructive discharge claim.  Id.  To make the latter claim,

---

[22] Jones must also show that he did in fact quit.  Id.  That point does not appear to be in dispute.

45

Jones must show that his working conditions were not merely hostile, but rather "so difficult or unpleasant that a reasonable person" in his shoes "would have felt compelled to resign." Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir. 1982); see also Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991).

Cinergy contends that there was nothing inherently "difficult or unpleasant" about Jones' Manual Technician position, let alone anything so intolerable that Jones could have reasonably felt compelled to resign.[23]  (Doc. 86 at 19.)  It further asserts that Jones cannot even show he suffered any "termination, demotion [or] material loss of benefits" during his time at CG&E.  (Doc. 111 at 13.)  Jones responds that his assignment to the Manual Technician position was objectively intolerable because he understood from the outset that CG&E did not intend to hire anyone else to that job and that there was "no way to progress in the job, get raises, or get assigned more duties" over time.  (Id. at 67.)  He avers that this already difficult situation was compounded over the next three-plus years, as CG&E superiors denied him at least seven promotions to a Lineperson C position and downplayed or dismissed his complaints about potential biases in the hiring process.  (Id. at 67-68.)  Jones also avers that by the time of his July 2001 resignation, even one of his

---

[23] Cinergy also contends that it could not have reasonably forseen that Jones intended resignation because "Jones did not provide any notice of his intent to resign as a result of his failure to obtain a Lineperson C position"  Id. (citing King v. State Farm Mutual Auto Ins. Co., 679 N.E.2d 1158, 1162 (Ohio. App. 6th 1996)).  The Court, however, does not read the case law to require plaintiffs alleging constructive discharge to show that they gave their employers any specific notice of their intention to quit if conditions did not improve.  In any event, it appears that Jones did complain to Human Relations about the Lineperson C hiring process, thus satisfying any putative requirement that any resigning employee who seeks to bring a constructive discharge claim "first notify the employer" of any potential "problem with working conditions."  (See, e.g., Doc. 101 at 67-68; King, 679 N.E.2d at 1162.))

direct supervisors had expressed surprise that Jones had chosen to remain at CG&E so long.  (Id. at 68.)

As Cinergy observes, not every denied promotion or forced transfer to a less prestigious position rises to the level of a constructive discharge.  See Vannoy v. OCSEA Local 11, 36 F. Supp. 2d 1018, 1024 (D. OH 1999).  But constructive discharge inquiries are fact-sensitive, and the circumstances of Jones' case suggest that a reasonable employee in Jones' position could have felt compelled to resign when Jones did.  Jones remained a Manual Technician for almost four years despite repeated applications for promotion to a Lineperson C position he contends – and Cinergy does not directly dispute – he was fully qualified to hold.  Therefore, Cinergy's motion for summary judgment as to this claim is **DENIED**.

### 2.    Tolbert's ADA Disability Discrimination Claim

Tolbert contends that by treating him less favorably than white co-workers who were also overweight, CG&E subjected him not only to race discrimination in violation of Title VII, but also to *disability* discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  Cinergy contends Tolbert's disability discrimination claim should be barred because it was not pleaded in Tolbert's complaint.  (See Doc. 108 at 9-10.)  Cinergy further contends that if Tolbert's claim is properly before the Court, Cinergy is entitled to summary judgment because Tolbert has failed to state even a *prima facie* claim of disability discrimination.  (Doc. 83 at 21-24; Doc. 108 at 10-13.)  For the reasons below, the Court agrees and **GRANTS** summary judgment to Cinergy on Tolbert's ADA disability discrimination claim.

47

### a.    Scope of Tolbert's Complaint

Claims brought under the authority of 42 U.S.C. § 1983 are subject to the liberal notice pleading standards of Federal Rule of Civil Procedure 8. See, e.g., Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993). Rule 8 requires only a "short and plain statement of the claim" sufficient to "give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." Fed. R. Civ. P. 8(a)(2); Colonial Refrigerated Transp., Inc. v. Worsham, 704 F.2d 821, 825 (6th Cir. 1983) (internal citations omitted). To satisfy Rule 8, a complaint must simply allege facts that would support a claim to relief under some applicable legal theory; a plaintiff need not detail the elements of any specific theory at the outset. See, e.g., Worsham, 704 F.2d at 825; 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219 at 281-84 (3d. ed. 2004).

Plaintiff's consolidated complaint introduces Tolbert's claim as follows:

Todd Tolbert is an African-American person, and is an employee of the Defendant, Cinergy Corp. Plaintiff has been denied equal employment opportunity for initial job assignments, promotion, wages, and other terms and conditions of employment by the Defendant solely because of his race.

(Id. at 2.) The complaint uses identical language to introduce the claims of co-Plaintiffs Brantley, Jones, and Martin. (See id. at 1-2.) It does not mention, or allege any facts obviously relating to, Tolbert's disability discrimination claim. Thus, Tolbert's claim is barred[24] and Defendant's motion for summary judgment is **GRANTED** as to Tolbert's

---

[24]Although Cinergy was clearly aware of this claim in their motion for summary judgment, it did not raise this "failure to plead" argument until its reply brief. Therefore, considerations of equity strongly counsel against barring this claim. However, Plaintiff

disability claim.

### b.    Merits of Tolbert's claim

However, even if Tolbert had properly plead his disability discrimination claim, Tolbert has failed to satisfy the required elements of a ADA claim.   In order to establish a *prima facie* case of disability discrimination, a plaintiff must show (1) he has a disability; (2) that he is "otherwise qualified" for the job; and (3) that defendant either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability.  Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997), citing, Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996).  The defendant must then offer a legitimate explanation for its action.  Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1186 (6th Cir. 1996).   If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. *Id.*

The ADA defines a disabled person as one who either  (1) has a physical or mental impairment that "substantially limits" one or more of his "major life activities," and (2) has a record of this impairment, or (3) does not have an impairment, but is regarded as having one.  See 42 U.S.C. § 12102(2).  With respect to the major life activity of working, an impairment constitutes a disability only if it restricts an individual's ability "to perform either a class of jobs or a broad range of jobs in various classes" relative to an average individual of  "comparable training, skills and abilities"; "inability to perform a single, particular job"

---

Tolbert did have ample time to amend his complaint and failed to do so.  Further, for the reasons set forth in D(2)(b) below the ADA claim fails as a matter of law.

does not establish disability.  29 C.F.R. 1630.2(j)(3)(I).

Plaintiff Tolbert alleges that he is disabled due to his weight.[25]  First, as Defendants correctly point out, weight is not a disability under the ADA.  See Andrews v. State of Ohio, 104 F.3d 803 (6th Cir. 1997)("The definition of the term 'impairment' does not include physical characteristics such as ... weight or muscle tone that are within 'normal' range and are not the result of a physiological disorder.").  To overcome this, Plaintiff argues that his doctor told him that sleep apnea was hindering his weight loss efforts.  However, Plaintiff does not cite to anything in the record to support this.  If, in fact, the sleep apnea was the problem then the sleep apnea would be the disability and not the weight.  Since there is no evidence in the record to support this, the Court finds that Plaintiff does not have a physical impairment.  Additionally, even the Court assumes that Plaintiff has a physical impairment, it only constitutes a disability if it restricts his ability "to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. 1630.2(j)(3)(I).  As Plaintiff acknowledges, he continues to be employed by the Defendant.  As such, he certainly can perform a class of jobs or a broad range of jobs.

## V.    CONCLUSION

For the reasons above, Defendant Cinergy's Motion to Sever (Doc. 91) is **DENIED**. Defendant's Motions for Summary Judgment as to Plaintiffs Billy Brantley (Doc. 82), Rodney Jones (Doc. 86), Anthony Martin (Doc. 84), and Todd Tolbert (Doc. 83), are **GRANTED** to the extent the discrete instances of racial discrimination occurred before

---

[25]Over the years Plaintiff Tolbert's weight fluctuated from 260 to 326 pounds. The weight limitation for his job was 275 pounds.

June 7, 1995 as to the state law claims and before June 16, 1999 as to the Title VII claims.

Defendant's Motion for Summary Judgment as to Plaintiff Tolbert's claim of disability

discrimination is also **GRANTED.**   The Motions (Docs. 82, 83, 84, 86) are otherwise

**DENIED**.

     **IT IS SO ORDERED**.

          s/Michael R. Barrett
          MICHAEL R. BARRETT, Judge
          United States District Court